# Exhibit K

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

EDWARD A. COPELAND and SHERYL )
COPELAND,                      )
                               )
            Plaintiffs,        )
                               )
       -vs-                    )   No. 5:22-cv-00212-CAR
                               )
TRISTAR PRODUCTS, INC., and    )
ABC, INC.,                     )
                               )
            Defendants.        )

    Deposition of ROBERT S. GIACHETTI, PH.D., taken before TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 2250, 222 West Adams Street, in the City of Chicago, Cook County, Illinois at 9:25 a.m. on the 31st day of January, A.D., 2024.

Page 98

1  overpressure relief mechanism that allows the inner pot
2  to break the lid should the other safeties fail."
3      That last one, that has to do with if the pot
4  doesn't stop pressurizing, that's the safety mechanism
5  to stop the pressurization, correct?
6    A  The one where the pot separates?
7    Q  Yes.
8    A  So that's if the other thing fails, as well.  So
9  that's like a third -- well, it's actually like the
10 fourth level because first it's got the electronic
11 controls, and then those controls have safeties like
12 thermal fuses.  And then it's got the manual relief
13 valve.  So that's just a weight.  And so if there is too
14 much pressure, that weight will just lift and vent on it
15 its own.  So that's like a passive maximum setting.
16     And if that fails, like if it's clogged and all
17 those other things have failed, then it's got this other
18 thing in it where, basically, the pot and lid will
19 separate to vent out the sides.
20   Q  That's if the temperature control doesn't work
21 like it's supposed to, right?
22   A  A number of like three other things have to fail
23 for it to get there.
24   Q  That's not at issue here, right?

Page 99

1    A  Not to my knowledge.
2    Q  Okay.  And the two independent valves and the
3  lid you're talking about, one is the mechanical -- I
4  mean, the manual release valve --
5    A  Correct.
6    Q  -- and the float valve?
7    A  That's right.
8    Q  The float valve is what we've been talking about
9  that's part of the issue here?
10   A  Right.
11   Q  At what pressure, I think you testified to this,
12 but at what pressure does the float valve pop up through
13 the strike plate or the plate, whatever we're calling
14 it?
15   A  Yes, usually around a quarter of a psi.  Below
16 half.
17   Q  Would it be necessary for the temperature of the
18 liquid inside the pot at that point to be at least 212
19 so that it's boiling creating steam?
20   A  Yes, so it has to create enough steam that it
21 can't get out of the float valve.  So the float valve
22 has a tiny little hole that's, basically, a restriction.
23 So the float valve will allow some steam to get out.
24 But if steam is being generated rapidly enough, it can't

Page 100

1  all get out of that hole, and then pressure starts to
2  build and then it will push the float valve upwards.
3    Q  So for it to seal, it requires the temperature
4  of the liquid inside the cooker to be 212?
5    A  Yes.
6    Q  Okay.  If you turn to page 9, we're still kind
7  of just talking about the components of the lid.  In
8  that second paragraph the last sentence says, "At
9  cooking pressures, the substantial clamping force
10 between the lid and the base generated by the internal
11 pressure."
12     Now, here you're talking about the locking
13 tabs, right?
14   A  Right, and the friction between them.
15   Q  Okay.  "Is sufficient to resist inadvertent
16 rotation of the lid through friction alone."
17     By that do you mean even if there was not a
18 locking valve, a locking mechanism, that friction
19 between those locking tabs would be enough to keep a
20 person from opening it?
21   A  Yes.
22   Q  Is there a point in your opinion where the pot
23 is still -- Strike that.  Let me re-ask this.
24     Take out the fact that there is a locking

Page 101

1  mechanism, the locking pin, say that didn't exist on
2  this pot.  Is there a point in which there is enough
3  pressure in the pot to expel the liquids but that the
4  tabs could be -- the frictional tabs could be overcome
5  by the normal strength of a person?
6    A  I think if a person were to use it according to
7  the instructions and they didn't have a lock on it,
8  they -- well, they wouldn't do that if they had read the
9  instructions.
10     But suppose they ignored the part about not
11 forcing it open and there was no lock whatsoever on just
12 the friction holding it, someone could probably grab the
13 base handle and use like a straight arm and, basically,
14 your shoulder is a lot stronger than your wrist, so in
15 that aspect they probably could around 2 psi.
16     So in that paper that I published, I removed
17 the float valve.  I cut it so that it never reached the
18 level of the sliding plate.  And I also put Teflon tape
19 between the lid and the base to make it easy.  And even
20 then at 3 psi had to use two hands on a rope to pull the
21 lid open.
22   Q  Okay.
23   A  So it's really tough even taking the lock out.
24   Q  So let's go through your opinions.  If you turn

Page 122

1  is, for example, when you pulled out the float valve in
2  the picture that we're talking about here, you didn't
3  perform any testing on the hardness of that material or
4  anything like that, right?
5      A   No.
6      Q   And when you mentioned, I forget the word you
7  used, but you measured the, what was it, the extrusion
8  of the pin?
9      A   Excursion.
10     Q   Excursion of the pin.  And, basically, you're
11 saying you measured as the pin is traveling across the
12 locking pin, you measured how far in and out the pin
13 moves -- on the locking tab?  I'm sorry.
14     A   Sort of.  So it's more like I hold the float
15 valve closed and then I take a caliper and measure how
16 far I can move the pin outward before it stops moving.
17     Q   Okay.  Not as it travels across the locking tab,
18 just how far you can manually move it out?
19     A   Well, no, I'm not trying to force it outward.  I
20 just engage the float valve with the sliding plate, and
21 then I measure how far it moves outward before it stops
22 and I measure that.
23     Q   What does that show you?  What are you testing
24 for?

Page 123

1      A   So what I've seen in these models is if you
2  haven't forced open the lid before, then that distance
3  that it can travel before it stops will change depending
4  if you force it over because it basically, when you
5  force it open, you stretch out the pieces inside
6  permanently.
7          Like if somebody comes by and you're wearing a
8  sweatshirt and they put both their hands in the sleeve
9  of your sweatshirt and then the cuff never goes back to
10 the way it was, it's kind of the same thing with that
11 mechanism.  Once you open it --
12     Q   With the float valve up?
13     A   With the float valve up under pressure you're
14 going to stretch those components out, and then they
15 don't go back exactly the way they were beforehand.
16     Q   When you say the components, you're referring to
17 the pin and the strike plate?
18     A   The whole mechanism together.
19     Q   Okay.  But, again, on this pot, on this specific
20 pressure cooker, we don't know if that stretching
21 happened on the incident in question or sometime before,
22 right?
23     A   That's right.
24     Q   Okay.  So if a lid has been opened with the

Page 124

1  float valve up in the locked position, then those
2  components would have been stretched and that would
3  cause the pin to travel a further distance or shorter
4  distance?
5      A   Shorter distance because it's already out a
6  little bit more.
7      Q   Okay.
8      A   And on top of that, when it makes that scoring
9  that you see on there, then that also decreases the
10 amount of distance that it has to go across.
11     Q   Okay.  Along those same -- that same question,
12 did you do any tests on the hardness of the locking
13 tabs, the materials that compose those?
14     A   No.
15     Q   Okay.  We talked about the first subbullet or
16 the first bullet under your opinion 3.  The second
17 bullet is, "The pressure cooker, as tested at low
18 pressure, well below cooking pressure, showed a large
19 resistance to opening force:  45 pounds.  45 pounds is
20 not consistent with easy or effortless opening force."
21         Start back at the beginning of that one.  The
22 pressure cooker, as tested at low pressure.  What is low
23 pressure?
24     A   So when we did our opening test, it was likely

Page 125

1  below 1 psi because we unplugged it as soon as the float
2  valve popped up.
3      Q   Okay.
4      A   And the cooking pressure, the timer probably
5  doesn't start around until 6 or 7 psi and then the
6  maximum it will hit is 10.
7      Q   When you say it is likely .5 psi, you don't know
8  that for sure because you didn't measure it?
9      A   Right.  But I've done it in other cases where
10 the float valves are all very similar in size, weight,
11 and so forth.  And it's been my experience it's usually
12 .25, .3, somewhere around there, psi.
13     Q   But we don't know for sure in this incident,
14 right?
15     A   Well, the size and shape of it are consistent
16 and the weight are all consistent with others that I've
17 seen, so it will be somewhere around there, below, like
18 I said earlier, below half.
19     Q   You didn't measure it in this case, though,
20 right?
21     A   That's right.
22     Q   And you said it showed a large resistance to
23 opening force.  And you measured that at 45 pounds.
24         Now, you did that by a different method than

Page 186

1  EXAMINATION
2  by Mr. Hubert:
3  Q  All right. Dr. Giachetti, you have four
4  opinions outlined or identified in your June 28th, 2023,
5  report, is that true?
6  A  Yes.
7  Q  And counsel asked you about those opinions, so
8  my question is simply, in opinions 1 and 2 did you rely
9  upon the narrative that plaintiffs provided you,
10 including the response to the demand for admissions?
11 A  I did.
12 Q  And did you do forensic testing to understand
13 what the significance of that narrative and admissions
14 were?
15 A  No.
16 Q  Okay. And when you followed the admissions and
17 the recipe, it was your testimony that the unit is not
18 pressurized?
19 A  That's correct.
20 Q  Now, Dr. Eshraghi said that he tested water to
21 see if after 45 minutes the unit was still pressurized.
22 And he gave some examples. He did it a couple of times.
23 He said, well, at one time at 45 minutes there was no
24 pressure but then at another point in time there was

Page 187

1  pressure left up until I think he said around 55
2  minutes.
3        Is that a scientifically reliable test to
4  determine whether the unit that plaintiff was using on
5  the day in question was still pressurized after 45
6  minutes when you follow their narrative and admissions?
7  A  So in this case, no, because, firstly, just
8  water doesn't follow their recipe. Secondly, they used
9  a large piece of meat in there. And meat has something
10 like a quarter of the heat capacity of water. So that
11 means the meat will have less heat energy in it and will
12 be able to cool down faster than water.
13       So if you just use water, you're likely to get
14 a number that's higher.
15 Q  And is that why you took the effort to replicate
16 what plaintiff was specifically cooking as best you
17 could?
18 A  I just as good practice used the recipe. And
19 then after the fact made the connection to the specific
20 heat of meat versus water.
21 Q  So, yes or no, was Dr. Eshraghi's testing to
22 determine whether the unit would still be pressurized
23 after 45 minutes with just water, was that reliable to
24 determine what happened in this case?

Page 188

1  A  No.
2  Q  Now, I think you explained there is an inherent
3  inconsistency in the plaintiffs' version of events where
4  the narrative tells you the unit is not pressurized but
5  their conclusion where they say that the unit was
6  pressurized and expel contents there is a contradiction
7  there, right?
8  A  That's correct.
9  Q  And so when you analyzed or so if you assume
10 that the unit was pressurized, did your testing
11 reveal -- did you also forensically test the unit under
12 pressure?
13 A  So the incident unit was tested under a low
14 pressure. And then I tested exemplars at various levels
15 of pressure.
16 Q  Right. And so you wanted to see what would
17 happen -- how hard or easy it would be opened if the
18 unit was pressurized, right?
19 A  Correct.
20 Q  And your opinion was that it was hard to open,
21 and, therefore, the unit was not defective, right?
22 A  That's right, that it was not easy to open.
23 Q  Okay. Now, Dr. Eshraghi testified that he only
24 used the subject unit to perform his tests. Is that a

Page 189

1  scientifically valid way to determine whether the design
2  of this pressure cooker meets UL 136?
3  A  No, because as I described earlier, the lock
4  changes once the lock has been overcome. It's
5  essentially broken. So the only thing that you can
6  infer from these tests is that the changed condition of
7  the lock still resists 45 pounds at the edge.
8  Q  And you recall Dr. Eshraghi testifying that
9  he -- that if a unit passes UL 136, it's reasonably safe
10 and not defective?
11 A  I recall reading that.
12 Q  Okay. And he performed two tests in this case,
13 is that true?
14 A  To my knowledge.
15 Q  Okay. The two tests are the backyard test,
16 right?
17 A  Right.
18 Q  And the test with the torque wrench?
19 A  Correct.
20 Q  Are either of those tests a UL 136 test?
21 A  No.
22 Q  Do either of those tests tell you from a
23 scientific perspective whether this unit, the design of
24 this unit passes UL 136?

Page 190

1  A  No, because this unit has been damaged.
2  Q  When UL does its UL 136 test, does it use a unit
3  that has been forced open previously or a brand new
4  unit?
5  A  A brand new unit.
6  Q  So testing a broken unit does not tell you
7  whether the unit will pass UL 136, right?
8  A  Correct.
9  Q  Does Dr. Eshraghi have an opinion in this case
10 whether testing a broken unit has any impact on the
11 unit's ability to withstand external force on the lock?
12    MR. SENN:  Objection, calls for speculation.
13    THE WITNESS:  I didn't -- I have not seen that
14 opinion.
15    MR. HUBERT:  Q  Do you recall me asking him at his
16 deposition if he agreed or disagreed or had any opinion
17 with your opinions?
18 A  My reading of his deposition is that he didn't
19 have an opinion regarding my opinion of the broken lock.
20 Q  And the impact, if any, that the broken lock has
21 on it to withstand external force, right?
22 A  Correct.
23 Q  So, in other words, your opinion that the broken
24 lock makes it easier to open is not challenged by

Page 191

1  Dr. Eshraghi in this case?
2  A  That's correct.  And it's also supported by my
3  testing with the exemplar.
4  Q  And so should Dr. Eshraghi have tested an
5  exemplar like you did to determine whether this unit can
6  meet the requirements of UL 136?
7  A  That's right.
8  Q  The back of the -- in your report from June you
9  have a picture of the pressure cooker, and I'm talking
10 about that picture.
11 A  Figure 1?
12 Q  Yes, figure 1 on page 4.  There is a UL mark
13 there.  What is that?
14 A  It says UL listed.
15 Q  Okay.  And then did you see the certificate from
16 UL in this case?
17 A  I did.
18 Q  Does that certificate indicate or state that UL
19 tested the pressure cooker to UL 136 and it passed?
20 A  That's correct.
21 Q  And Dr. Eshraghi in his first report, did he
22 want to know whether the unit passed UL 136?
23 A  I believe so.
24 Q  Okay.  And he saw that certificate of compliance

Page 192

1  with UL 136, right?
2  A  That's right.  I think in his deposition he
3  testified that he reviewed a bunch of Tristar design
4  documents and that was included in it.
5  Q  Okay.  So tell me why the backyard -- Let me
6  back up.
7     Do you remember when Dr. Eshraghi testified
8  that the backyard test he performed was not a UL 136
9  test?
10 A  Yes.
11 Q  Can you explain for us why the backyard test was
12 not a UL 136 test?
13 A  Sure.  So --
14 Q  And I can pull up the video if that would help
15 you.
16 A  I think I have an okay recollection.  So he
17 didn't, to my knowledge, did not fill it halfway.  I
18 believe he filled it more than halfway.  The heating of
19 the unit was not in the spirit of UL 136.  So either you
20 turn the unit on and get it to heat and you unplug it as
21 soon as the float valve raises or you bring it all the
22 way to the point at which the timer starts, apply the
23 load, and then unplug it and let the pressure dissipate
24 from the unit.  He didn't do either of those things.

Page 193

1     And then UL 136 also does not have -- does not
2  describe anywhere within it where you use one or two
3  hands to open the unit.
4     And it also describes that the unit should be
5  restrained by the handles on the base, which that also
6  didn't occur.
7  Q  And the unit was broken, right?
8  A  That's right.
9  Q  Did the backyard test that Dr. Eshraghi
10 performed -- Let me back up.
11    There was a lot of questions from plaintiffs'
12 counsel about the perception, subjective perception
13 someone has on whether something is easy or hard to
14 open.
15    Do you recall that testimony?
16 A  I do.
17 Q  In the video with the broken lock, was
18 Dr. Eshraghi able to use one hand to open the unit?
19 A  No.
20 Q  And plaintiffs' version of events in this case
21 is that they used one hand to open the unit, right?
22 A  That's my recollection.
23 Q  So what does that tell you in terms of your
24 conclusions in terms of whether plaintiff had one hand

Page 194

1  or two hands on the unit?
2     A  Well, my conclusions are that he had two hands
3  on the unit.
4     Q  And going back to plaintiffs' questioning about
5  subjective uses of force, Dr. Eshraghi testified as
6  follows on page 125 of his deposition, line 22, "If
7  Mr. Copeland only had one hand on the lid holding the
8  handle, would it -- would significant force be needed to
9  get up to 45 pounds?  Answer:  Probably."
10        What does that tell you with respect to the
11 line of questioning that plaintiffs' counsel was
12 discussing with you about force and whether force was
13 significant or not?
14    A  So one-handed force at that level is significant
15 and difficult.
16    Q  And does Dr. Eshraghi agree with you on that?
17    MR. SENN:  Object to the form, calls for
18 speculation.
19    THE WITNESS:  It sounds like it.
20    MR. SENN:  Q  Now, where did you have to go to test
21 the subject unit with Dr. Eshraghi?
22    A  I went to his house in California.
23    Q  And where does his -- Okay.  He lives in
24 California.

Page 195

1        So you flew there?
2     A  I did.
3     Q  And when you went there, was it your impression
4  that he was going to do this backyard test?
5     A  Yes.
6     Q  That you were going to have an opportunity to
7  observe him do it, right?
8     A  Yes.
9     Q  And it's from your testimony, I take it, that
10 you feel that that is not a scientifically valid test
11 that would tell you whether the unit passes UL 136?
12    A  That's correct.
13    Q  So you wanted to watch it so you could point out
14 all of the flaws with the test?
15    A  Yes.  I was very interested to see exactly what
16 he was going to do and how he was going to do it.
17    Q  And did you have a camera set up to record the
18 test?
19    A  Yes.
20    Q  And why didn't you record it?
21    A  I believe he had a sidebar with counsel, and
22 they decided that they didn't want to do it.  I don't
23 remember who told me, but one of them told me that they
24 weren't going to do that test.  And I said, well, okay,

Page 196

1  then it sounds like we're finished, I'm paraphrasing,
2  it's not a direct quote.  And so I packed up the gear
3  and I left.
4     Q  Was Mr. Senn present at the day of testing at
5  Dr. Eshraghi's house in California?
6     A  Yes.
7     Q  All right.  And you were told by one of them or
8  both of them that they would not perform the test?
9     A  Correct, after it was set up and I had set up my
10 video camera and actually recorded some footage there.
11    Q  Okay.  You then left and subsequently learned
12 that they did perform the test, right?
13    A  That's right.
14    Q  Because when we received Dr. Eshraghi's file,
15 you saw the video where he performs the test?
16    A  Correct.
17    Q  All right.  Now, Dr. Eshraghi testified, and you
18 mentioned it, that there was a hissing sound that can be
19 heard on the video.  And Dr. Eshraghi stated at his
20 deposition that when steam escapes from the unit, it
21 makes a hissing sound.
22       Do you agree with that?
23    A  I do agree with that.
24    Q  And he said we can't see it on the video,

Page 197

1  though, because the camera was far away.
2        Had you been there, would you have been able to
3  make personal observations of whether there was steam
4  escaping from the unit?
5     A  Probably.
6     Q  And why is it significant to know if steam is
7  escaping from the unit?
8     A  Well, it gives a sense of how the lid was on
9  originally, what sort of pressures you could expect.
10 And I would have known how long the pressure cooker was
11 allowed to heat.  So there are a number of the
12 conditions of the pressure cooker leading up to opening
13 it that would have been clear had I been there.
14    Q  And do all of those conditions relate to how
15 easy or how hard it is to get the lid off?
16    A  Yes.
17    Q  Have you ever seen a similar test to the
18 backyard test before?
19    A  Yes.
20    Q  And who performed that test?
21    A  John Pratt.
22    Q  And is that the person that got Dr. Eshraghi
23 involved in pressure cooker litigation?
24    MR. SENN:  Objection, calls for speculation.

Page 198

1  THE WITNESS: Actually, Dr. Eshraghi told me that at
2  the inspection. And he also had Dr. Pratt's test
3  enclosure in his backyard, as well. And when I said I
4  recognize it, he said he got it from John Pratt.
5  MR. HUBERT: Q  And when you saw the video where
6  John Pratt did this backyard test, and when I say
7  backyard test, was that test also in John Pratt's
8  backyard?
9  A  Yes.
10  Q  Okay. And when you saw him do the backyard
11  test, were you able to observe based upon the location
12  of the camera steam coming out of the unit?
13  A  Yes.
14  And he used the similar technique with the
15  leverage on the handle of the base and the handle to
16  open the pressure cooker.
17  Q  Okay. Now, the other test that was performed
18  with the torque wrench by Dr. Eshraghi, why doesn't that
19  tell us whether the unit will pass or fail UL 136?
20  A  Well, again, that's on the incident unit which
21  has a broken lock. So it only is going to give us
22  inferences about the unit with the broken lock.
23  Q  Okay. So was the purpose of that testing to
24  understand kind of at a baseline what a broken lock can

Page 199

1  withstand in terms of force?
2  A  Yes.
3  Q  And so is it true that none of the testing that
4  Dr. Eshraghi did tells us whether the design of the unit
5  passes or fails UL 136?
6  A  Correct.
7  Q  But the certificate that you saw does tell us
8  that, right?
9  A  And my own testing in addition to that.
10  Q  And when you performed testing on the exemplar
11  unit, you actually tested UL 136?
12  A  That's right. So I used commonly and easily
13  obtainable lab equipment to put a rope around a pulley
14  with 100 pounds of sand in it and used that to run the
15  UL 136 test.
16  Q  Going back to the torque wrench test, you
17  testified that the pressure in your estimation was below
18  1 psi, right?
19  A  Correct.
20  Q  And so if you open -- I know you had a lock or a
21  key on it to prevent the lid from completely opening.
22  But had that lock and key not been out there, was the
23  amount of pressure in the unit unable or so low that no
24  explosive event were to occur?

Page 200

1  MR. SENN: Object, calls for speculation.
2  THE WITNESS: Based on the Journal of Burns
3  peer-reviewed paper with half filled, I don't believe
4  that there would have been risk of injury from that.
5  MR. HUBERT: Q  So that means that when there is no
6  risk -- when the unit is pressurized but there is no
7  risk of injury, when using a unit with a broken lock, it
8  still takes 45 pounds of force to open the unit?
9  A  Correct.
10  Q  Which Dr. Eshraghi characterized as probably
11  being significant force when only using one hand?
12  A  Correct.
13  Q  And had the equipment you purchased worked that
14  day at Home Depot, you would have been able to measure
15  exactly the pressure, is that right?
16  A  I would have been able to enforce the pressure,
17  which is what my goal was.
18  Q  You regulate the pressure which allows you to
19  know what it is?
20  A  That's right.
21  Q  And why did you have to go to Home Depot to do
22  that? Why didn't Dr. Eshraghi have that available?
23  MR. SENN: Object, calls for speculation.
24  THE WITNESS: He doesn't have an air compressor in

Page 201

1  his garage.
2  MR. HUBERT: Q  Okay. Were you informed that he
3  didn't have the equipment that was needed for you to
4  perform the test and is that why you went to Home Depot?
5  A  Yes, I went to California a day early so that I
6  could go and purchase it.
7  Q  And you were asked questions about UL 136.
8  There was some testimony about 9.1.
9  Is it true that if the unit opens under
10  pressure but there is no hazard or risk of -- no risk of
11  injury when it's able to be opened because the pressure
12  is so low, that's a pass?
13  A  That's my understanding of 9.6.
14  Q  And does that relate to the fact that similar to
15  the test you did with Dr. Eshraghi that when the
16  pressure is so low that no explosive event can occur
17  even when it's opened there is no harm?
18  A  Correct.
19  Q  And that's why it's a pass under UL 136?
20  MR. SENN: Speculating.
21  THE WITNESS: That's my understanding of 9.6.
22  MR. HUBERT: Thank you, Dr. Giachetti. I don't have
23  any further questions.
24  MR. SENN: I just got a few follow-up.

51 (Pages 198 - 201)