## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

EDWARD A. COPELAND AND          )
SHERYL COPELAND,                )
                                )
      **Plaintiffs,**          )
                                )
v.                              )          **Case No: 5:22-cv-00212-CAR**
                                )
TRISTAR PRODUCTS, INC., and     )
ABC, INC.,                      )
                                )
      **Defendants.**          )

## PLAINTIFFS' RESPONSE TO DEFENDANT TRISTAR PRODUCTS, INC.'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiffs submit the following responses to Tristar Products, Inc.'s ("Tristar") statement of material facts pursuant to Local Rule 56. Plaintiffs show through citation to the record that many of the "facts" identified by Tristar are in dispute.

1.      Plaintiffs allege they were injured due to a defectively designed Tristar PPC780 pressure cooker when the lid exploded off of the base of the pressure cooker causing hot liquid and steam to burn them. See Plaintiffs' complaint, attached hereto as **Exhibit A**.

**Plaintiffs' Response:** Disputed as worded. Plaintiffs do not dispute that they have alleged a design defect as to Tristar PPC780 or that they were burned by the hot contents of that cooker when the lid exploded off the base. However, Plaintiffs dispute that a design defect is the only allegation against Tristar. Plaintiffs also allege a manufacturing defect, warnings defect, breach of warranty, and punitive damages.

1

2.      Tristar distributed the PPC 780 pressure cooker after being approached by a third-party vendor by the name of Cheer Master. <u>See</u> Alex Lozano deposition transcript at page 50:17-19, attached hereto as **Exhibit B**.

**Plaintiffs' Response:** Disputed as worded. Plaintiffs do not dispute that Tristar was approached by Cheer Master regarding the PPC780, but dispute that Tristar was merely a distributor. Tristar supervised and made changes to the manufacturing process, practices, and parts on the pressure cooker. (Ex. A – Depo. of Alex Lazano, p. 55). Tristar also had its own engineering team in Asia to do compliance checks, testing, and made changes to the cooker (*Id.* at 65-66).

3.      Cheer master advised TriStar that they had a factory that could make the 770.[1] <u>Id.</u> at 49:4-13.

**Plaintiffs' Response:** Not disputed.

4.      Cheer Master has their own engineering team and advised Tristar how the pressure cooker would be manufactured in China. Tristar inspected the factory and audited the factory to determine it was capable of making the pressure cooker. <u>Id.</u> at 51:20 – 52:14.

**Plaintiffs' Response:** Disputed as worded. Plaintiffs do not dispute that Cheer Master had their own factory and assisted in manufacturing the pressure cookers in China. However, as stated in Plaintiff's response to no. 2 above, Plaintiffs dispute that Tristar's only role was to distribute the cookers.

5.      Tristar audited the factory Cheer Master wanted to use to ensure that the appropriate manufacturing practices were in place and that best practices were followed. <u>Id.</u> at 53:2-14.

**Plaintiffs' Response:** Not disputed.

6.      An audit includes reviewing the factory's inspection procedure, warehouse management, testing procedures and equipment calibration records. <u>Id.</u> at 53:15-19.

**Plaintiffs' Response:** Not disputed.

7.      Tristar performed this audit of the factory in the 2011 timeframe prior to any sale of the unit. <u>Id.</u> at 54:11-13.

2

**Plaintiffs' Response:** Disputed as worded. Tristar got into the pressure cooker business as early

as 2002. (Ex. A, p. 42 ll 13-19).

8.    Prior to deciding on selecting the manufacturer ("Blossom"), Tristar reviewed three
additional factories before giving Blossom the go-ahead to start manufacturing the pressure
cooker. Id. at 56:17-25.

**Plaintiffs' Response:** Not disputed.

9.    No pressure cookers were made for Tristar until the audit process was complete. Id. at
56:11-16.

**Plaintiffs' Response:** Disputed as worded. Alex Lazano testified that prior to the audit, the factory

was making 770 model. (*Id.* at p. 56 ll 11-16).

10.    After Blossom began manufacturing the pressure cookers, Tristar had another
manufacturer, Leeper, also make some pressure cooker units. Leeper became involved after
Tristar went through an initial audit and compliance check with Leeper just as it did for
Blossom. Id. at 59:2-12 and 61:9-13.

**Plaintiffs' Response:** Not disputed.

11.    After the factories were selected, testing of the units continued to be done during the
manufacturing process to ensure quality. Tristar had the factories perform ongoing
reliability testing meaning that they verify the unit's capabilities and means of control. This
would include testing the thermostat and other operations that control the temperature and
operation of the unit. Id. at 61:14 – 62:1.

**Plaintiffs' Response:** Not disputed subject to qualification. Plaintiffs dispute that this testing was

sufficient.

12.    These tests would be performed by the manufacturer and supervised by Tristar. Id. at 62:2
to 5.

**Plaintiffs' Response:** Not disputed subject to qualification. Tristar performed its own testing as

well. (*Id.* at p. 61).

13.    After Tristar began having the factories make the PPC 770, they began manufacturing a
larger unit, the PPC780. When the 780 went into production Tristar repeated the audit and
inspection process that it required the factory to for the PPC 770. Id. 68:4-18.

**Plaintiffs' Response:** Not disputed.

14.    Tristar had to make sure that the unit was retested so that it could be certified by Intertek as meeting their manufacturing requirements. Id. at 68:4 – 69:7.

**Plaintiffs' Response:** Not disputed.

15.    Intertek is a third-party quality testing company that a manufacturer and distributor can provide products to ensure it complies with voluntary safety standards. Id. at 32:12 - 21.

**Plaintiffs' Response:** Disputed as worded. The section of Mr. Lazano's testimony cited by Tristar only establishes that Intertek is a third-party evaluating company and would tell Tristar what its quality insurance standards were. (*Id.* at p. 32 ll 12-19).

16.    Intertek will then certify the product complies with the relevant safety standard and allow the manufacturer or distributor to put their mark on the product to show consumers that it satisfies the Intertek testing requirements. Id. at 34:4-8.

**Plaintiffs' Response:** Disputed as worded. Intertek is a third-party lab that issues an authorization to mark (use its logo). Mr. Lazano does not discuss the safety requirements referred to by this statement of fact. (*Id.* at p. 34).

17.    Additionally, Tristar did its own testing to verify that the pressure cooker met the safety requirements. Id. at 34:9-14.

**Plaintiffs' Response:** Not disputed.

18.    The Intertek mark alerts the consumer that the pot has been through numerous steps for quality assurance. Id. at 63:12-16.

**Plaintiffs' Response:** Not disputed subject to qualification. There is no evidence to reflect what the consumer believes the Intertek mark represents.

19.    Another third-party company, Underwriter Laboratories, also inspected and tested the pressure cooker. Underwriter Laboratories certified that the PPC 780 passed the tests known as UL 136 and UL 1026. Id. at 70:3-14. See Certification of Compliance from Underwriters Laboratories stating that the pressure cooker passed UL 136 and UL 1026, attached hereto as **Exhibit C**.

**Plaintiffs' Response:** Disputed as worded. Plaintiffs do not dispute that the original cooker has a UL Certificate, but no UL test results have been produced.

20.     Plaintiff's expert, Dr. Eshraghi, admitted that if a pressure cooker passes UL 136 it is reasonably safe and is not defective. <u>See</u> Dr. Eshraghi's deposition at 32:9-12; 46:14 – 47:19, attached hereto as **Exhibit D**.

**Plaintiffs' Response:** Disputed as worded. Dr. Eshraghi testified that if a pressure cooker passes UL 136 it is reasonably safe. He did not mention if he would consider it not defective. (Ex. B – Depo. of Eshraghi, p.30 ll 9-12). Dr. Eshraghi qualifies this statement by mentioning that the subject cooker was not tested by UL and because the pressure cookers are produced in different lots the properties need to be retested and validated because deviation may render a pressure cooker not in compliance with the design approved by UL. (Ex. B, p. 47).

21.     UL 136 tests whether a pressure cooker lid will remain connected to the body of the pressure cooker while 100 pounds of force is exerted on the lid. <u>See</u> UL 136, section 9, cover opening test, attached hereto as **Exhibit E**.

**Plaintiffs' Response:** Disputed as worded. UL 136 provides several measures of guidance when testing pressure cookers. The requirement that the clamping mechanism of the pressure cooker withstands 100 pounds of force is only one element of UL suggested testing. (Ex. C).

22.     Additionally, Tristar testified that Intertek performed testing of the lock and lid. <u>See</u> Exhibit B at 185:10-22.

**Plaintiffs' Response:** Disputed as worded. Mr. Lazano testified that he believed Intertek tested the lock and lid but did not see that tests were performed himself. (Ex. A, p. 185).

23.     Prior to shipment, Tristar engaged a third-party quality assurance company, called Pro QC. Pro QC does engineering services and they perform pre-shipment inspections to verify that the specifications are accurate before a product is sent to the marketplace. <u>Id.</u> at 19:5-15.

**Plaintiffs' Response:** Disputed. The citation provided for this position discusses Mr. Lazano's role with Pro QC when he was employed by Pro QC. (Ex. A, p. 19).

24.     Pro QC's inspections relate to aesthetics and product functionality. <u>Id.</u> at 19:16 – 20:1. During its review of the units, Pro QC would perform testing on the Tristar pressure cooker and operate the unit to verify that it works properly. <u>Id.</u> at 76:5 – 81:8.

**Plaintiffs' Response:** Disputed as worded. Plaintiffs do not dispute that Pro QC inspected Tristar pressure cookers to verify they work properly according to the parameters set by Tristar. (Ex. A, p. 76-81).

25.     After the pressure cookers began to be sold, Tristar did receive complaints of the lid separating from the pressure cooker. However, when Tristar tested the unit and attempted to force the lid open they were only able to do so when there was not enough pressure inside to expel the contents. Id. at 110:4-9.

**Plaintiffs' Response:** Disputed as worded. Plaintiffs do not dispute Tristar was notified of events regarding lid separation. Alex Lazano testified that he observed tests performed where attempts were made to open pressure cookers under pressure. He testified that during the test, they were able to open the lid, but no contents were expelled. However, he testified that he also observed test where the lid was damaged prior to opening. (*Id.* at p. 110).

26.     Tristar also witnessed the factory perform tests where it attempted to force open the unit which were unsuccessful i.e., no explosion occurred. Id. at 110:4 to 111:22.

**Plaintiffs' Response:** Disputed as worded. As described in no. 25 above, Mr. Lazano also testified that in some of the testing the lid was damaged prior to being able to pull it open. (*Id.*).

27.     After Tristar began receiving customers complaining of the lid coming off the unit, Tristar engaged a third-party engineering firm called SEA to inspect and test the unit. SEA could not identify or determine a scenario that replicated the customer's complaints. Id. at 128:14 – 129:18.

**Plaintiffs' Response:** Disputed. Mr. Lazano testified that after he engaged SEA, Tristar couldn't come up with a definitive theory of what people were doing. He did not testify that SEA was unable to replicate the customers' complaint and did not discuss the findings of the SEA report. (*Id.* at p. 129).

28.     Tristar was never able to replicate an incident or explosion and concluded it could not determine what the user was really doing or what happened. Id. at 156:7 – 157:2.

**Plaintiffs' Response:** Disputed as worded. Mr. Lazano testified that he did not know what happened in the incidents complained of by customers. He stated that many times he found conflicting information and most of the time they could not figure out what the user was really doing. He makes no mention of specifically being unable to replicate an incident or explosion. (*Id.* at pp. 156-57). Plaintiffs do not dispute that this was Tristar's conclusion.

29.     Thus, it was Tristar's conclusion that they did not see a defect in the unit, the unit worked as intended and therefore could not verify the customers' complaints. Id. at 157:12-16.

**Plaintiffs' Response:** Disputed as worded. Mr. Lazano testified that Tristar doesn't have an explanation for how people were getting injured by their pressure cookers. (*Id.* at p. 159, ll 12-16).

30.     Tristar explained they never determined how people were getting injured because they could not find a defect. Id. at 158:9-13.

**Plaintiffs' Response:** Disputed as worded. Mr. Lazano testified that they could not figure out what the users were doing, so they could not find a defect. (*Id.* at pp. 156-57).

31.     Dr. Eshraghi opines that the PPC780 is defectively designed. He does not opine that the pressure cooker contains a manufacturing defect or warnings defect. See deposition transcript of Dr. Eshraghi at 58:22 – 59:14.

**Plaintiffs' Response:** Disputed. Plaintiffs do not dispute that Dr. Eshraghi opines that the PPC780 was defectively designed. However, Dr. Eshraghi testified that he did have opinions on warnings. (Ex. B, p. 100, l 25). Furthermore, while Dr. Eshraghi may not have specifically designated his opinions regarding the defects as "manufacturing defects", many of his opinions can apply to manufacturing defects, and regardless, this does not entitle Tristar to summary judgment. (Ex. C - Dr. Eshraghi Report).

32.     Dr. Eshraghi concludes the PPC780 is defectively designed because the pressure cooker's lock should prevent any ordinary human from overcoming the lock while the unit is under pressure. Because he was able to overcome the lock, the pressure cooker is defective. Id. at 59:19 – 60:1.

**Plaintiffs' Response:** Disputed. Dr. Eshraghi first opines that an ordinary user should not be capable of manually defeating the holding action of the clamping device (locking tabs) of the cooker. (Ex. C, p. 10; Ex. B, p. 49-51). He also opines that since the pressure cooker was fitted with a mechanical lock (locking pin), that lock should not be defeated. (Ex. C, p. 9; Ex. B, p. 73-74). He opines that because the lock was defeated, and the clamping device was able to be overcome by ordinary human strength, that the cooker was defective. (*Id.*) This response should not be construed as explaining all of Dr. Eshraghi's opinions. He also opines that because Tristar affirmatively stated in its owner's manual (Ex. D – Owner's Manual) that the lid safety device prevents the lid from being opened while the cooker is pressurized, the cooker fails the design parameters set forth by Tristar, and Tristar's warnings are defective. (Ex. C, p. 6). Dr. Eshraghi also opines that the design of the lid and float valve are defective because it confuses the user and is not effective in allowing the user to determine if the cooker is pressurized. (*Id.*).

33.    Dr. Eshraghi does not identify in his reports the specific design flaw that makes the PPC 780 defective. See expert reports of Dr. Eshraghi, attached hereto as **Exhibit F**.

**Plaintiffs' Response:** Disputed. Dr. Eshraghi opines, in his report, that the clamping and the mechanical lock were defectively designed because they were able to be overcome by ordinary users. (Ex. C). Dr. Eshraghi also opines that the user manual states that the lid safety device prevents the cooker from being opened under pressure.  (*Id.*). And the fact that it opened under pressure is evidence that the design was defective. (*Id.*) Furthermore, Dr. Eshraghi opines, in his report, that the pressure cooker is defectively designed because a user cannot easily determine whether the float valve is in up or down position, and later design modifications to TriStar's pressure cookers address this issue. (*Id.*).

34.     Dr. Eshraghi has no opinions as to how the lock should be designed. See Exhibit D at 105:10-12.

**Plaintiffs' Response:** Disputed. Dr. Eshraghi opines that the lock should be designed in a manner such that is not allowed to be overcome by an ordinary user. (*Id.*).

35.     Dr. Eshraghi does not opine that any alternative design should be utilized. Id. at 105:13-16.

**Plaintiffs' Response:** Disputed. Dr. Eshraghi opines that the clamping mechanism and the mechanical lock should be designed so that a normal user should not be able to defeat either mechanism. (*Id*). Dr. Eshraghi also testified that the float valve should be redesigned so that it is easier to determine if the float valve is up or down in order to determine whether the cooker is pressurized. (*Id*). Dr. Eshraghi also points out that subsequent design changes were made to address this exact issue. (*Id*). Regardless, alternative design theories are not required, and any absence thereof does not entitle Tristar to summary judgment.

36.     Dr. Eshraghi admitted that his theory of defect can only cause an injury when the pressure cooker is pressurized. Id. at 105:24 – 106:3.

**Plaintiffs' Response:** Partially disputed. Dr. Eshraghi does testify that in order for the defect to cause injury, the pressure cooker has to be pressurized, but he also testifies that the cooker can be pressurized in a range from low to high, and injury could occur in a range of values that may injure a user. (Ex. B, p. 106, ll 10-17).

37.     For the pressure cooker to be pressurized, an object known as the float valve must be in the "up" position. Id. at 106:18 – 107:4.

**Plaintiffs' Response:** Not disputed subject to qualification. The float valve's lock and how it relates to pressurization is not defined in the manual.

38.     When the float valve is in the down position, there is no pressure in the unit and no explosive event can occur. Id. at 40:3-9.

**Plaintiffs' Response:** Not disputed.

39.    Dr. Eshraghi admitted all of his opinions are dependent upon the user attempting to remove the lid while the unit is pressurized. Id. at 106:18 – 107:10.

**Plaintiffs' Response:** Not disputed. However, this does not entitle Tristar to summary judgment

because Plaintiffs thought the cooker was depressurized when they attempted to open the

cooker. (Ex. E – Depo. of Sheryl Copeland, p. 50).

40.    Plaintiff Edward Copeland responded to Tristar's request for admissions on November 15, 2022. See Plaintiff Edward Copeland's response to Tristar's request for admissions, attached hereto as **Exhibit G**.

**Plaintiffs' Response:** Not disputed.

41.    Plaintiff Edward Copeland admitted that he "waited until the float valve dropped, before attempting to remove the lid." Id. at #15.

**Plaintiffs' Response:** Not disputed subject to qualification. Plaintiff does not dispute that Mr.

Copeland admitted that he waited until the float valve dropped before attempting to remove

the lid. However, in doing so Mr. Copeland only admitted he thought the float valve had

dropped. All the other evidence in the case explains that he could have been mistaken, and

it is undisputed that the cooker was pressurized.

42.    The float valve is a small cylindrical pin that is inside the pressure cooker's lid with a silicone gasket on the bottom, so when it gets pushed up by the steam, the pressure cooker is sealed allowing it to pressurize. See Exhibit D at a 34:33 – 35:24.

**Plaintiffs' Response:** Not disputed.

43.    The float valve weights just a few grams. Id. at 35:25 – 36:11.

**Plaintiffs' Response:** Not disputed.

44.    When the pressure begins to build in the unit, the pressure will push the float valve into the up position helping to lock the lid in place. Id at 36:12-20.

**Plaintiffs' Response:** Not disputed subject to qualification. Dr. Giachetti (Tristar's expert)

testified that at lower pressure the lock is not as strong as it is at higher pressure because

of the wiggle and play in the valve that allows it to "tip" a little and tilt. (Ex. F- Depo of

Dr. Giachetti, p. 82-83).

45.    When the pressure is gone inside the pressure cooker, gravity will bring the float valve
back into the down position. Id. at 37:18-20; 43:3-18.

**Plaintiffs' Response:** Not disputed.

46.    In addition to his conclusion that a pressure cooker is not defective if it passes UL 136,
Dr. Eshraghi testified that he will not find a defect in a product if he cannot replicate what
Plaintiff claimed occurred. Id. at 32:9-12; 24:2-11; 19:21-25.

**Plaintiffs' Response:** Disputed. Dr. Eshraghi does not testify that a pressure cooker is not

defective if it passes UL 136 as worded by this statement. Dr. Eshraghi testified that if the

specific pressure cooker itself passed UL 136 test, he would consider it reasonably safe.

(Ex. B, p. 32). This statement mischaracterizes Dr. Eshraghi's testimony. Dr. Eshraghi was

not asked to replicate what Plaintiffs did here, he was asked to evaluate whether, given the

fact of the case, the pressure cooker could be opened under pressure. The testimony referred

to in Tristar's statement above concerns testing Dr. Eshraghi has done on other pressure

cookers and theoretical questions regarding recreating the events. (Ex. B, p. 24, p. 19).

47.    Dr. Eshraghi admitted that he did not attempt to replicate or recreate what Plaintiff did in
this case. Id. at 33:4-12.

**Plaintiffs' Response:** Not disputed subject to qualification. Dr. Eshraghi did not attempt to

recreate the exact circumstances that day, but he didn't need to in order to test his theories.

(Ex. C).

48.    Dr. Eshraghi did not perform a formal UL 136 test in this case. Id. at 30:20-22.

**Plaintiffs' Response:** Not disputed subject to qualification. Dr. Eshraghi did not perform a formal

UL 136 but he did perform an analogous test, and one that in his opinion, reaches a better

result than those suggested by UL 136. (Ex. B, pp. 30-31). In fact, Dr. Eshraghi has been

in communication with UL regarding modifications to their suggested testing method and is working with UL to develop that testing. (*Id.* at p. 31). Dr. Giachetti's test also is not a formal UL test, both experts agree that the results produced were acceptable. (Ex. F, p. 78, ll 22-24).

49.    Instead, Dr. Eshraghi tested the subject unit using an analogous test to UL 136. Id. at 30:11-19.

**Plaintiffs' Response:** Not disputed.

50.    However, the subject unit was forced open at some point in time prior to Dr. Eshraghi's test due to the presence of scratch over a locking tab. Id. at 55:20 – 56:25; 119:20 – 120:2.

**Plaintiffs' Response:** Disputed. Plaintiffs do not dispute that the pressure cooker had been opened at some point prior to Dr. Eshraghi's test, but dispute that the cooker was "forced open" and there is no evidence to suggest any force was used to open the cooker at any time. The scratch on the locking tab is simply evidence that at some point in time the pressure cooker was opened while pressurized. (Ex. F, p. 112, ll 21-24; Ex. B, p. 49, p. 56).

51.    Dr. Giachetti, Tristar's engineering expert, opines that forcing open the unit degrades the ability of the locking mechanism. See Dr. Giachetti's 6.28.23 report at 19-21, attached hereto as **Exhibit H**.

**Plaintiffs' Response:** Not disputed subject to qualification. Plaintiff does not dispute that Dr. Giachetti opines that forcing open the unit degrades the ability of the locking mechanism. However, this does not entitle Tristar's summary judgment because there is no evidence that the cooker at issue was ever opened while under pressure prior to the incident at issue. (Ex. G – Dr. Giachetti Report, p. 12; Ex. F, p. 56). Furthermore, plaintiffs testified they have never used force to open the cooker. (Ex. E, p. 50-52).

52.    Dr. Giachetti explains that "because tolerances are small and material is lost on the locking tab when the lock is forcefully overcome . . . the loss in the distance the locking pin needs to travel around the locking tab . . . reduces the ability of the lock to withstand external opening force." Id. at 20.

**Plaintiffs' Response:** Not disputed subject to qualifications. Plaintiff does not dispute that Dr. Giachetti opines that forcing open the unit degrades the ability of the locking mechanism. However, this does not entitle Tristar's summary judgment because there is no evidence that the cooker at issue was ever opened while under pressure prior to the incident at issue. (Ex. F, p. 112; Ex. B, p. 56). Furthermore, plaintiffs testified they have never used force to open the cooker. (Ex. E, p. 50-52).

53.     Dr. Eshraghi has no opinion on whether forcing open the pressure cooker degrades the lock's ability to withstand external opening force. See Exhibit D at 125:11-21.

**Plaintiffs' Response:** Not disputed subject to qualification. Plaintiffs do not dispute that Dr. Eshraghi did not offer an opinion on this issue. He testified that he did not know that to be true. (Ex. B, p. 125, ll 9-21). However, this does not entitle Tristar's summary judgment because, as Dr. Eshraghi explained, he did not need to opine on this matter because there is no evidence that the cooker had been opened while pressurized prior to the subject incident. (*Id.* at p. 56).

54.     Dr. Eshraghi concluded the subject pressure cooker will open at 40-45 pounds, not 100 pounds. Id. at 69:15-20.

**Plaintiffs' Response:** Not disputed.

55.     Dr. Eshraghi did not test any exemplar units. Id. at 66:21-25.

**Plaintiffs' Response:** Not disputed subject to qualification. Plaintiffs do not dispute that Dr. Eshraghi did not test an exemplar unit. However, this does not entitle Tristar to summary judgment because Dr. Eshraghi did not need to test the exemplar unit because Tristar's design failed its own stated parameters, and those set forth by UL. (Ex. D).

56.     Dr. Eshraghi admitted he does not know if the reason he was able to open the pressure cooker at 40-45 pounds versus 100 pounds was because the lock had been already degraded from being forced open previously since he did not test any exemplar units. Id. at 121:5 – 122:10.

**Plaintiffs' Response:** Disputed. This statement takes Dr. Eshraghi's testimony out of context

without distinguishing between the two mechanisms of the clamping device (locking tabs)

and the mechanical lock (locking pins). Dr. Eshraghi testified that if the lid was able to

open at low loads, that doesn't meet requirements. (Ex. B, p. 50). He goes on to testify that

an ordinary user should not be able to defeat the lid safety mechanism when there is a risk

of injury. The 100-pound requirement is only one element of the test. (*Id.* at pp. 74-76).

57.    Plaintiff alleges that he cooked boneless chucked roast in the pressure cooker. He cooked it
       for 40-45 minutes, the cook cycle automatically ended, and Plaintiff waited 45 minutes
       before checking the contents of the pressure cooker. *See* Plaintiffs' answers to
       interrogatories at #2, attached hereto as **Exhibit I**.

**Plaintiffs' Response:** Not disputed subject to qualification. Mrs. Copeland testified the roast

cooked for approximately 45 minutes, and then they heard the audible alarm notification

that the cooking cycle was complete. (Ex. E, p. 42). Plaintiffs then waited approximately

40-45 minutes before attempting to open the cooker. (*Id.* at 42-43).

58.    Plaintiff then opened the pressure cooker with only his right hand touching the pressure

       cooker. <u>See</u> deposition transcript of Sheryl Copeland at 50:3-10; 51:19 – 52:10, attached

       hereto as **Exhibit J**.

**Plaintiffs' Response:** Disputed. Mrs. Copeland did testify that Mr. Copeland used his right hand

on the lid, but stated that she did not remember what he was doing with his left hand. (Ex.

E, p. 51, ll 19-22). She stated as soon as Mr. Copeland barely turned the handle, the lid

blew off (*Id.* at p. 50, ll 9-13).

59.    While Dr. Eshraghi did not recreate the incident to see if an accident would occur, Dr.
       Giachetti did. Dr. Giachetti recreated Plaintiff's recipe and conduct and found that the
       pressure cooker was not pressurized after 45 minutes. <u>See</u> 6.28.23 Giachetti report at 19.

**Plaintiffs' Response:** Disputed as worded. Dr. Eshraghi did perform a test to determine whether

the cooker at issue would open under pressure. (Ex. B). He also performed tests to

14

pressurize the cooker with water and measured the time it took to fully be depressurized, finding it could take up to 55 minutes. (Ex. B, p. 34, ll 1-6).

60.    Dr. Eshraghi did admit that a user would probably need significant force to open the subject pressure cooker with just one hand while it was pressurized. See Dr. Eshraghi's deposition transcript at 125:22 – 126:2.

**Plaintiffs' Response:** Disputed. This statement takes Dr. Eshraghi's testimony out of context. When asked this question, he stated that he did not agree that 45 pounds was significant force because he was able to open the cooker with minimal effort. (*Id.* at p. 123-124). During that line of questioning, Dr. Eshraghi had been discussing using two hands in the context of simply holding the base of the cooker to keep it from rotating while removing the lid. He was not discussing using two hands on the lid to open the cooker. Dr. Eshraghi testified that 45 pounds can turn the lid and a person may need to stop the base from rotating. So if a person used their other hand to stop the rotation of the base, it would not require significant force to open the cooker. (*Id.* at p. 127 ll 2-11)

61.    He admitted you would need two hands to open the unit. Id. at 126:3-12.

**Plaintiffs' Response:** Disputed. Dr. Eshraghi testified a person may need to use two hands for opening in order to keep the base from rotating while turning the lid. He did not testify that you need two hands to open the lid of the unit. (*Id.* at p. 126 ll 10-12; p. 127 ll 2-11).

62.    Dr. Eshraghi admitted that a person can exert up to 200 pounds of force by using two hands. Id. at 70:9-21.

**Plaintiffs' Response:** Disputed. Again, this statement takes Dr. Eshraghi's testimony out of context. Dr. Eshraghi testified that if a person were pushing with one hand and pulling with the other, creating a counter balancing force, that it would be possible a person could generate 200 pounds. (*Id.* at p. 70, ll 16-21). However, there is no evidence in this case that

15

Plaintiffs were pushing with one hand and pulling with the other. In fact, Mrs. Copeland

has repeatedly testified to the contrary. (Ex. E, p. 50-52).

63.    Dr. Eshraghi also performed a test on the subject unit his backyard, where he was able to
open the unit under pressure. However, he admitted this is not a U L136 test. Id. at 96:512.

**Plaintiffs' Response:** Disputed as worded. Dr. Eshraghi did testify that the test he performed in

his backyard was not a test suggested by UL 136, but it did not need to be. (*Id.* at p. 97).

Dr. Eshraghi was simply saying that he did not use one of the testing methods suggested

by UL. He did, however, pressurize the cooker and was able to open it while it was

pressurized showing that the cooker did not meet UL specifications. (*Id.* at p. 96). The test

produced results showing that the pressure cooker failed those requirements. (Ex. H –

Video of Dr. Eshraghi Test).

64.    During this "backyard" test, Dr. Eshraghi admitted he needed two hands to open the
pressure cooker. Id. at 96:17 – 97:1

**Plaintiffs' Response:** Disputed. Tristar attempts to discredit the test performed by Dr. Eshraghi

by calling it a "backyard" test. The only thing that makes the test a "backyard" test is that

it was performed in Dr. Eshraghi's backyard for safety. This statement does not imply that

Dr. Eshraghi testified he needed two hands to open the pressure cooker because of the force

that was required. However, Dr. Eshraghi testified that he only needed two hands in order

to keep the base from rotating. (Ex. B, p. 96, ll 20 -25; p. 96, ll 1-4).

65.    Dr. Giachetti testified that the tests Dr. Eshraghi testified performed do not analyze whether
the pressure cooker's design satisfies UL 136. In other words, those tests are not
scientifically valid for determining whether the pressure cooker passes UL136. See Dr.
Giachetti's deposition at 189:8 – 190:8, attached hereto as **Exhibit K**.

**Plaintiffs' Response:** Disputed. The citation provided in this statement does not support the

position that Dr. Giachetti testified as to what Dr. Eshraghi used to analyze the cooker's

designs. It is simply his opinion that the test performed did not meet with specifications of

UL 136, which is disputed by Dr. Eshraghi. (Ex. B, p. 31).

66.    Dr. Giachetti explained that the subject unit had a broken lock which degraded the lock's ability to withstand external opening force. Thus, testing the subject unit does not tell you whether the design is sufficient to pass UL 136. Id. at 188:23 – 190:8.

**Plaintiffs' Response:** Not disputed subject to qualification. Plaintiffs do not dispute that this is

what Dr. Giachetti testified to. However, there is no evidence that the lock was broken prior

to the incident at issue, and therefore that opinion is irrelevant. Furthermore, even with a

broken lock, the cooker's clamping device (the locking tab) should be able to withstand

100 pounds of force. (Ex. C).

67.    Dr. Giachetti testified that when UL performs the UL136 test, UL tests new units, not broken units. Id. at 190:6-8.

**Plaintiffs' Response:** Not disputed.

68.    Dr. Giachetti testified the purpose for testing the subject unit was to understand how much force would be needed to open a unit with a degraded and broken lock. Id. at 198:17 – 199:2.

**Plaintiffs' Response:** Not disputed.

69.    With respect to the "backyard test" performed by Dr. Eshraghi, Dr. Giachetti agreed with Dr. Eshraghi's testimony that the "backyard" test is not a UL136 test and is not scientifically valid to determine whether unit's design passes UL 136. Id. at 195:9-12; 192:7-13.

**Plaintiffs' Response:** Disputed. Plaintiffs do not dispute that Dr. Giachetti opines that the test

performed by Dr. Eshraghi in his backyard was not a UL 136 test. However, Dr. Eshraghi

never testified that the test or the test results were not valid to determine whether units'

designs pass UL 136. In fact, he opines that the test proves the defect. (Ex. C).

70.    Dr. Giachetti opined the "backyard" test is not a UL 136 test because the water in the unit was not filled halfway, Eshraghi did not unplug the unit as soon as the float vale raised or allow it to pressurize until the timer starts for the cook cycle, and UL does not use two hands to attempt to open the lid, and the unit should be restrained by the handles on the base, which did not occur, and the unit was broken. Id. at 192:7 – 193:8.

**Plaintiffs' Response:** Disputed. Plaintiffs do not dispute that may be Dr. Giachetti opinion. However, Dr. Eshraghi testified the only reason he used two hands was to keep the base from rotating, not because he needed two hands on the lid to force it open. (Ex. B at p. 96, ll 20-25; p. 97, ll 1-4). Additionally, the fact that Dr. Eshraghi did not unplug the unit as soon as the float valve was raised is not relevant to the test performed. (Ex. I – UL 136, § 9.5). The fact that Dr. Eshraghi did not turn the pressure off immediately only created more pressure, which would have created more friction against the locking tabs that should have made it even harder for him to open. However, as seen in the video, he was successful in opening the cooker with very little effort. (Ex. H).

71. With respect to the torque wrench test performed by Dr. Eshraghi and the force gauge test performed by Dr. Giachetti, Dr. Giachetti opined the pressure in the unit during these tests was so low that no explosive event could have occurred. Id. at 199:16 – 200:9; UL 9.1;9.5.

**Plaintiffs' Response:** Disputed. The citations provided for this statement address issues about the test during when Dr. Giachetti states that there was a key in place that would prevent the lid from blowing off the base. (Ex. F, p. 199, ll 16-24). Dr. Giachetti estimates the pressure to be at around 1psi when that test was performed, and it was just an estimation. (*Id.*). Dr. Eshraghi testified that even low pressure inside the cooker could cause an explosive event that would cause injury to the user. (Ex. B, p. 106, ll 10-17).

72. Dr. Giachetti testified that Eshraghi's torque wrench test does not inform us whether the design will pass UL 136 because the lock was broken. Id. at 198:17-22.

**Plaintiffs' Response:** Not disputed subject to qualification. Plaintiffs do not dispute that this was Dr. Giachetti's testimony. However, this testimony is in direct contradiction to UL requirements. (Ex. I).

73. None of the testing performed by Eshraghi informs us whether the unit's design is sufficient to pass UL 136. Id. at 199:3-6.

**Plaintiffs' Response:** Disputed. As explained, Dr. Eshraghi testified that his testing does show

that the cooker's design does not pass UL 136. The clamping device of the cooker was able

to be defeated with approximately half of the required minimum load as specified by the

UL (Ex. B, p. 69, ll 15-16).

74.    The UL certificate does tell us that the unit's design passes UL 136. Id. at 199:7-9.

**Plaintiffs' Response:** Not disputed subject to qualification. UL certificate shows that at some

point in the past, the cooker's original design passed UL certification. However, this does

not entitle Tristar to summary judgment.

75.    Dr. Giachetti performed UL 136 tests on exemplar units, and they passed. Id. at 199:7-15.

**Plaintiffs' Response:** Disputed as worded. This statement provides that Dr. Giachetti tested

exemplar units, when his report stated he only tested one exemplar unit, which was not

new. (Ex. G, p. 17). Dr. Giachetti points out in his report that the 100-pound weight that

was attached to the lid of the cooker pulled the lid forward so that it hung over the front of

the base. (*Id.*). This is exactly the type of result Dr. Eshraghi is concerned about that will

influence testing results because it causes binding of the lid against the base. (Ex. B, p. 31,

ll 7-16). Furthermore, Dr. Giachetti's test results show that the force on the edge of the lid

did not meet 100 pounds. (Ex. G, p. 19).

76.    Dr. Giachetti opined the pressure in the unit was less than one psi for the torque wrench
       and force gauge tests performed on the subject unit. Id. at 199:16-19.

**Plaintiffs' Response:** Disputed. Dr. Giachetti testified that he estimated the pressure inside the

cooker during the torque wrench and forced gauge test was below 1 psi, (Ex. F, p. 199 ll

16-19).

77.    The unit had less than one psi because Dr. Eshraghi and Dr. Giachetti unplugged the unit
       as soon as the float valve was raised, which occurs at about a quarter of a psi. Id. at 124:21
       – 125:3; 99:11-16.

**Plaintiffs' Response:** Disputed. Dr. Giachetti testified that the pressure in the cooker at the time of the testing was likely below 1 psi, he did not state that as an absolute. (Ex. F, p. 124, l 24; p. 125 ll 1-2).

78.     Dr. Eshraghi admitted that no explosive event can occur at less than 1 psi. <u>See</u> Dr. Eshraghi's deposition testimony, at 61:23 – 62:3.

**Plaintiffs' Response:** Disputed. Dr. Eshraghi testified at very low pressure there may not be an explosive event, but an explosive event may occur at 1-2 psi. (Ex. B, p. 61, ll 23-25; p. 62 ll 1-3).

79.     Dr. Eshraghi admitted the float valve is raised at less than one psi. <u>Id.</u> at 61:18-22.

**Plaintiffs' Response:** Not disputed subject to qualification. Dr. Eshraghi was following protocol suggested by UL 136 and that of Plaintiffs' expert. (Ex. B, p. 60 ll 22-25; p. 61 ll 1-2).

80.     Dr. Eshraghi did not know how much pressure was in the unit when he performed his torque wrench test and when Dr. Giachetti performed his force gauge test on the subject unit. <u>Id.</u> at 60:20 – 61:2.

**Plaintiffs' Response:** Disputed as worded. Plaintiff did not dispute that this is how Dr. Giachetti testified. However, Dr. Giachetti testified that he estimated that the pressure inside the cooker at the time of the torque wrench test was below 1 psi. He then testified, subject to objection for speculation, that he believed there would be no risk of injury at that level of pressure. (Ex. F, p. 199 ll 16-24; p. 200 ll 1-9).

81.     Dr. Giachetti opined that if the unit is only filled halfway – which follows UL 136 instructions – there is no risk of an explosive event and 45 pound of force is still needed to open the unit with a broken lock. <u>See</u> Exhibit K at 199:16 – 200:9.

**Plaintiffs' Response:** Disputed as worded. Plaintiff did not dispute that this is how Dr. Giachetti testified. However, Dr. Giachetti testified that he estimated that the pressure inside the cooker at the time of the torque wrench test was below 1 psi. He then testified, subject to

objection for speculation, that he believed there would be no risk of injury at that level of pressure. (Ex. F, p. 199 ll 16-24; p. 200 ll 1-9).

82.    The Tristar owner's manual instructs users to read it prior to using the pressure cooker. See owner's manual, at 1 (the cover page), attached hereto as **Exhibit L**.

**Plaintiffs' Response:** Disputed as worded. The manual simply states "[r]ead and follow all instructions carefully." (Ex. I).

83.    Plaintiff Edward Copeland admitted he read the owner's manual thoroughly. *See* Exhibit G at #4.

**Plaintiffs' Response:** Not disputed.

84.    Plaintiff Edward Copeland admitted he used the pressure cooker multiple times between 2016 and 2020, and that is operated as Plaintiff expected and intended. *Id.* at #8 & 9

**Plaintiffs' Response:** Not disputed.

85.    Tristar testified that it expects consumers to follow the instructions in the owner's manual. *See* Exhibit B at 215:7-10; 213:6-8.

**Plaintiffs' Response:** Plaintiffs do not dispute that Tristar testified in this manner.

86.    The owner's manual instructs users to not force open the lid and that if the unit is difficult to open, it is still pressurized. See Exhibit M at 3, under heading "Important Safeguards."

**Plaintiffs' Response:** Disputed. There is no Exhibit M attached to Tristar's statement of facts.

87.    This warning is repeated with the language "never force open" the Power Pressure cooker XL. *Ibid*.

**Plaintiffs' Response:** Disputed for reasons set forth in no. 86 above.

88.    Plaintiff Sheryl Copeland testified she knew from her prior experience and common sense not to force open the pressure cooker. *See* Exhibit J at 87:23 – 91:9.

**Plaintiffs' Response:** Disputed as worded. Mrs. Copeland testified that she knew from experience not to force open the cooker. (Ex. E, p. 9, ll 8-12).

89.    She knew from using the pressure cooker that when the pressure is released she would not feel any resistance and could open it with one hand. Id. at 52:17-21.

**Plaintiffs' Response:** Not Disputed.

90.    Plaintiff Sheryl Copeland testified that her husband knew not to force open the pressure cooker. *See* Exhibit J at 52:11-16.

**Plaintiffs' Response:** Not disputed.

91.    Dr. Eshraghi has never worked for a pressure cooker manufacturer, distributor or a retailer that sells pressure cookers. *See* Exhibit D at 10:25 – 11:8.

**Plaintiffs' Response:** Not disputed. However, this does not entitle Tristar to summary judgment.

92.    Dr. Eshraghi has never designed a pressure cooker. Id. at 11:9-10.

**Plaintiffs' Response:** Not disputed. However, this does not entitle Tristar to summary judgment.

93.    Dr. Eshraghi has never worked for a company that performs quality control services for manufacturers or distributors of pressure cookers. Id. at 11:11-14.

**Plaintiffs' Response:** Not disputed. However, this does not entitle Tristar to summary judgment.

94.    Dr. Eshraghi has never owned a pressure cooker or used a pressure cooker to eat food. Id. at 11:15-19.

**Plaintiffs' Response:** Not disputed. However, this does not entitle Tristar to summary judgment.

95.    Dr. Eshraghi could not identify any benefits of using a pressure cooker other than speed. Id.  at 11:25 – 12:7.

**Plaintiffs' Response:** Not disputed. However, this does not entitle Tristar to summary judgment.

96.    Dr. Eshraghi's professional work as an engineer does not involve pressure cookers. He works in the airplane industry. Id. at 13:25 – 14:4; 52:6-11.

**Plaintiffs' Response:** Disputed as worded. Plaintiffs do not dispute that Dr. Eshraghi does not

design pressure cookers as part of his work as an engineer in the aerospace industry.

However, Dr. Eshraghi's experience and education cover a variety of fasteners and

clamping devices, and he has inspected and analyzed multiple pressure cookers in his role

as a consultant. (Ex. C; Ex. B, p. 21-22).

97.    No court has ever qualified Dr. Eshraghi as being an expert in the design of a pressure cooker. Id. at 14:5-7.

**Plaintiffs' Response:** Disputed as worded. To the extent that Tristar is asserting that Dr. Eshraghi

has been limited or excluded by any court, this statement is disputed. It is not disputed that

Dr. Eshraghi has never been challenged as an expert.

98.    Dr. Eshraghi became involved in pressure cooker litigation after his former boss asked him
to go to a pressure cooker inspection. Id. at 14:8 – 15:2.

**Plaintiffs' Response:** Disputed subject to qualification. Dr. Eshraghi testified that he went to an

inspection for his supervisor, Dr. John Pratt, and that was his first experience working in

the pressure cooker field. He further explained that is how he became interested in the

subject. (Ex. B, p. 14). Since then, he has examined numerous pressure cookers and offers

opinions as to their design and operation. (*Id.* at 21-22).

99.    Dr. Eshraghi's former boss educated Dr. Eshraghi different tests to perform and how to
prepare reports. Id. at 15:7-15.

**Plaintiffs' Response:** Not disputed. However, this is not the only means by which Dr. Eshraghi is

qualified to testify regarding pressure cookers. (Ex. C).


Respectfully submitted, this 11th day of March, 2024.


**REYNOLDS, HORNE & SURVANT**          */s/ Marty K. Senn*
6320 Peake Road                        MARTY K. SENN
P.O. Box 26610                         Georgia Bar No.: 513896
Macon, Georgia 31210                   *Attorney for Plaintiff Edward A. Copeland and*
Telephone: (478) 405-0300              *Sheryl Copeland*
Facsimile: (478) 405-0550
msenn@reynoldsinjurylaw.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this date, the undersigned served a true and correct copy of the foregoing

pleading with the Clerk of Court using the CM/ECF system and served all parties of record via

electronic service through the CM/ECF system to:

Sanjay Ghosh
Steven H. Campbell
Nelson Mullins Riley & Scarborough LLP
201 17th Street NW, Suite 1700
Atlanta, GA 30363
sanjay.ghosh@nelsonmullins.com
steven.campbell@nelsonmullins.com
*Attorneys for Defendant*

David S. Osterman, Esq.
Thaddeus J. Hubert, IV, Esq.
Goldberg Segalla
301 Carnegie Center, Suite 200
Princeton, NJ 08540
dosterman@goldbergsegalla.com
thubert@goldbergsegalla.com
*Attorneys for Defendant*

This 11th day of March 2024.

**REYNOLDS, HORNE & SURVANT**

6320 Peake Road                              */s/ Marty K. Senn*

P.O. Box 26610                              MARTY K. SENN

Macon, Georgia 31210                        Georgia Bar No.: 513896

Telephone: (478) 405-0300                   *Attorney for Plaintiffs Edward A. Copeland and*

Facsimile: (478) 405-0550                   *Sheryl Copeland*

msenn@reynoldsinjurylaw.com