Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

                     FOR THE MIDDLE DISTRICT OF GEORGIA

2                              MACON DIVISION

3

    EDWARD A. COPELAND and SHERYL   )

4   COPELAND,                       )

                                    )

5                    Plaintiffs,    )

                                    )

6              -vs-                 )   No. 5:22-cv-00212-CAR

                                    )

7   TRISTAR PRODUCTS, INC., and     )

    ABC, INC.,                      )

8                                   )

                     Defendants.    )

9

10

11             Deposition of ROBERT S. GIACHETTI, PH.D.,

12   taken before TRACY L. BLASZAK, CSR, CRR, and Notary

13   Public, pursuant to the Federal Rules of Civil Procedure

14   for the United States District Courts pertaining to the

15   taking of depositions, at Suite 2250, 222 West Adams

16   Street, in the City of Chicago, Cook County, Illinois at

17   9:25 a.m. on the 31st day of January, A.D., 2024.

18

19

20

21

22                    Exhibit D

23

24

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 2

1           There were present at the taking of this
2      deposition the following counsel:
3

            REYNOLDS, HORNE & SURVANT by
4           MR. MARTY K. SENN
            6320 Peake Road
5           Macon, Georgia 31210
            (478) 405-0300
6           msenn@reynoldsinjurylaw.com
7                on behalf of the Plaintiffs;
8

            GOLDBERG SEGALLA by
9           MR. THADDEUS J. HUBERT, IV
            301 Carnegie Center Drive
10          Suite 200
            Princeton, New Jersey 08540
11          (609) 986-1301
            thubert@goldbergsegalla.com
12

                on behalf of the Defendant
13              Tristar Products, Inc.
14
15                     - - - - -
16
17
18
19
20
21
22
23
24

Page 3

1                          DEPOSITION OF
                    ROBERT S. GIACHETTI, PH.D.

2

                         January 31, 2024

3

4      EXAMINATION BY:                                  PAGE

5    Mr. Marty K. Senn                                     4
                                                         202

6

     Mr. Thaddeus J. Hubert, IV                          186

7

8                        * * * * * *

9

                       INDEX OF EXHIBITS

10

11    EXHIBIT          DESCRIPTION                       PAGE

12    Exhibit 1        Curriculum vitae of Robert         10
                       Giachetti, Ph.D.

13

      Exhibit 2        Invoices from Fusion Engineering   67

14                     to Goldberg Segalla

15    Exhibit 3        Letter from Giachetti to Hubert     9
                       6/28/23

16

      Exhibit 4        Excerpt of UL 136                  160

17

      Exhibit 5        Power pressure cooker XL owner's   167

18                     manual

19

20                        * * * * * *

21

22

23

24

Page 4

1              ROBERT S. GIACHETTI, PH.D.,

2     called as a witness herein, having been first duly

3     sworn, was examined upon oral interrogatories and

4     testified as follows:

5                         EXAMINATION

6                       by Mr. Senn:

7         MR. SENN:  This will be the deposition of Dr. Robert

8     Giachetti.

9              Is it Giachetti or Giachetti?

10        THE WITNESS:  Giachetti.

11        MR. SENN:  Giachetti.  Okay.  All right.  Taken

12    pursuant to notice and agreement for all purposes

13    allowed under the Civil Practice -- I'm sorry, the

14    Federal Rules of Civil Procedure.

15             I would propose that we reserve objections

16    until first use except for form of the question or

17    unresponsive answer.  Is that agreed?

18        MR. HUBERT:  That's fine, Marty.

19        MR. SENN:  Okay.

20        MR. HUBERT:  I do want to add that I did send

21    Dr. Giachetti Dr. Eshraghi's deposition testimony and

22    one of the exhibits that was referenced at the UL 136

23    certification.

24        MR. SENN:  Okay.

Page 5

1          MR. HUBERT:  I just want to give you a heads up that

2      he did see that additional material.

3          MR. SENN:  Okay.  Sounds good.

4      Q   Dr. Giachetti, right?

5      A   Uh-huh.

6      Q   I understand you have been deposed before, is

7      that correct?

8      A   That's correct.

9      Q   On multiple occasions?

10     A   That's right.

11     Q   All right.  So you're familiar, then, with kind

12     of how this works.  It's my opportunity to ask you

13     questions.  You've been identified as an expert witness

14     in the case we're here about today.

15         MR. SENN:  Oh, and one other thing, Ted, just for

16     the record, you're agreeable to making this deposition

17     for use in both Mr. and Mrs. Copeland's case?

18         MR. HUBERT:  What do you mean?

19         MR. SENN:  Well, I'm just thinking of the future.

20     Now they're the same case.

21         MR. HUBERT:  Right.

22         MR. SENN:  But if we have to -- you know, he died.

23         MR. HUBERT:  Right.

24         MR. SENN:  So I don't think it would affect it

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 6

1    because we'll just substitute his estate.  So, yes, now

2    that I'm thinking about it, it's probably not an issue.

3    I was thinking if we ever had to split the cases, but.

4         MR. HUBERT:  Yes, I don't think that's an issue.

5         MR. SENN:  That's right.  I agree with you now that

6    I thought through it out loud.

7         Q    So just a couple of ground rules.  You probably

8    know to keep all of your responses verbal instead of

9    head shakes or uh-huh and uh-uh because she is taking

10   down everything we say.

11          Also, kind of in everyday conversation we tend

12   to talk over each other or you may anticipate what I'm

13   going to say, try to finish my sentence.  If you will

14   let me finish my question, I'll let you finish your

15   answer.  That way we're not talking over each other,

16   okay?

17        A    Okay.

18        Q    I'll probably be the first person to break that

19   rule, but I'll try not to.

20          Also, I tend to talk fast and I mumble.  I have

21   a southern accent.  So if you don't understand anything

22   I say, just ask me to repeat the question.  If you

23   answer the question, I'll assume you understood the

24   question.  Is that fair?

Robert S. Giachetti , Ph.D.                                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 7

1        A    Okay.

2        Q    All right.  And, finally, if you need a bathroom

3    break or any kind of break, just let me know.  It's not

4    an endurance contest.  I just ask that you answer any

5    question that's pending before we take that break, okay?

6        A    Okay.

7        Q    All right.  Can you state your full name for me,

8    please.

9        A    Robert Salvatore Giachetti.

10       Q    All right.  Have you ever been known by any

11   other names?

12       A    No.

13       Q    As part of the deposition notice you were asked

14   to produce certain documents, which your attorney

15   forwarded to us.

16            Those documents that were requested, is that

17   your entire file?

18       A    I believe so.

19       Q    Okay.  And that file that was sent to your

20   attorney that was sent to us, that would include

21   everything that you looked at or referenced in forming

22   your opinions we're here about today?

23       A    To my knowledge, yes.

24       Q    Okay.

Page 8

1          MR. HUBERT:  Not including the stuff I sent you or

2     sent him after.

3          MR. SENN:  Sure.

4          Q    I understand there has been a few extra things

5     you looked at, Dr. Eshraghi's deposition, who we

6     recently took, that's our expert.

7          A    Correct.

8          Q    And you looked at some exhibits to his

9     deposition?

10         A    Just the one exhibit.

11         Q    That was the UL certification?

12         A    Correct.

13         Q    Okay.  In your report that you filed with the

14    Court -- You filed two reports with the Court, is that

15    correct?

16         A    That's my recollection.

17         Q    One was a preliminary report dated February

18    20th, 2023, and the next was a supplemental report dated

19    June 28, 2023, is that correct?

20         A    That sounds right.

21         Q    Okay.  The first report, that was done prior to

22    the inspection of the pressure cooker we're here about

23    today, is that right?

24         A    Correct.

Robert S. Giachetti , Ph.D.                           January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 9

1      Q   Okay.  So would it be fair or accurate to say

2    that all of the opinions that you issued in the February

3    20th report are now also included and moved over into

4    the June 28, 2023, report?

5      A   Yes.

6      Q   Okay.  So there is nothing in the February 20,

7    2023, report that wouldn't be encompassed in the June

8    28, 2023, report?

9      A   Correct.  Those hold all of my opinions for this

10   case.

11     Q   All right.

12     MR. SENN:  I'm going to mark -- Ted, this is just

13   his report I'm going to mark.  I have another copy if

14   you need it.

15     MR. HUBERT:  I'm pulling it up now.

16     MR. SENN:  You can mark that as 3 and we'll just go

17   out of order.

18          (Exhibit 3 marked as requested.)

19     MR. SENN:  Q   Dr. Giachetti, can you identify that?

20   Is that your report that was filed in this matter?

21     A   Just flipping through it, it looks like it.

22     Q   Can you turn to the page, I think it's the

23   second page where it lists the materials received.  Does

24   that list provide all of the materials you received and

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 10

1    reviewed in forming your opinions in this matter?

2        A    I believe it does unless there is like a

3    footnote or something later on that I identified

4    something else.  This is the list of everything that I

5    got from Ted's office regarding this case.

6        Q    Would that also include everything you reviewed

7    or relied on in making your opinions in this case?

8        A    Yes, everything I relied on is in this report,

9    yes.

10        Q    Okay.  All right.  You can toss that back to me.

11        A    Oh, sure.

12        MR. SENN:  I went out of order a little bit.  I had

13    the court reporter mark these before I started.  So I'm

14    going to show you now what I'm marking as Plaintiffs'

15    Exhibit 1.  Ted, that's just his CV.

16        MR. HUBERT:  Yes.

17            (Exhibit 1 marked as requested.)

18        MR. SENN:  Q    Does that look to be an accurate copy

19    of the CV that you attached to your report?

20        A    Yes, it seems like it.

21        Q    Okay.  All right.  I just want to quickly hit

22    some of the highlights here.  It says you have a

23    bachelor's of science in mechanical engineering from

24    Marquette and you received that in 1997?

Robert S. Giachetti , Ph.D.                         January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                      Page 11

1          A    That's right.

2          Q    With a minor in physics.

3               You got a mechanical engineering degree from

4     the University of Illinois in 2000, is that right?

5          A    That's correct.

6          Q    Then you got a Ph.D. from the University of

7     Wisconsin-Madison in mechanical engineering in 2008,

8     correct?

9          A    That's right.

10         Q    All right.  Do you hold any other degrees?

11         A    No.

12         Q    Okay.  Have you attended school for any other

13    fields of study?

14         A    Yes.  So I was enrolled with the University of

15    Oregon and Universitatis Senarum in Italy for Italian

16    language.  That was in -- that was right after

17    undergraduate work.  But that's not anything I really

18    use professionally.

19         Q    Did you get a degree in Italian?

20         A    No.

21         Q    Were you born in Italy?

22         A    No, I'm from Chicago.

23         Q    Are you Italian?

24         A    Yes.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 12

1      Q    Okay.  I'm putting that together from your name

2    and from you learning Italian.

3      A    Yeah.

4      Q    Sherlock over here.

5          What about at Oregon, what did you do?  What

6    were you studying?

7      A    It was the same.  It was basically the same

8    program.  It was like a joint admission, I guess.

9      Q    This was during your undergrad time period?

10     A    After, yeah, the same time period.

11     Q    All right.  So no other degrees other than the

12   ones we've talked about?

13     A    Correct, nothing that I'm going to use

14   professionally.

15     Q    Okay.  Was there anything, any degrees you got

16   that you wouldn't use professionally?

17     A    I don't know.  I don't think I have them yet.

18     Q    Are you in the process of it?

19     A    No.

20     Q    Okay.  All right.  As far as what you've done

21   work-wise in the engineering field, you have on your CV

22   that in 1998 you worked at Alloy Sling Chain Industries?

23     A    Correct.

24     Q    That would have been during your undergrad time?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 13

1        A    Right afterwards.

2        Q    Okay.  Right afterwards?

3        A    Yes.

4        Q    Design of lifting equipment and mechanical

5    desktop.

6             Did this company manufacture these type of

7    items?

8        A    Some yes, some no.  So they also distribute.

9    They make custom equipment when they need to and other

10   times they just sell off-the-shelf stuff.  But all of

11   that is sized based on client requests.

12       Q    Okay.  How long did you work for them?

13       A    Less than a year.

14       Q    Okay.  What did you do there?

15       A    So I was involved in estimating new work,

16   designing custom pieces.  I did estimates for repairs

17   for wire ropes.  I made a number of technical worksheets

18   to let other people do some sizing where, basically, the

19   engineering was embedded into like a computer program.

20   So other people could like, you know, just plug in

21   dimensions or plug in loads that they needed, that sort

22   of thing.

23       Q    Okay.  Dimensions for what?  Are we talking

24   about furniture?

Robert S. Giachetti , Ph.D.                              January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 14

1        A    No, this was all stuff for lifting equipment.

2    So this is like anything that would hang off the end of

3    a crane, so hooks, slings, wire ropes, I-beams, stuff

4    like that.

5        Q    All right.  It looks like you next worked at

6    Braner U.S.A.?

7        A    Right.

8        Q    Why did you leave Alloy Sling?

9        A    I thought that Braner offered a better

10   opportunity to do engineering work.

11       Q    Okay.  Tell me what you did for them?

12       A    So for them I designed -- primarily did the

13   design of their recoiler piece of machinery.  So a steel

14   processing line has probably eight or ten discrete

15   components to it because the way it works is the sheet

16   metal comes in on a giant roll like a humongous roll of

17   toilet paper or paper rolls, and then it gets unrolled.

18   It goes through something that kind of trims it up, and

19   it goes through something that tensions it and then it

20   goes through a cutter.

21            And then by the end it goes through all of

22   these difference processes and then it has to get rolled

23   back up into its discrete new rolls, basically.  So it

24   takes an old roll, processes it, either, you know, makes

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 15

1     it into smaller widths or whatever and then it has to

2     get rolled back up.

3          And then that thing that rolls it back up puts

4     it on a little like they call it a coil car, which is,

5     basically, like a little itsy-bitsy train car on wheels

6     and it like takes it wherever.  So I did the recoiler,

7     which is the thing that rolls it back up.

8          Q    When you said you did it, you mean you designed

9     it or did you maintain it?

10         A    Yes.  So I was the guy in charge of -- so if we

11    got an order for a processing line, then I would get the

12    specs for it, and then I would do all of the drawings

13    and things that would then go into the shop and be

14    fabricated for that.

15         Q    Because you're mounting different size rollers

16    for different size projects and sheets?

17         A    Right.  So these things are enormous.  It's

18    like -- it's been a long time since I looked at it, but

19    it was like 600- to 1,000-horsepower motors and a giant

20    gearbox.  The gearbox is like as big as this table and

21    it has a lot to turn.

22         Q    Okay.

23         A    So all that stuff needed to get sized

24    appropriately and figure out how to fasten it to the

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 16

1    floor, things like that.

2          Q    Okay.  It looks like you worked there from '98

3    to '99, about a year-ish, is that right?

4          A    That's right.

5          Q    Okay.  Then you have that you worked at

6    BioTechPlex as an intern in 2001?

7          A    Yes.

8          Q    Why as an intern at that point?

9          A    So I started getting my master's while I was at

10   Braner.

11         Q    Okay.

12         A    And then while I was doing my master's, I left

13   Braner and then picked up the BioTechPlex thing while I

14   was getting my master's.

15         Q    Okay.

16         A    Since I was in school, they gave me an

17   internship during the summer.

18         Q    Okay.  What did you do for them there at

19   BioTechPlex?

20         A    So they were consulting with a -- like a pharma

21   company that was building assay trays, which is kind of

22   like a plastic egg carton that you put biological

23   samples in to run through a machine.

24         Q    I gotcha.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 17

1      A    And so we were doing consulting on, basically,

2   the mechanical integrity of those assay trays.

3      Q    And then you were there, it looks like not long,

4   right?

5      A    It was the summer.

6      Q    It was the summer?

7      A    Yes.

8      Q    And then it looks like there was a gap in

9   employment from 2001 to 2008.  What were you doing

10  during that time?

11     A    Well, that's only sort of true.  So I was

12  already working on my Ph.D. at that point.  And so if

13  you flip to the -- maybe two pages, I was working as a

14  teaching assistant and research assistant during that

15  time.

16     Q    Okay.

17     A    So I guess page 3 you can see all of that stuff

18  there.  So 2000 to 2005, you know, lecturer and stuff.

19     Q    During the time you were doing your Ph.D. you

20  were a teaching assistant and lecturer?

21     A    Yes.

22     Q    Okay.  When did you start your Ph.D.?  Was that

23  in 2001?

24     A    2000, I think.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 18

1          Q    Okay.

2          A    I'm pretty sure 2000.

3          Q    You were a teaching assistant and lecturer at

4     University of Wisconsin-Madison?

5          A    Yes.

6          Q    Okay.  Was that like a full-time job or was that

7     part-time while you were doing your education?

8          A    I mean, it could be a little bit of both

9     depending on how much the professor wanted you to do.

10         Q    I got you.

11         A    But, generally speaking, I would say it's

12    probably closer to part-time.

13         Q    Okay.

14         A    Because I still had to do the studying and

15    everything.

16         Q    Okay.  When you were a lecturer, did you

17    actually have a specified class or did you do like guest

18    lectures or how did that work?

19         A    So someone -- I had a lecture of probably 50

20    students, and I was their primary instructor for that

21    case.

22         Q    Okay.  That says Engineering People.  Is that

23    the class name?

24         A    No, so that's a different program.  I should

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 19

1      just stay on that page.

2          Q    Oh, I see.  The other one is, Introduction to

3      Dynamic Systems?

4          A    Yes, so I lectured that course as, basically,

5      the primary instructor for that course.

6          Q    Okay.  What does that mean, dynamic systems?

7          A    So dynamic systems is what it's called at

8      Wisconsin.  Other universities call it vibrations.  But

9      the gist of it is systems that oscillate.

10            So most people think of it as spring mass

11     dampers type systems.  So think of like a mug hanging

12     from a rubber band and if you go with the right

13     frequency, you get resonance.  It's all topics about

14     that.

15            But at Wisconsin it's a little more

16     encompassing where you get into gear trains and

17     vibrations there and you get into fluid systems that

18     have transients where depending on the dampers and the

19     fluid viscosity, you know, you're looking at like how

20     long does it take water to exit something or if you've

21     got a system of hydraulics, how does that, those systems

22     function together.

23            And then also threw on a little top of that

24     sundae, I guess, if you want to call it, where we did

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 20

1    some electrical circuits, which is, you know, a

2    resistor, inductor, capacitor where you basically look

3    at, you know, alternating current.

4        Q    Okay.  And then you lectured in -- is that class

5    titled, Engineering People?

6        A    So Engineering People I did a bunch of different

7    things for it, but this was a really awesome program.

8    So University of Wisconsin partnered with a bunch of

9    high schools in Wisconsin for underprivileged kids who

10   showed talent academically.  And if they got accepted to

11   this program, which was free for the summer, they'd come

12   to UW and they would live on campus and they would take

13   courses throughout the summer.  And if they did that for

14   four years, then they got a full ride to the University

15   of Wisconsin at the end of it.

16       Q    Oh, wow, that is pretty cool.

17       A    And so I did -- they didn't have an engineering

18   version.  So you could do it for literature, you could

19   do it for language, or you could do it for chemistry or

20   whatever.  And I was the first guy who did it for

21   engineering.

22            So I basically planned the whole thing.  And

23   the first year I did all of the teaching for it.  But

24   then after that then I transitioned to more of like an

Robert S. Giachetti , Ph.D.                        January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 21

1    overseer for the engineering one, and I had some other

2    grad students who were doing the teaching.

3        Q    Okay.

4        A    And that was only a summer program, so I did

5    that a couple of summers.

6        Q    And then in 2008 you received your Ph.D. in

7    mechanical engineering, right?

8        A    Correct.

9        Q    And then you went to work for Exponent?

10       A    Right.

11       Q    And that's who you work for still now?

12       A    No, I work for Fusion right now.

13       Q    I'm sorry, that's right.  How long did you work

14   for Exponent?  Up until 2020?

15       A    That sounds right.  I mean, the pandemic kind of

16   screwed up my clock.

17       Q    Okay.

18       A    But, yes, I'd say around 15 years or so.

19       Q    When you were at Exponent, that was in a

20   consulting role?

21       A    Yes.

22       Q    So is that roughly the same thing you do now for

23   Fusion?

24       A    Roughly.

Robert S. Giachetti , Ph.D.                      January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 22

1      Q    Okay.  So since 2001 you've been in either an

2   academic or consulting position, is that fair to say?

3      MR. HUBERT:  Consulting engineer.

4      MR. SENN:  Q    Consulting engineer?

5      A    Yes, that's fair.

6      Q    And I'm not trying to trick you or trip you up.

7   I'm just trying to make sure you didn't have any other,

8   during that time period, any other jobs or positions

9   where you were, like you were before, involved in the

10   design, manufacturing process, things like that?

11      A    Well, in my consulting roles I have had those

12   types of retentions, so that's not outside of the scope

13   of what I do from day to day stuff.

14      Q    But that would be consulting on those types of

15   issues as opposed to actively designing these things

16   like you did when you were with Braner or Alloy or is

17   that incorrect?

18      A    Well, I mean, the difference is as a consultant,

19   you're not employed full-time by whoever you're working

20   for, but I have done some design work.  I've done a lot

21   of front end work on design of products as a consultant.

22      Q    Okay.

23      A    It's just I'm not employed full-time by the

24   people who are asking me to do that work.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 23

1     Q   Let me ask it this way, this is probably a

2   better way to ask it.  During your time at Exponent, was

3   your employment there limited to consulting as a witness

4   in litigation, or did it also encompass consulting on

5   design plans, implementation, things like that?

6     A   So I did both of those things while at Exponent.

7     Q   Okay.  What about at Fusion?

8     A   Same.

9     Q   Same?  Okay.

10        So in that role instead of working for a

11   company like Braner, Braner may hire you to design and

12   develop these rollers, or would you be looking at their

13   design and plans to see if they were adequate?  Give me

14   an example of how that would work.

15    A   Yes, so I've done a little bit of both.  And so

16   I would call that "front end work," which is before,

17   like premarket type work.

18    Q   Okay.

19    A   So someone would come and say, hey, we want to

20   sell this thing, this is our idea.  We would like you to

21   look at it and tell us if you think that there is

22   something that we're missing or we're not sure how

23   strong it is, can you help us either, you know, beef it

24   up, or can you tell us what you think you would want to

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 24

 1     do to test it so that it's adequate for the marketplace.

 2         Q    Okay.

 3         A    And I've done numerous jobs like that.

 4         Q    Okay.  With your role at Fusion, what is the

 5     percentage of expert witness consulting in litigation or

 6     prelitigation as opposed to consulting on what I would

 7     call design projects for clients?

 8         A    I don't keep track of the distinction, and I

 9     haven't been at Fusion very long, but I would say

10     probably that sort of work right now is 10 percent and

11     I'm actively trying to grow that.

12         Q    Which part is 10 percent?

13         A    The front end work.

14         Q    Okay.  So about 90 percent is consulting and

15     witness testimony in litigation?

16         A    I would take another 15 to 20 percent and put

17     that into work with standards committees and things,

18     which are not -- that's more of like pro bono type work

19     where I sit on -- like I am on a number of ASTM

20     committees and we're -- right now I'm working on

21     revising the standards for furniture tip-overs, like how

22     do you test a dresser, how do you test the tether that

23     holds a dresser to the wall, that sort of thing.  So I

24     actually dump a ton of time into that sort of thing.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 25

1              So I would put that at about 15 to 20 percent,

2       the front end work is around 10 percent, and then the

3       rest would be, you know, litigation-related things and

4       marketing, all of the other stuff that goes along with

5       the job.

6          Q    Okay.  You said you're on some ATSM committees.

7       What is ATSM?

8          A    ASTM.

9          Q    I'm sorry, ASTM.

10         A    It's, actually, ASTM International.  It used to

11      stand for something, but now their name is ASTM

12      International because it used to be American Society of

13      Testing and Materials and now it's International.

14              So they are a standards body that makes

15      consensus standards.  So they bring together people that

16      use products, people that make the products, and

17      regulators together.  And those groups of people create

18      standards and review them and vote on them to make them

19      into an ASTM standard.

20         Q    Okay.  Is there an ASTM standard for pressure

21      cookers?

22         A    Not that I'm aware of.

23         Q    Okay.  Do you have any idea of why that is?

24         A    I think because there is another standard out

Robert S. Giachetti , Ph.D.                        January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                        Page 26

1      there already.

2              So usually you won't find a new standard or

3      competing standards between two.  And if there are,

4      usually one adopts the other one and basically just

5      copies it.

6         Q    The other standard you're referring to, is that

7      the UL?

8         A    Yes, so UL has pressure cooker standards.

9         Q    Okay.  And that's in 136?

10        A    UL has 1026 and 136.

11        Q    Okay.  We'll get into that in a little bit.  I'm

12     getting a little bit ahead of myself here.

13             What about when you were at Fusion, can you

14     give me a percentage of what your role was as a

15     consulting testifying witness in litigation as opposed

16     to what you call the front end?

17        A    Do you mean Exponent?  Because I think we just

18     talked about Fusion.

19        Q    I'm sorry, Exponent.  I'm conflating the two.

20        A    Yes, no problem.  That varied year to year.

21     Some years it was 50 percent front end work and other

22     years 5 percent, but it was all over the place.

23             My first couple of years there, you know, I'm

24     just kind of a worker bee and just doing whatever I

Page 27

1    could get my hands on internally.

2        Q    Okay.  Now you work now for Fusion.

3        A    Correct.

4        Q    Do you get paid a salary at Fusion?

5        A    That's right.

6        Q    So the type of work that you do at Fusion either

7    front end work or consulting witness work doesn't affect

8    your income?

9        A    Correct.

10       Q    Okay.  But I think I understood you to say,

11   correct me if I'm wrong, but as of right now over 50

12   percent of your work comes from witness consulting in

13   litigation, is that right?

14       A    That sounds about right.

15       Q    Okay.  Was that true at Exponent, too, did you

16   get paid a salary?

17       A    Yes.

18       Q    Okay.  So when you're hired, whoever hires you

19   pays Fusion, and Fusion pays you a salary, is that

20   right?

21       A    That's right.

22       Q    Okay.  How do you market your expert witness

23   business?

24       A    Well, I wouldn't say that I market expert

Robert S. Giachetti , Ph.D.                     January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 28

1    witnessing, but I try to maintain a presence in, say,

2    LinkedIn where I talk about my expertise.  And so I

3    found that people who are looking for consulting work

4    with someone who has my expertise seem to find me that

5    way.  Most of it is word of mouth.

6         Q    Okay.

7         A    I have done a number of projects where people

8    who have worked with me on, say, an ASTM committee have

9    found me because of my work there.

10        Q    Okay.

11        A    I go to conferences and I go to CLEs and things

12   like that, as well.

13        Q    What kind of conferences do you go to?

14        A    So the last one I went to was last year, and

15   that was the ICPHSO, which is the International Consumer

16   Product Safety and Health Organization.

17        Q    That's a mouthful.

18        A    It is.  It's the worse acronym in the world.

19        Q    I would agree.

20        A    And I'll be surprised if that's actually 100

21   percent accurate, my recitation of that.

22        Q    That's close enough for me.

23        A    Thank you.

24             But that was like a week and it was all about

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 29

1    product safety.  So it had people from all over the

2    place.  And I've actually spoken at a couple of

3    conferences about product safety, as well.

4        Q    Okay.  You mentioned you go to CLEs?

5        A    Yes.

6        Q    Is that continuing legal education?

7        A    Yes.

8        Q    What type of CLEs have you gone to?

9        A    So I've gone to a couple, but most of those are

10   related to intellectual property.  But those have

11   like -- it will be one day and they'll touch on, you

12   know, ethics and they'll touch upon developments in the

13   legal world and some other stuff like that.

14       Q    All right.  Have you ever been to any DRI CLEs?

15       A    I think a long time ago I've been to one.

16       Q    To speak or just to it attend?

17       A    Just to attend.  I think -- Actually, I've been

18   to a couple, but that was usually I'm sitting in the

19   booth outside the door trying to --

20       Q    Marketing material?

21       A    Yes, throwing pens and things at people.

22       Q    Do you do that at other seminars and other CLEs?

23       A    I haven't.  That was something for the new

24   people to do, and it wasn't a worthwhile experience.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 30

```
 1        Q   Do you know if that's something Fusion does?
 2        A   I know that we have done it.  I don't think that
 3   we do it very frequently, though.
 4        Q   When you say worthwhile, you mean you didn't get
 5   enough business from it to do it, is that what you mean?
 6        A   Well, I would say sitting at a booth for three
 7   days twiddling your fingers with people trying to pass
 8   you by without talking to you is not very worthwhile.
 9        Q   That's when you got to get the good swag, that's
10   how you get people to stop.
11        A   Well, I had no power for that at Exponent.
12        Q   Have you ever attended any CLEs or seminars
13   hosted or organized by the plaintiffs' bar or
14   institutions that provide education to attorneys who are
15   more geared toward the plaintiffs' side of the business?
16        A   No, I don't think so.  But I have -- I actually
17   was invited to give one a number of years ago, which I
18   did about consumer products, at a law firm.  And I don't
19   know what their -- I know that they do a lot of defense
20   work.  I don't know what their plaintiff work is like.
21        Q   Okay.  Do you do any kind of direct mailing to
22   any kind of mailing list for your services?
23        A   As far as I know, Fusion has a list of existing
24   contacts that they've -- that they send an e-mail out
```

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                             Page 31

1      every once in a while to, you know, like holiday stuff,

2      but that's it.  As far as I know, there is no like cold

3      calling or anything like that.

4          Q   Anything that would be done like that would be

5      done on the Fusion corporate level, not on your

6      professional --

7          A   Correct.  I mean, I have the ability to do that.

8      If I found someone's name that I thought that I could --

9      that I would be a resource for them, I have the ability

10     to send them a message or call them if I wanted to.

11         Q   So, for example, though, you don't send any kind

12     of e-mailing or mailing to like the Illinois State bar

13     members?

14         A   No, I've never done that.

15         Q   Do you blog?

16         A   Well, I have a LinkedIn page and I post blurbs

17     here and there.

18         Q   About your profession?

19         A   No.  I rarely post about anything directly

20     related to what I do.  I try to -- in general I try to

21     post things that are engineering related that I think

22     people who would want to hire me would also be

23     interested in or to highlight my experience.

24         Q   All right.  Now, we're here today about a case

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 32

1      involving my clients, the Copelands, and Tristar.

2              Have you ever been retained by Tristar as an

3      expert consultant or witness prior to this case?

4          A    Yes.

5          Q    Okay.  You've worked with them several times,

6      correct?

7          A    That's correct.

8          Q    Okay.  Have you ever been retained prior to this

9      case by Goldberg Segalla?

10         A    For Tristar matters.

11         Q    Okay.  For other Tristar matters, not just this

12     one?

13         A    Correct.

14         Q    How many times have you served as an expert

15     witness for Tristar, whether you actually ended up

16     testifying in court or as a consulting witness?

17         A    A number of times, probably five or six times

18     I'm guessing.  I don't keep track.  Maybe it could be

19     ten times.  I'm not sure.

20         Q    Okay.  Have you ever been retained by Goldberg

21     Segalla for a case not involving Tristar?

22         A    I'm not sure as I sit here.

23         Q    All right.  How many cases have you worked on

24     with Tristar that you've had to testify in court for?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 33

1          A    In court I've had one trial.

2          Q    Okay.   Where was that?

3          A    That was in Las Vegas.

4          Q    Okay.   Do you remember the parties' names on

5      that case?

6          A    I think that was Heath.

7          Q    Heath?

8          A    Yes.

9          Q    Heath vs. Tristar?

10         A    That sounds right.

11         Q    When was that?

12         A    Three years ago, something like that.

13         Q    Okay.   Do you know the outcome of that case?

14         A    I believe that was a defense verdict.

15         Q    Do you remember what the facts of that case

16     were?

17         A    No.

18         Q    Do you remember what your opinions were in that

19     case?

20         A    I don't have a concrete memory of that.

21         Q    Okay.   How many times have you been deposed as

22     an expert witness?

23         A    Probably 15 to 20 times.

24         Q    Okay.   So on other cases that are not Tristar

Robert S. Giachetti , Ph.D.                     January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 34

1    matters you've been deposed on, is that correct?

2        A    That's correct.

3        Q    How many times have you been deposed on a

4    Tristar matter, not including this time?

5        A    Three or four.  I think they're probably all in

6    that list on the back of my -- on the back of Exhibit 1.

7        Q    They're all back there?

8        A    I'd say most of them are there.

9        Q    Okay.

10       A    I think there was probably two before Heath, I'm

11   guessing, two or three before Heath.

12       Q    Okay.  So you're referring to on Exhibit 1, the

13   page, your four-year testimony list, this is a list of

14   all cases you provided testimony on in the last four

15   years?

16       A    Yes.  Well, I mean, I've had -- after I

17   submitted this report I've had more depositions.

18       Q    Okay.  So this would include anything you

19   provided deposition or in-court testimony on other than

20   the ones since this list?

21       A    Can you say that again?

22       Q    This includes all of the cases in the last four

23   years you provided testimony either by deposition or

24   trial except for the ones you've done since you provided

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 35

1      this list?

2          A    That's right.

3          Q    How many have you done since you provided this

4      list, do you know?

5          A    Three or four.

6          Q    Were those Tristar cases?

7          A    No.

8          Q    Who was your client on those cases?

9          A    So one was an intellectual property matter and

10     that had three depositions in it.  And that was like two

11     weeks ago.

12         Q    Okay.

13         A    And so I think -- that was an IPR, so I'm not

14     sure if that counts as plaintiff or defendant.

15              Actually, I think that's it, as a matter of

16     fact, yes, Perez.

17         Q    What's an IPR?

18         A    So interparties review.  So if you don't believe

19     that someone should have gotten a patent, you can

20     basically petition a committee and they can vacate it if

21     they feel like it.

22         Q    Got you.  I'm not going to belabor this list.

23     We'll go through it just quickly.  Those first two you

24     have listed there, you were providing expert witness

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                            Page 36

1      services for Tristar, correct?

2          A    Correct.

3          Q    The second case there -- I mean, the third case,

4      American Manufacturing vs. Sleep Number, who was your

5      client in that case?

6          A    I don't recall.

7          Q    Okay.  Do you recall what kind of case that was?

8      It was an IPR?

9          A    That's a patent case, yes.

10         Q    What about that next case, B&P Littleford vs.

11     Prescott?

12         A    That's also -- that's a copyright claim, so

13     someone was getting sued over stealing trade secrets.

14         Q    What kind of testimony do you provide in those

15     cases?  And I don't mean anything in depth, just kind of

16     generally what are you opining about?

17         A    So in the IPRs you're essentially doing an

18     analysis as a person skilled in the art.  So you have to

19     show that you are a person who has got ordinary skill in

20     the art.

21              And then you do an analysis of the technology

22     that's available to someone and what people know at the

23     time.

24              And so I'm using that and saying, well, if you

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 37

1    put all of these things together, then it's obvious to

2    take this next step, which is not something that you can

3    patent like if it's super obvious.

4         Q    Okay.

5         A    Like, say, suppose someone sells pen caps and

6    another person sells pens and then you make an invention

7    that's a pen sold with a cap, you know, that's like

8    obvious.

9         Q    Okay.

10        A    Yes.

11        Q    Got you.

12             So you're opining -- your opinions, would it be

13   accurate to say, like in those type of cases your

14   opinions kind of concern engineering processes?

15        A    It's kind of like what does someone know, do

16   they know how to use this sort of technology, what sort

17   of things is commonplace in the industry, things like

18   that.

19             The next one, the Prescott Machinery vs.

20   Littleford, that was copyright.  So they were basically

21   suing that their shop drawings were works of art and

22   that someone had copied them.

23        Q    And you would be offering the same kind of

24   testimony about what --

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 38

1        A    That was kind of like what's normal in a shop

2    drawing and how do people construct shop drawings and

3    things like that.

4        Q    And that would be based on your knowledge

5    generally as having designed things in the engineering

6    world?

7        A    Correct.

8        Q    What about Musso vs. Schnuck Markets, who was

9    your client there?

10       A    Schnuck's.

11       Q    Just briefly, generally, what kind of case was

12   that?

13       A    That was a lady broke her ankle while walking in

14   a supermarket.

15       Q    What kind of opinions were you offering in that

16   case?

17       A    So she was blaming the floor for her injury, and

18   my opinion based on the video analysis from the security

19   camera was that the floor had nothing to do with it.

20       Q    Okay.  You were looking at, what, materials of

21   the floor?

22       A    So I did -- yes, they sent me -- I think in that

23   case they sent me floor tiles.  So I have a slip meter

24   that I can use to measure the slipperiness.  But she

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 39

1      didn't slip and you could see that in the video and that

2      was clear.

3           Q    What about the next one, Pulford vs. Ridg-U-Rak,

4      who was your client?

5           A    So my client, I believe, was Ridg-U-Rak on that.

6           Q    What kind of case was that?

7           A    So that was a gentleman who worked at like a

8      conduit -- I don't know, not conduit but like electrical

9      wire distributor.  And so if you order 50 feet of such

10     and such gauge of wire, they go to the spool on the wall

11     and then they have a giant machine that winds it up.

12              And he was -- the thing got jammed and

13     basically pulled the whole machine like into him and

14     like smashed -- he got some serious injuries from that.

15     And so my -- I don't have a clear memory of what my

16     opinions were in that case, but it revolved around how

17     the machine works and things like that.

18          Q    Okay.  All right.  The next one, Kraslen vs.

19     W.E. O'Neil, what kind of case was that?

20          A    That was a hotel in the City of Chicago that was

21     being renovated.  And one of their service people was

22     walking in the basement, and he alleged that when he was

23     walking over a sump pump cover that it fractured and he

24     fell in injuring himself.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 40

1        Q    Okay.  So you were offering opinions about the

2    integrity of that pump cover?

3        A    So I didn't do that because the video showed

4    that the cover wasn't -- there was a security camera

5    that showed that the cover was not on the manhole.

6        Q    Easy case, then?

7        A    Yes.

8        Q    From that aspect, anyway?

9        A    Well, it was tough to determine that because the

10   hole was obscured by some things.  So there was a lot of

11   photographic analysis.

12       Q    Got you.

13            What about Vance vs. Norfolk Southern?

14       A    That is a railroad case where someone was

15   injured in a rail yard.  I can't remember what the

16   injury was, though.

17       Q    Were you representing Norfolk Southern?

18       A    Yes, Norfolk Southern hired me.

19       Q    Okay.  What about Tripp vs. Union Pacific

20   Railroad, another railroad case, I'm assuming, injury?

21       A    Yes, yes.  I think Vance was a ladder on a

22   railcar failed.

23       Q    Okay.

24       A    And then Vance was -- or then Tripp was a

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 41

1      conductor who fell down the stairs of a locomotive while

2      the locomotive was on the repair tracks, which are like

3      six feet above a sidewalk.

4          Q    Okay.  And I'm probably going to butcher that

5      name, Touliatos, Touliatos vs. Home Depot.  Your client

6      was Home Depot?

7          A    My client was Home Depot in that case.

8          Q    What kind of case was that?

9          A    Someone put their hand in the blind cutter at

10     Home Depot and pulled the lever, and so they were suing

11     Home Depot about that.

12         Q    You offered testimony about the design of the

13     cutter?

14         A    Well, the cutter wasn't owned or serviced by

15     Home Depot, so I really didn't have much in terms of the

16     cutter to say.

17         Q    Okay.

18         A    That I remember.

19         Q    What were you opining about in that case?

20         A    I'm trying to remember what -- yeah, I didn't

21     study the cases beforehand coming here, but, you know,

22     there was a lot to do about what is the industry

23     standard for, basically, hardware stores and tools that

24     they have out in the aisles that people could injure

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 42

1    themselves with.

2        Q    Okay.  And then, finally, Perez vs. RUF, who was

3    your client in that case?

4        A    RUF.

5        Q    That's the client's name, RUF?

6        A    That's right.

7        Q    Okay.  What kind of case was that?

8        A    That was an employee was servicing -- an

9    employee who wasn't trained to service a machine was

10   servicing a machine that was operating without the

11   guards on it, and they put their hand in the machine and

12   lost some fingers.

13       Q    Okay.  Back on Exhibit 1 on the first page we've

14   already talked about your degrees.  On this first page

15   under engineering applications you list several topics.

16            Are these all topics that you hold yourself out

17   as having an expertise in?

18       A    Yes.

19       Q    Okay.  So this CV contains everything that you

20   have expertise in, is that correct?

21       A    I think it gives the general flavor for what I

22   can do if you want to take it that way.  But, in

23   general, I would say the primary skills that I have are

24   shown here.

Robert S. Giachetti , Ph.D.                      January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                     Page 43

1          Q    Okay.  Do you think you have knowledge and

2     experience to offer expertise or expert opinion in areas

3     other than those listed here on the first page?

4          A    You know, those are targeted areas, but my

5     degree in mechanical engineering is very broad as well

6     as my training in biomechanics.  So, you know, outside

7     of that bullet list, you know, you will find other

8     things in here.

9               You know, I've done a bunch of motion capture

10    type things where, you know, measuring people's force

11    output and things like that.  So that's something that I

12    can also do that I don't highlight here.

13              These are basically the highlights of my

14    background.

15         Q    Now, you mentioned biomechanical engineering.

16    Is that a subset of mechanical engineering?  You don't

17    have a separate degree in that, right?

18         A    Correct.  They don't necessarily -- not all

19    schools have separate degrees for that.  But all of the

20    research that I have done in graduate school has

21    basically been biomechanical related.

22         Q    Okay.  What makes it biomechanical as opposed to

23    mechanical?

24         A    Well, there is biomechanical and biomedical.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                        Page  44

1              And biomechanical is essentially using the

2       tools of mechanical engineering looking at the human

3       body, so not necessarily a tendon, it's more like a

4       spring, you know, and a muscle is an actuator and this

5       is a linkage.

6              And so I've taken my mechanical academic

7       training and applied it to the human body as kind of the

8       machine, if you will.  And all of my research has been,

9       as a Ph.D., was looking at the control scheme of how we

10      command our joints to make force.

11      Q   Okay.  You mentioned biomedical.  You don't have

12      expertise in biomedical, right?

13      A   I have some limited expertise in that.  But if

14      you're going to ask me about, you know, biocompatible

15      materials, like that's starting to get away from -- you

16      know, unless it's stainless steel or titanium, like I'm

17      not the guy doing that research, but, you know, I've

18      used it.

19             I'm not a person that's making artificial

20      hearts and things like that, but, you know, my master's

21      was all on total knee replacements, and I had a surgeon

22      on my committee.

23      Q   So when you say limited expertise in biomedical,

24      is that kind of what you're talking about, that time

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                          Page 45

1      period when you were --

2          A    Correct.  And I've worked on several cases for

3      implants that have failed.  But those are not like

4      things that help the body process anything.  You know,

5      like I'm looking at failures of fusion plates and things

6      like that that have a more mechanical spin to them.

7          Q    Okay.  Have you been retained ever to consult or

8      offer witness testimony for a company that manufactures

9      pressure cookers other than Tristar?

10         A    Yes.

11         Q    Who is that?

12         A    Well, I've been retained by Sensio to handle

13     some of their matters.

14         Q    Is that litigation matters, or is that like

15     front end stuff like you mentioned?

16         A    So I've been retained several times for front

17     end pressure cooker work.  But since those were under

18     Exponent's confidentiality agreement and I was never

19     disclosed by anyone, I have to maintain the

20     confidentiality there.

21              But as far as litigation stuff, Sensio has

22     hired me and then there have been some other like pseudo

23     pressure cookers that aren't really -- I mean, they

24     might top out at like 1 psi at most, and it's more like

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 46

```
 1      a glorified pot.  It has a lid that has a special

 2      release valve on it as opposed to a pressure cooker.

 3          Q    That's a Sensio product?

 4          A    That's not a Sensio product and I cannot

 5      remember who that manufacturer was.

 6               And I've had a couple of cases here and there

 7      with some insurers for different pressure cookers, but

 8      it's just kind of been --

 9          Q    Do you remember the brands?

10          MR. HUBERT:  For the insurers?  I just want to be

11      mindful of the confidentiality statement.

12          THE WITNESS:  Yes, so for the -- I want to say

13      probably two or three have been insurance claims that an

14      insurance company hired me to go look at and then it

15      hasn't gone any further, at least on my end.  So like

16      there are no reports or no nothing.  So I don't actually

17      know if I'm allowed to say those names.  And, honestly,

18      I don't remember them, anyway.  But it's been one or two

19      short cases.

20          MR. SENN:  Q   What did you do just generally, and I

21      don't need each specific case, but like when that came

22      up, the insurance company hired you to go look at the

23      cooker, what did you do?

24          A    Well, just basically go look at it or look at
```

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 47

1     pictures.  And sometimes for an insurer they just want

2     to get a flavor if they should -- you know, they're not

3     necessarily savvy to what a pressure cooker does or how

4     it works.  And so sometimes I'll just get them up to

5     speed and then they'll just be like, well, that's good,

6     that's all we need.

7          Q   Was that in the context of like an explosion or

8     a separation or was that in some other context?

9          A   It was just -- my recollection is that I didn't

10    have that information yet.  It was just someone was

11    injured or they alleged that there was a defect.

12         Q   I got you.  So the work you were talking about

13    earlier that's protected by Exponent's nondisclosure,

14    that was front end work or that was expert witness work?

15         A   That was front end work.

16         Q   Okay.

17         A   So that was someone says -- comes to me, says we

18    want to sell this thing, would you look at it, tell us

19    what you think of it.

20         Q   Okay.

21         A   And I did that several times for different

22    clients.

23         MR. SENN:  Let's go off the record just a second.

24             (a brief recess was taken from 10:16 a.m. to

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                          Page 48

 1              10:21 a.m.)

 2        MR. SENN:  Q   Dr. Giachetti, right before we took

 3     the break I was asking you about some of your other

 4     consulting.

 5              You mentioned that with Exponent you had some

 6     consulting on what we've been calling the front end,

 7     which is, I guess, the design, implementation type

 8     stuff.  You said some of that is protected by

 9     nondisclosure.

10              I just want to make sure, none of that work was

11     for Tristar, is that right?

12        A    That's right.

13        Q    Okay.  So as far as Tristar goes, have you only

14     been involved as an expert witness in litigation?

15        A    I think that's generally true.  I did author a

16     scientific paper which I reached out to them for to see

17     if they wanted to help subsidize the work for that, and

18     they did provide some money for the work that I did as

19     part of that paper.

20              So that would, I think, constitute

21     nonlitigation work but that's a small piece.

22        Q    Would that be the only type of nonlitigation

23     work that you did for them?

24        A    Yes.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 49

1        Q    Are you referencing the article that you

2    provided in your file?

3        A    That's right.

4        Q    Would you contact them about funding -- or let

5    me ask this a different way.  When you contacted them

6    about funding, had you already been doing some

7    litigation work for them, for Tristar?

8        A    Yes.

9        Q    Okay.  And this is the article titled,

10   Characterization of the release of heated and

11   pressurized water from a pressure cooker?

12       A    That's right.

13       Q    Okay.  How much funding did Tristar give you for

14   that?

15       A    10K.

16       Q    That was to fund the experiments?

17       A    That provided about -- that provided about 5

18   percent of the hours that went into writing this paper

19   and setting it up.

20            Well, actually, they had no input on the

21   contents of the paper or the setup or anything.  But

22   that basically got us the materials and the manpower

23   because we built a little room and we had to buy a

24   mannequin and we had to buy some pressure cookers and

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 50

1        some support surfaces for it.

2                So, basically, that went to those things, and

3        then all of the manpower was all paid for by Exponent.

4            Q    Did Tristar pay you any money as income for this

5        study or this article?

6            A    No, that was billed by Exponent.

7            Q    Okay.  Was Tristar's involvement simply here is

8        a check, end of story, or did they have more

9        involvement?

10           A    No, that was it.

11           Q    Why would Tristar be interested in funding a

12       study and an article like this?

13           MR. HUBERT:  Objection.

14                You can answer, if you can.

15           THE WITNESS:  I don't know what their interest was.

16       But I was interested in exploring these topics from a

17       perspective that wasn't based in litigation, and then I

18       proposed to them or I told them what I'd like to do.

19       And I said if you would like to subsidize this, we'd

20       appreciate it.  If not, we're going to do it anyway, so.

21           MR. SENN:  Q    Okay.  What did -- you said it was

22       from a nonlitigation perspective.  What were you curious

23       about?  What made you want to do this study?

24           A    So I think there were a number of questions

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 51

1    about how could people react, how quickly could they

2    react.  And there were questions about, you know, how do

3    contents really come out of these things.

4         And if you look in the scientific literature,

5    there is nothing out there.  There is a lot of

6    literature for people being treated for burns.  There is

7    a lot of literature for people who have like ocular

8    injuries from a pressure cooker itself exploding, not

9    the contents coming out of it.

10        And there is nothing that went across all of

11   the different types of scientific fields where you could

12   talk about reactions and how do people get burned, what

13   are the dosages that are required to get burned and then

14   how does all of that relate to pressure cookers.

15        And so a lot of that information was out there.

16   There is a lot of work in perception/reaction time,

17   there is a lot of work in startle reflex, but those

18   aren't put together for consumer products.  So this was

19   for me general research into consumer products that

20   could be useful for people.

21        And then the pressure cooker aspect on the side

22   was something that no one had done from a thermal

23   perspective with cameras and high-speed cameras and

24   things like that.

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                      Page 52

1        Q    Okay.  So would it be fair -- I read this

2    article, and there is some technical stuff in it, but is

3    it accurate to say this is a study on how the contents

4    of the pot after they come out are making contact with

5    people's bodies, is that what this is about?

6        A    That's certainly an aspect of it, yes.

7        Q    Okay.  What are the other aspects of it?  Kind

8    of, if you had to summarize your conclusions, what you

9    were looking for in your conclusions, what would you

10   tell me?

11       A    So one aspect of the paper is how do contents go

12   from inside the pot to the person and what are the

13   characteristics of that, that's the first part.

14            The second part is how does the fill level in

15   the pressure cooker, how does that affect how those

16   contents come out, so that's the second part.

17            The third part would be what does it take for

18   someone to get burned and how do their clothes influence

19   that from water.

20            And then the fourth part is how fast does this

21   happen and once the contents begin to come out is it

22   possible for someone to change what they're doing before

23   the contents touch them.

24       Q    Okay.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 53

1      A    I think those are the four main points of it.  I

2    didn't read it before I came here but that's my

3    recollection.

4      Q    That's fine.  Why did you think Tristar would be

5    interested in funding this project?

6      MR. HUBERT:  Objection.

7      THE WITNESS:  Because they sell pressure cookers.

8      MR. SENN:  Q   Okay.  Did you think they would be

9    interested in it from the standpoint of having

10   information to defend lawsuits?

11     MR. HUBERT:  Objection.

12         You can answer.

13     THE WITNESS:  Well, I think having scientific

14   information in a peer-reviewed journal is helpful for

15   anyone who is involved in one of these incidents or is

16   selling consumer products that have the ability to heat

17   something up.

18     MR. SENN:  Q   Okay.  And you wrote this along with

19   someone with the last name, I'll butcher this, too,

20   Hardyniec.

21     A    That's pretty close, Hardyniec.

22     Q    Hardyniec, okay.  Who is he or she?

23     A    He is an engineer who was working at Exponent at

24   the same time that I was there, and I said I can't do

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 54

1       this by myself, do you want to help?  And he said yes.

2            Q    And I'm just looking at your conclusions.  It

3       looks like you found that both pressure and volume play

4       a role in the features of water dispersion after

5       opening.

6                 Does that sound familiar?

7            A    That sounds right.

8            Q    Conditions, I think you kind of mentioned this,

9       conditions with higher fill volumes under higher

10      pressure resulted in more contents being ejected from

11      the cooker.

12                Does that sound right?

13           A    I think so.

14           Q    It looks like you found that the speed of the

15      lid and the components were too fast for human reaction

16      time, is that right?

17           A    That's right.

18           Q    Okay.  And that volumes of liquid inside the pot

19      do affect the ejection of the liquids, is that correct?

20           A    Right.

21           Q    Okay.  So would this be accurate to say this is

22      looking at how contents of the pot, how they move after

23      the -- what would you call that, explosion, rapid

24      boiling event, separation, what would you --

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 55

1      A    Yes, so everything that gets ejected is from the

2      boiling action of the water.  It's not that the pressure

3      pops it out.  The pressure causes the lid to leave, but

4      everything that comes out of the pot after that is due

5      to the boiling of the fluid inside.

6      Q    It's the flash boiling from the pressure drop,

7      right?

8      A    Right.  So, then, basically instead of getting a

9      bunch of little bubbles, you get like a giant bubble

10     that forms.  And I think that air increases in size by

11     like 20 times in volume.  So that's basically this

12     bubble forms that pushes everything out.

13     Q    Okay.  So you're not looking at the actual

14     explosion or rapid boiling event in this study, you're

15     just looking at how those particles move after that

16     explosion?

17     A    Well, I don't know that that's true because we

18     did find some things that we weren't expecting

19     leading -- before we did it because we used -- we had

20     like three or four cameras in there.  We had a

21     high-speed camera, we had a regular camera, and we had a

22     thermal camera.

23          I think going into it there was an expectation

24     that the water and everything would kind of come out at

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 56

1    once.  And what we did find, though, is that there are

2    circumstances where the lid departs and then a couple of

3    ticks later then the boiling happens, which was not

4    necessarily intuitive until you thought about it a bit

5    because the steam, basically, acts like a spring that

6    pops the lid off, and then everything else comes out

7    after it.

8         And depending on how much of the headspace is

9    in that pressure cooker changes the spring qualities and

10   the timing changes.

11        But the one thing that did come out of it that

12   we didn't expect is that a high-speed release with a

13   spray is actually less of a hazard for burns than a boil

14   over like you would have on the stove because when stuff

15   sprays out at you, its surface area increases

16   dramatically.  So a little droplet has a lot of surface

17   area in comparison to like a pool.

18        So if a hot pool of water goes on you, it's

19   much hotter and it stays in your clothing in one spot

20   longer and you get a higher dosage of heat, which is

21   more likely to cause a burn.

22        But if you get a spray, the speed and the

23   surface area combine to reduce the temperature

24   substantially in comparison to like the slug of water

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 57

1      that comes out.  And we were not -- no one saw that

2      coming in advance.

3             So there were some things that came out that

4      were, you know, I think, actually, you know, were

5      counterintuitive.

6        Q    With a boil over, that's not something that --

7      You're saying that's what would happen on an uncovered

8      pot on the stove as opposed to a spray from the lid

9      separation on a pressure cooker?

10       A    So that can also happen on a pressure cooker

11     depending on the fill level and the pressure at which

12     you open it.

13            Now, the one thing that this study didn't

14     replicate that you might have in a home situation is

15     that we basically screwed the pressure cooker down to

16     the surface it was on.  So that pressure cooker could

17     not wobble or move.

18       Q    Okay.

19       A    And, now, if someone is exerting all of their

20     effort and it suddenly gives way on it, then you would

21     expect that pressure cooker could tilt or --

22       Q    It could change the trajectory of the

23     components?

24       A    So that could change and then that could also

Robert S. Giachetti , Ph.D.                        January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 58

1    make contents come out that aren't being forcibly

2    ejected by a boiling event.

3        Q   Because of the motion of the base?

4        A   Right.

5        Q   Okay.

6        A   But, also, if you have a full pot and low

7    pressure, it can just bubble and then kind of overflow

8    over the side.  And I believe we called that a surge in

9    that paper.

10       Q   Okay.

11       A   So we did see that also happen.

12       Q   We'll get into this a little bit more, but just

13   while we're on this when you're mentioning boil overs

14   and sprays, the liquid that comes out of a pressure

15   cooker is hotter than a liquid that comes over from a

16   boil over from a stove, right?

17       A   I don't believe so.

18       Q   You don't believe so?  Why is that?

19       A   Because it's not at an elevated pressure.  So

20   once the pressure drops and it's boiling, that liquid is

21   now back at ambient --

22       Q   Immediately?

23       A   Well, that's what causes it to boil.  So then as

24   it's boiling, that's where that energy goes.  But once

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 59

1      it comes out, it's down at 212 or below under normal

2      atmospheric conditions.

3          Q    Is it accurate to say that until pressure is

4      released while it's pressurized inside a pressure

5      cooker, that liquid is at higher than atmospheric

6      boiling temperature?

7          A    That's correct.

8          Q    What's that, 212?

9          A    212 is the standard atmospheric --

10         Q    212 degrees?

11         A    Yes.

12         Q    So while that pressure cooker is pressurized,

13     that liquid inside of that pot is higher than 212?

14         A    Yes.

15         Q    But it's not boiling?

16         A    The higher the pressure inside, the higher the

17     temperature of that water.

18         Q    The increased pressure allows the temperature in

19     the water to increase without boiling, is that right?

20         A    Yes.  I think that's true because the steam

21     basically keeps the water particles in liquid.  So it's

22     basically holding them down inside.

23         Q    And then the food can cook at a higher

24     temperature, right?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 60

1      A    That's right.

2      Q    So if the pot is pressurized and you remove that

3    lid while it's still pressurized, you have a rapid

4    depressurization, is that correct?

5      A    That's correct.

6      Q    So for some period of time the liquid inside

7    that pot is going to be hotter than 212, correct?

8      A    Right.  But once that pressure is lower, all

9    that water turns to steam.  And the steam is what I was

10    mentioning before increases in volume by like a factor

11    of 20.  So it's that bubble that gets out.  All of that

12    other liquid in there is 212 or below.

13      Q    So isn't that part of the rapid event is that

14    that liquid that's not at boiling when it depressurized,

15    it immediately converts that liquid to a gas to the

16    steam, is that right?

17      A    Correct, yes.

18      Q    And so the steam is hot.  Can the steam burn

19    you, as well?

20      A    Yes.

21      Q    And then it would make sense to me, but I want

22    to know your opinion just so we're on the same page.

23    For some period of time, it may be milliseconds, the

24    liquid inside that pot, even after it's open, has to be

Robert S. Giachetti , Ph.D.                   January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 61

1      higher than 212, doesn't it?

2          A    Yes.  So like I was saying before, like the

3      steam kind of acts like a spring.  And as it expands out

4      of the pot, then with every bit of expansion, then the

5      pressure on that surface is relieved.

6               So by the time all of that steam comes out,

7      then you're back down to atmospheric.  And then once

8      you've hit that atmospheric pressure, then that bubble

9      expands and shoots everything out.

10         Q    Okay.  How hot is the steam that comes out

11     during a rapid depressurization like that?

12         A    Probably at the temperature that it was when it

13     was inside.

14         Q    Hotter than 212?

15         A    Yes.  So steam can be hotter than 212, but the

16     liquid can't.

17         Q    So the steam and the liquid can cause burns --

18         A    Yes.

19         Q    -- when it comes out of the pressure cooker

20     during a depressurization?

21         A    Correct.

22         Q    Okay.  We kind of started talking about this,

23     and we got off topic a little bit.  Have you ever

24     offered expert witness testimony for any other pressure

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 62

1      cooker companies other than Tristar?

2          A    Not so far.

3          Q    Okay.  Have you ever offered expert witness

4      testimony for a plaintiff on behalf of an injured party

5      in litigation?

6          A    No, but I've been retained and have several

7      plaintiff retentions.

8          Q    Okay.  Currently?

9          A    Currently.

10         Q    Okay.  Are those pressure cooker cases?

11         A    No.

12         Q    What percentage of your business as an expert

13     witness would you say comes from defendants versus

14     plaintiffs?

15         A    It fluctuates year to year, but the majority is

16     defense.

17         Q    Okay.  On a pressure cooker case that you've

18     been asked to look at and either offered testimony on or

19     offered consulting testimony in litigation, have you

20     ever found the pressure cooker to be defective?

21         A    I don't think I have given that opinion.

22         Q    Okay.  In every case you've been asked to work

23     on related to litigation in a pressure cooker case, have

24     you found that it was user error that caused the

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 63

1    injuries?

2        A    I have -- I don't recall if that's been every

3    case, but I certainly look at the injuries in every case

4    before I make that determination.

5        Q    Okay.  Well, if you never found that the

6    pressure cooker was defective and you don't know if

7    you've made the determination that it was user error,

8    what else would your opinion be?

9        A    Yes, I think that there -- well, I mean, there

10   was a case where two people admitted to opening it and

11   there were several cases like that, so I guess that

12   would be misuse.  But you could put that in user error.

13           So probably -- it probably all boils down to

14   user error.  I don't believe I found a pressure cooker

15   to be defective.  And, you know, if someone had hired me

16   for a pressure cooker case and I found that, I would

17   probably tell them that I wouldn't be able to write a

18   report to support them.

19       Q    Why is that?

20       A    Well, I don't think someone would want to spend

21   a bunch of money for me to write a report to tell them

22   that their product is terrible.

23       Q    Okay.

24       A    And, you know, I don't think they would want to

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 64

1    spend that money and then it wouldn't help their case at

2    all.

3        Q    What about if a plaintiff had contacted you with

4    a pressure cooker and you inspected it and found that it

5    was defective, you wouldn't issue an opinion on that

6    case?

7        A    Oh, no, I would.  I would.

8        Q    Okay.

9        A    But if someone hired me to defend them and I

10   said you don't have a defensible position, do you still

11   want me to write a report for you and it's going to cost

12   you 10 to $15,000, I feel like they would tell me, no,

13   thank you.

14       Q    Sure.  You said that you've had a couple of

15   cases where an injured party admitted to opening the

16   pressure cooker.  Do you mean admitted to opening it

17   while it was under pressure?

18       A    Yes.

19       Q    And they knew it was under pressure?

20       A    I think that they ignored that it was under

21   pressure.

22       Q    Okay.  In those cases were they just able to

23   open that by hand?

24       A    With multiple -- with two people.

Robert S. Giachetti , Ph.D.    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 65

1    Q   Do you have any idea why they did that?

2    A   I do not know.

3    Q   Okay.

4    A   I think they thought that it was jammed.  But it

5    was pressurized, so it was actually doing what it was

6    supposed to.

7    Q   Okay.  In this case when were you first retained

8    by Tristar?

9    A   I don't have a recollection of that, but it was

10   either 2022 or 2023.  I don't remember.

11   Q   Okay.  In the files that we asked you to provide

12   that you provided, would all of your e-mails and

13   communication with Tristar and with Goldberg Segalla be

14   in that file?

15   A   I left it up to them if they wanted to produce

16   those things.

17   MR. SENN:  Ted, did you all produce everything or

18   did you have a privilege log?

19   MR. HUBERT:  I produced to you all of the e-mails

20   that weren't privileged.  And in the response to your

21   deposition notice, the document production, I listed

22   four or five e-mails that were privileged.

23   MR. SENN:  Oh, you did list -- you sent a privileged

24   log?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 66

1        MR. HUBERT:  Yes.

2        MR. SENN:  I don't think I saw that.

3        MR. HUBERT:  It's not separate from the responses to

4    your document request for Dr. Giachetti's file.

5        MR. SENN:  Okay.

6        MR. HUBERT:  The response says the e-mails have been

7    produced except for the following that are privileged

8    and explained the nature of the privilege and the date

9    of the e-mail.

10       MR. SENN:  Okay.  That's in an e-mail you sent to

11   me?

12       MR. HUBERT:  It's in the response I provided to you

13   to the document request.

14       MR. SENN:  Okay.  I'll take a look at it.  I don't

15   think I saw that.  I'll take a look at it.

16       Q   So everything that your attorney has not deemed

17   privileged you produced in that file?  Okay.

18           That includes all of your invoices to date, you

19   produced -- I know you produced some, but did you

20   produce all of them to date?

21       A   I'm not sure what's in there, but there hasn't

22   been any billing on this matter since my last report,

23   so, whatever, that was June, so there probably haven't

24   been any bills issued since then.

Robert S. Giachetti , Ph.D.              January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 67

1        Q    The latest invoice I have is August of '23.
2    That would sound right?
3        A    Yes.
4        Q    Just doing quick math looking through this, it
5    looks like approximately you've been paid around $42,000
6    for this case so far, does that sound right?
7        A    I didn't add it up beforehand, but if that's
8    what the Fusion bills say, then that's what Goldberg
9    paid Fusion.
10       MR. SENN:  I'm going to show you what's been marked
11   as Exhibit 2.
12            (Exhibit 2 marked as requested.)
13       MR. SENN:  Q    That's just your invoices.  I don't
14   want you to add them up.  I just want you to identify
15   them and make sure that is copies of your invoices?
16       A    Just flipping through, this looks like copies of
17   Fusion's invoices.
18       Q    Somebody else at Fusion handles that aspect of
19   it, you don't handle that personally, I'm assuming?
20       A    Correct, not usually unless it's very
21   delinquent.
22       Q    You just submit your bills or your hours, and
23   then they generate invoices for it?
24       A    Correct.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 68

1      Q   All right.  Now, we talked about you offering

2   your expert witness services in different cases.  Has

3   your opinion ever been excluded in any cases?

4      A   I believe it's been limited one time.

5      Q   Okay.  Was that in a Tristar case?

6      A   That was.

7      Q   Okay.  What were you limited for or to, do you

8   remember?

9      A   I don't remember what it was.

10     Q   Did that case go to trial?

11     A   No.

12     Q   Other than your consulting business, whether it

13  be -- well, you still do some front end consulting on

14  design and things like that for clients?

15     A   Yes, yes.  If anyone wants to hire me, I prefer

16  that to litigation, to be honest.

17     Q   All right.  Other than the consulting business

18  with Fusion, do you do anything else to generate income?

19     A   Well, I think it would be generous to say that

20  it generates income, but my family has a pasta sauce

21  company that's sold in Chicago, and I'm the

22  vice-president of that company.

23     Q   Okay.  It's a local company here in Chicago?

24     A   That's right.

Robert S. Giachetti , Ph.D.    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 69

1      Q    What's it called?

2      A    Gia Villa.

3      Q    Okay.   Where can I find that?

4      A    Whole Foods and Mariano's.

5      Q    Okay.   That's only in the Chicago area?

6      A    That's right.

7      Q    Is that like a family recipe or something?

8      A    Yes.   My mom learned it from my grandma.   And I

9  asked her for the recipe when I went to college, and she

10  said no.   And she commercialized it instead.

11     Q    So they started that process, and now you're

12  involved in that at a family business level?

13     A    Right.   Yes, I don't actually have a ton of

14  involvement, but I did all of the conversions for the

15  recipes from -- so she did end up giving me the recipe

16  after all because she needed help converting it to the

17  commercial size.

18     Q    I got you.   Okay.   That's interesting.

19          So we talked a little bit about your employment

20  background, but I just want to make sure, you've never

21  worked for a pressure cooker manufacturer or designer,

22  correct?

23     A    Well, outside of those front end things that we

24  mentioned, that's correct.

Robert S. Giachetti , Ph.D.                     January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 70

1        Q    Not for an actual company that --

2        A    Right, it's all been on like a consulting basis.

3        Q    Do you currently have any clients that you're

4    doing consulting work for in the pressure cooker

5    industry?

6        A    Yes.

7        Q    Who is that?

8        A    Sensio I mentioned, so I have -- I believe I've

9    been disclosed on those, so I'm not violating any

10    confidentiality.  So that's -- I think that's as far as

11    I could go with that.

12        Q    Any other pressure cooker companies that you've

13    acted as an expert witness for other than Sensio and

14    Tristar?

15        A    I've been retained by another one, but that has

16    not gone anywhere yet so it's still -- so I haven't been

17    disclosed or anything so I can't talk about it.

18        Q    You have a confidentiality agreement for that?

19        A    Yes.

20        Q    With a law firm?

21        A    Right.  So once I'm disclosed, then I can talk

22    about it.

23        Q    Okay.

24        MR. SENN:  Let's go off for just a second.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 71

1          (discussion had off the record)

2      MR. SENN:  Dr. Giachetti, right before we went off

3   we were talking about some other work you might have

4   been recently retained on involving a pressure cooker.

5          I understand you have concerns that that might

6   be protected by some kind of confidentiality order.

7          So, Ted, as we discussed off the record, for

8   purposes of today and just moving through this, we'll

9   just reserve our right to discover that to the extent it

10  is discoverable if we determine we need it later if

11  that's agreeable to you?

12     MR. HUBERT:  Sounds good.

13     MR. SENN:  Q   All right.  Move on a little bit,

14  then.

15          Other than Sensio, are you currently providing

16  any what we've been calling front end consulting for any

17  pressure cooker companies?

18     A   Oh, so I have not done front end work for

19  Sensio.

20     Q   Oh, you haven't?

21     A   No.  That's litigation related.  And I've been

22  disclosed.

23          So if I'm doing front end work for a company

24  that's not -- and they don't have any litigation, that

Robert S. Giachetti , Ph.D.                            January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 72

1     would all be under, you know, Fusion's and there is --

2     like I'm working on some front end work for a company,

3     and like before they will even touch me, there is an NDA

4     in place.  So if it's not litigation, that stuff is all

5     like blocked off.

6         Q    Okay.  Well, without asking what the names of

7     these companies are, are you currently providing any

8     what we've been calling front end consulting for any

9     pressure cooker companies?

10        A    Not at the moment.

11        Q    When was the last time you did that?  And just

12    to clarify for the record, like front end, to me that

13    encompasses everything up to litigation and not even

14    being -- not just being identified during litigation but

15    approached with, hey, we got litigation pending.  I

16    mean, it encompasses everything like giving input or

17    consulting advice on design, manufacturing, anything

18    involving a pressure cooker.

19        A    Right, so that's what they would be hiring me

20    for.  They would be hiring me for design, safety, things

21    like that, usability, warnings.

22        Q    So when was the last time you provided that kind

23    of consulting work for a pressure cooker company?

24        A    2018 or 2019.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

                                                              Page 73

1        Q    And none of that has ever been for Tristar, is

2    that correct?

3        A    That's right.

4        Q    Those are the companies, though, that you can't

5    tell us about under the NDA --

6        A    That's right.

7        Q    -- with Fusion -- I'm sorry, with Exponent?

8        A    Correct.  Exponent would make my life

9    unpleasant.

10       Q    Okay.  How many times have you tested or

11   inspected a Tristar pressure cooker?

12       A    I've probably seen ten incident units or

13   something like that, somewhere give or take.  And then I

14   have had a ton of exemplars that I've looked at.  I

15   own -- I have owned a Tristar pressure cooker, and I

16   currently have an Emeril pressure cooker that I believe

17   is also made by Tristar.

18       Q    Okay.  Why did you get rid of the other Tristar

19   pressure cooker?

20       MR. HUBERT:  Objection.

21       THE WITNESS:  Because they used it as a

22   demonstrative in the trial and I never got it back.

23       MR. SENN:  Q   Okay.  All of those ten incident

24   cookers you talked about, did you perform testing and

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 74

1    inspection on those?

2        A    I at least examined them visually.  Not every

3    one was tested.

4        Q    Okay.  And so just to make sure I understand

5    because we've kind of gotten a little vague about it,

6    but as far as expert witness testimony consulting,

7    you've only done that for Tristar and Sensio as far as

8    pressure cookers go?

9        A    Correct.  I mean, I've been -- as far as writing

10   a report and involved in the litigation matter, it's

11   only been those two.

12       Q    Have you been identified as an expert witness

13   for any other pressure cooker litigation other than

14   Tristar and Sensio?

15       A    I wrote a report for another case but they were

16   suing the big box store, so it wasn't really -- I wasn't

17   retained by the pressure cooker manufacturer, so I was

18   retained by the big box store, so I don't know how that

19   fits in.

20       Q    What did that report concern?  Was that a report

21   about the pressure cooker?

22       A    Yes, it was similar.  It was just, basically,

23   how they work is my recollection of that.

24       Q    Do you remember which pressure cooker company

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 75

1    that was?

2        A    I don't.

3        Q    That would be the only three pressure cooker

4    companies, though, that you've been identified as an

5    expert witness for?

6        A    Yes.  And I guess since I gave them my report, I

7    assume that they pass it on to whoever was suing them at

8    the time, but that was it.

9        Q    Okay.  Let's talk a little bit about this case

10   and this pressure cooker.  You did have the opportunity

11   to inspect this pressure cooker, right?

12       A    I did.

13       Q    We did that at Dr. Eshraghi's house in

14   California?

15       A    That's right.

16       Q    Okay.  In your report, your June 28th report,

17   I'll hand that back to you, it's already been marked as

18   an exhibit.  And we talked earlier, there is no opinions

19   in the February report that are not in the June 28th

20   report, is that right?

21       A    I would say both of those reports as containing

22   all of my opinions.

23       Q    Okay.  So you think there are some in the

24   February report that are not in the June --

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 76

1    A    I mean, when I reviewed them for this, I didn't

2    separate the two as far as it.  But I would say if there

3    is an opinion in there, then I would still stand by it.

4    I don't think I negated any of those -- whatever I wrote

5    in there I didn't negate any of that with the June

6    report.

7    Q    Okay.  We may need to let you look at both of

8    them, then.  But as far as the inspection goes, you talk

9    a little bit about the inspection at Dr. Eshraghi's

10   house.

11        We did that back in May of 2023, does that

12   sound right?

13   A    That sounds right.

14   Q    Okay.  And you mention in your report, if you

15   look at page 15, you say, "Due to limitations and

16   equipment available, Dr. Eshraghi and myself were unable

17   to follow the protocol agreed upon."

18        Prior to that inspection, you had been told

19   what kind of equipment Eshraghi had at his house, right?

20   A    Right.  So I went to the local Home Depot to buy

21   a bunch of equipment once I got out there to bring to

22   his house to do the testing.

23   Q    Okay.  And, then, that equipment that you

24   brought you couldn't get to work, is that right?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 77

1          A    Yes.  I'm not sure why the pressure cooker

2     wouldn't pressurize with the air compressor.  I think we

3     tried a bicycle pump, too, that he had kind of rigged up

4     with an inner tube that he cut up to pressurize it.  We

5     couldn't get it to do it.

6               You know, I went to BEAR in Berkeley and it

7     works there and it works in my lab.  So I can't tell you

8     why it didn't work in Dr. Eshraghi's garage.

9          Q    You're not blaming Dr. Eshraghi for any of that,

10    right?

11         A    No, I just don't -- I can't tell you why it

12    didn't work there.

13         Q    I just want to make sure you're not claiming

14    that anyone -- or Dr. Eshraghi or anyone on the

15    plaintiffs' side of this litigation prevented you from

16    doing the test that you wanted to do?

17         A    No.  I was just disappointed that I had to go

18    out early to buy commonly found lab equipment at the

19    Home Depot near his house.

20         Q    Okay.  Now, you said in your test, when you're

21    talking about the test on that same page.

22         MR. HUBERT:  Which page are we on, Marty?

23         MR. SENN:  Q    That's page 15, that same page.

24              You said instead of performing the test that

Page 78

 1    you wanted to perform, you overcame the locking

 2    mechanism by rotating the lid of the pressure cooker to

 3    an intermediate position while it was under pressure

 4    from internal heat.

 5              How does that differ from what you wanted to

 6    do?

 7        A    Well, I wanted to do it on a cold -- on a cold

 8    pressure cooker.  And so what that allows you to do is

 9    you can take the lid completely off and you don't have

10    to worry about a boiling event.

11              So in this case we ended up using a -- I called

12    it a key here, but, basically, you put a stopper in

13    there to keep the lid from rotating all the way to the

14    open position so that you can overcome the lock but not

15    take the lid all the way off.

16        Q    So it doesn't blow off?

17        A    That's right.  And it's easier to regulate.  You

18    can, basically, if you use compressed air, you can just

19    put a regulator on it and set it for 1 psi or you can

20    set it for 2 psi and then do more scientific testing

21    that way.

22        Q    But the way that you guys did it, it still

23    produced the test that you wanted to perform, right?

24        A    The test was acceptable.  It's not the test that

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 79

1    I wanted to do.  But with the absence of being able to

2    do it the way I wanted to do, this is an alternate way

3    that it's not as good, in my opinion, because we weren't

4    measuring the pressure at the time because we were

5    letting it do its own thing.  And we were kind of at

6    its -- bent to its will as opposed to imparting a known

7    pressure.  We just let it heat and build pressure and

8    did it that way.

9         Q    Okay.

10        A    So it's acceptable.  I got results that are

11   usable, and I'm not complaining about those results.

12        Q    Okay.  So you don't have any ultimate issues

13   with the way that you were able to obtain those results,

14   is that correct?

15        A    I would have preferred the other way, like I

16   said, because I find it to be more scientific.  But this

17   gave us results for a low pressure.

18        Q    Okay.  Tell me why you think the other way is

19   more scientific?

20        A    I think the other way is more scientific because

21   you can set the pressure at a specific level using the

22   regulator, and you can basically dial it in.

23             The way we did it -- and so I could say, hey,

24   this is half psi, we open it, dial it up 1 psi, open it.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 80

1    You can basically set those thresholds and do the

2    measurements, have a number of different measurements.

3           The way we did it, we heated the pressure

4    cooker and we followed what Dr. Eshraghi wanted to do,

5    which was once the float valve pops up to unplug it.  So

6    the second the float valve pops up, he unplugged it.

7    And then we did the opening test.

8           So, really, we're not sure what the pressure

9    was.  It was very low, below 1 psi, but we are not sure

10   where.

11       Q   Why does it matter where the pressure was if the

12   float valve was up?  Because the float valve activates

13   the locking mechanism, right?

14       A   So the float valve is the piece that interferes

15   with the ability of the locking mechanism to move.  And

16   the greater the pressure in the pressure cooker, the

17   stronger that float valve is at staying put because the

18   pressure is pushing up on it and holding it against the

19   inside surface of the lid.

20          And the more pressure there is pushing that

21   into the surface of the lid, the less it tends to

22   wiggle.

23          So higher pressure means the float valve is a

24   little bit stronger in terms of resisting that movement.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 81

1      But as the pressure increases, as well, the friction

2      between the lid and the base also increases.  I should

3      say the friction capacity.  So that will also make it

4      more difficult to open the lid as the pressure

5      increases.

6          Q    And you're talking about the friction on the

7      locking tab, is that right?

8          A    No.  So there are a number of tabs around it,

9      and I've called the one that the pin rides over the

10     locking tab.  But there is -- the lid has its own tabs

11     that go underneath that.  And so there is friction

12     between those two materials.

13         Q    Okay.

14         A    That increases with the amount that you smoosh

15     them together.

16         Q    But that doesn't increase the tension on the --

17     or the friction on the float valve, right?

18         A    That's right.

19         Q    Okay.  So the float valve is either up or it's

20     not, correct?

21         A    Right.  It usually raises or falls in like less

22     than a second.

23         Q    So that's what I'm trying to figure out why it

24     matters what the pressure is.  If the float valve is up,

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 82

1       it's up, right?

2           A    That's right.

3           Q    And the locking mechanism should be activated,

4       right?

5           A    I think -- I don't subscribe to the word

6       activated because the float valve being up is the

7       interference that doesn't allow the parts to move, so I

8       don't know if activate is the right word, but I think,

9       actually, it's probably fine.

10               But at very low pressures the lock isn't as

11      strong.  And at very low pressures UL testing protocols

12      actually allow the lid to open so long as the water

13      doesn't come out of it.  And I know from the scientific

14      literature that we went over about characterizing it at

15      low pressures we don't have to worry about a flash boil

16      because it's already at low enough pressure.

17          Q    Okay.  So here is what I'm trying to understand.

18      If the float valve is up even under very low pressure,

19      why is the locking mechanism less strong at low

20      pressures?

21          A    Right.  So as I mentioned earlier that the float

22      valve is basically a cylinder inside of a hole.  And

23      when it pops up, it goes into the hole of the slider

24      that it has to go around that's the cam follower.  And

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 83

1    it bumps into the side of the float valve.

2          And if the float valve can tip a little bit,

3    then that allows the slider to move further out which

4    correlates to a reduction in how hard it is to turn the

5    lid.

6          So the less pressure that's pushing that float

7    valve up, so suppose the second that it rises it's like

8    probably a quarter of a psi, there is basically all that

9    pressure is just holding the weight of the float valve,

10   which means it can probably wiggle in there a little

11   bit, which means it's not as strong.

12         Now, once you get up to, say, 1 1/2, 2 psi, now

13   there is a lot more pressure pushing up on that float

14   valve which means it can wiggle less and it has less

15   ability to tilt.

16      Q    Okay.

17      A    Because it's being held much more strongly.

18      Q    Okay.

19      A    And so then the lock is more difficult to

20   overcome.

21      Q    So does that mean, then, as the pressure

22   decreases in the pot, the mechanical locking mechanism

23   becomes weaker?

24      A    Yes.  So, generally, once you're around 1 psi or

Page 84

1    below, then most of that pressure is into holding the

2    float valve up as opposed to like making it strong and

3    rigid.  And you'll still have interference, it just

4    won't be as substantial as it is at higher pressures.

5            Plus, the frictional resistance to turning that

6    you find in the lid is decreased because the clamping

7    that's pinching those pieces together is decreasing, as

8    well.

9        Q    Now, with that you're talking about a different

10   locking mechanism, right?  There is two locking

11   mechanisms on the pot, is that correct?

12       A    On this one I think there is just one.

13       Q    Which one is that?

14       A    So that's the cam and cam follower.

15       Q    That's what we've been calling the locking pin?

16       A    Right.  So the locking pin basically rides over

17   the tab.  And in engineering that would be a cam and a

18   cam follower.

19       Q    Have you read Tristar's corporate rep's

20   deposition, Alex Lozano?

21       A    I haven't seen that.

22       Q    Okay.  He says in his deposition that the

23   primary locking mechanism is the friction between the

24   locking tabs.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 85

1            Do you disagree with that?

2       A    Well, that probably provides most of the

3   resistance to turning once you're at 3 psi and higher.

4       Q    So you don't consider that a locking mechanism,

5   then?

6       A    I don't think that that is -- I don't think that

7   that would consider a lock.  I mean, it's basically

8   you're forcing two things together.

9       Q    Okay.

10      A    And that makes it difficult to turn.  But it's

11  not locked.

12      Q    So you would disagree with him that that's the

13  primary locking mechanism on the cooker?

14      A    If that's what he said, then I suppose that we

15  would disagree that that constitutes a lock.

16      Q    Okay.  So your opinion is the only locking

17  mechanism on the pressure cooker is the locking pin that

18  we've just been talking about?

19      A    Right.  But the two of them work together to

20  resist opening by people.

21      Q    Okay.  In your opinion, what's the lowest level

22  of pressure that can be in the pot and still cause

23  expulsion of the material inside the pot?

24      A    Well, it's connected to the fill level, as well.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 86

1    Q    Okay.

2    A    So if you go by the industry standard for

3    stovetop pressure cookers, they specify half filled is

4    the test that should be used.  And at half full you can,

5    I believe, get up to 2 psi and not expect to have

6    anything substantial come out of the pressure cooker.

7    Q    Okay.  At 2 psi would you expect the friction

8    between the locking tabs to hold the lid on?

9    A    Yeah, it's very difficult at 2.

10    Q    When, in your opinion, at what pressure level

11    does it become easy to overcome the friction on the

12    locking tabs, say if the locking pin wasn't there at

13    all?

14    A    At what point that it's easy?  I would say

15    around below half a psi.

16    Q    Okay.  Let us back up a little bit and talk

17    about -- because we talked about a few different

18    components of this pressure cooker, and I think it would

19    be good to go back and talk about the basics of it.

20         And you hit on this in your report if you go to

21    page 4 in that first paragraph.  You say the base

22    contains electronics, a heating element, and metal

23    locking tabs.

24         Now, in the case we're here about today, the

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 87

1    electronics and the heating element are not at issue

2    here, right?

3        A    I don't believe so since they said it was

4    unplugged.

5        Q    Okay.  But now the metal locking tabs on the

6    base, that's part of what we just talked about, right,

7    part of what creates the friction?

8        A    Correct.

9        Q    Okay.

10       A    And there is also other pieces that are touching

11   that are frictional.  So the gasket and the top of the

12   pot are touching the lid, as well, so there is friction

13   there, too.

14       Q    Would you agree, though, that the primary

15   friction is caused by the two locking tabs on the base

16   and the lid, is that correct?

17       A    I think that that's likely.

18       Q    Okay.  Now, the base contains -- so in the base

19   of the pressure cooker that we're here about today, the

20   only thing we're concerned about is or that's involved

21   in our inspection and analysis is the tabs, the locking

22   tabs on the base, correct?

23       A    Can you say that again?

24       Q    As far as the base of the pressure cooker goes,

Robert S. Giachetti , Ph.D.          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 88

1      the only part of that base that we're concerned about or

2      that relates to our issue here today is the locking tabs

3      on the base, is that correct?

4          A    So the single locking tab that the locking pin

5      rides across, that's the focus.

6          Q    Okay.

7          A    So they didn't -- those locking tabs also hold

8      the lid down, which is the pinching force.  So none of

9      those tabs were found to be bent up, meaning that the

10     lid just overcame them and went straight up.  It had to

11     have been turned.  So the only one that I'm concerned

12     with is the one where the pin rides over.

13         Q    Okay.  And I'm just trying to get some -- to

14     kind of narrow this down and get some terms.  So when

15     you say locking tab, there is more than one tab on the

16     base, right?

17         A    Correct.

18         Q    You're referring to the locking tab as one of

19     those tabs that the locking pin rides over --

20         A    Correct.

21         Q    -- when the lid is rotated, correct?

22         A    That's right.

23         Q    Just for purposes of simplifying this a little

24     bit, the portion of the base that we're concerned about

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 89

1    is the tabs and specifically the locking tab, is that

2    right?

3        A    On the base portion that has been my focus.

4        Q    Okay.  And then the lid has corresponding tabs

5    that slide in and interface with the tabs on the pot, is

6    that correct?

7        A    That's right.  They go underneath.

8        Q    And those are the ones that you were talking

9    about creates the friction when it's pressurized to help

10   lock the pot or to help hold the lid in place?

11       A    That's right.  They hold the lid down.

12       Q    Okay.  Is there any other portion of the lid

13   that is at issue here in this case?

14       A    Well, the locking mechanism is inside of the

15   lid.  So there is a slider that that pin is attached to.

16   And the slider moves radially within the lid.  It's got

17   a little spring in it that keeps it positioned inward.

18   And then there is the float valve which is in the lid

19   and the gasket for that and then also the manual relief

20   valve.

21            So I would say those things are part of the

22   investigation as well as, you know, the general geometry

23   of the pressure cooker overall, like how high are the

24   handles and how big are the handles and things like

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 90

1      that.

2            Q    We'll talk about the locking mechanism, the

3      locking pin in just a second.  But as far as like the

4      manual release valve, you found this one to be in

5      working order, is that correct?

6            A    That's right.  It was clear of obstructions and

7      operated the way I expected it to work.

8            Q    As to the float valve, as to its function of

9      moving up and down, did you find that to work as it

10     should, no restrictions on it?

11           A    Right.  That was clear of obstructions, as well.

12           Q    And so just for the record and to help me

13     understand, we just talked about the tabs on the lid and

14     the base how they interface with each other once the lid

15     is rotated into a closed and locked position.  And then

16     you almost have like overlapping, for lack of a better

17     explanation, fingers that are holding this lid down onto

18     the pot, is that right?

19           A    That's right.

20           Q    Overlapping tabs.  What are those tabs made out

21     of?

22           A    So the cover is steel.  I'm not sure what the

23     composition of the base is, but it's metal, as well, and

24     it has a plastic insert under it.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 91

1      Q    Do you know how thick that layer of steel is on
2    the cover of the tab?
3      A    I don't believe I've measured that.
4      Q    Okay.  So in addition to these tabs, then, one
5    of those tabs you're calling the locking tab interfaces
6    with the locking mechanism on the lid, is that correct?
7      A    That's right.
8      Q    And the locking mechanism on that lid is a pin
9    that's connected to a spring?
10     A    Right.
11     Q    That is then connected to, what do you call
12   that, a strike plate?
13     A    Sure.  We can.
14     Q    Okay.  What do you call it?
15     A    I usually call it like a slider or something
16   like that.
17     Q    That's, basically, like a plate with a hole in
18   it that the spring slides back and forth over the hole
19   above the slip float valve, right?
20     A    Pretty much.
21     Q    Okay.  So the plate is connected to a spring
22   that's connected to a pin?
23     A    Yeah, I mean, they're all together.  So the pin
24   has two ends.  There is a big side and then there is a

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 92

1     skinny side.  And the skinny side pops out of the side

2     of the lid.  And between the lid and where the plate

3     comes down where the skinny piece is attached to, there

4     is a little spring that's like the size of one that's

5     like in a pen that you can click open and closed.

6          Q    And, then, so when you put the lid on in the

7     open position and you rotate it, you would rotate it

8     which way, clockwise or counterclockwise?

9          A    Counterclockwise.

10         Q    Counterclockwise to close it?

11         A    Right.

12         Q    And when you rotate it to close it, that pin

13    that we just talked about because of that spring rides

14    up over the locking tab, that is right?

15         A    That's right.

16         Q    And the spring becomes depressed and the pin is

17    sticking out further out of the lid, right?

18         A    That's right.

19         Q    Then once it slides past that locking tab, that

20    spring pulls that pin back in?

21         A    Correct.

22         Q    Which, in turn, slides the plate back into a

23    position where the float valve can come up through the

24    hole in the plate, right?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 93

1        A    Right.  When the lid is fully open, rotated

2    fully open and rotated fully closed, the hole on that

3    plate lines up with the float valve.

4        Q    When it's in the partially closed position,

5    meaning when the pin is out over that locking tab and

6    not behind it, the strike plate or the plate covers the

7    hole that the float valve is in so it can't raise up and

8    seal, is that right?

9        A    That's right.

10       Q    So the purpose of -- is part of the purpose of

11   the locking mechanism that we're talking about here, the

12   locking pin and plate, to prevent the pot from sealing

13   while it's partially open or closed?

14       A    Yes, it also does that.  That's why there is a

15   little hole in the float valve so that that's how

16   pressure can escape.

17       Q    When we took the corporate representative, Alex

18   Lozano's, deposition, he testified that that was the

19   purpose, the primary purpose of that locking pin was to

20   prevent pressurization when it was open and to allow

21   pressurization when it was closed.

22            Do you disagree with that?

23       A    I would say that that is one of its functions.

24   I think it's a design that's used in probably 99 percent

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 94

1    of the pressure cookers out there.  And it does two

2    things.  One, it allows you to lock it when it's

3    pressurized.  And then the other thing is it keeps it

4    from pressurizing if it's not all the way closed.

5        Q    Okay.  So if he testified that he didn't

6    consider the locking pin really a locking mechanism, you

7    would disagree with that?

8        A    So just the pin part that rides over or are we

9    talking about that whole assembly?

10       Q    The whole assembly, the locking mechanism.

11       A    Well, it's called the locking mechanism, so.

12       Q    I agree.  I'm asking you if he testified to

13   that, you would disagree with him?

14       A    If that's what his testimony is.

15       Q    Okay.  So once the pin slides past the locking

16   tab and the spring I guess you would call that

17   extending, right?

18       A    Yes.

19       Q    So the spring extends, the locking pin moves in

20   toward the lid, and it pushes the plate into a position

21   where the float valve can pop up --

22       A    Right.

23       Q    -- through the hole in the plate?

24       A    Right.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 95

1        Q    So once that happens, once it's pressurized and

2    that float valve pops up through the hole in the plate,

3    the idea is that because that locking pin or that float

4    valve is extending through the hole in the plate, the

5    lid now can't be turned, is that right?

6        A    That's the premise of it, yes.

7        Q    Okay.  And that's because the spring is

8    extended, the float valve is through the hole in the

9    plate, so that pin that's behind the locking tab is not

10   supposed to be slid back across, not supposed to be able

11   to be slid back across the locking tab, right?

12       A    I think I follow you.  So the spring basically

13   is so weak that it only has enough springiness to it

14   where it can just slide that mechanism in and out

15   towards the center of the lid.  And its only job is to

16   keep, if there are no other forces in play, to keep the

17   slider and that locking pin as close to the middle of

18   the lid as possible.  And that's all the spring does.

19       Q    Yes.  So it's not supposed to hold the pin

20   against an effort to slide it across the locking

21   mechanism.  The float valve and the hole in the plate

22   does that, right?

23       A    Can you say that again?

24       Q    The spring doesn't work as a force to keep you

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 96

1    from opening the lid, to overcoming the locking tab.

2    What does that is the float valve popping up through the

3    hole in the plate, the strike plate, right?

4        A    Correct, correct.  The spring is so weak you

5    could not sense it.

6        Q    The spring just moves the plate into place so

7    the float valve can pop up through the plate?

8        A    That's right.

9        Q    So just for easier understanding, when we call

10   it float valve, it's really kind of like a cylinder or a

11   piston that pops up through this hole in the plate that

12   then holds the lid in place because the idea is it keeps

13   the pin in a position where it can't ride back across

14   the locking tab, correct?

15       A    I agree that it's like a piston.  It kind of has

16   a piston shape.  It's like a little cylindrical thing,

17   and it goes up and down depending on what the pressure

18   is.

19            But as far as keeping the lid on the pressure

20   cooker, that's more of the role of the tabs itself.  It

21   holds the lid down.  The float valve and that locking

22   mechanism provides resistance to someone trying to open

23   it while it's under pressure.

24       Q    To rotation?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 97

1       A    To rotation, yes.

2       Q    And the way it does that -- that's just what I'm

3    trying to get at.  The way it does that is that that

4    cylinder, that piston popping up through the plate is

5    supposed to keep the pin from riding back over the

6    locking tab because it holds it in an inward position?

7       A    So, yes, we've been calling the pin attached to

8    a slider.  And the role of the float valve is to keep

9    the slider from sliding.

10      Q    Yes.  Which keeps the pin from moving outwards,

11   correct?

12      A    Correct.

13      Q    Okay.  And preventing that outward movement is

14   what is supposed to prevent the rotation across the

15   locking tab?

16      A    Right, because it's like going over a hill,

17   basically.

18      Q    I got you.  I just wanted to make sure we're all

19   good on the components here.

20      A    Yes.

21      Q    Okay.  So if you move to page 7 of your report,

22   you say, "There are four mechanical safety mechanisms,

23   two independent valves in the lid, a valve and a lid

24   locking mechanism in the lid, and there is an

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 98

1    overpressure relief mechanism that allows the inner pot

2    to break the lid should the other safeties fail."

3         That last one, that has to do with if the pot

4    doesn't stop pressurizing, that's the safety mechanism

5    to stop the pressurization, correct?

6    A    The one where the pot separates?

7    Q    Yes.

8    A    So that's if the other thing fails, as well.  So

9    that's like a third -- well, it's actually like the

10   fourth level because first it's got the electronic

11   controls, and then those controls have safeties like

12   thermal fuses.  And then it's got the manual relief

13   valve.  So that's just a weight.  And so if there is too

14   much pressure, that weight will just lift and vent on it

15   its own.  So that's like a passive maximum setting.

16        And if that fails, like if it's clogged and all

17   those other things have failed, then it's got this other

18   thing in it where, basically, the pot and lid will

19   separate to vent out the sides.

20   Q    That's if the temperature control doesn't work

21   like it's supposed to, right?

22   A    A number of like three other things have to fail

23   for it to get there.

24   Q    That's not at issue here, right?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 99

1          A     Not to my knowledge.

2          Q     Okay.  And the two independent valves and the

3      lid you're talking about, one is the mechanical -- I

4      mean, the manual release valve --

5          A     Correct.

6          Q     -- and the float valve?

7          A     That's right.

8          Q     The float valve is what we've been talking about

9      that's part of the issue here?

10         A     Right.

11         Q     At what pressure, I think you testified to this,

12     but at what pressure does the float valve pop up through

13     the strike plate or the plate, whatever we're calling

14     it?

15         A     Yes, usually around a quarter of a psi.  Below

16     half.

17         Q     Would it be necessary for the temperature of the

18     liquid inside the pot at that point to be at least 212

19     so that it's boiling creating steam?

20         A     Yes, so it has to create enough steam that it

21     can't get out of the float valve.  So the float valve

22     has a tiny little hole that's, basically, a restriction.

23     So the float valve will allow some steam to get out.

24     But if steam is being generated rapidly enough, it can't

Robert S. Giachetti , Ph.D.                           January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 100

1    all get out of that hole, and then pressure starts to

2    build and then it will push the float valve upwards.

3        Q   So for it to seal, it requires the temperature

4    of the liquid inside the cooker to be 212?

5        A   Yes.

6        Q   Okay.  If you turn to page 9, we're still kind

7    of just talking about the components of the lid.  In

8    that second paragraph the last sentence says, "At

9    cooking pressures, the substantial clamping force

10   between the lid and the base generated by the internal

11   pressure."

12            Now, here you're talking about the locking

13   tabs, right?

14       A   Right, and the friction between them.

15       Q   Okay.  "Is sufficient to resist inadvertent

16   rotation of the lid through friction alone."

17            By that do you mean even if there was not a

18   locking valve, a locking mechanism, that friction

19   between those locking tabs would be enough to keep a

20   person from opening it?

21       A   Yes.

22       Q   Is there a point in your opinion where the pot

23   is still -- Strike that.  Let me re-ask this.

24            Take out the fact that there is a locking

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 101

1    mechanism, the locking pin, say that didn't exist on

2    this pot.  Is there a point in which there is enough

3    pressure in the pot to expel the liquids but that the

4    tabs could be -- the frictional tabs could be overcome

5    by the normal strength of a person?

6        A    I think if a person were to use it according to

7    the instructions and they didn't have a lock on it,

8    they -- well, they wouldn't do that if they had read the

9    instructions.

10            But suppose they ignored the part about not

11   forcing it open and there was no lock whatsoever on just

12   the friction holding it, someone could probably grab the

13   base handle and use like a straight arm and, basically,

14   your shoulder is a lot stronger than your wrist, so in

15   that aspect they probably could around 2 psi.

16            So in that paper that I published, I removed

17   the float valve.  I cut it so that it never reached the

18   level of the sliding plate.  And I also put Teflon tape

19   between the lid and the base to make it easy.  And even

20   then at 3 psi had to use two hands on a rope to pull the

21   lid open.

22       Q    Okay.

23       A    So it's really tough even taking the lock out.

24       Q    So let's go through your opinions.  If you turn

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 102

1    to page 20 -- I'm sorry, page 21 of your report, you

2    list your opinions.  You've got four separate opinions

3    listed here.

4         Do those four opinions contain all of the

5    opinions you have, the entirety of your opinions in this

6    case?

7         MR. HUBERT:  Subject to having to check the older

8    report.

9         MR. SENN:  We'll do that in a second.

10        Q   Well, you can answer that first.  Subject to us

11   reviewing the February 20th report, the four opinions

12   contained at the end of your June report, do those

13   contain all of the opinions you have in this case?

14        A   Yes, withstanding what's in there.  But I don't

15   remember that these superseded anything in there or

16   negated it, so.

17        Q   Let's just do it this way for ease.  Those four

18   opinions plus the opinions issued in the February 20th

19   report, that contains all of your opinions in this

20   matter, right?

21        A   Correct.

22        Q   Okay.  And a lot of the opinions in the previous

23   report -- or all of them were issued before you had the

24   opportunity to inspect the pot.  So some of those don't

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 103

1    have anything to do with the pot.  It's just opinions

2    about Dr. Eshraghi's report.

3         Do you have any recollection of that?

4    A    I remember his initial report was pretty thin on

5    work that he had done on the matter.  And so my

6    preliminary report was just based on what materials I

7    had at the time, which wasn't very much, and my

8    experience with this model of pressure cooker.

9    Q    Okay.  So let's go through your opinions and

10   then we'll kind of explore them individually.

11        Your first opinion says that, "When I recreated

12   the Copeland recipe and cooldown protocol per

13   Mrs. Copeland's testimony and the admissions, no

14   contents were ejected from the exemplar pressure cooker

15   when I opened it.  The exemplar was unplugged upon

16   completion of the cycle and completely depressurized 45

17   minutes later."

18        In that opinion -- I guess I'm looking for some

19   clarity on that opinion.  Are you just opining that

20   given the timeframe that Mrs. Copeland laid out in her

21   testimony that the pot would have been depressurized?

22   A    That's right.

23   Q    Okay.

24   A    That's right.  And that's consistent with their

Robert S. Giachetti , Ph.D.                                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 104

1    narrative that they had let it sit and that the float

2    valve was down when they opened it.

3        Q    Okay.  If she was mistaken or off on some of her

4    times, that could affect that opinion, right?

5        A    Yes.  I'm limited by the narrative that she

6    provided.  I was just using -- I was just going by

7    exactly what she had said.

8        Q    Okay.  Do you think there was not a -- and we

9    can define what we want to call it, an explosion, a lid

10   separation, do you think that didn't happen in this

11   case?

12       A    Well, I think given their injuries that it's

13   likely that the fluid did come out of it.  I mean, you

14   can see their injuries.  It's on two people.  I think

15   what she testified to in their admissions say the

16   opposite.

17            So if we just read her narrative and the

18   admissions were the float valve was down, they let it

19   sit plenty long to cool down and depressurize on its

20   own, they also opened the manual release valve, they saw

21   the float valve was down and then they opened it.

22            So if you take their narrative without anything

23   else up until the moment that they opened it, that is a

24   depressurized pressure cooker completely.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 105

1        Q    Okay.

2        A    If you look at their injuries, it's likely that

3    there was some pressure in the pressure cooker.  And if

4    you look further at their injuries, then it seems to me

5    like it's likely that they were also working together to

6    open it.

7        Q    Okay.  Now, that's not in your report, is it,

8    that you think they were working together to open it?

9        A    Right.

10       Q    That is in your report?

11       A    That's not in my report.

12       Q    It's not.  Okay.  Why didn't you put that in

13   your report?

14       A    It didn't seem like something that needed to go

15   in there.  I mean, I've got these four opinions, which I

16   think are solid enough.

17            But if you look at the injuries from

18   Mrs. Copeland, I think the question is how does someone

19   only burn their fingertips if they're exposed to this

20   sort of thing.  And the only thing I can come up with is

21   that her hands were on the lid at that time.

22       Q    So you think she only had burns to her

23   fingertips?

24       A    No.  She was burned in multiple areas.  But she

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 106

1    had burns not on her hands but on her fingertips on both

2    hands.

3              And so I don't know how someone is standing

4    adjacent to the pressure cooker and that contents come

5    out of it and contact her in her chest and other areas

6    but manage on both hands to only hit the tips of her

7    fingers.

8              Like that doesn't correlate with anything I

9    know or have performed experiments with with contents

10   coming out of a pressure cooker.  So that didn't line

11   up.  And the only thing I can think of is that her hands

12   would have been on top of the lid with the fingertips

13   near the edge of it where contents could contact it when

14   they came out.

15       Q    Okay.  You can't think of any other way she

16   would have burned her fingertips?

17       A    That's the only plausible thing that I could

18   come up with.

19       Q    Okay.  But there is no evidence of that, is that

20   correct?

21       A    Just the burns on her fingertips.

22       Q    Okay.  That would be contrary to her testimony,

23   is that right?

24       A    As well as a pressurized release, yes.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 107

1     Q    Okay.  When you say as well as a pressurized

2     release, what methodology are you using to come up with

3     that opinion?

4     A    Well, I was responding to you saying that would

5     be contrary to her testimony.

6           So if we follow her testimony, which is what

7     I've been calling her narrative, that pressure cooker

8     has no pressure in it when it's opened.

9     Q    Okay.  Is your opinion that it had pressure in

10    it when it was opened?

11    A    I think that it's likely that it did.

12    Q    Do you have an explanation of how they would

13    have suffered these injuries if it didn't have pressure

14    in it?

15    A    I think that it would be difficult for a spill

16    to account for the different injuries that they have.

17    Q    Okay.  So just so we're clear, your opinion here

18    today is that the pressure cooker was pressurized when

19    it was opened, is that right?

20    A    So that's opinion No. 4 in my report.

21    Q    Okay.

22    A    Which is the burns observed are consistent with

23    forcing the pressure cooker lid open while there is

24    pressure inside.

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 108

1      Q    Okay.  So isn't that contradictory to opinion 1?

2      A    Well, opinion 1 is their narrative.  So if I

3   follow the narrative of what they've done exactly, then

4   there is no pressure in it.

5      Q    Okay.  But you've done an analysis, an

6   investigation into this, so you have an opinion.

7           So is your opinion that it was pressurized or

8   that it wasn't?

9      MR. HUBERT:  Objection, he's identified -- he has

10  four opinions, not one opinion.

11     MR. SENN:  I didn't say he had one opinion.

12     Q    I said you've done an analysis and inspection on

13  this case.  So is it your opinion that it was

14  pressurized or not pressurized?

15     MR. HUBERT:  I'm objecting based upon the fact that

16  you're trying to limit him to one specific scenario when

17  he has opinions regarding multiple scenarios.

18     MR. SENN:  Q   I'm not trying to limit you to any

19  scenario.  I'm saying you've looked at this pot, you've

20  inspected, you looked at the evidence, you performed

21  your analysis on it.  Do you have an opinion about

22  whether it was under pressure or not under pressure?

23     A    Yes, so the difficult thing in this case is if

24  you read the testimony and the admissions and you follow

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 109

1      that recipe, that all aligns with a depressurized

2      pressure cooker.

3              If you look at the burns on Mr. or

4      Mrs. Copeland, then that more aligns with a pressure

5      cooker that had pressure in it when it was opened.  So

6      those are essentially my two opinions.

7          Q    Okay.  But you've been asked to look at this

8      event and form opinions.  So I'm asking you just simply,

9      do you have an opinion about whether the pressure cooker

10     was pressurized or not when it was opened?

11         A    Right.  And I said that that's opinion No. 4,

12     which is their burns are consistent with a pressurized

13     pressure cooker.

14         Q    Okay.  So what I'm trying to understand is,

15     then, how do you have opinion 1 that the exemplar was

16     not pressurized?  I'm sorry, not the exemplar.  The

17     incident pot.

18         A    So what I'm saying is that if I follow their

19     narrative, then it's not pressurized.

20         Q    Okay.  And I'm not trying to trip you up.  I

21     just want to make sure I'm clear.

22              Just to be clear, your opinion is that it was

23     pressurized when it was opened, is that correct?

24         A    That would be consistent with their injuries.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 110

1      Q    Okay.  So is that your opinion?

2      A    Well, that is opinion No. 4.

3      Q    Okay.  You are not opining today that the

4    pressure cooker was not under pressure when it was

5    opened, is that right?

6      A    Correct.  I believe that that is what their

7    narrative tells us.

8      Q    Okay.

9      A    But the injuries show that it was pressurized.

10     Q    So would it be an accurate to statement to say

11   your opinion No. 1 is that your opinion is what her

12   narrative tells me would indicate a depressurized pot

13   when it was opened?

14     A    That's right.

15     Q    But your opinion No. 4 is that your opinion

16   based on your analysis is that it was pressurized?

17     A    Based on their injuries, yes.

18     Q    All right.  So if we move to opinion No. 2, it

19   says, "The narrative of the usage of the pressure cooker

20   on the day of the accident is consistent with a

21   completely vented and depressurized unit."

22          Again, is that accurate to say that you're

23   opining here that her narrative would indicate a vented

24   and depressurized unit?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 111

1          A    Correct, yes, depressurized, yes.

2          Q    And you are stating that -- I'm sorry,

3     depressurized.

4               You're stating that, "The uncleaned float valve

5     and manual release valve were both found to be free of

6     clogs," meaning there was nothing to prevent them from

7     working as they should, is that right?

8          A    That's right.

9          Q    "The narrative of the usage of the pressure

10    cooking is inconsistent with a pressurized expulsion of

11    contents."

12              Is that fair to say that kind of tracks with

13    No. 1?

14         A    Yes.

15         Q    Okay.  And then, "Testing of the exemplar and

16    the incident unit are inconsistent with the narrative

17    presented."

18              Are you just saying here that when you tested

19    an exemplar pot and followed her protocol based on her

20    testimony that the pot was depressurized before you

21    opened it?

22         A    I think there is more in there.

23         Q    Okay.

24         A    So looking at the incident unit, we can see the

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 112

1      scoring where the locking pin caused damage to the

2      locking tab.  So we have that.

3           That's inconsistent with a depressurized unit,

4      usage of a depressurized unit as well as the witness

5      marks on the float valve from getting contacted by the

6      slider or the locking -- the strike plate.  I forgot

7      what we were calling it.  And then the recipe that I

8      cooked and also the opening test that I performed on my

9      exemplar.  So all of those things are rolled up into

10     that last bullet.

11          Q    Okay.  So you kind of referenced and brought us

12     into your third opinion, "There is no evidence that the

13     pressure cooker is defective or that the condition of

14     the pressure cooker as sold was unreasonably dangerous."

15          And you've got several bullets under here.  But

16     let's talk about those a little bit.  The first one

17     says, "The pressure cooker shows signs that it had been

18     forcibly opened at least one time and that attempts had

19     been exerted to open it while under pressure in several

20     instances."

21          That first time that it had been forcibly

22     opened at least one time, do you know whether that was

23     the time at issue here or sometime before that?

24          A    I don't know.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 113

1      Q    Is there a way to know that?

2      A    I only saw one score which the locking pin made

3    on there.

4           Now, sometimes, depending on how people might

5    misuse it, the pin might not be in the same place on the

6    locking tab, in which case you could see two scores or

7    three scores or you might see a big swath of material

8    removed.  So in those it's more obvious that there were

9    multiple attempts.

10          But in this one there is just a single score on

11   that locking tab.  And so in that case I don't know if

12   that's happened a bunch of times and it just happened to

13   line up every time or if this was just the once.  So I

14   wouldn't be able to tell.

15     Q    Okay.  And just for ease of explanation, the

16   score that you're talking about, that's the scratch

17   that's on the locking tab that the locking pin rides

18   against, is that right?

19     A    You can call that a scratch, yes.

20     Q    Okay.  Is that what's represented in the top

21   figure of figure 7 on page 16?

22     A    Yes.

23     Q    And you got the arrows pointing to the score or

24   the scratch?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 114

1        A    That's right.

2        Q    Okay.  How were you able to tell from that that

3    it was completely opened?

4        A    So you can see where the contact initiated on

5    the right side of this image.

6             So when the pressure cooker is closed, the

7    locking pin is sitting on the right side of the picture.

8        Q    Okay.

9        A    And then as you try to open it, the locking pin

10   will ride along this tab from right to left in the

11   picture.

12       Q    Okay.

13       A    And so you can see it starts low and then it

14   gets high.  As you get to the left-hand side, you can

15   see the scoring curl around to the top, which tells me

16   that the locking pin is now above the locking tab, which

17   means that the lid is off.

18       Q    All right.  And so other than that scratch or

19   score, you don't see or didn't see any other scores on

20   the locking tab?

21       A    Right.  There was a little bit at the very edge.

22   You can see on the middle row there is an arrow, there

23   is a second arrow.  But, you know, I wasn't able to make

24   anything out of that conclusively.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 115

1           But that is the only -- that is the only score

2      that I could see that would have resulted from the pin

3      riding over that tab.

4           Q    Okay.  And, now, the images underneath that,

5      that's images of the float valve, right?

6           A    Correct.

7           Q    That's on the underside of the lid?

8           A    The float valve kind of rides inside the lid.

9           Q    Oh, I mean, but this picture we're looking at is

10     the underside of the lid, right?

11          A    Oh, no, this is just sitting on a table.  I

12     pulled the float valve out, and this is sitting on the

13     table in Dr. Eshraghi's garage.

14          Q    Yes.  But what I'm asking is to have this float

15     valve pulled out like this, we're looking at the

16     underside of the lid, right?  This is the float valve as

17     it would look when it's dropped, not when it's pushed up

18     to pressurize, is that correct?

19          A    No, I don't think you can say that.

20          So this is totally removed out of the pressure

21     cooker, so it doesn't have any relationship with the lid

22     or how it would look.

23          The part that interfaces with the bottom of the

24     lid is a gasket that wraps around that channel that's at

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 116

1    the bottom.

2        Q    The indention?

3        A    Yes, on the left-hand side of it.

4        Q    So what I'm asking is, this is what the float

5    valve would look like, obviously, the gasket isn't

6    there, but this is what a float valve would look like in

7    a dropped position.  It would be -- I guess the right

8    word would be protruding out of the bottom of the lid,

9    right?

10       A    So all you could see if you just pulled the lid

11   off and you looked at the float valve in it, you would

12   see from a little bit -- see the hole in the side?

13       Q    Uh-huh.

14       A    And then there is like a scratch around it.

15       Q    Uh-huh.

16       A    You would basically see from that scratch to the

17   left if you picked up the lid and looked underneath it.

18   I think I have another picture in here.

19       Q    I think I'm following you.

20            So that part of the float valve is what moves

21   up and down to seal the --

22       A    The whole thing moves up and down.  So if you

23   look at page 7.

24       Q    Okay.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 117

1      A   So there is a picture at the top.

2      Q   Yes.

3      A   You see that there is a float valve, one it

4   shows someone with like long fingernails pulling it up.

5   And then on the inset picture there, that's exactly what

6   you would see if the float valve were down.  So a lot of

7   that float valve is actually inside of the lid that you

8   don't see unless you remove that gasket and take it

9   fully out.

10     Q   Okay.  So back to the image we were just on on

11  page 16, those bottom pictures, the part that's to the

12  right of the hole where it looks like it gets a little

13  bit wider, that portion of the float valve is inside the

14  lid?

15     A   Correct.  So that part where it gets bigger is

16  actually what keeps the float valve from going all the

17  way down and falling through.

18     Q   Okay.  So the float valve, the left portion of

19  that picture rides inside of the right portion of that

20  picture, is that right, when it floats?

21     A   No.  This whole thing is in a hole in the lid.

22     Q   So this whole thing would go up?

23     A   This whole piece goes up and down.

24     Q   And then that part is what keeps it, the part on

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 118

1    the right is what keeps it from falling back through the

2    lid?

3        A   Correct.  And the gasket keeps it from going all

4    the way through the top end.

5        Q   So you've got some arrows marking some scratches

6    here.  Is that what you're referring to as evidence of

7    prior attempts to open it while the float valve is up?

8        A   That's right.

9        Q   Okay.  Because your opinion is that's making

10   contact with the strike plate?

11       A   That's right.

12       Q   Okay.  What about that scratch mark right below

13   or right to the right of the hole?

14       A   So that's from this thing getting tilted -- I

15   guess it would be a bending action.  And that's from

16   contacting the edge of that hole that it's riding in.

17   So that means it's getting -- something is pushing on it

18   and basically jamming it sideways into that hole in the

19   lid.

20       Q   You don't find that to be an example of a prior

21   opening attempt?

22       A   It would be.  And I don't know, I didn't put an

23   arrow on that.

24       Q   Okay.  How do you know that something else

Robert S. Giachetti , Ph.D.                      January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 119

1     didn't contact that float valve and cause those

2     scratches?

3         A    Well, there is nothing else in the pressure

4     cooker that has the opportunity to do -- to make that

5     sort of a mark.

6         Q    Okay.  How do you know that it wasn't an attempt

7     to open but once there was a realization that it was

8     still locked, pressurized, it was stopped?

9         A    Well, that's why I said attempts.  So I don't

10    know if they were successful or not.

11        Q    So by attempts you don't necessarily mean that

12    there was an attempt to overcome the lock.  You just

13    mean an attempt was initiated and it was not successful?

14        A    Yes.  So I would call the attempt meaning

15    someone tried to open it while it was under pressure.

16    Whether they stopped that attempt once they hit that

17    resistance or not I don't know.

18        Q    Okay.

19        THE WITNESS:  We've been going a couple of hours --

20    or, actually, an hour, do you mind if we take a break?

21        MR. SENN:  Yes, we can take a break.

22             (a brief recess was taken from 11:54 a.m. to

23             12:04 p.m.)

24        MR. SENN:  Q    All right.  Before we took our break

Page 120

1    we were talking about your third opinion.  We talked a

2    little bit about the scratch marks that were on the

3    float valve.

4              Did you do any testing on the strength of the

5    components of the float valve or the plate?

6         A    Not in this case.

7         Q    Have you before on other cases?

8         A    Yes.  So in other cases plaintiffs have provided

9    finite element models which I reviewed and did an

10   analysis on.

11        Q    You didn't test any of the strengths of the

12   components, the parts, the float valve, striking plate,

13   anything like that in this case?

14        A    Well, I think on a component-by-component basis

15   where I'm separating them and then doing tension tests

16   and things like that, no.

17              But I would say that the cover opening test

18   that we did did test the strength of those components.

19        Q    The one you did at Eshraghi's house?

20        A    So that one on the incident unit had already

21   been through some events.  I tested an exemplar that

22   didn't have any scratches or scoring on it, and I tested

23   that, as well.

24        Q    Okay.  But as far as this specific pot, you

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 121

1    didn't actually test the strength of the components, the

2    float valve, the striking plate, any of those

3    components, right?

4        A    We tested that assembly after.  You know, it's

5    my opinion that it's damaged.  So we tested it after it

6    was damaged.

7        Q    Okay.  I'm asking, though, specifically about

8    the material makeup of the individual parts, the float

9    valve, the striking plate, did you test the thickness,

10   the strength of the materials against any standard?

11       A    Well, to my knowledge there is not a standard

12   for what those thicknesses need to be.  I mean, I did

13   take the float valve out and put a ruler on it so I can

14   figure out what those measurements are.

15            But I didn't -- to my knowledge, no one has

16   disassembled the lid.  And you have to -- I think on

17   this model you would have to break the handle to get at

18   those parts inside.

19       Q    Okay.

20       A    But I did measure the excursion of the sliding

21   plate or not really the sliding plate, the locking pin,

22   I measured that excursion and compared it to an exemplar

23   that hadn't been through the same type of usage.

24       Q    Okay.  I guess a better way to ask the question

Robert S. Giachetti , Ph.D.    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 122

1    is, for example, when you pulled out the float valve in

2    the picture that we're talking about here, you didn't

3    perform any testing on the hardness of that material or

4    anything like that, right?

5        A    No.

6        Q    And when you mentioned, I forget the word you

7    used, but you measured the, what was it, the extrusion

8    of the pin?

9        A    Excursion.

10       Q    Excursion of the pin.  And, basically, you're

11   saying you measured as the pin is traveling across the

12   locking pin, you measured how far in and out the pin

13   moves -- on the locking tab?  I'm sorry.

14       A    Sort of.  So it's more like I hold the float

15   valve closed and then I take a caliper and measure how

16   far I can move the pin outward before it stops moving.

17       Q    Okay.  Not as it travels across the locking tab,

18   just how far you can manually move it out?

19       A    Well, no, I'm not trying to force it outward.  I

20   just engage the float valve with the sliding plate, and

21   then I measure how far it moves outward before it stops

22   and I measure that.

23       Q    What does that show you?  What are you testing

24   for?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 123

1        A    So what I've seen in these models is if you

2    haven't forced open the lid before, then that distance

3    that it can travel before it stops will change depending

4    if you force it over because it basically, when you

5    force it open, you stretch out the pieces inside

6    permanently.

7              Like if somebody comes by and you're wearing a

8    sweatshirt and they put both their hands in the sleeve

9    of your sweatshirt and then the cuff never goes back to

10   the way it was, it's kind of the same thing with that

11   mechanism.  Once you open it --

12       Q    With the float valve up?

13       A    With the float valve up under pressure you're

14   going to stretch those components out, and then they

15   don't go back exactly the way they were beforehand.

16       Q    When you say the components, you're referring to

17   the pin and the strike plate?

18       A    The whole mechanism together.

19       Q    Okay.  But, again, on this pot, on this specific

20   pressure cooker, we don't know if that stretching

21   happened on the incident in question or sometime before,

22   right?

23       A    That's right.

24       Q    Okay.  So if a lid has been opened with the

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 124

1    float valve up in the locked position, then those

2    components would have been stretched and that would

3    cause the pin to travel a further distance or shorter

4    distance?

5        A    Shorter distance because it's already out a

6    little bit more.

7        Q    Okay.

8        A    And on top of that, when it makes that scoring

9    that you see on there, then that also decreases the

10   amount of distance that it has to go across.

11       Q    Okay.  Along those same -- that same question,

12   did you do any tests on the hardness of the locking

13   tabs, the materials that compose those?

14       A    No.

15       Q    Okay.  We talked about the first subbullet or

16   the first bullet under your opinion 3.  The second

17   bullet is, "The pressure cooker, as tested at low

18   pressure, well below cooking pressure, showed a large

19   resistance to opening force:  45 pounds.  45 pounds is

20   not consistent with easy or effortless opening force."

21            Start back at the beginning of that one.  The

22   pressure cooker, as tested at low pressure.  What is low

23   pressure?

24       A    So when we did our opening test, it was likely

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 125

1    below 1 psi because we unplugged it as soon as the float

2    valve popped up.

3         Q    Okay.

4         A    And the cooking pressure, the timer probably

5    doesn't start around until 6 or 7 psi and then the

6    maximum it will hit is 10.

7         Q    When you say it is likely .5 psi, you don't know

8    that for sure because you didn't measure it?

9         A    Right.  But I've done it in other cases where

10   the float valves are all very similar in size, weight,

11   and so forth.  And it's been my experience it's usually

12   .25, .3, somewhere around there, psi.

13        Q    But we don't know for sure in this incident,

14   right?

15        A    Well, the size and shape of it are consistent

16   and the weight are all consistent with others that I've

17   seen, so it will be somewhere around there, below, like

18   I said earlier, below half.

19        Q    You didn't measure it in this case, though,

20   right?

21        A    That's right.

22        Q    And you said it showed a large resistance to

23   opening force.  And you measured that at 45 pounds.

24             Now, you did that by a different method than

Robert S. Giachetti , Ph.D.                      January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 126

1    what Dr. Eshraghi used to measure that opening force,

2    correct?

3         A    That's right.

4         Q    You used a strap, is that right?

5         A    So I, basically -- it's called a strap wrench,

6    but it's a cord that goes around the edge of the lid,

7    and when you pull on it, it locks itself together, so it

8    gives you something to grab onto --

9         Q    And Dr. Eshraghi --

10        A    -- on the lid.

11        Q    I'm sorry.  I didn't mean to talk over to you.

12        A    It just gives you something to grab onto on the

13   lid, and it gives you mechanical advantage.  So I didn't

14   have to exert 45 pounds, I only had to exert like 18,

15   which makes it safer and easier.

16        Q    How does it give you a mechanical advantage?

17        A    So the UL 136 test says to exert the force at

18   the lid edge.  And this basically puts the lid edge at

19   another I forgot how many extra inches it gives me,

20   something like six or eight inches.

21            So my force -- the force that I applied to the

22   handle of my wrench is eight inches away from the lid.

23   And then the wrench itself applies a different force to

24   the edge of the lid because of leverage.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 127

1      Q    Okay.  So you get mechanical advantage because

2    of the leverage?

3      A    Yes.

4      Q    So why does UL specify that the force should be

5    applied to the edge of the lid or do you know?

6      A    So they don't explain it.  But my interpretation

7    of it is that they want that force to be on the edge,

8    the outermost edge of the lid.  So the old-style pot has

9    a long handle, so in that case it you would put it at

10   the edge of the handle of that pot.

11         But new ones, generally speaking, they're just

12   the round cover like what we have here.  And so why they

13   want their force exerted on the lid edge is, first of

14   all, it's going to be as close to the interface as

15   possible.

16         So if I apply, if we use this cup as an example

17   and -- oh, I've got this teabag here.  So if I pull on

18   this string here on the cover that is touching this top,

19   all this force is basically in the plane where the cover

20   meets the pot.  And because I'm doing that, I'm not

21   trying to tilt the pot forward or to the side or

22   backward.  I'm only spinning it.

23         So that's my interpretation of reading the

24   standard holistically, that's my interpretation of why

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 128

1    they want it because they want that 100 pounds only to

2    be an opening force.

3        Q    So you're not tilting it by pushing or pulling

4    on a specific area?

5        A    Right.  And if I exerted this force, say, four

6    or five inches higher, now in addition to turning it,

7    I'm also trying to pull it.  And that would cause the

8    lid to like clamp down on the front or it could move

9    some other way that's not desirable.

10       Q    I'm with you.

11            And in Dr. Eshraghi's test, he used a torque

12   wrench, right?

13       A    Correct.

14       Q    And that's just a wrench that he attached to the

15   handle and rotated, is that right?

16       A    Well, so that's basically getting at what I was

17   just describing that he is applying a force at the top a

18   couple of inches above where the lid meets the pot.

19            And the advantage of pulling on a rope or some

20   sort of connection that's not rigid is that you can tell

21   what direction that force is in because it has to go

22   through that connection.

23            So if I pull on this string, I know all of the

24   force is going through that string and so the force

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 129

1    direction is very clear it's through that string.  If I

2    grab a solid handle and move it, you cannot observe how

3    you're pushing.  And even as a human you have limited

4    ability to sense that direction.

5           So the first issue with the torque wrench

6    method is that you actually don't know how you're

7    pushing.  And the torque wrench might not necessarily

8    pick it up.

9           The second thing is, the torque wrench is much

10   higher than where the lid meets the pot, so you will get

11   some of that tilting that I talked about earlier.

12          And then the third, I don't know what number

13   I'm on now, but then if it's not centered, if it's not

14   perfectly centered, it will read a reduced amount of

15   force.  And those are my gripes with it.

16          His result was within 10 percent of mine, so --

17       Q   That was what my next question was going to be.

18   The two results were it looks like to me pretty similar.

19   Do you find a discernible or an important difference in

20   you found almost 40, I think you found almost 45 or vice

21   versa?

22       A   Yes.  So I think in this matter the difference

23   between 40 and 45 pounds probably is not

24   indistinguishable from a human perception of effort.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 130

1        You know, the differences could be magnified.

2   He was very careful while I was there.  I watched him

3   put it on, and, you know, we were observing each other

4   so everyone is being very careful about how they're

5   applying it.

6        But there are portions of that that do change

7   and whether, you know, at higher levels of force that

8   might change or higher levels of pressure that might

9   change down the line.

10        But I think in this matter it's probably okay.

11   I wouldn't recommend that method, though, going forward

12   because you still need to have a device that measures,

13   so why not do it consistent with the way the standard is

14   written.

15        Q   Okay.  But you don't have any or do you have

16   any -- Strike that.

17        Do you find that to be a significant difference

18   in what he found versus what you found?

19        A   Right.  So in this matter I don't think the

20   difference is significant enough that anyone should have

21   a gripe over it.

22        Q   Okay.

23        A   I don't care for that method, but I think the

24   outcome is not substantial enough to discuss.

Robert S. Giachetti , Ph.D.                     January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 131

1      Q    Okay.  Now, you mentioned that you had to

2    convert your results, you had 18 pounds, you had to

3    convert that to do away with the mechanical advantage.

4            How do you do that?

5      A    Yes.  So the lid has a diameter and the handle

6    adds to that diameter.  So the distance, it's basically

7    like doing a teeter-totter type.  If you ever took

8    physics in high school or whatever and you look at the

9    teeter-totter and where the fulcrum is on it, you know,

10   you look at the distance from the center of the lid to

11   the edge, which I think in this is something like five

12   or six inches.  And then you look at the distance from

13   the center of the lid to where I applied the force to

14   the lever, and so it's basically the ratio.  And that's

15   just the leverage.

16           So the force I apply way out is lower than the

17   equivalent force at the edge of the lid.

18     Q    Okay.

19     A    Which is what the lever applies to the lid.

20           So I apply 18 to the lever, and then the lever

21   applied 45 to the lid.

22     Q    So 18 is what you had to input, 45 is what the

23   lever had to input?

24     A    Yes.

Robert S. Giachetti , Ph.D.                       January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 132

1      Q    Dr. Eshraghi had to do the same thing for his

2      findings, right, he had to adjust for the mechanical

3      advantage of the torque wrench?

4      A    No.  So his torque wrench measures torque.  I

5      was doing force.  Everything I do is force.  So that's

6      the other thing is that now we're talking about torque

7      and force, and then it confuses everybody who doesn't

8      work with these things every day.

9      Q    Sure.

10     A    So torque measures a rotational equivalent --

11     it's not an equivalent.  It's the rotational version of

12     force.  And so that is measured in inch pounds or foot

13     pounds or whatever, but it's always a distance and a

14     force.

15     Q    Okay.

16     A    And so, then, he had to then say, okay, well, I

17     applied 10 inch pounds and I don't know what that -- if

18     that's what he read, just hypothetically.  If he said I

19     measured 10 inch pounds and he wants to convert that to

20     a force somewhere and then he just says, okay, well, the

21     edge of the lid is 5 inches away, he would multiply 5

22     times 10 and get 50.  Or if he wanted to go to 10 feet

23     away, it would be -- well, I don't want to do that

24     conversion in my head, but basically you just multiply

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 133

1      it out.

2          Q    Okay.  Now, you said you found 45 pounds, which

3      is similar to what Dr. Eshraghi found.  But you say 45

4      pounds is not consistent with an easy or effortless

5      opening force.

6               What are you basing that opinion on?

7          A    So my education, training, and experience with

8      these coupled with the fact that if there is no pressure

9      in this unit, you can rotate it open and closed with a

10     couple of things, maybe even one finger.

11              So if that's the threshold of force that's

12     required when it's not pressurized and having measured

13     it on other units, that two-finger force is somewhere

14     around like a twentieth of a pound.  So now we're

15     measuring a force that's 40, 45 pounds so that we're

16     talking, you know, hundreds of times of more effort

17     required.

18         Q    Okay.  Would you agree that whether it's easy or

19     effortless opening is subjective to the user?

20         A    I don't think so in this case.  I think 45

21     pounds is something that is not easy or effortless to

22     anyone because we're talking about a comparison between

23     something that's the weight of a pencil and something

24     that's equivalent to like holding like 8 gallons of milk

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 134

1      in your hand.

2          Q    Isn't that still subjective to you, though?

3          A    Well, you could also look at the population.

4      And the population of users their maximal efforts, I

5      think I have that in here, it's something like 50

6      percent of people -- let me find it so I don't misquote

7      it.

8          Q    It's on page 20, I think, is what you're

9      referring to.

10         A    Thank you.  Yes.  So, basically, you can look

11     and he says, the mean maximum effort of one-handed

12     pushing ability.  So this is like 60 percent of

13     people -- Let me read it here.  45 pounds represents a

14     substantial effort to generate.  This amount of force

15     represents approximately 50 percent -- 58 percent of the

16     mean maximum effort of one-handed pushing ability of

17     23-year-old males.

18              So if you ask a 23-year-old male to push on

19     something with one hand at elbow height and you average

20     all of the maximums out, 45 pounds is like 60 percent of

21     the way there.

22              So that is pretty substantial to, you know, to

23     say that that's, you know, something that's just

24     particular to me or whatever, but, you know, when it's

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 135

1    measured amongst a population of healthy young males,

2    that's actually pretty high.

3        Q    That's another way of saying it was a little

4    over half the effort of a 23-year-old male, is that

5    right, at elbow height?

6        A    Yes, 60 percent at elbow height.

7        Q    And that's of pushing strength, right?

8        A    That's right.

9        Q    Now, you cite an article here, Static force

10   exertion in postures with different degrees of freedom.

11   I didn't see where you provided that article.  Did you

12   provide that to us?

13       A    Well, I meant to.  If I didn't, I can get you

14   that.

15       Q    I didn't see that.

16           So there is a lot of different types of force,

17   pushing force, different angles, different heights.  You

18   mentioned two of them here, right, elbow height,

19   shoulder height?

20       A    Correct.

21       Q    Is this article talking about -- what kind of

22   pushing force is this article talking about?

23       A    So this is having someone stand and push at

24   something that's elbow height.  So outside of that,

Robert S. Giachetti , Ph.D.
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

January 31, 2024

Page 136

1    uncontrolled.  And so then they also had the people push

2    against something at shoulder height while they're

3    standing, and they just measured that force.

4        Q    Pushing straight out?

5        A    So usually -- I believe this article had the arm

6    in a number of different positions.  So holding

7    something -- usually they do arm here and arm straight

8    out or arm with the elbow bent and arm with the elbow

9    straight.  And then they'll usually do two heights with

10   that.  So here they called it shoulder and elbow height.

11        So this, I'm sure they reported more data than

12   this.  But my recollection is that I took the lower

13   numbers out of that study to report here.

14       Q    The lower numbers of what?

15       A    The strength capability.  But I would say, you

16   know, somebody exerting 50 percent of their maximum

17   strength capability isn't something that anyone would

18   call easy.

19       Q    But that statement alone is still subjective to

20   you, right?  Whether you would call it easy or not might

21   not be what somebody else would call easy, right?

22       A    Well, I think easy implies not much effort.  And

23   half of my maximal exertion I don't think -- I don't

24   think that's reasonable to say that anyone would call

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 137

1    that easy.  If you said push half as hard as you can,

2    that's a different instruction than push easy.

3        Q    Well, this is half of the average maximum

4    exertion, right?

5        A    The average of the maximum.

6        Q    So by definition, there is some of these

7    23-year-olds had higher maximum forces and some had

8    lower?

9        A    I'm sure.

10       Q    So maximum force varies from person to person?

11       A    That's right.

12       Q    Do you know how much it varies?

13       A    This study probably reported it.  Usually they

14   give you the standard deviation and so you can go from

15   that to, say, what 70 percent of the population is

16   within one standard deviation either way of the average.

17       Q    You don't cite any of that in your report?

18       A    I didn't because it seemed to me that 60 percent

19   is such a large number that that excluded easiness from

20   it.

21       Q    Well, would you agree that holding a ten-pound

22   weight to a bodybuilder might not be considered

23   substantial effort or force when holding a ten-pound

24   weight to a person who has never lifted weights might be

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 138

1     considered a substantial force?

2         A    Yes.  But I think as part of the general

3     population, which this study represents, that those

4     might be on the far ends of the spectrum, which, you

5     know, you wouldn't be -- you know, the design process

6     usually takes into account 95 percent of the population.

7              So I would put those people at the very

8     extremes.

9         Q    But your agreement to that statement, doesn't

10    that necessarily make it subjective?

11        A    Well, I'm giving you objective data to base it

12    off of.  So there is a scientific study that says this

13    is about 60 percent of a 23-year-old male's maximum

14    pushing effort.

15        Q    But my question is, is the perception of whether

16    that's difficult or easy is subjective to the person

17    doing the activity, right?

18        A    The amount of effort that you exert is based on

19    the person, their strength, and the, you know, how big

20    their limbs are and things like that.

21             As someone who has studied people and my whole

22    Ph.D. was on pushing efforts from people's limbs, I

23    would say that if we're up in the 60 percent range, that

24    that is outside of the easy category.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 139

1      Q    But the perception of whether that's easy is

2   subjective to the user, right?  That's you saying it's

3   outside of the --

4      A    It's been my experience that that level of

5   exertion is outside of what someone would say is easy.

6   If we're saying they were exerting 10 percent of their

7   maximum effort, then I would be onboard with that could

8   potentially be easy.

9           But we're talking 60 percent of their maximal

10  effort for a young healthy male, and so it's been my

11  experience doing tests on humans who I've asked to push

12  maximally and not push maximally that this would not be

13  considered easy.

14     Q    Did you ask each one of them whether they

15  considered it easy?

16     A    I believe that was part of my protocol for my

17  Ph.D. is that we measured their maximum effort and then

18  had them push at different levels that were low, medium,

19  and high.

20          And medium and high are up here in the 58

21  percent range.

22     Q    And every single person you asked at the medium

23  range said that it was difficult?

24     A    No, but the easy is lower than that.  And that's

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 140

1    been my experience.

2        Q    That's my point.  That's what makes it

3    subjective, right?  Is that not everybody at medium said

4    it was difficult.  Some people at low said it was

5    difficult or some people at low said it was not

6    difficult.  So by definition that makes it subjective,

7    right?

8        A    Well, I'm sure someone could push with their

9    full effort and say that was easy, also.  But I don't

10   think that's reasonable.

11       Q    Okay.  Well, that's different than whether it's

12   subjective, whether you think it's reasonable.

13            What I'm asking is doesn't that make it

14   subjective, the perception of whether it's difficult?

15       A    So I think that everyone has a different

16   perception of effort.  That can be calculated if you

17   want to.  I don't believe it was in this study.  They

18   just measured the maximum effort.

19            And I'm using my experience having tested

20   humans for pushing efforts that that is not an easy --

21   58 percent of your maximum is not something that the

22   average human would say is easy.

23       Q    Let me pose this to you:  If you asked me to go

24   outside right now and run five miles, I would tell you

Robert S. Giachetti , Ph.D.                     January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 141

1    that's easy.  If you asked my wife to go out and run

2    five miles, she would tell you that's impossible.

3            So that's subjective, right?

4       A   Those two things are subjective.  But that has a

5    huge part in your conditioning leading up to that.

6       Q   Wouldn't that be true for anybody pushing or

7    pulling, as well?

8       A   Well, this study of males is a smattering of

9    them.  So we've got everything pulled into that, you

10   know, dudes that work out and dudes that do not.

11           And what we've got here is this mean of their

12   maximum.

13      Q   Do you know that for sure?  Did you see the

14   population study?

15      A   Well, that's my recollection.  At the beginning

16   they always tell you how they recruited their people,

17   so.

18      Q   But you didn't cite that here and didn't provide

19   the article, right?

20      A   Certainly, we can look it up here.  I've got --

21   explained exactly what it is in the citation there.  And

22   I regret that it wasn't in the materials.  I intended to

23   put it in there.

24      Q   And back to my original point, even if you have

Robert S. Giachetti , Ph.D.                        January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 142

1    a smattering of the population and you develop an

2    average maximum effort, that's still not measuring the

3    perception of whether that effort was hard or easy,

4    correct?

5        A    Well, yes, I don't think in this study they

6    asked them hard or easy.

7        Q    Okay.  But you don't agree or do you that

8    whether pushing at a certain force is easy or hard would

9    be subjective to the person doing it?  Do you agree with

10   that or no?

11       A    I think that they're -- you can -- you're going

12   to have to account for the person and their physique

13   leading up to their exertion.

14            However, I think what I'm saying is that 60

15   percent has pushed us way beyond that limit where it's

16   reasonable to discuss is this easy or hard because 60

17   percent of maximal is not something that could be called

18   easy.  It's out of that gray -- as far as I'm concerned,

19   it's out of that gray area.

20       Q    But, again, we're talking about 60 percent of

21   the average, right?  We're not talking about 60 percent

22   of a set number per person, we're talking about an

23   average of all of the people?

24       A    Yes.  So you ask all of the people to do their

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 143

1    most and then you average that.

2        Q    Some of those people may push at 200, some may

3    push at 100?

4        A    Right.

5        Q    Some may push at 25.

6        A    Right.

7        Q    So you got a wide range of what people can push

8    at to begin with and you take that average.  So, again,

9    back to my point, how are you coming to the conclusion

10   that it's not subjective that 60 percent of the average

11   maximum is difficult other than just your personal

12   feeling that it's not reasonable?

13       MR. HUBERT:  Objection to form.

14       THE WITNESS:  So it's really not my personal

15   feeling.  It's my experience based on doing experiments

16   with asking different people to push with their maximum

17   effort and then to push with low, medium, and high

18   efforts after that.

19           And this is saying if I took an average

20   23-year-old man off the street, I would expect 45 pounds

21   to be 60 percent of the maximum that they can push.  And

22   that's all this is saying.

23           And then I'm coupling that with my own

24   experience that says if you ask someone to push with 60

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 144

1    percent of their maximum, they would not put that in the

2    low effort category.  And I am equating low effort with

3    easy.  Anything outside of low effort for me is not

4    easy.

5         MR. SENN:  Q   Okay.  Tell me what experience that

6    is that allows you to say that a person pushing at 60

7    percent of their max they would not qualify that as

8    easy?

9         A    Right.  So when I was doing my dissertation

10   work, all that revolved around measuring the force

11   output of the limbs, asking someone to push with their

12   maximum and then asking them to push at different effort

13   levels.  And so that's where that experience comes from.

14        Q   But you just told me that some of those people

15   that pushed at medium didn't classify that as being

16   hard.  Some people did and some people didn't.  I

17   believe that's what you just told me?

18        A   But I'm equating low effort with easy.  So

19   medium effort for me not easy, hard effort not easy.

20   But low effort I would say is easy.

21        Q   And we're talking about medium effort here, a

22   little bit over medium effort, right, 60 percent of the

23   maximum effort, that's in the medium effort category,

24   right?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 145

1        A    Sure.

2        Q    So you just told me that people when you're

3     studying them in your dissertation, you had them push at

4     medium force, not all of them classified that as being

5     hard?

6        A    Well, if I said that, I didn't mean to because I

7     didn't ask what their perception of it.  But I asked

8     them to exert low, medium, and high efforts.

9        Q    Okay.  So, specifically, my question is about

10    their perception of it.  And my question was, isn't the

11    perception of whether that's hard or easy subjective to

12    the person exerting the force?  How can it not be?

13       A    Yes, people perceive their effort levels that

14    they exert for sure.  And people -- and scientists have

15    developed ways of quantifying that effort numerically

16    speaking, which no one has done in this case.

17            I think -- and so I'm not arguing that people's

18    perception of how much effort they're putting in is

19    subjective.  That I agree with you on.

20            I think what I'm seeing from these numbers is

21    that we're at medium and high levels of effort.  And

22    what I understand the word "easy" to mean does not

23    correspond to medium or high levels of effort.  Easy is

24    low.  Easy is on the low to negligible effort.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 146

1         Q    Isn't that your subjective opinion, though?

2         A    Well, that's what I understand the word "easy"

3    to mean, so.

4         Q    Based on your experiences?

5         A    Yes.

6         Q    Okay.  So if someone had particularly strong

7    arms through something they did as their occupation or

8    lifting weights, working out, however they came about

9    that, if they had particularly strong arms, would you

10   agree that they may not classify 60 percent of their

11   maximum effort as being difficult?

12        A    No.

13        Q    You wouldn't agree with that?

14        A    I would not agree with that.

15        Q    Tell me why?

16        A    Because 60 percent is of their maximum.  It's

17   not of a 95-year-old lady's maximum.

18        Q    Again, we're talking about their perception of

19   it, though.  I'm not asking about scientific measurement

20   of their output.  I'm talking about their perception of

21   whether that's easy or hard.

22        A    Yes, but I think you're conflating two different

23   things.  So your exertion of effort here is I am

24   outlining it as a comparison to your maximum.  And I

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 147

1    think what you're saying is, well, look, I can have this

2    guy who has, you know, worked in the steel mill his

3    whole life lifting cinderblocks and his perception of

4    easy is different.

5            Well, I'm saying that if that guy is still

6    exerting 60 percent of his maximum, that's not easy for

7    him.

8            Now, that might be medium for him, but it would

9    be really difficult for me.  But if we're gauging it

10   based on his maximum, then that's a different question

11   there.  So 60 percent of a person's maximum is not easy.

12       Q    And you don't think that's subjective to that

13   person?

14       A    No.

15       Q    Okay.  So you say 45 pounds of pressure here to

16   open this pot that y'all tested, and you say that's not

17   a significant amount of force, right?  I'm sorry, you

18   say that is a significant amount of force?

19       A    That's right.

20       Q    Okay.  Have you seen the video of Dr. Eshraghi

21   opening the pressure cooker?

22       A    I have.

23       Q    Okay.

24       A    I wish I was there to witness it.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 148

1      Q    Okay.  Why didn't you perform that test?

2      A    Well, I had already gotten my data to the best

3   that I could do it.  I wasn't able to do the test that I

4   wanted to due to whatever was going on with the

5   equipment there.  But I wasn't interested in doing that

6   test.

7      Q    Okay.

8      A    I was interested in observing it.  I wasn't

9   interested in performing it.

10     Q    Why would you want to observe it if you didn't

11  want to perform it?

12     A    Because I wanted to know what he was doing.  And

13  when he told me that he wasn't going to do it, I left.

14  And then he did it after I left.

15     Q    But if you didn't have any desire to do it, why

16  did you care?

17     A    I wanted to see how he was doing it, how he was

18  applying his pressure.  There was a loud hissing in that

19  video.  And if I was on site, I would have been able to

20  see better what was going on.  And I had my video camera

21  set up and everything.  I had already taken pictures of

22  his stand out there, and I was ready to videotape it.

23     Q    You didn't think that test was important for you

24  to do, though, right?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 149

1      A    No, but if he was going to do it, I wanted to

2      observe it.

3      Q    Nobody stopped you from doing it?

4      A    Correct.

5      Q    Okay.  So you saw that he opened the pot with

6      very little effort, right?

7      MR. HUBERT:  Objection.

8      THE WITNESS:  Well, I don't know that.  And I don't

9      know what the conditions of the pot were leading up to

10     that.

11     MR. SENN:  Q   Okay.  What would you be concerned

12     about as far as the conditions of the pot leading up to

13     that?

14     A    Well, I -- you know, from his deposition it

15     sounded like he had let it heat up.  And then after the

16     float valve raised he let it heat up for an amount of

17     time that he estimated but didn't measure, so I don't

18     know how much pressure was in it.  He didn't measure the

19     pressure in it.  And then I don't think he recalled how

20     much water was in it when he did that test.

21          So I don't know how representative of it it is

22     of a UL-style test.  And on top of that I think he used

23     a methodology to open it that is inconsistent with the

24     narrative that's been presented in this case already.

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 150

1     And he used a method that I think that is inconsistent

2     with the way most users would open the lid.

3         Q    How so?

4         A    So he used a two-hand technique with one hand on

5     the top and one hand on the side.  And the hand on the

6     side basically you turn it into a lever that is I would

7     say something that most people wouldn't be able to know,

8     but he has some high-level engineering training.

9              So he recognized that if you exert some force

10    with your fingers and some force with your palm, that

11    you can basically get a lot of leverage at that handle

12    area at the edge of the lid.  And you can see that he

13    does that in his video.

14        Q    With which hand?

15        A    I don't remember which hand off the top of my

16    head.  But he uses that to open it.  And then he goes

17    partially partway.  And I think the one thing, the

18    outcome, though, is that he does show that if you try to

19    open it with one hand at whatever pressure that was,

20    that the whole pressure cooker just moves, so the

21    one-handed opening isn't possible.

22        Q    Could that be because he was aware that the top

23    was going to come off, so he was standing further back

24    than a normal user would?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 151

1      A    Why, the pressure cooker moved when he tried to

2    rotate the lid?

3      Q    Yes.

4      A    No.

5      Q    Why is that?

6      A    Because the lid still wasn't off yet and he was

7    trying to rotate it open with one hand.

8      Q    Yes.  Wouldn't it be possible if he was

9    anticipating that, he was standing further back than a

10   normal user would?

11     A    But I don't think that has anything to do with

12   him trying to rotate the lid.

13     Q    You don't think that would change the leverage

14   and the motion of the forces that you put on the lid?

15     A    So if you're suggesting that he should have been

16   pushing down on the lid, that would also be another --

17     Q    No, I'm not suggesting that.  I'm just asking is

18   that possible that he could have been in a position that

19   wouldn't have been normal for a person opening the -- a

20   normal user opening the lid?

21     A    Well, I think the whole using that leverage

22   technique on the side is inconsistent with the way a

23   user would open it.

24     Q    When you say the side, are you talking about the

Robert S. Giachetti , Ph.D.                        January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 152

1    side of the pot or the side of the lid?

2        A    Correct.  So he uses his whole hand to generate

3    leverage between the base handle and the edge of the

4    lid.  And he uses that as the primary way to open it up,

5    but he also has a hand on the top.

6        Q    You mean like a counterbalancing force or

7    something?

8        A    That's right.

9            But as far as opening it with one hand, I don't

10   think that his location had anything to do with the

11   pressure cooker sliding around.

12           The only thing is if he were closer to it, it

13   would be easier for him to push downward on it to make

14   it stay put.

15       Q    Okay.  So you would consider it abnormal for a

16   user to use both hands, one hand on the side of the pot,

17   the other hand on the top to correct counterbalancing

18   forces?

19       A    If a unit is depressurized, you don't need any

20   of that.

21       Q    Well, I'm not asking if you need it.  I'm

22   saying, would you consider that an abnormal way for

23   somebody to open the pot?

24       A    Yes.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 153

1        Q    What's that opinion based on?

2        A    So the pot, you're not supposed to force the pot

3    open.  And if you can open the pot with two fingers when

4    there is no pressure in it, you don't need anything for

5    leverage when --

6        Q    I'm not suggesting they force it open.

7             I'm asking would it be abnormal for a person to

8    put their hand on the side of the pot because the side

9    of the pot also has little handle levers on it, right?

10       A    It has handles, yes.

11       Q    And so you're saying it would be abnormal for a

12   person to put their hand there and the other hand on the

13   lid to rotate to keep the pot still while the lid is

14   rotating?

15       A    I don't think it's abnormal for a person to

16   place their hand on that handle if they wanted to.  But

17   it's abnormal for them to require that to apply a

18   significant amount of force.

19       Q    Okay.  At any time when you were doing your

20   testing on the incident pot did you measure how much

21   force it would take to open the lid using only the

22   locking mechanism with no friction from the tabs, the

23   locking tabs?

24       A    Can you say that -- I'm not sure I follow that.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 154

1    Can you say that again?

2         Q    Did you do any testing to see how much force it

3    required to open the lid with only the locking mechanism

4    activated, with no pressure causing friction on the

5    tabs?

6         A    No, I didn't do that test.  And if there is no

7    pressure holding that float valve up, then it is not as

8    effective.  That I already know that.

9         Q    Meaning the locking pin is not as effective

10   without the friction of the locking tabs?

11        A    No, you need pressure holding that up.  So the

12   only way to remove the friction is to take away the

13   pressure.

14        Q    Well, couldn't you hold the float valve up with

15   no pressure and test how much force it takes to open the

16   lid with no friction on the tabs, just the locking pin

17   in place?

18        A    Right.  So that -- so I'm aware of that style of

19   testing.  It's been my experience that that is a -- that

20   doesn't really show the strength of the locking

21   mechanism because I've seen people hold the pressure

22   cooker upside-down to do that.

23             But in that case you only have the weight --

24   you only have the weight of the float valve there and

Robert S. Giachetti , Ph.D.                 January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 155

1    it's just laying in the orifice.  And the gasket

2    underneath it is a little spongy, and so it actually

3    needs pressure to force it all the way into position.

4    So it's not 100 percent engaged if you just do the hold

5    it upside-down test.

6              So that to me isn't a test that would show us

7    or give us an indication or would allow us to infer

8    about the performance of the lock under pressure.

9        Q   Is that just your personal opinion, or are there

10   studies or peer-reviewed journals who have stated that

11   that same position, that that's not an effective test?

12       A   Well, that's based on all of my experience

13   working with this pressure cooker and -- or this style

14   of pressure cooker.  Like I said, I had a 770.  The

15   pressure cooker paper that we discussed earlier was also

16   a Tristar 770 that we used.  And I think there might

17   have even been a 771 in there.  I'm not sure.  And I

18   mentioned to you that we put Teflon in between there to

19   take away that friction.  And I also killed the lock and

20   it was still difficult to open.

21       Q   With pressure?

22       A   With pressure, yes.

23       Q   What I'm asking is why would -- once you pulled

24   the float valve up through the hole in the strike plate,

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 156

1      why does that not lock the locking pin in place?

2          A    Right.  So the gasket that holds -- that is

3      keeping the seal there and that also keeps the float

4      valve from going straight up and just like firing out,

5      so that is actually shaped like an accordion and it's

6      silicone.

7              So as the pressure cooker pressurizes, at first

8      it just counteracts the weight of the float valve.  And

9      then as it pressurized, that accordion compresses and

10     the float valve goes up and becomes more rigid with

11     where it is in the hole in the lid.  And I explained

12     this earlier.

13             And so if you're just holding the float valve

14     there by its own self weight, which is like practically

15     nothing, you don't have any of that effect of the

16     pressure.  So you're really not testing -- that test

17     isn't really testing the lock from a pressurized

18     condition.

19         Q    But the float valve is up through the strike

20     plate hole at that point, right?  As soon as it raises,

21     the float valve goes up through the strike plate?

22         A    That's right.

23         Q    Okay.  The next bullet under your third opinion

24     you say, "The exemplar pressure cooker reviewed by

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 157

1      Fusion conformed to voluntary standards for

2      over-the-stove pressure cooker pressurized lid removal

3      force."  And then, "The exemplar passed UL 136 cover

4      opening requirements."

5              Now, here you're talking about the exemplar,

6      not the incident pot, right?

7          A   Correct.

8          Q   And you mentioned here that UL 136 applies to

9      over-the-stove pressure cookers.  Now, is it your

10     opinion that UL 136 does not apply to electric pressure

11     cookers?

12         A   That's right.

13         Q   What is the standard that applies to electric

14     pressure cookers as far as lid opening forces?

15         A   I don't think there is one.

16         Q   Why would UL 136 not apply?

17         A   Because in the scope of UL 136 it says that this

18     is for over-the-stove pressure cookers.  And it talks a

19     lot about clamps and clamping and things like that.  And

20     those are typically things that you would see on

21     over-the-stove ones.

22         Q   Why would the standard not be the same?  Why

23     would there be a different 100-pound standard for

24     electric pressure cookers as opposed to over-the-stove

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 158

1    pressure cookers?

2         MR. HUBERT:  Objection to answer.

3              You can answer.

4         THE WITNESS:  I don't know that there is a standard

5    for electric pressure cookers.  I just know for whatever

6    reason UL when they made their standard, they put at the

7    beginning of it that says this is for over-the-stove

8    pressure cookers.  So to me that says that this is not

9    that.

10        MR. SENN:  Q   I understand.  My question is, do you

11   have an opinion about why the 100 pounds of force

12   opening standard for pressure cookers, over-the-stove

13   pressure cookers would be any different than an electric

14   pressure cooker?

15        A    There is no -- so I don't know what the basis

16   for the 100 pounds is from the UL test.  And I don't

17   know what they would come up with if they made an

18   electric one.

19        Q    Is it your opinion or do you have an opinion

20   that the 100-pound force standard would or should be

21   less for an electric pressure cooker than it would be

22   for an over-the-stove pressure cooker?

23        A    I don't have an opinion on that.

24        Q    Okay.  And the UL 136 is a voluntary standard,

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 159

1    right, it's not a legal requirement, as far as you know?

2        A    To my knowledge.

3        Q    Why would or do you have an opinion about why a

4    pressure cooker company would seek UL approval if it

5    doesn't apply to that pressure cooker?

6        A    I don't have an opinion on that.

7        Q    Okay.  Have you ever testified that UL 136

8    applies to electric pressure cookers?

9        A    I don't remember ever doing that.

10       Q    Have you ever used UL 136 as the standard for

11   whether an electric pressure cooker functioned the way

12   it should?

13       A    I don't think that -- well, I think the way you

14   phrased that question is a little bit not quite lined up

15   with the way I approach UL 136.  I have recommended to

16   manufacturers for electric ones that they should -- that

17   they should conform to that even though it doesn't

18   apply.

19       Q    Why did you do that?

20       A    Because given my experience in litigation

21   matters, I said that even though it says it doesn't

22   apply that people will use it.

23       Q    Okay.  Do you have an opinion about what the

24   opening force for an electric pressure cooker should be?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 160

1        A    I don't have an opinion on that.

2        MR. SENN:  Can you mark that as the next exhibit for

3    me.

4            (Exhibit 4 marked as requested.)

5        MR. SENN:  Q    I'm going to show you what we're

6    going to mark as Plaintiffs' Exhibit 4.  That was part

7    of a document provided in the material you provided to

8    us.  This is a section of the UL.

9            First of all, let me ask you this, have you

10   ever inquired to the UL about whether this standard

11   applies to electric pressure cookers?

12       A    I have not asked UL anything.

13       Q    Okay.  Never been curious?

14       A    Well, it states it pretty clearly in the scope.

15   I know that a number of plaintiffs' experts have opined

16   that it actually does apply.  So that's been an ongoing

17   disagreement.

18       Q    Are you aware of whether UL has ever made a

19   statement about whether it applies?

20       A    Not publicly.

21       Q    Okay.  Do you know whether they ever have

22   privately?

23       A    Well, a number of the plaintiff experts who have

24   stated that they contacted UL also state that UL told

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 161

1      them that it does apply.

2          Q    And that never made you want to follow up with

3      UL to want to ask them their reasons as to why they

4      think it applies?

5          A    Well, so a couple of things.  One, I've seen

6      test standard reports or testing reports from ETL after

7      it was bought by UL, and they put N/A next to the check

8      box for UL 136 cover opening test on an electric

9      pressure cooker.  So I've seen that.

10         Q    You're talking about before it was bought by UL?

11         A    No, after it was bought by UL.  So it's,

12     basically, a UL subsidiary now.  And they did testing to

13     UL 1026.  And in the parts of UL -- and then it listed

14     UL 136 and said not applicable.

15         Q    What is UL 1026?

16         A    That is electronic pressure cooker standard.

17         Q    Okay.

18         A    But it does not include a cover opening test

19     like UL 136 has.

20         Q    Do you have any opinion as to why that is?

21         A    I don't have an opinion on that.

22         Q    Okay.  So if you look at UL 136, I think, and

23     correct me if I'm wrong, 9.3, section 9.3 is the section

24     that this issue arises in, whether that 100 pounds of

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 162

1    opening force applies to electric or stovetop, this is

2    the section we're talking about, is that right?

3        A    Correct.

4        Q    That's the section that requires the 100 pounds

5    of force to open the lid, correct?

6        A    Well, you apply 100 pounds and then you see what

7    happens.

8        Q    Yes.  I'm just trying to establish, this is

9    where, this 9.3 is where that standard comes from, is

10   that right?

11       A    This is the part of UL 136 that we've been

12   talking about here.

13       Q    Okay.  So do you know or do you have any opinion

14   as to why 100 pounds, where that came from?

15       A    I have no idea.

16       Q    Okay.  Also, I want you to turn the page and

17   look at section 9.8.  That section says, and I know your

18   opinion is this doesn't apply to electric pressure

19   cookers, but this says, "If the pressure cooker is

20   provided with a mechanical locking device (e.g., a

21   locking pin) that prevents the opening of the cover

22   under pressure, it shall not be defeated during the

23   cover opening test."

24            Does that mean that the locking pin should not

Page 163

1    be defeated and if it is, it fails UL standards?

2        A   Well, if you read that in conjunction with 9.6

3    above it, 9.6 tells you the passing, what it takes to

4    pass.  And so it basically tells you that the test is

5    over when the pressure is out or the lid rotates to

6    open.  So if -- or, I'm sorry, if the lid rotates to

7    open and nothing -- let me walk that back.  The test is

8    over if the lid opens or the pressure is relieved.

9            To pass the test, either the lid remains closed

10   or nothing comes out.  If neither of those things

11   happen, then it's a fail.  And so once the pressure is

12   out, then the test is over.

13       Q   You mean if neither of those happens, it's a

14   pass?

15       MR. HUBERT:  You said fail.

16       THE WITNESS:  Oh, yes, sorry.  Sorry, sorry, sorry.

17   Yes, I got twisted up there.

18       MR. SENN:  Q   But if you read those in conjunction,

19   if you then go to 9.8, isn't that then saying, also, if

20   it has a locking device, mechanical locking device,

21   regardless of 9.6, that locking device shouldn't be

22   defeated?

23       A   Well, once all of the pressure is out of it,

24   then the test is over so then the lock doesn't need to

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 164

1    be there.

2        Q    But isn't that saying if there is a lock there,

3    it shouldn't be defeated?

4        A    That's what 9.8 says.

5        Q    Okay.  And then if we flip back to the beginning

6    of section 9, at 9.1 says, "An ordinary user shall not

7    be capable of manually defeating the holding action of

8    the clamping device when the pressure in the cooker

9    reaches a value that creates a risk of injury to

10   persons."

11            Do you read that as saying if there is pressure

12   that could expel the liquids inside the pot that

13   ordinary users should not be able to manually defeat the

14   holding action?

15       A    So I read that as a single user, an ordinary

16   user, it's singular.  And it says clamping device.  It

17   doesn't say locking device.  So that creates a little

18   uncertainty there.

19            But, yes, in general it says a single person

20   should not be capable of opening it.  That's how I read

21   it.

22       Q    Could the interlocking tabs be considered a

23   clamping device?

24       A    I don't think so.  I think a clamping device

Robert S. Giachetti , Ph.D.                                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 165

1      would be consistent with what you see in like old school

2      pressure cookers where they have the threaded rods that

3      rotate up and then you screw like giant --

4          Q    My mom and grandma had one of those.

5          A    Yes, those are substantial units.  I think

6      that's -- if somebody says clamping device, that's --

7          Q    That's what you interpret it to mean?

8          A    Yes.

9          Q    There is no interpretation in the UL as to what

10     that means, right?

11         A    Right.  I mean, I think everyone reads that as

12     the lock here.

13         Q    As the locking pin?

14         A    Just whatever locking action this thing has.

15         Q    All of the locking actions together?

16         A    Yes.

17         Q    So in our case if UL does apply, then we would

18     be calling the clamping mechanism the friction on the

19     tabs and the locking pin?

20         A    Yes.

21         Q    Now, you said that it shouldn't be defeated by a

22     single user.  Is your opinion in this case that there

23     was more than one person opening this pressure cooker?

24         A    I think if you examine the injuries, that's the

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 166

1    only conclusion that I could draw from it.

2         Q    But you didn't put that in your report?

3         A    I didn't.

4         Q    Okay.  Did you, as part of your analysis of this

5    pressure cooker, did you look at Tristar's instruction

6    manuals?

7         A    Yes, I reviewed the manual.

8         Q    Okay.  Are you offering any opinion about

9    warnings or labels in this litigation?

10        A    I don't believe Dr. Eshraghi has any that I need

11   to rebut, so outside of the manual speaks for itself, it

12   says don't force it open and it shows the float valve

13   and tells you what the float valve is, so to the extent

14   that it just is what it is there, I don't have any

15   opinions.

16        Q    Okay.  Are you also aware that it says the lid

17   safety device prevents pressure buildup if the lid is

18   not closed properly and prevents lid from opening until

19   all pressure is released?

20        A    Yes, I am aware of that.

21        Q    So in this case that didn't happen, right?

22        A    Probably not.

23        MR. SENN:  Let me just mark that as the next

24   plaintiffs' exhibit just so we have it in the record.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 167

1      That will be No. 5.

2                (Exhibit 5 marked as requested.)

3          MR. SENN:  Do you need a copy of that, Ted?

4      Actually, that might be the only copy I have with me,

5      the exhibit copy.  I don't have another copy with me.

6          MR. HUBERT:  Dr. Giachetti needs to look at that.

7      If you're going to ask questions about it, I can pull it

8      up on my --

9          MR. SENN:  No, I just wanted to introduce that.

10     That was the only question I had about it.

11         Q    So as to the last part of your opinion 3, "A

12     reduction in lock performance is consistent with a

13     plastically deformed (stretched out)."

14               By plastically deformed, you mean stretched

15     out?

16         A    Yes.

17         Q    "Locking plate and a deep cut groove in the

18     locking tab and float valve."

19               And that's based on your opinion that this pot

20     had been opened under pressure?

21         A    Right.

22         Q    But we don't know if that was prior to this

23     incident or on this incident in question, right?

24         A    Correct.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 168

1        Q    Okay.  All right.  As to your last opinion,

2    opinion 4, you say, "The burns observed on

3    Mr. Copeland's arms are consistent with forcing open the

4    pressure cooker lid while there was pressure inside of

5    it."  To support that opinion you say, "The burns on his

6    right hand and arm are consistent with the right hand on

7    the lid's handle."

8             By that you just mean in your opinion the

9    locations of the burns show that he had his right hand

10   on the lid handle?

11       A    That's right.

12       Q    And the next bullet says, "The burns on his left

13   arm are consistent with his left hand holding onto the

14   base's handle."

15            By that you just mean your opinion is that the

16   burn patterns show he had his left hand up on the handle

17   of the base?

18       A    Right, on the side like this.

19       Q    Okay.  Then you say, "In this posture,

20   Mr. Copeland would be looking downward at the pressure

21   cooker thereby exposing his chin and only portions of

22   his neck to the escaping contents while his arms would

23   serve to funnel existing contents onto his chest."

24            What are you trying to clarify or demonstrate

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 169

1    there?

2        A    I'm just saying that that posture aligns with

3    his injuries.

4        Q    Okay.  What about any of that, doesn't that just

5    show us placement of his hands?

6        A    Right.  So I'm saying if you look at the burns

7    on his hands and arms and his chest, they all make sense

8    if he's got one hand here on the side and one hand here

9    on the top and then he kind of has like this V shape

10   here and he is looking down, and so that exposes all of

11   those burned areas and they all align with the way

12   contents would come out in that condition.

13       Q    Okay.  How do you reach the conclusion that he

14   was using force based on the positions of his hands?

15       A    Well, the pressure cooker had enough pressure in

16   it to expel the contents all the way up to his chin and

17   over to his chest, and you wouldn't have to grab it like

18   this and like over here to push it forward if you didn't

19   have to exert any force.  And their narrative said

20   one-handed.  So that would just be a turn and that.  And

21   that's not consistent with what his injuries are.

22       Q    Well, her testimony says she wasn't sure what he

23   was doing with his other hand.  She didn't say he didn't

24   have it on there.

Robert S. Giachetti , Ph.D.                         January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 170

1        MR. HUBERT:  So there is no evidence it was on

2    there.

3        MR. SENN:  I agree.  Is that an objection?

4        MR. HUBERT:  Yes, it is.  But I'm clarifying what

5    you're saying.  There is no evidence in this case that

6    he had two hands on the lid.

7        MR. SENN:  So what's your objection?

8        MR. HUBERT:  Just to the form of the question.

9        MR. SENN:  Q   Isn't it your opinion that he had two

10   hands on the pressure cooker?

11       A   Yes.

12       Q   Okay.  Again, my question, though, is what about

13   the placement of his hands shows you that he was using

14   force?  Doesn't that just show where his hands were?

15       A   Well, so the way his hands would have been, this

16   sort of outstretched arm here gives you a lot of

17   leverage from the big muscles in your shoulders and your

18   hips that you can hold, restrain the pressure cooker

19   with the left hand.

20           And if you try to push in the middle of the

21   lid, well, the whole pressure cooker will move away from

22   you because then there is no rotational -- the force

23   produces no rotational action about the lid.

24           But if you move your hand over to the edge of

Robert S. Giachetti , Ph.D.                      January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 171

1    the lid, that actually gives you a lot of ability to

2    exert force with your large muscles, restrain the

3    pressure cooker's base, and get a large lid opening

4    force from the rest of your body.

5        Q    Okay.  Let me unpack a few things in that.

6             Nothing in your opinions says that his hand was

7    over toward the edge of the lid, right?

8        A    No, but you need that to open it.

9        Q    You can't just put your hand in the middle of

10   the lid and rotate?

11       A    You could try that, but then you wouldn't need

12   the hand on the other end to balance the pressure cooker

13   out.  And since it all expelled -- since it expelled it

14   under pressure, I know that that took effort to open.

15       Q    But you don't know if he was using his left hand

16   as a counterbalancing force.  It's possible he could

17   have just had it up on the handle, correct?

18       A    That's unlikely.

19       Q    It's possible, though, right?

20       A    But unlikely.

21       Q    Is it possible?

22       A    Possible but unlikely.

23       MR. SENN:  Object to the response to my question.

24       Q    The question is, is it possible?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 172

1      A    I'm going to have to say no, then, because we

2     have already seen Dr. Eshraghi try it with one hand and

3     the pressure cooker slid all over the place.

4      Q    So you're telling me it is not possible that he

5     could have just had his hand up on the lid, it's

6     necessary he was using that as a counterbalancing force?

7      A    Well, my initial answer was that that's the most

8     likely.

9           If you are trying to just twist the lid, you're

10    going to need to -- and there is pressure in it, you

11    have to restrain the base from turning.

12          So is there a sliver of possibility that the

13    stars aligned and the frictional qualities of his

14    countertop are different and the weight of it was just

15    right that he was able to rotate it open?  There is a

16    hair of a possibility of that.  But it is unlikely.

17     Q    So your evidence that he was using force to open

18    this lid is solely based on where his hands were, is

19    that correct?

20     MR. HUBERT:  Objection to form.

21     THE WITNESS:  No.  So I'm saying his injuries

22    correspond to what I understand pressurized release is

23    characterized -- sorry, I lost my words here.

24          His injuries correspond to what I understand

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 173

1    would occur under a pressurized release.

2           So because it's a pressurized release that made

3    it all the way to his chest and I can see where they are

4    on his arms, I know that he had to exert effort to turn

5    that.

6           And I've seen from -- well, it was my

7    experience beforehand that you can't just turn the lid

8    because the whole base will rotate with it or move away,

9    and Dr. Eshraghi showed that.  So you're going to need

10   to exert force to keep that pressure cooker from moving

11   around on you.

12        MR. SENN:   Q   Okay.  Let me ask you this way.  The

13   first bullet where it says, "The burns on his right hand

14   and arm are consistent with the right hand on the lid's

15   handle," that statement in and of itself doesn't prove

16   that he was using force, correct?

17        A    Correct.

18        Q    That only shows where his hand was, correct?

19        A    That's right.

20        Q    The second bullet, "The burns on his left arm

21   are consistent with his left hand holding onto the

22   base's handle," the same question, that in and of itself

23   doesn't prove he was using any force, that just shows

24   where his hand was, correct?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 174

1      A    That's correct.

2      Q    Okay.  The third one, his posture, he would be

3    looking downward at the pressure cooker, again, that

4    statement in and of itself only shows that what his

5    posture was, it doesn't prove that he was using force,

6    correct?

7      A    Right.  My basis for effort is that it was under

8    pressure.

9      Q    Okay.  So when you say, "The burns on his left

10   arm are consistent with his left hand holding onto the

11   base's handle," how do you know it was the handle?  How

12   do you know he didn't have his left hand further down on

13   the base?  How do you know it was specifically the

14   handle?

15     A    Because of the burns on top of his thumb and his

16   fingers here.

17     Q    Isn't it possible he could have had his hand

18   down at the base of the pressure cooker and those burns

19   still got on his hand?

20     A    So if he had his hands down near the bottom of

21   it so he is resting on the countertop, then that liquid

22   would have gone all over the other fingers.

23          So I guess if you're saying he had -- he was

24   like just had his hand touching the side of it, I still

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 175

1     think most of the water -- if it had enough to get out

2     of that pressure cooker and come out like what we saw

3     with Dr. Eshraghi's test, then all of that would have

4     jumped over his hand and hit the countertop.

5              But if your hand is up at the lid, now that

6     wave that comes out touches the top part of your thumb

7     and fingers.

8        Q   Now, you said you think.

9              What methodology, equations are you using to

10    come to that conclusion?

11       A   Well, I have that paper from the Journal of

12    Burns that's peer-reviewed where I characterized how

13    water comes out at different fill levels and different

14    pressures.  And there are a number of different

15    conditions that were observed in that testing using

16    high-speed cameras and all sorts of stuff.

17             So if you look at him, how tall he is, where

18    the injuries are, it's likely that most of this water

19    kind of came out more horizontal than vertical because I

20    think he is only 5 foot, 6 or something.  And that's

21    pretty close to the top of where the pot will be on the

22    countertop.  So there wasn't a lot of vertical here.

23    This is mostly horizontal.

24             And if it's mostly horizontal like what we saw

Page 176

1    with Dr. Eshraghi's test, if his hand is down low on the

2    side of the pressure cooker, he is not going to be able

3    to restrain it from moving.  And since there is pressure

4    in it, we know that you have to restrain it from moving

5    somehow.  So it makes sense that he would have his hand

6    on the handle.

7         And that also aligns with what I just said

8    about how the water comes out.  If it's mostly

9    horizontal and his hand is right there at the edge, that

10   water will graze over the top of that hand and hit the

11   thumb and the first fingers and then continue on over.

12        So all of that aligns for me.  So that's the

13   analysis that goes into it.

14   Q   Okay.  So you're using terms like "I think" and

15   "likely."  Do you have any, other than just the paper

16   that you wrote based on those experiments, do you have

17   any formulas, any equations, anything that would tell us

18   that's what happens, that this is what these particles

19   do when they leave the pot?

20   MR. HUBERT:  Objection to form.

21   THE WITNESS:  Right, so we have a peer-reviewed

22   scientific paper that characterizes what water does when

23   it comes out of a pressure cooker.

24   MR. SENN:  Q   Under certain situations, right?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 177

1    A    Well, we tested a quarter full, half full, and

2    all the way full at pressures of 1, 2, 3, and 4 psi.  So

3    there is no way this thing opened at 3 or 4 psi.  And at

4    lower pressures we see -- we characterize exactly what

5    happens.  And we know that it's possible for the water

6    to come out this way more like a --

7    MR. HUBERT:  When you say "this way," can you just

8    describe that for the record.

9    THE WITNESS:  Yes, so more horizontally and radially

10   outward from the lid or the pot, I should say.

11        So that's accepted in the scientific community

12   right now.  I don't need an equation to say that because

13   it's already been established that that's how water can

14   come out.  Now, I say can because it could spray or

15   whatever.

16        But because of his injuries, the only way those

17   puzzle pieces line up is if his hand is at the top and

18   we have that horizontally directed water flow out.  And

19   then once you put those two pieces together, then you

20   get the complete picture of where the hand likely was.

21   Plus we know it was under pressure, which means that he

22   had to be restraining that base from moving around on

23   him.  So that's why he would also have to have his hand

24   on the handle.

Page 178

1        So all of those things go together to give this

2    complete picture.  And I don't need to do an equation to

3    determine that.  And it doesn't need -- you know, we

4    don't have to figure out what velocity is because it's

5    already been characterized in the literature.

6        MR. SENN:  Q   Okay.  The literature meaning the

7    study you did?

8        A   Right, the peer-reviewed study.

9        Q   In that study wasn't the pot affixed to the

10   table somehow?

11       A   Yes.

12       Q   Okay.  Where the base would be immovable?

13       A   That's right.

14       Q   Okay.

15       A   But the mannequin that we used as a surrogate

16   had one hand on each side of the pressure cooker on the

17   handle.

18       Q   Okay.  How long was your surrogate's arms?

19       A   We used a surrogate that was proportionally a

20   50th percentile female.

21       Q   Okay.  You don't know what Mr. Copeland's

22   proportions were, do you?

23       A   Well, I know his height.  And I generated a

24   model here that would tell me based on population data

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 179

1      what his most likely proportions were.

2          Q   So that answer is no?

3          A   Not as I sit here, but I did calculate that.

4          Q   Calculated what?

5          A   His arm lengths.

6          Q   Based on population?

7          A   Correct.

8          Q   Not on him, though?

9          A   That wasn't available to me.

10         Q   Okay.  So you talked today and you have some

11     information in your report about the locations of the

12     burns, things like that.  You have some graphs on page

13     13 and 14.  Those graphs aren't meant to be identical

14     replications, right?  That's meant to be a loose

15     representation of the burn pattern, is that correct?

16         A   Yes, I would say going along with what the

17     captions say, a simplified graphic of the approximate

18     locations.

19         Q   Okay.  Because you haven't seen any pictures of

20     the day the burns happened or anything like that, have

21     you?

22         A   There were pictures of Mr. Copeland at the

23     hospital.  And there are other pictures that I had of

24     him.  I don't remember if they were the day of or the

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 180

1    day after.

2         Q    Okay.  You don't have any -- we were talking

3    about degrees earlier.  You don't have any medical

4    degrees, right?

5         A    I don't have medical degrees, but I actually had

6    a medical doctor on my committee for my master's.

7         Q    Okay.  But you got, again, no medical degree?

8         A    Correct.

9         Q    Any medical training?

10        A    I've had a CPR class, I think that counts, but

11   also --

12        Q    It's more than I've had.

13        A    As far as medical stuff, my master's, you know,

14   we had a cadaver leg that we opened up and had a

15   prosthetic knee in, so I've had that experience, as

16   well.

17        Q    Okay.  You never treated any patients?

18        A    No, I am not a treating person, but I have tons

19   of experience reading doctors' notes and reading medical

20   records.

21        Q    I do, as well, but I wouldn't hold myself out as

22   a medical expert.  You're not either, right?

23        A    Right.  I rely on doctors to make the diagnoses.

24        Q    Okay.  Specifically, you don't have any

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 181

1    experience treating burns?

2        A    I have never treated a single person in my life.

3        Q    Okay.

4        A    But I do rely on what the medical professionals

5    diagnose, and I use that as a basis for my opinions.

6        MR. SENN:  Okay.  I think I'm almost done.  Are you

7    good or do you need a break?

8        THE WITNESS:  I could go another ten minutes if you

9    want to, but then I'm going to need a break and probably

10   a snack.

11       MR. SENN:  I think I'll be done by then.

12       MR. HUBERT:  I'm going to have some questions, just

13   so you know.

14       MR. SENN:  Q   Just really quick, I want to run

15   through your February 20th opinions.  I don't think I'm

16   going to introduce this.  I just want to make sure that

17   we're not missing anything.

18            No. 1 is there is no evidence that the pressure

19   cooker was defective or unreasonably dangerous as sold.

20            That's kind of encapsulated in your June

21   report, right?

22       A    Correct.

23       Q    Your opinion is still that Dr. Eshraghi has not

24   provided any scientific analysis, testing, basis or

Robert S. Giachetti , Ph.D.                                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 182

1    conclusive evidence that the incident pressure cooker

2    contains a defect responsible for Mr. Copeland's

3    injuries, you still have that opinion?

4        A    Correct, he still hasn't identified a specific

5    flaw.

6        Q    You say Dr. Eshraghi states that a pressure

7    cooker can be opened while still pressurized is

8    unreasonably dangerous, and you disagreed with that.

9             Do you still hold that opinion?

10       A    Right, because there are a number of -- it's an

11   unlimited statement that he made, and you need to limit

12   that before I can agree with it.

13       Q    Yes.  You make some limitations like I think you

14   say something about somebody could use a tool to open

15   it.  You're not opining here that Mr. Copeland used some

16   kind of tool, something other than his hands to open

17   this, are you?

18       A    Correct.  So the UL 136 says one person.  I

19   suspect that it was two.  But that also tool usage would

20   come into that, as well.

21       Q    You think he did use a tool?

22       A    No, I don't.  I don't.

23       Q    Okay.  And then your last opinion you say

24   Dr. Eshraghi has incomplete information and performs an

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 183

1    incomplete analysis using data that's available,

2    prohibited from rendering an opinion.

3           I think that's probably because y'all hadn't

4    tested the pot at that time?

5       A   Yes, his initial report sounded like he never

6    looked at a pressure cooker before.  So I think that

7    changed between the first and second report.

8       Q   Okay.  And you understand that at the time he

9    wrote that first report he hadn't inspected the cooker

10   because we were waiting for you guys to get onboard,

11   right?

12      A   I don't -- he hadn't seen it at that point, to

13   my knowledge, so I don't know what was going on with

14   him.

15      Q   Okay.  We talked a little bit about this, the

16   float, or not a little bit, we talked a lot about the

17   float valve.  And I know in her testimony Mrs. Copeland

18   testified that they felt the float valve had dropped,

19   right?

20      A   Uh-huh.

21      Q   Now, in this particular pot the float valve is

22   recessed, right?  It doesn't protrude out of the top of

23   the handle when it's up?

24      A   Correct.

Robert S. Giachetti , Ph.D.    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 184

1    Q    Is it your understanding or do you know that in

2    later models that was changed to show the float valve

3    protruding through the top of the handle?

4    A    It varies from model to model.  So the new one

5    that I have, the Emeril that I have, the float valve is

6    not easy to see.  It's actually below a screen.  Some

7    models have a more obvious float valve than others.  But

8    this one you can observe it in here.  But I'm not sure

9    whichever one, another one that you're talking about.

10    Q    Okay.  Do you know or do you have an opinion

11    about whether in Tristar's design of this pressure

12    cooker it was meant to be able to be visibly seen so

13    that the customer knew when the float valve had dropped?

14    A    Well, I know that there is an instruction on the

15    pressure cooker's lid to look for it to fall.  So as far

16    as I can tell based on that, I haven't seen any internal

17    communications or anything that describes what they were

18    thinking.  But they put a label on there to look for it.

19    So they must believe that you could see it.

20    Q    Was that label on this lid?

21    A    Yes.

22    Q    Okay.  Do you have an opinion about whether

23    that's easy to see since it's recessed?

24    A    You know, I have the 770, which is nearly

Robert S. Giachetti , Ph.D.                  January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 185

1    identical to this -- well, I had it until like 2018 or

2    2019.  I didn't have an issue when I was using it as a

3    consumer seeing it.

4        Q   Okay.  You haven't done any kind of research or

5    investigation as to any kind of studies consumers as a

6    whole whether that's been addressed, have you?

7        A   I haven't seen any studies that critique or

8    enforce the visibility of the float valve.

9        MR. SENN:  Okay.  I think that's all I have for now.

10   I may have a few more after Ted, depends on what he asks

11   you, but I'm done for now.

12       MR. HUBERT:  You need to take a break to eat?

13       THE WITNESS:  Yes, if you wouldn't mind, if we could

14   eat something.  There is a place downstairs if we want

15   to go fast.

16       MR. HUBERT:  Yes, if we can do a half hour, 20

17   minutes.

18       THE WITNESS:  That works for me if you guys are

19   fine.

20       MR. SENN:  I mean, I'm good with -- I don't need

21   one, but I'm good if you need one.

22       THE WITNESS:  I do.  Actually, I'm pretty hungry.

23           (a brief recess was taken from 1:30 p.m. to

24           2:09 p.m.)

Robert S. Giachetti , Ph.D.                     January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 186

1                          EXAMINATION

2                      by Mr. Hubert:

3       Q    All right.  Dr. Giachetti, you have four

4    opinions outlined or identified in your June 28th, 2023,

5    report, is that true?

6       A    Yes.

7       Q    And counsel asked you about those opinions, so

8    my question is simply, in opinions 1 and 2 did you rely

9    upon the narrative that plaintiffs provided you,

10   including the response to the demand for admissions?

11      A    I did.

12      Q    And did you do forensic testing to understand

13   what the significance of that narrative and admissions

14   were?

15      A    No.

16      Q    Okay.  And when you followed the admissions and

17   the recipe, it was your testimony that the unit is not

18   pressurized?

19      A    That's correct.

20      Q    Now, Dr. Eshraghi said that he tested water to

21   see if after 45 minutes the unit was still pressurized.

22   And he gave some examples.  He did it a couple of times.

23   He said, well, at one time at 45 minutes there was no

24   pressure but then at another point in time there was

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 187

1    pressure left up until I think he said around 55

2    minutes.

3              Is that a scientifically reliable test to

4    determine whether the unit that plaintiff was using on

5    the day in question was still pressurized after 45

6    minutes when you follow their narrative and admissions?

7        A    So in this case, no, because, firstly, just

8    water doesn't follow their recipe.  Secondly, they used

9    a large piece of meat in there.  And meat has something

10   like a quarter of the heat capacity of water.  So that

11   means the meat will have less heat energy in it and will

12   be able to cool down faster than water.

13             So if you just use water, you're likely to get

14   a number that's higher.

15       Q    And is that why you took the effort to replicate

16   what plaintiff was specifically cooking as best you

17   could?

18       A    I just as good practice used the recipe.  And

19   then after the fact made the connection to the specific

20   heat of meat versus water.

21       Q    So, yes or no, was Dr. Eshraghi's testing to

22   determine whether the unit would still be pressurized

23   after 45 minutes with just water, was that reliable to

24   determine what happened in this case?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 188

```
1       A    No.

2       Q    Now, I think you explained there is an inherent

3    inconsistency in the plaintiffs' version of events where

4    the narrative tells you the unit is not pressurized but

5    their conclusion where they say that the unit was

6    pressurized and expel contents there is a contradiction

7    there, right?

8       A    That's correct.

9       Q    And so when you analyzed or so if you assume

10   that the unit was pressurized, did your testing

11   reveal -- did you also forensically test the unit under

12   pressure?

13      A    So the incident unit was tested under a low

14   pressure.  And then I tested exemplars at various levels

15   of pressure.

16      Q    Right.  And so you wanted to see what would

17   happen -- how hard or easy it would be opened if the

18   unit was pressurized, right?

19      A    Correct.

20      Q    And your opinion was that it was hard to open,

21   and, therefore, the unit was not defective, right?

22      A    That's right, that it was not easy to open.

23      Q    Okay.  Now, Dr. Eshraghi testified that he only

24   used the subject unit to perform his tests.  Is that a
```

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 189

1      scientifically valid way to determine whether the design

2      of this pressure cooker meets UL 136?

3          A    No, because as I described earlier, the lock

4      changes once the lock has been overcome.  It's

5      essentially broken.  So the only thing that you can

6      infer from these tests is that the changed condition of

7      the lock still resists 45 pounds at the edge.

8          Q    And you recall Dr. Eshraghi testifying that

9      he -- that if a unit passes UL 136, it's reasonably safe

10     and not defective?

11         A    I recall reading that.

12         Q    Okay.  And he performed two tests in this case,

13     is that true?

14         A    To my knowledge.

15         Q    Okay.  The two tests are the backyard test,

16     right?

17         A    Right.

18         Q    And the test with the torque wrench?

19         A    Correct.

20         Q    Are either of those tests a UL 136 test?

21         A    No.

22         Q    Do either of those tests tell you from a

23     scientific perspective whether this unit, the design of

24     this unit passes UL 136?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 190

1        A    No, because this unit has been damaged.

2        Q    When UL does its UL 136 test, does it use a unit

3    that has been forced open previously or a brand new

4    unit?

5        A    A brand new unit.

6        Q    So testing a broken unit does not tell you

7    whether the unit will pass UL 136, right?

8        A    Correct.

9        Q    Does Dr. Eshraghi have an opinion in this case

10   whether testing a broken unit has any impact on the

11   unit's ability to withstand external force on the lock?

12       MR. SENN:  Objection, calls for speculation.

13       THE WITNESS:  I didn't -- I have not seen that

14   opinion.

15       MR. HUBERT:  Q   Do you recall me asking him at his

16   deposition if he agreed or disagreed or had any opinion

17   with your opinions?

18       A    My reading of his deposition is that he didn't

19   have an opinion regarding my opinion of the broken lock.

20       Q    And the impact, if any, that the broken lock has

21   on it to withstand external force, right?

22       A    Correct.

23       Q    So, in other words, your opinion that the broken

24   lock makes it easier to open is not challenged by

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 191

1    Dr. Eshraghi in this case?

2         A    That's correct.  And it's also supported by my

3    testing with the exemplar.

4         Q    And so should Dr. Eshraghi have tested an

5    exemplar like you did to determine whether this unit can

6    meet the requirements of UL 136?

7         A    That's right.

8         Q    The back of the -- in your report from June you

9    have a picture of the pressure cooker, and I'm talking

10   about that picture.

11        A    Figure 1?

12        Q    Yes, figure 1 on page 4.  There is a UL mark

13   there.  What is that?

14        A    It says UL listed.

15        Q    Okay.  And then did you see the certificate from

16   UL in this case?

17        A    I did.

18        Q    Does that certificate indicate or state that UL

19   tested the pressure cooker to UL 136 and it passed?

20        A    That's correct.

21        Q    And Dr. Eshraghi in his first report, did he

22   want to know whether the unit passed UL 136?

23        A    I believe so.

24        Q    Okay.  And he saw that certificate of compliance

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 192

1    with UL 136, right?

2        A    That's right.  I think in his deposition he

3    testified that he reviewed a bunch of Tristar design

4    documents and that was included in it.

5        Q    Okay.  So tell me why the backyard -- Let me

6    back up.

7            Do you remember when Dr. Eshraghi testified

8    that the backyard test he performed was not a UL 136

9    test?

10       A    Yes.

11       Q    Can you explain for us why the backyard test was

12   not a UL 136 test?

13       A    Sure.  So --

14       Q    And I can pull up the video if that would help

15   you.

16       A    I think I have an okay recollection.  So he

17   didn't, to my knowledge, did not fill it halfway.  I

18   believe he filled it more than halfway.  The heating of

19   the unit was not in the spirit of UL 136.  So either you

20   turn the unit on and get it to heat and you unplug it as

21   soon as the float valve raises or you bring it all the

22   way to the point at which the timer starts, apply the

23   load, and then unplug it and let the pressure dissipate

24   from the unit.  He didn't do either of those things.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 193

1        And then UL 136 also does not have -- does not

2    describe anywhere within it where you use one or two

3    hands to open the unit.

4        And it also describes that the unit should be

5    restrained by the handles on the base, which that also

6    didn't occur.

7        Q    And the unit was broken, right?

8        A    That's right.

9        Q    Did the backyard test that Dr. Eshraghi

10   performed -- Let me back up.

11       There was a lot of questions from plaintiffs'

12   counsel about the perception, subjective perception

13   someone has on whether something is easy or hard to

14   open.

15       Do you recall that testimony?

16       A    I do.

17       Q    In the video with the broken lock, was

18   Dr. Eshraghi able to use one hand to open the unit?

19       A    No.

20       Q    And plaintiffs' version of events in this case

21   is that they used one hand to open the unit, right?

22       A    That's my recollection.

23       Q    So what does that tell you in terms of your

24   conclusions in terms of whether plaintiff had one hand

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 194

1    or two hands on the unit?

2         A    Well, my conclusions are that he had two hands

3    on the unit.

4         Q    And going back to plaintiffs' questioning about

5    subjective uses of force, Dr. Eshraghi testified as

6    follows on page 125 of his deposition, line 22, "If

7    Mr. Copeland only had one hand on the lid holding the

8    handle, would it -- would significant force be needed to

9    get up to 45 pounds?  Answer:  Probably."

10            What does that tell you with respect to the

11   line of questioning that plaintiffs' counsel was

12   discussing with you about force and whether force was

13   significant or not?

14        A    So one-handed force at that level is significant

15   and difficult.

16        Q    And does Dr. Eshraghi agree with you on that?

17        MR. SENN:  Object to the form, calls for

18   speculation.

19        THE WITNESS:  It sounds like it.

20        MR. SENN:  Q    Now, where did you have to go to test

21   the subject unit with Dr. Eshraghi?

22        A    I went to his house in California.

23        Q    And where does his -- Okay.  He lives in

24   California.

Robert S. Giachetti , Ph.D.                      January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 195

1              So you flew there?

2         A    I did.

3         Q    And when you went there, was it your impression

4    that he was going to do this backyard test?

5         A    Yes.

6         Q    That you were going to have an opportunity to

7    observe him do it, right?

8         A    Yes.

9         Q    And it's from your testimony, I take it, that

10   you feel that that is not a scientifically valid test

11   that would tell you whether the unit passes UL 136?

12        A    That's correct.

13        Q    So you wanted to watch it so you could point out

14   all of the flaws with the test?

15        A    Yes.  I was very interested to see exactly what

16   he was going to do and how he was going to do it.

17        Q    And did you have a camera set up to record the

18   test?

19        A    Yes.

20        Q    And why didn't you record it?

21        A    I believe he had a sidebar with counsel, and

22   they decided that they didn't want to do it.  I don't

23   remember who told me, but one of them told me that they

24   weren't going to do that test.  And I said, well, okay,

Robert S. Giachetti , Ph.D.                     January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 196

1    then it sounds like we're finished, I'm paraphrasing,

2    it's not a direct quote.  And so I packed up the gear

3    and I left.

4         Q    Was Mr. Senn present at the day of testing at

5    Dr. Eshraghi's house in California?

6         A    Yes.

7         Q    All right.  And you were told by one of them or

8    both of them that they would not perform the test?

9         A    Correct, after it was set up and I had set up my

10   video camera and actually recorded some footage there.

11        Q    Okay.  You then left and subsequently learned

12   that they did perform the test, right?

13        A    That's right.

14        Q    Because when we received Dr. Eshraghi's file,

15   you saw the video where he performs the test?

16        A    Correct.

17        Q    All right.  Now, Dr. Eshraghi testified, and you

18   mentioned it, that there was a hissing sound that can be

19   heard on the video.  And Dr. Eshraghi stated at his

20   deposition that when steam escapes from the unit, it

21   makes a hissing sound.

22             Do you agree with that?

23        A    I do agree with that.

24        Q    And he said we can't see it on the video,

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 197

1    though, because the camera was far away.

2         Had you been there, would you have been able to

3    make personal observations of whether there was steam

4    escaping from the unit?

5         A    Probably.

6         Q    And why is it significant to know if steam is

7    escaping from the unit?

8         A    Well, it gives a sense of how the lid was on

9    originally, what sort of pressures you could expect.

10   And I would have known how long the pressure cooker was

11   allowed to heat.  So there are a number of the

12   conditions of the pressure cooker leading up to opening

13   it that would have been clear had I been there.

14        Q    And do all of those conditions relate to how

15   easy or how hard it is to get the lid off?

16        A    Yes.

17        Q    Have you ever seen a similar test to the

18   backyard test before?

19        A    Yes.

20        Q    And who performed that test?

21        A    John Pratt.

22        Q    And is that the person that got Dr. Eshraghi

23   involved in pressure cooker litigation?

24        MR. SENN:  Objection, calls for speculation.

Robert S. Giachetti , Ph.D.                        January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 198

1        THE WITNESS:  Actually, Dr. Eshraghi told me that at

2     the inspection.  And he also had Dr. Pratt's test

3     enclosure in his backyard, as well.  And when I said I

4     recognize it, he said he got it from John Pratt.

5        MR. HUBERT:  Q   And when you saw the video where

6     John Pratt did this backyard test, and when I say

7     backyard test, was that test also in John Pratt's

8     backyard?

9        A   Yes.

10       Q   Okay.  And when you saw him do the backyard

11    test, were you able to observe based upon the location

12    of the camera steam coming out of the unit?

13       A   Yes.

14           And he used the similar technique with the

15    leverage on the handle of the base and the handle to

16    open the pressure cooker.

17       Q   Okay.  Now, the other test that was performed

18    with the torque wrench by Dr. Eshraghi, why doesn't that

19    tell us whether the unit will pass or fail UL 136?

20       A   Well, again, that's on the incident unit which

21    has a broken lock.  So it only is going to give us

22    inferences about the unit with the broken lock.

23       Q   Okay.  So was the purpose of that testing to

24    understand kind of at a baseline what a broken lock can

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 199

1    withstand in terms of force?

2        A    Yes.

3        Q    And so is it true that none of the testing that

4    Dr. Eshraghi did tells us whether the design of the unit

5    passes or fails UL 136?

6        A    Correct.

7        Q    But the certificate that you saw does tell us

8    that, right?

9        A    And my own testing in addition to that.

10        Q    And when you performed testing on the exemplar

11    unit, you actually tested UL 136?

12        A    That's right.  So I used commonly and easily

13    obtainable lab equipment to put a rope around a pulley

14    with 100 pounds of sand in it and used that to run the

15    UL 136 test.

16        Q    Going back to the torque wrench test, you

17    testified that the pressure in your estimation was below

18    1 psi, right?

19        A    Correct.

20        Q    And so if you open -- I know you had a lock or a

21    key on it to prevent the lid from completely opening.

22    But had that lock and key not been out there, was the

23    amount of pressure in the unit unable or so low that no

24    explosive event were to occur?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 200

1         MR. SENN:  Object, calls for speculation.

2         THE WITNESS:  Based on the Journal of Burns

3    peer-reviewed paper with half filled, I don't believe

4    that there would have been risk of injury from that.

5         MR. HUBERT:  Q   So that means that when there is no

6    risk -- when the unit is pressurized but there is no

7    risk of injury, when using a unit with a broken lock, it

8    still takes 45 pounds of force to open the unit?

9         A   Correct.

10        Q   Which Dr. Eshraghi characterized as probably

11   being significant force when only using one hand?

12        A   Correct.

13        Q   And had the equipment you purchased worked that

14   day at Home Depot, you would have been able to measure

15   exactly the pressure, is that right?

16        A   I would have been able to enforce the pressure,

17   which is what my goal was.

18        Q   You regulate the pressure which allows you to

19   know what it is?

20        A   That's right.

21        Q   And why did you have to go to Home Depot to do

22   that?  Why didn't Dr. Eshraghi have that available?

23        MR. SENN:  Object, calls for speculation.

24        THE WITNESS:  He doesn't have an air compressor in

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 201

1    his garage.

2         MR. HUBERT:   Q   Okay.  Were you informed that he

3    didn't have the equipment that was needed for you to

4    perform the test and is that why you went to Home Depot?

5         A   Yes, I went to California a day early so that I

6    could go and purchase it.

7         Q   And you were asked questions about UL 136.

8    There was some testimony about 9.1.

9              Is it true that if the unit opens under

10   pressure but there is no hazard or risk of -- no risk of

11   injury when it's able to be opened because the pressure

12   is so low, that's a pass?

13        A   That's my understanding of 9.6.

14        Q   And does that relate to the fact that similar to

15   the test you did with Dr. Eshraghi that when the

16   pressure is so low that no explosive event can occur

17   even when it's opened there is no harm?

18        A   Correct.

19        Q   And that's why it's a pass under UL 136?

20        MR. SENN:  Speculating.

21        THE WITNESS:  That's my understanding of 9.6.

22        MR. HUBERT:  Thank you, Dr. Giachetti.  I don't have

23   any further questions.

24        MR. SENN:  I just got a few follow-up.

Robert S. Giachetti , Ph.D.                              January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 202

1                          FURTHER EXAMINATION

2                          by Mr. Senn:

3      Q    Right before our break or during our break you

4  went to eat lunch with Mr. Huber, who is counsel for

5  Tristar, correct?

6      A    Correct.

7      Q    What did you guys talk about at lunch?

8      A    His wife and some of his in-laws who he had

9  dinner with yesterday.

10     Q    Okay.  Did y'all talk about anything about this

11 case?

12     A    No.

13     Q    Didn't discuss anything at all?

14     A    No.

15     Q    What is UL?

16     A    Underwriters Laboratory.

17     Q    What is that?

18     A    It's a business that writes standards.  And then

19 also you can ship your things to them to have them

20 tested to those standards.  And if you pass them, then

21 you can get a label to put on your device or product or

22 whatever and show that you've passed it.

23     Q    Okay.  So they write their own standards, and

24 they give you a label if your product passes those

Robert S. Giachetti , Ph.D.                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 203

1      standards, is that correct?

2          A    Right.  So they -- you can't -- I don't believe

3      you can test it yourself.  But there are several other

4      corporations that are licensed or I don't know how

5      they're authorized, but you can get ETL or CTL licenses,

6      not license, but you can get the authorization to mark

7      that you've passed it from a number of other

8      institutions; but, yes.

9          Q    Other companies will test to UL standards, and

10     they're allowed to issue what's called an authorization

11     to mark for UL if they pass those tests?

12         A    Right.

13         Q    And those are companies that have agreements

14     with UL to --

15         A    Yes, I'm not sure what they need to do to have

16     that certification process, but a company like Intertek

17     will also do that.

18         Q    Okay.  So you get your product tested at

19     Intertek, and then Intertek has a license or agreement

20     or whatever it is with UL that UL said, okay, you can do

21     the testing to our standards?

22         A    I actually think it might be their own label,

23     but it will be like Intertek, you know, this passes.

24         Q    Passes UL?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 204

1      A    Yes.

2      Q    That's called an authorization to mark?

3      A    When you've passed the test, then you get that

4    certificate.

5      Q    UL is not like a government entity or anything

6    like that, it's just a private company who says we've

7    created these standards, get your product tested, if

8    they meet these tables, we'll give you a label that says

9    it passes our standards?

10     A    That's right.

11     Q    And that's what's called the authorization to

12   mark?

13     A    Yes.  So once you have the authorization to

14   mark, then I don't know how you get the sticker or the

15   label to go on it, but that's what gives you the backing

16   to do it.

17     Q    The authorization to mark is basically their

18   stamp saying you met our protocol or our standards?

19     A    That's right.

20     Q    And that was done sometime in the production of

21   whatever product was getting tested, UL or Intertek,

22   whoever is doing the UL authorization mark, they're not

23   testing every single pot that comes off the production

24   line, right?

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 205

1      A    Well, so for this one I think it says you only

2   need to test one to pass this test.  So that depends

3   on -- the standards are different for all different

4   things.  Like they have a garage door standard, too, you

5   know.

6      Q    Yes, that's what I mean.  They're like the, you

7   know, say Tristar gets their product, they get an

8   authorization to mark because they submitted their

9   product, an exemplar to UL or Intertek, whoever issues

10  the authorization to mark, they get that authorization

11  to mark, then they can put it on every pressure cooker

12  on that model?

13     A    Yes.

14     Q    They're not having UL or Intertek test every

15  single individual pressure cooker, right --

16     A    Right.

17     Q    -- as it comes off the assembly line?

18     A    Right, no, they wouldn't normally do that.

19     Q    And in production and in manufacturing, I'm sure

20  you've seen this in your practice, you can have either

21  inadvertently or advertently, however you want to say

22  it, variances in production, material, the way it's

23  built, how it's put together, things like that, right?

24     A    Yes.

Robert S. Giachetti , Ph.D.                      January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 206

1      Q    And just so I'm clear, your opinion is that UL

2    136 doesn't even apply to this pressure cooker, is that

3    right?

4      A    Right, because it's not an over-the-stove

5    pressure cooker.

6        MR. SENN:  That's all I have.

7        MR. HUBERT:  No other questions.

8        THE WITNESS:  Thank you.

9        MR. SENN:  Did y'all discuss reading and signing,

10    too?

11        MR. HUBERT:  Do you want to read the dep before you

12    sign or waive?

13        THE WITNESS:  Yes, please.

14            (Whereupon, the deposition concluded at 2:37

15            p.m.)

16                          - - - - -

17

18

19

20

21

22

23

24

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 207

1    STATE OF ILLINOIS   )

                         )   ss:

2       COUNTY OF COOK   )

3

4           The within and foregoing deposition of the

5    aforementioned witness was taken before TRACY L.

6    BLASZAK, CSR, CRR, and Notary Public, at the place, date

7    and time aforementioned.

8           There were present during the taking of the

9    deposition the previously named counsel.

10          The said witness was first duly sworn and was

11   then examined upon oral interrogatories; the questions

12   and answers were taken down in shorthand by the

13   undersigned, acting as stenographer and Notary Public;

14   and the within and foregoing is a true, accurate and

15   complete record of all of the questions asked of and

16   answers made by the aforementioned witness, at the time

17   and place hereinabove referred to.

18          The signature of the witness was not waived,

19   and the deposition was submitted, pursuant to

20   Rules 30(e) and 32(d) of the Rules of Civil Procedure

21   for the United States District Court, to the deponent

22   per copy of the attached letter.

23          The undersigned is not interested in the within

24   case, nor of kin or counsel to any of the parties.

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 208

1         Witness my official signature and seal as

2    Notary Public in and for Cook County, Illinois, on this

3    13th day of February, A.D. 2024.

4

5

6

7

8    _____

     TRACY L. BLASZAK, CSR, CRR

9    CSR No. 084-002978

     One North Franklin Street

10   Suite 3000

     Chicago, Illinois  60606

11   Phone:  (312) 442-9087

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 209

1    THADDEUS J. HUBERT, IV

2    thubert@goldbergsegalla.com

3                        February 13, 2024

4    RE: Copeland, Edward A., Et Al v. Tristar Products, Inc., Et Al

5         1/31/2024, Robert S. Giachetti , Ph.D. (#6436010)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-southeast@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

Page 210

1    Copeland, Edward A., Et Al v. Tristar Products, Inc., Et Al

2    Robert S. Giachetti , Ph.D. (#6436010)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Robert S. Giachetti , Ph.D.                        Date

25

Page 211

1    Copeland, Edward A., Et Al v. Tristar Products, Inc., Et Al

2    Robert S. Giachetti , Ph.D. (#6436010)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Robert S. Giachetti , Ph.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Robert S. Giachetti , Ph.D.                    Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

Robert S. Giachetti , Ph.D.    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

[& - 30]    Page 1

## &

**&** 2:3

## 0

**00212** 1:6
**084-002978**
  208:9
**08540** 2:10

## 1

**1** 3:12 10:15,17
  34:6,12 42:13
  45:24 78:19
  79:24 80:9
  83:12,24 108:1
  108:2 109:15
  110:11 111:13
  125:1 177:2
  181:18 186:8
  191:11,12
  199:18
**1,000** 15:19
**1/2** 83:12
**1/31/2024**
  209:5
**10** 3:12 24:10
  24:12 25:2
  64:12 125:6
  129:16 132:17
  132:19,22,22
  139:6
**100** 28:20
  128:1 143:3
  155:4 157:23
  158:11,16,20
  161:24 162:4,6

162:14 199:14
**1026** 26:10
  161:13,15
**10:16** 47:24
**10:21** 48:1
**10k** 49:15
**11:54** 119:22
**125** 194:6
**12:04** 119:23
**13** 179:13
  209:3
**136** 3:16 4:22
  26:9,10 126:17
  157:3,8,10,16
  157:17 158:24
  159:7,10,15
  161:8,14,19,22
  162:11 182:18
  189:2,9,20,24
  190:2,7 191:6
  191:19,22
  192:1,8,12,19
  193:1 195:11
  198:19 199:5
  199:11,15
  201:7,19 206:2
**13th** 208:3
**14** 179:13
**15** 21:18 24:16
  25:1 33:23
  76:15 77:23
**15,000** 64:12
**16** 113:21
  117:11

**160** 3:16
**167** 3:17
**18** 126:14
  131:2,20,22
**186** 3:6
**1997** 10:24
**1998** 12:22
**1:30** 185:23

## 2

**2** 3:13 67:11,12
  78:20 83:12
  86:5,7,9
  101:15 110:18
  177:2 186:8
**20** 9:6 24:16
  25:1 33:23
  55:11 60:11
  102:1 134:8
  185:16 211:15
**200** 2:10 143:2
**2000** 11:4
  17:18,24 18:2
**2001** 16:6 17:9
  17:23 22:1
**2005** 17:18
**2008** 11:7 17:9
  21:6
**2018** 72:24
  185:1
**2019** 72:24
  185:2
**202** 3:5
**2020** 21:14
**2022** 65:10

**2023** 8:18,19
  9:4,7,8 65:10
  76:11 186:4
**2024** 1:17 3:2
  208:3 209:3
**20644** 208:7
**20th** 8:18 9:3
  102:11,18
  181:15
**21** 102:1
**212** 59:1,8,9,10
  59:13 60:7,12
  61:1,14,15
  99:18 100:4
**22** 194:6
**222** 1:15
**2250** 1:15
**23** 67:1 134:17
  134:18 135:4
  137:7 138:13
  143:20
**25** 125:12
  143:5
**28** 8:19 9:4,8
**28th** 75:16,19
  186:4
**2:09** 185:24

## 3

**3** 3:15 9:16,18
  17:17 85:3
  101:20 124:16
  125:12 167:11
  177:2,3
**30** 207:20
  209:16

Robert S. Giachetti , Ph.D.
January 31, 2024

Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[3000 - account]**

Page 2

**3000**  208:10
**301**  2:9
**31**  3:2
**312**  208:11
**31210**  2:5
**31st**  1:17
**32**  207:20

**4**

**4**  3:5,16 86:21
  107:20 109:11
  110:2,15 160:4
  160:6 168:2
  177:2,3 191:12
**40**  129:20,23
  133:15
**405-0300**  2:5
**42,000**  67:5
**442-9087**
  208:11
**45**  103:16
  124:19,19
  125:23 126:14
  129:20,23
  131:21,22
  133:2,3,15,20
  134:13,20
  143:20 147:15
  186:21,23
  187:5,23 189:7
  194:9 200:8
**478**  2:5

**5**

**5**  3:17 26:22
  49:17 125:7

132:21,21
167:1,2 175:20
**50**  18:19 26:21
  27:11 39:9
  132:22 134:5
  134:15 136:16
**50th**  178:20
**55**  187:1
**58**  134:15
  139:20 140:21
**5:22**  1:6

**6**

**6**  125:5 175:20
**6/28/23**  3:15
**60**  134:12,20
  135:6 137:18
  138:13,23
  139:9 142:14
  142:16,20,21
  143:10,21,24
  144:6,22
  146:10,16
  147:6,11
**600**  15:19
**60606**  208:10
**609**  2:11
**6320**  2:4
**6436010**  209:5
  210:2 211:2
**67**  3:13

**7**

**7**  97:21 113:21
  116:23 125:5

**70**  137:15
**770**  155:14,16
  184:24
**771**  155:17

**8**

**8**  133:24

**9**

**9**  3:15 100:6
  164:6
**9.1**  164:6
**9.1.**  201:8
**9.3**  161:23,23
  162:9
**9.6**  163:2,3,21
**9.6.**  201:13,21
**9.8**  163:19
  164:4
**9.8.**  162:17
**90**  24:14
**95**  138:6
  146:17
**98**  16:2
**986-1301**  2:11
**99**  16:3 93:24
**9:25**  1:17

**a**

**a.d.**  1:17 208:3
**a.m.**  1:17 47:24
  48:1 119:22
**abc**  1:7
**ability**  31:7,9
  53:16 80:15
  83:15 129:4
  134:12,16

171:1 190:11
**able**  63:17
  64:22 79:1,13
  95:10 113:14
  114:2,23 148:3
  148:19 150:7
  164:13 172:15
  176:2 184:12
  187:12 193:18
  197:2 198:11
  200:14,16
  201:11
**abnormal**
  152:15,22
  153:7,11,15,17
**above**  41:3
  91:19 114:16
  128:18 163:3
  209:6 211:7
**absence**  79:1
**academic**  22:2
  44:6
**academically**
  20:10
**accent**  6:21
**acceptable**
  78:24 79:10
**accepted**  20:10
  177:11
**accident**
  110:20
**accordion**
  156:5,9
**account**  107:16
  138:6 142:12

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[accuracy - ambient]**                                              Page 3

| | | | |
|---|---|---|---|
| **accuracy** 209:9 | 57:4 65:5 | **adopts** 26:4 | **agreements** |
| **accurate** 9:1 | 69:13 82:9,12 | **advance** 57:2 | 203:13 |
| 10:18 28:21 | 98:9 117:7,16 | **advantage** | **ahead** 26:12 |
| 37:13 52:3 | 119:20 121:1 | 126:13,16 | **air** 55:10 77:2 |
| 54:21 59:3 | 129:6 135:2 | 127:1 128:19 | 78:18 200:24 |
| 110:10,22 | 155:2 156:5 | 131:3 132:3 | **aisles** 41:24 |
| 207:14 | 160:16 167:4 | **advertently** | **al** 209:4,4 |
| **acknowledge...** | 171:1 180:5 | 205:21 | 210:1,1 211:1 |
| 211:3 | 184:6 185:22 | **advice** 72:17 | 211:1 |
| **acknowledg...** | 196:10 198:1 | **affect** 5:24 27:7 | **alex** 84:20 |
| 209:12 | 199:11 203:22 | 52:15 54:19 | 93:17 |
| **acronym** 28:18 | **actuator** 44:4 | 104:4 | **align** 169:11 |
| **acted** 70:13 | **adams** 1:15 | **affixed** 178:9 | **aligned** 172:13 |
| **acting** 207:13 | **add** 4:20 67:7 | **aforemention...** | **aligns** 109:1,4 |
| **action** 55:2 | 67:14 | 207:5,7,16 | 169:2 176:7,12 |
| 118:15 164:7 | **addition** 91:4 | **ago** 29:15 | **alleged** 39:22 |
| 164:14 165:14 | 128:6 199:9 | 30:17 33:12 | 47:11 |
| 170:23 | **additional** 5:2 | 35:11 | **allotted** 209:19 |
| **actions** 165:15 | **additions** 211:6 | **agree** 6:5 28:19 | **allow** 82:7,12 |
| **activate** 82:8 | **addressed** | 87:14 94:12 | 93:20 99:23 |
| **activated** 82:3 | 185:6 | 96:15 133:18 | 155:7 |
| 82:6 154:4 | **adds** 131:6 | 137:21 142:7,9 | **allowed** 4:13 |
| **activates** 80:12 | **adequate** 23:13 | 145:19 146:10 | 46:17 197:11 |
| **actively** 22:15 | 24:1 | 146:13,14 | 203:10 |
| 24:11 | **adjacent** 106:4 | 170:3 182:12 | **allows** 59:18 |
| **activity** 138:17 | **adjust** 132:2 | 194:16 196:22 | 78:8 83:3 94:2 |
| **acts** 56:5 61:3 | **admission** 12:8 | 196:23 | 98:1 144:6 |
| **actual** 55:13 | **admissions** | **agreeable** 5:16 | 200:18 |
| 70:1 | 103:13 104:15 | 71:11 | **alloy** 12:22 |
| **actually** 18:17 | 104:18 108:24 | **agreed** 4:17 | 14:8 22:16 |
| 24:24 25:10 | 186:10,13,16 | 76:17 190:16 | **alternate** 79:2 |
| 28:20 29:2,17 | 187:6 | **agreement** 4:12 | **alternating** |
| 30:16 32:15 | **admitted** 63:10 | 45:18 70:18 | 20:3 |
| 35:15 46:16 | 64:15,16 | 138:9 203:19 | **ambient** 58:21 |
| 49:20 56:13 | | | |

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[american - astm]**                                                    Page 4

**american** 25:12
36:4
**amount** 81:14
124:10 129:14
134:14 138:18
147:17,18
149:16 153:18
199:23
**analysis** 36:18
36:21 38:18
40:11 87:21
108:5,12,21
110:16 120:10
166:4 176:13
181:24 183:1
**analyzed** 188:9
**angles** 135:17
**ankle** 38:13
**answer** 4:17
6:15,23 7:4
50:14 53:12
102:10 158:2,3
172:7 179:2
194:9
**answers** 207:12
207:16
**anticipate** 6:12
**anticipating**
151:9
**anybody** 141:6
**anyway** 40:8
46:18 50:20
**appended**
211:7

**applicable**
161:14 209:8
**applications**
42:15
**applied** 44:7
126:21 127:5
131:13,21
132:17
**applies** 126:23
131:19 157:8
157:13 159:8
160:11,19
161:4 162:1
**apply** 127:16
131:16,20
153:17 157:10
157:16 159:5
159:18,22
160:16 161:1
162:6,18
165:17 192:22
206:2
**applying**
128:17 130:5
148:18
**appreciate**
50:20
**approach**
159:15
**approached**
72:15
**appropriately**
15:24
**approval** 159:4

**approximate**
179:17
**approximately**
67:5 134:15
**area** 56:15,17
56:23 69:5
128:4 142:19
150:12
**areas** 43:2,4
105:24 106:5
169:11
**arguing** 145:17
**arises** 161:24
**arm** 101:13
136:5,7,7,8,8
168:6,13
170:16 173:14
173:20 174:10
179:5
**arms** 146:7,9
168:3,22 169:7
173:4 178:18
**arrow** 114:22
114:23 118:23
**arrows** 113:23
118:5
**art** 36:18,20
37:21
**article** 49:1,9
50:5,12 52:2
135:9,11,21,22
136:5 141:19
**artificial** 44:19
**asked** 7:13
62:18,22 65:11

69:9 109:7
139:11,22
140:23 141:1
142:6 145:7
160:12 186:7
201:7 207:15
**asking** 22:24
48:3 72:6
94:12 109:8
115:14 116:4
121:7 140:13
143:16 144:11
144:12 146:19
151:17 152:21
153:7 155:23
190:15
**asks** 185:10
**aspect** 40:8
51:21 52:6,11
67:18 101:15
**aspects** 52:7
**assay** 16:21
17:2
**assembly** 94:9
94:10 121:4
205:17
**assistant** 17:14
17:14,20 18:3
**assume** 6:23
75:7 188:9
**assuming** 40:20
67:19
**astm** 24:19
25:8,9,10,11,19
25:20 28:8

Robert S. Giachetti , Ph.D.                                  January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[atmospheric - basis]**                                            Page 5

**atmospheric**
59:2,5,9 61:7,8
**atsm** 25:6,7
**attached** 10:19
89:15 92:3
97:7 128:14
207:22 209:11
**attempt** 118:21
119:6,12,13,14
119:16
**attempts**
112:18 113:9
118:7 119:9,11
**attend** 29:16,17
**attended** 11:12
30:12
**attorney** 7:14
7:20 66:16
209:13
**attorneys** 30:14
**august** 67:1
**author** 48:15
**authorization**
203:6,10 204:2
204:11,13,17
204:22 205:8
205:10,10
**authorized**
203:5
**available** 36:22
76:16 179:9
183:1 200:22
209:6
**average** 134:19
137:3,5,16

140:22 142:2
142:21,23
143:1,8,10,19
**aware** 25:22
150:22 154:18
160:18 166:16
166:20
**awesome** 20:7

**b**

**b&p** 36:10
**bachelor's**
10:23
**back** 10:10
14:23 15:2,3,7
34:6,6,7 42:13
58:21 61:7
73:22 75:17
76:11 86:16,19
91:18 92:20,22
95:10,11 96:13
97:5 117:10
118:1 123:9,15
124:21 141:24
143:9 150:23
151:9 163:7
164:5 191:8
192:6 193:10
194:4 199:16
**background**
43:14 69:20
**backing** 204:15
**backward**
127:22
**backyard**
189:15 192:5,8

192:11 193:9
195:4 197:18
198:3,6,7,8,10
**balance** 171:12
**band** 19:12
**bar** 30:13
31:12
**base** 58:3 81:2
86:21 87:6,15
87:18,18,22,24
88:1,3,16,24
89:3 90:14,23
100:10 101:13
101:19 138:11
152:3 168:17
171:3 172:11
173:8 174:13
174:18 177:22
178:12 193:5
198:15
**base's** 168:14
173:22 174:11
**based** 13:11
38:4,18 50:17
103:6 108:15
110:16,17
111:19 138:18
143:15 146:4
147:10 153:1
155:12 167:19
169:14 172:18
176:16 178:24
179:6 184:16
198:11 200:2

**baseline** 198:24
**basement**
39:22
**basically** 12:7
13:18 14:23
15:5 17:1 19:4
20:2,22 26:4
35:20 37:20
39:13 41:23
43:13,21 46:24
49:22 50:2
55:8,11 56:5
57:15 59:21,22
74:22 78:12,18
79:22 80:1
82:22 83:8
84:16 85:7
91:17 95:12
97:17 98:18
99:22 101:13
116:16 118:18
122:10 123:4
126:5,18
127:19 128:16
131:6,14
132:24 134:10
150:6,11
161:12 163:4
204:17
**basics** 86:19
**basing** 133:6
**basis** 70:2
120:14 158:15
174:7 181:5,24

Robert S. Giachetti , Ph.D.                                      January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[bathroom - build]**                                                      Page 6

**bathroom** 7:2
**beams** 14:3
**bear** 77:6
**bee** 26:24
**beef** 23:23
**beginning**
 124:21 141:15
 158:7 164:5
**behalf** 2:7,12
 62:4
**belabor** 35:22
**believe** 7:18
 10:2 33:14
 35:18 39:5
 58:8,17,18
 63:14 68:4
 70:8 73:16
 86:5 87:3 91:3
 110:6 136:5
 139:16 140:17
 144:17 166:10
 184:19 191:23
 192:18 195:21
 200:3 203:2
**bending** 118:15
**bent** 79:6 88:9
 136:8
**berkeley** 77:6
**best** 148:2
 187:16
**better** 14:9
 23:2 90:16
 121:24 148:20
**beyond** 142:15

**bicycle** 77:3
**big** 15:20 74:16
 74:18 89:24
 91:24 113:7
 138:19 170:17
**bigger** 117:15
**billed** 50:6
**billing** 66:22
**bills** 66:24 67:8
 67:22
**biocompatible**
 44:14
**biological**
 16:22
**biomechanical**
 43:15,21,22,24
 44:1
**biomechanics**
 43:6
**biomedical**
 43:24 44:11,12
 44:23
**biotechplex**
 16:6,13,19
**bit** 10:12 18:8
 23:15 26:11,12
 56:4 58:12
 61:4,23 69:19
 71:13 75:9
 76:9 80:24
 83:2,11 86:16
 88:24 112:16
 114:21 116:12
 117:13 120:2
 124:6 144:22

159:14 183:15
 183:16
**bitsy** 15:5
**blaming** 38:17
 77:9
**blaszak** 1:12
 207:6 208:8
**blind** 41:9
**blocked** 72:5
**blog** 31:15
**blow** 78:16
**blurbs** 31:16
**bodies** 52:5
**body** 25:14
 44:3,7 45:4
 171:4
**bodybuilder**
 137:22
**boil** 56:13 57:6
 58:13,16,23
 82:15
**boiling** 54:24
 55:2,5,6,14
 56:3 58:2,20
 58:24 59:6,15
 59:19 60:14
 78:10 99:19
**boils** 63:13
**bono** 24:18
**booth** 29:19
 30:6
**born** 11:21
**bottom** 115:23
 116:1,8 117:11
 174:20

**bought** 161:7
 161:10,11
**box** 74:16,18
 161:8
**brand** 190:3,5
**brands** 46:9
**braner** 14:6,9
 16:10,13 22:16
 23:11,11
**break** 6:18 7:3
 7:3,5 48:3 98:2
 119:20,21,24
 121:17 181:7,9
 185:12 202:3,3
**brief** 47:24
 119:22 185:23
**briefly** 38:11
**bring** 25:15
 76:21 192:21
**broad** 43:5
**broke** 38:13
**broken** 189:5
 190:6,10,19,20
 190:23 193:7
 193:17 198:21
 198:22,24
 200:7
**brought** 76:24
 112:11
**bubble** 55:9,12
 58:7 60:11
 61:8
**bubbles** 55:9
**build** 79:7
 100:2

Robert S. Giachetti , Ph.D.                              January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[building - case]**                                                    Page 7

| | | | |
|---|---|---|---|
| **building**  16:21 | **business**  27:23 | **calling**  31:3 | **careful**  130:2,4 |
| **buildup**  166:17 | 30:5,15 62:12 | 48:6 71:16 | **carnegie**  2:9 |
| **built**  49:23 | 68:12,17 69:12 | 72:8 84:15 | **carton**  16:22 |
| 205:23 | 202:18 | 91:5 97:7 | **case**  5:14,17,20 |
| **bullet**  43:7 | **butcher**  41:4 | 99:13 107:7 | 9:10 10:5,7 |
| 112:10 124:16 | 53:19 | 112:7 165:18 | 18:21 31:24 |
| 124:17 156:23 | **buy**  49:23,24 | **calls**  190:12 | 32:3,9,21 33:5 |
| 168:12 173:13 | 76:20 77:18 | 194:17 197:24 | 33:13,15,19 |
| 173:20 | | 200:1,23 | 36:3,3,5,7,9,10 |
| **bullets**  112:15 | **c** | **cam**  82:24 | 38:11,16,23 |
| **bumps**  83:1 | **cadaver**  180:14 | 84:14,14,17,18 | 39:6,16,19 |
| **bunch**  20:6,8 | **calculate**  179:3 | **camera**  38:19 | 40:6,14,20 |
| 43:9 55:9 | **calculated** | 40:4 55:21,21 | 41:7,8,19 42:3 |
| 63:21 76:21 | 140:16 179:4 | 55:22 148:20 | 42:7 46:21 |
| 113:12 192:3 | **california** | 195:17 196:10 | 62:17,22,23 |
| **burn**  56:21 | 75:14 194:22 | 197:1 198:12 | 63:3,3,10,16 |
| 60:18 105:19 | 194:24 196:5 | **cameras**  51:23 | 64:1,6 65:7 |
| 168:16 179:15 | 201:5 | 51:23 55:20 | 67:6 68:5,10 |
| **burned**  51:12 | **caliper**  122:15 | 175:16 | 74:15 75:9 |
| 51:13 52:18 | **call**  15:4 19:8 | **campus**  20:12 | 78:11 86:24 |
| 105:24 106:16 | 19:24 23:16 | **cap**  37:7 | 89:13 102:6,13 |
| 169:11 | 24:7 26:16 | **capability** | 104:11 108:13 |
| **burns**  51:6 | 31:10 54:23 | 136:15,17 | 108:23 113:6 |
| 56:13 61:17 | 91:11,14,15 | **capable**  164:7 | 113:11 120:6 |
| 105:22 106:1 | 94:16 96:9 | 164:20 | 120:13 125:19 |
| 106:21 107:22 | 104:9 113:19 | **capacitor**  20:2 | 127:9 133:20 |
| 109:3,12 168:2 | 119:14 136:18 | **capacity**  81:3 | 145:16 149:24 |
| 168:5,9,12 | 136:20,21,24 | 187:10 | 154:23 165:17 |
| 169:6 173:13 | **called**  4:2 19:7 | **caps**  37:5 | 165:22 166:21 |
| 173:20 174:9 | 58:8 69:1 | **captions** | 170:5 187:7,24 |
| 174:15,18 | 78:11 81:9 | 179:17 | 189:12 190:9 |
| 175:12 179:12 | 94:11 126:5 | **capture**  43:9 | 191:1,16 |
| 179:20 181:1 | 136:10 142:17 | **car**  1:6 15:4,5 | 193:20 202:11 |
| 200:2 | 203:10 204:2 | **care**  130:23 | 207:24 |
| | 204:11 | 148:16 | |

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[cases - closed]**                                                    Page 8

**cases**  6:3 32:23
  33:24 34:14,22
  35:6,8 36:15
  37:13 41:21
  45:2 46:6,19
  62:10 63:11
  64:15,22 68:2
  68:3 120:7,8
  125:9
**category**
  138:24 144:2
  144:23
**cause**  56:21
  61:17 85:22
  119:1 124:3
  128:7
**caused**  62:24
  87:15 112:1
**causes**  55:3
  58:23
**causing**  154:4
**center**  2:9
  95:15 131:10
  131:13
**centered**
  129:13,14
**certain**  7:14
  142:8 176:24
**certainly**  52:6
  63:3 141:20
**certificate**
  191:15,18,24
  199:7 204:4
**certification**
  4:23 8:11

203:16
**chain**  12:22
**challenged**
  190:24
**change**  52:22
  57:22,24 123:3
  130:6,8,9
  151:13 210:4,7
  210:10,13,16
  210:19
**changed**  183:7
  184:2 189:6
**changes**  56:9
  56:10 189:4
  209:10 211:6
**channel**  115:24
**characteristics**
  52:13
**characterizati...**
  49:10
**characterize**
  177:4
**characterized**
  172:23 175:12
  178:5 200:10
**characterizes**
  176:22
**characterizing**
  82:14
**charge**  15:10
**check**  50:8
  102:7 161:7
**chemistry**
  20:19

**chest**  106:5
  168:23 169:7
  169:17 173:3
**chicago**  1:16
  11:22 39:20
  68:21,23 69:5
  208:10
**chin**  168:21
  169:16
**cinderblocks**
  147:3
**circuits**  20:1
**circumstances**
  56:2
**citation**  141:21
**cite**  135:9
  137:17 141:18
**city**  1:16 39:20
**civil**  1:13 4:13
  4:14 207:20
**claim**  36:12
**claiming**  77:13
**claims**  46:13
**clamp**  128:8
**clamping**  84:6
  100:9 157:19
  164:8,16,23,24
  165:6,18
**clamps**  157:19
**clarify**  72:12
  168:24
**clarifying**
  170:4
**clarity**  103:19

**class**  18:17,23
  20:4 180:10
**classified**  145:4
**classify**  144:15
  146:10
**clear**  39:2,15
  90:6,11 107:17
  109:21,22
  129:1 197:13
  206:1
**clearly**  160:14
**cles**  28:11 29:4
  29:8,14,22
  30:12
**click**  92:5
**client**  13:11
  35:8 36:5 38:9
  39:4,5 41:5,7
  42:3
**client's**  42:5
**clients**  24:7
  32:1 47:22
  68:14 70:3
**clock**  21:16
**clockwise**  92:8
**clogged**  98:16
**clogs**  111:6
**close**  28:22
  53:21 92:10,12
  95:17 127:14
  175:21
**closed**  90:15
  92:5 93:2,4,13
  93:21 94:4
  114:6 122:15

**[closed - condition]**                                      Page 9

133:9 163:9
166:18
**closer**  18:12
152:12
**clothes**  52:18
**clothing**  56:19
**coil**  15:4
**cold**  31:2 78:7
78:7
**college**  69:9
**combine**  56:23
**come**  20:11
23:19 51:3
52:4,16,21
55:24 56:11
58:1 82:13
86:6 92:23
104:13 105:20
106:4,18 107:2
150:23 158:17
169:12 175:2
175:10 177:6
177:14 182:20
**comes**  14:16
27:12 47:17
55:4 56:6 57:1
58:14,15 59:1
61:6,10,19
62:13 92:3
123:7 144:13
162:9 163:10
175:6,13 176:8
176:23 204:23
205:17

**coming**  41:21
51:9 57:2
106:10 143:9
198:12
**command**
44:10
**commercial**
69:17
**commercializ...**
69:10
**committee**  28:8
35:20 44:22
180:6
**committees**
24:17,20 25:6
**commonly**
77:18 199:12
**commonplace**
37:17
**communication**
65:13
**communicati...**
184:17
**community**
177:11
**companies**  62:1
70:12 71:17
72:7,9 73:4
75:4 203:9,13
**company**  13:6
16:21 23:11
45:8 46:14,22
68:21,22,23
70:1 71:23
72:2,23 74:24

159:4 203:16
204:6
**compared**
121:22
**comparison**
56:17,24
133:22 146:24
**competing**  26:3
**complaining**
79:11
**complete**
177:20 178:2
207:15 211:8
**completed**
209:16
**completely**
78:9 103:16
104:24 110:21
114:3 199:21
**completion**
103:16
**compliance**
191:24
**component**
120:14,14
**components**
14:15 54:15
57:23 86:18
97:19 100:7
120:5,12,18
121:1,3 123:14
123:16 124:2
**compose**
124:13

**composition**
90:23
**compressed**
78:18
**compresses**
156:9
**compressor**
77:2 200:24
**computer**
13:19
**concern**  37:14
74:20
**concerned**
87:20 88:1,11
88:24 142:18
149:11
**concerns**  71:5
**concluded**
206:14
**conclusion**
143:9 166:1
169:13 175:10
188:5
**conclusions**
52:8,9 54:2
193:24 194:2
**conclusive**
182:1
**conclusively**
114:24
**concrete**  33:20
**condition**
112:13 156:18
169:12 189:6

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[conditioning - cooker]**                                    Page 10

**conditioning**
  141:5
**conditions**  54:8
  54:9 59:2
  149:9,12
  175:15 197:12
  197:14
**conductor**  41:1
**conduit**  39:8,8
**conferences**
  28:11,13 29:3
**confidentiality**
  45:18,20 46:11
  70:10,18 71:6
**conflating**
  26:19 146:22
**conform**
  159:17
**conformed**
  157:1
**confuses**  132:7
**conjunction**
  163:2,18
**connected**
  85:24 91:9,11
  91:21,22
**connection**
  128:20,22
  187:19
**consensus**
  25:15
**consider**  85:4,7
  94:6 152:15,22
**considered**
  137:22 138:1

139:13,15
164:22
**consistent**
  103:24 107:22
  109:12,24
  110:20 124:20
  125:15,16
  130:13 133:4
  165:1 167:12
  168:3,6,13
  169:21 173:14
  173:21 174:10
**constitute**
  48:20
**constitutes**
  85:15
**construct**  38:2
**consult**  45:7
**consultant**
  22:18,21 32:3
**consulting**
  16:20 17:1
  21:20 22:2,3,4
  22:11,14 23:3
  23:4 24:5,6,14
  26:15 27:7,12
  28:3 32:16
  48:4,6 62:19
  68:12,13,17
  70:2,4 71:16
  72:8,17,23
  74:6
**consumer**
  28:15 30:18
  51:18,19 53:16

185:3
**consumers**
  185:5
**contact**  49:4
  52:4 106:5,13
  114:4 118:10
  119:1
**contacted**  49:5
  64:3 112:5
  160:24
**contacting**
  118:16
**contacts**  30:24
**contain**  102:4
  102:13
**contained**
  102:12
**containing**
  75:21
**contains**  42:19
  86:22 87:18
  102:19 182:2
**contents**  49:21
  51:3,9 52:3,11
  52:16,21,23
  54:10,22 58:1
  103:14 106:4,9
  106:13 111:11
  168:22,23
  169:12,16
  188:6
**contest**  7:4
**context**  47:7,8
**continue**
  176:11

**continuing**
  29:6
**contradiction**
  188:6
**contradictory**
  108:1
**contrary**
  106:22 107:5
**control**  44:9
  98:20
**controls**  98:11
  98:11
**conversation**
  6:11
**conversion**
  132:24
**conversions**
  69:14
**convert**  131:2,3
  132:19
**converting**
  69:16
**converts**  60:15
**cook**  1:16 59:23
  207:2 208:2
**cooked**  112:8
**cooker**  3:17
  8:22 26:8
  45:17 46:2,23
  47:3 49:11
  51:8,21 52:15
  54:11 56:9
  57:9,10,15,16
  57:21 58:15
  59:5,12 61:19

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[cooker - corrections]**                                              Page 11

62:1,10,17,20
62:23 63:6,14
63:16 64:4,16
69:21 70:4,12
71:4,17 72:9
72:18,23 73:11
73:15,16,19
74:13,17,21,24
75:3,10,11
77:1 78:2,8
80:4,16 85:13
85:17 86:6,18
87:19,24 89:23
96:20 100:4
103:8,14
104:24 105:3
106:4,10 107:7
107:18,23
109:2,5,9,13
110:4,19
112:13,14,17
114:6 115:21
119:4 123:20
124:17,22
147:21 150:20
151:1 152:11
154:22 155:13
155:14,15
156:7,24 157:2
158:14,21,22
159:4,5,11,24
161:9,16
162:19 164:8
165:23 166:5
168:4,21

169:15 170:10
170:18,21
171:12 172:3
173:10 174:3
174:18 175:2
176:2,23
178:16 181:19
182:1,7 183:6
183:9 184:12
189:2 191:9,19
197:10,12,23
198:16 205:11
205:15 206:2,5
**cooker's**  171:3
184:15
**cookers**  25:21
45:9,23 46:7
49:24 51:14
53:7 73:24
74:8 86:3 94:1
157:9,11,14,18
157:24 158:1,5
158:8,12,13
159:8 160:11
162:19 165:2
**cooking**  100:9
111:10 124:18
125:4 187:16
**cool**  20:16
104:19 187:12
**cooldown**
103:12
**copeland**  1:3,4
103:12,20
105:18 109:4

168:20 179:22
182:15 183:17
194:7 209:4
210:1 211:1
**copeland's**  5:17
103:13 168:3
178:21 182:2
**copelands**  32:1
**copied**  37:22
**copies**  26:5
67:15,16
209:14
**copy**  9:13
10:18 167:3,4
167:5,5 207:22
**copyright**
36:12 37:20
**cord**  126:6
**corporate**  31:5
84:19 93:17
**corporations**
203:4
**correct**  5:7,8
8:7,12,15,19,24
9:9 11:5,8
12:13,23 21:8
27:3,9,11 31:7
32:6,7,13 34:1
34:2 36:1,2
38:7 42:20
43:18 45:2
54:19 59:7
60:4,5,7,17
61:21 67:20,24
69:22,24 73:2

73:8 74:9
79:14 81:20
84:11 87:8,16
87:22 88:3,17
88:20,21 89:6
90:5 91:6
92:21 96:4,4
96:14 97:11,12
98:5 99:5
102:21 106:20
109:23 110:6
111:1 115:6,18
117:15 118:3
126:2 128:13
135:20 142:4
149:4 152:2,17
157:7 161:23
162:3,5 167:24
171:17 172:19
173:16,17,18
173:24 174:1,6
179:7,15 180:8
181:22 182:4
182:18 183:24
186:19 188:8
188:19 189:19
190:8,22 191:2
191:20 195:12
196:9,16 199:6
199:19 200:9
200:12 201:18
202:5,6 203:1
211:8
**corrections**
211:6

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[correlate - defect]**                                                          Page 12

**correlate**  106:8
**correlates**  83:4
**correspond**
   145:23 172:22
   172:24
**corresponding**
   89:4
**cost**  64:11
**counsel**  2:2
   186:7 193:12
   194:11 195:21
   202:4 207:9,24
   209:14
**counteracts**
   156:8
**counterbalan...**
   152:6,17
   171:16 172:6
**counterclock...**
   92:8,9,10
**counterintuiti...**
   57:5
**countertop**
   172:14 174:21
   175:4,22
**counts**  35:14
   180:10
**county**  1:16
   207:2 208:2
**couple**  6:7 21:5
   26:23 29:2,9
   29:18 46:6
   56:2 64:14
   119:19 128:18
   133:10 161:5

186:22
**coupled**  133:8
**coupling**
   143:23
**course**  19:4,5
**courses**  20:13
**court**  1:1 8:14
   8:14 10:13
   32:16,24 33:1
   34:19 207:21
**courts**  1:14
**cover**  39:23
   40:2,4,5 90:22
   91:2 120:17
   127:12,18,19
   157:3 161:8,18
   162:21,23
**covers**  93:6
**cpr**  180:10
**crane**  14:3
**create**  25:17
   99:20
**created**  204:7
**creates**  87:7
   89:9 164:9,17
**creating**  99:19
**critique**  185:7
**crr**  1:12 207:6
   208:8
**cs**  209:15
**csr**  1:12 207:6
   208:8,9
**ctl**  203:5
**cuff**  123:9

**cup**  127:16
**curious**  50:22
   160:13
**curl**  114:15
**current**  20:3
**currently**  62:8
   62:9 70:3
   71:15 72:7
   73:16
**curriculum**
   3:12
**custom**  13:9,16
**customer**
   184:13
**cut**  77:4 101:17
   167:17
**cutter**  14:20
   41:9,13,14,16
**cv**  1:6 10:15,19
   12:21 42:19
**cycle**  103:16
**cylinder**  82:22
   96:10 97:4
**cylindrical**
   96:16

**d**

**d**  207:20
**damage**  112:1
**damaged**  121:5
   121:6 190:1
**dampers**  19:11
   19:18
**dangerous**
   112:14 181:19
   182:8

**data**  136:11
   138:11 148:2
   178:24 183:1
**date**  66:8,18,20
   207:6 210:24
   211:12
**dated**  8:17,18
**day**  1:17 22:13
   22:13 29:11
   110:20 132:8
   179:20,24
   180:1 187:5
   196:4 200:14
   201:5 208:3
   211:15
**days**  30:7
   209:16
**decided**  195:22
**declare**  211:4
**decreased**  84:6
**decreases**
   83:22 124:9
**decreasing**
   84:7
**deemed**  66:16
   211:6
**deep**  167:17
**defeat**  164:13
**defeated**
   162:22 163:1
   163:22 164:3
   165:21
**defeating**  164:7
**defect**  47:11
   182:2

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[defective - differ]**                                                      Page 13

**defective** 62:20 63:6,15 64:5 112:13 181:19 188:21 189:10
**defend** 53:10 64:9
**defendant** 2:12 35:14
**defendants** 1:8 62:13
**defense** 30:19 33:14 62:16
**defensible** 64:10
**define** 104:9
**definition** 137:6 140:6
**deformed** 167:13,14
**degree** 11:3,19 43:5,17 180:7
**degrees** 11:10 12:11,15 42:14 43:19 59:10 135:10 180:3,4 180:5
**delinquent** 67:21
**demand** 186:10
**demonstrate** 168:24
**demonstrative** 73:22
**dep** 206:11

**departs** 56:2
**depending** 18:9 19:18 56:8 57:11 96:17 113:4 123:3
**depends** 185:10 205:2
**deponent** 207:21 209:13 211:3
**deposed** 5:6 33:21 34:1,3
**deposing** 209:13
**deposition** 1:11 2:2 3:1 4:7,21 5:16 7:13 8:5,9 34:19,23 65:21 84:20,22 93:18 149:14 190:16 190:18 192:2 194:6 196:20 206:14 207:4,9 207:19
**depositions** 1:15 34:17 35:10
**depot** 41:5,6,7 41:10,11,15 76:20 77:19 200:14,21 201:4
**depressed** 92:16

**depressurizat...** 60:4 61:11,20
**depressurize** 104:19
**depressurized** 60:14 103:16 103:21 104:24 109:1 110:12 110:21,24 111:1,3,20 112:3,4 152:19
**depth** 36:15
**describe** 177:8 193:2
**described** 189:3
**describes** 184:17 193:4
**describing** 128:17
**description** 3:11
**design** 13:4 14:13 22:10,20 22:21 23:5,11 23:13 24:7 41:12 48:7 68:14 72:17,20 93:24 138:5 184:11 189:1 189:23 192:3 199:4
**designed** 14:12 15:8 38:5

**designer** 69:21
**designing** 13:16 22:15
**desirable** 128:9
**desire** 148:15
**desktop** 13:5
**determination** 63:4,7
**determine** 40:9 71:10 178:3 187:4,22,24 189:1 191:5
**develop** 23:12 142:1
**developed** 145:15
**developments** 29:12
**deviation** 137:14,16
**device** 130:12 162:20 163:20 163:20,21 164:8,16,17,23 164:24 165:6 166:17 202:21
**diagnose** 181:5
**diagnoses** 180:23
**dial** 79:22,24
**diameter** 131:5 131:6
**died** 5:22
**differ** 78:5

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[difference - dr]**                                                    Page 14

**difference**
14:22 22:18
129:19,22
130:17,20
**differences**
130:1
**different**  15:15
15:16 18:24
20:6 46:7
47:21 49:5
51:11 68:2
80:2 84:9
86:17 107:16
125:24 126:23
135:10,16,17
135:17 136:6
137:2 139:18
140:11,15
143:16 144:12
146:22 147:4
147:10 157:23
158:13 172:14
175:13,13,14
205:3,3
**difficult**  81:4
83:19 85:10
86:9 107:15
108:23 138:16
139:23 140:4,5
140:6,14
143:11 146:11
147:9 155:20
194:15
**dimensions**
13:21,23

**dinner**  202:9
**direct**  30:21
196:2
**directed**  177:18
**direction**
128:21 129:1,4
**directly**  31:19
**disagree**  85:1
85:12,15 93:22
94:7,13
**disagreed**
182:8 190:16
**disagreement**
160:17
**disappointed**
77:17
**disassembled**
121:16
**discernible**
129:19
**disclosed**  45:19
70:9,17,21
71:22
**discover**  71:9
**discoverable**
71:10
**discrete**  14:14
14:23
**discuss**  130:24
142:16 202:13
206:9
**discussed**  71:7
155:15
**discussing**
194:12

**discussion**  71:1
**dispersion**  54:4
**dissertation**
144:9 145:3
**dissipate**
192:23
**distance**  123:2
124:3,4,5,10
131:6,10,12
132:13
**distinction**  24:8
**distribute**  13:8
**distributor**
39:9
**district**  1:1,1
1:14 207:21
**division**  1:2
**doctor**  180:6
**doctors**  180:19
180:23
**document**
65:21 66:4,13
160:7
**documents**
7:14,16 192:4
**doing**  16:12
17:1,9,19 18:7
21:2 26:24
36:17 44:17
49:6 52:22
65:5 67:4 70:4
71:23 77:16
120:15 127:20
131:7 132:5
138:17 139:11

142:9 143:15
144:9 148:5,12
148:17 149:3
153:19 159:9
169:23 204:22
**door**  29:19
205:4
**dosage**  56:20
**dosages**  51:13
**downstairs**
185:14
**downward**
152:13 168:20
174:3
**dr**  4:7,21,21 5:4
8:5 9:19 48:2
66:4 71:2
75:13 76:9,16
77:8,9,14 80:4
103:2 115:13
126:1,9 128:11
132:1 133:3
147:20 166:10
167:6 172:2
173:9 175:3
176:1 181:23
182:6,24 186:3
186:20 187:21
188:23 189:8
190:9 191:1,4
191:21 192:7
193:9,18 194:5
194:16,21
196:5,14,17,19
197:22 198:1,2

Robert S. Giachetti , Ph.D.                              January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[dr - electric]**                                                    Page 15

198:18 199:4
200:10,22
201:15,22
**dramatically**
56:16
**draw** 166:1
**drawing** 38:2
**drawings** 15:12
37:21 38:2
**dresser** 24:22
24:23
**dri** 29:14
**drive** 2:9
**drop** 55:6
**droplet** 56:16
**dropped**
115:17 116:7
183:18 184:13
**drops** 58:20
**dudes** 141:10
141:10
**due** 55:4 76:15
148:4
**duly** 4:2 207:10
**dump** 24:24
**dynamic** 19:3,6
19:7

**e**

**e** 30:24 31:12
65:12,19,22
66:6,9,10
207:20 210:3,3
210:3
**e.g.** 162:20

**earlier** 47:13
75:18 82:21
125:18 129:11
155:15 156:12
180:3 189:3
**early** 77:18
201:5
**ease** 102:17
113:15
**easier** 78:17
96:9 126:15
152:13 190:24
**easily** 199:12
**easiness** 137:19
**easy** 40:6 86:11
86:14 101:19
124:20 133:4
133:18,21
136:18,20,21
136:22 137:1,2
138:16,24
139:1,5,8,13,15
139:24 140:9
140:20,22
141:1 142:3,6
142:8,16,18
144:3,4,8,18,19
144:19,20
145:11,22,23
145:24 146:2
146:21 147:4,6
147:11 184:6
184:23 188:17
188:22 193:13
197:15

**eat** 185:12,14
202:4
**edge** 106:13
114:21 118:16
126:6,18,18,24
127:5,7,8,10,13
131:11,17
132:21 150:12
152:3 170:24
171:7 176:9
189:7
**education** 18:7
29:6 30:14
133:7
**edward** 1:3
209:4 210:1
211:1
**effect** 156:15
**effective** 154:8
154:9 155:11
**effort** 57:20
95:20 129:24
133:16 134:11
134:14,16
135:4 136:22
137:23 138:14
138:18 139:7
139:10,17
140:9,16,18
142:2,3 143:17
144:2,2,3,12,18
144:19,19,20
144:21,22,23
144:23 145:13
145:15,18,21

145:23,24
146:11,23
149:6 171:14
173:4 174:7
187:15
**effortless**
124:20 133:4
133:19,21
**efforts** 134:4
138:22 140:20
143:18 145:8
**egg** 16:22
**eight** 14:14
126:20,22
**either** 14:24
22:1 23:23
27:6 34:23
62:18 65:10
81:19 137:16
163:9 180:22
189:20,22
192:19,24
205:20
**ejected** 54:10
55:1 58:2
103:14
**ejection** 54:19
**elbow** 134:19
135:5,6,18,24
136:8,8,10
**electric** 157:10
157:13,24
158:5,13,18,21
159:8,11,16,24
160:11 161:8

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[electric - everybody]**                                    Page 16

162:1,18
**electrical** 20:1
39:8
**electronic**
98:10 161:16
**electronics**
86:22 87:1
**element** 86:22
87:1 120:9
**elevated** 58:19
**embedded**
13:19
**emeril** 73:16
184:5
**employed**
22:19,23
**employee** 42:8
42:9
**employment**
17:9 23:3
69:19
**encapsulated**
181:20
**enclosure**
198:3
**encompass**
23:4
**encompassed**
9:7
**encompasses**
72:13,16
**encompassing**
19:16
**ended** 32:15
78:11

**ends** 91:24
138:4
**endurance** 7:4
**energy** 58:24
187:11
**enforce** 185:8
200:16
**engage** 122:20
**engaged** 155:4
**engineer** 22:3,4
53:23
**engineering**
3:13 10:23
11:3,7 12:21
13:19 14:10
18:22 20:5,6
20:17,21 21:1
21:7 31:21
37:14 38:5
42:15 43:5,15
43:16 44:2
84:17 150:8
**enormous**
15:17
**enrolled** 11:14
**entire** 7:17
**entirety** 102:5
**entity** 204:5
**equating** 144:2
144:18
**equation**
177:12 178:2
**equations**
175:9 176:17

**equipment**
13:4,9 14:1
76:16,19,21,23
77:18 148:5
199:13 200:13
201:3
**equivalent**
131:17 132:10
132:11 133:24
**errata** 209:11
209:13,16
**error** 62:24
63:7,12,14
**escape** 93:16
**escapes** 196:20
**escaping**
168:22 197:4,7
**eshraghi** 76:16
76:19 77:9,14
80:4 126:1,9
132:1 133:3
147:20 166:10
172:2 173:9
181:23 182:6
182:24 186:20
188:23 189:8
190:9 191:1,4
191:21 192:7
193:9,18 194:5
194:16,21
196:17,19
197:22 198:1
198:18 199:4
200:10,22
201:15

**eshraghi's** 4:21
8:5 75:13 76:9
77:8 103:2
115:13 120:19
128:11 175:3
176:1 187:21
196:5,14
**essentially**
36:17 44:1
109:6 189:5
**establish** 162:8
**established**
177:13
**estate** 6:1
**estimated**
149:17
**estimates** 13:16
**estimating**
13:15
**estimation**
199:17
**et** 209:4,4
210:1,1 211:1
211:1
**ethics** 29:12
**etl** 161:6 203:5
**event** 54:24
55:14 58:2
60:13 78:10
109:8 199:24
201:16
**events** 120:21
188:3 193:20
**everybody**
132:7 140:3

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[everyday - exponent]**                                        Page 17

**everyday** 6:11
**evidence**
  106:19 108:20
  112:12 118:6
  170:1,5 172:17
  181:18 182:1
**exactly** 104:7
  108:3 117:5
  123:15 141:21
  177:4 195:15
  200:15
**examination**
  3:4 4:5 186:1
  202:1
**examine**
  165:24
**examined** 4:3
  74:2 207:11
**example** 23:14
  31:11 118:20
  122:1 127:16
**examples**
  186:22
**except** 4:16
  34:24 66:7
**excerpt** 3:16
**excluded** 68:3
  137:19
**excursion**
  121:20,22
  122:9,10
**exemplar**
  103:14,15
  109:15,16
  111:15,19

112:9 120:21
121:22 156:24
157:3,5 191:3
191:5 199:10
205:9
**exemplars**
  73:14 188:14
**exert** 126:14,14
  126:17 138:18
  145:8,14 150:9
  169:19 171:2
  173:4,10
**exerted** 112:19
  127:13 128:5
**exerting** 57:19
  136:16 139:6
  145:12 147:6
**exertion** 135:10
  136:23 137:4
  139:5 142:13
  146:23
**exhibit** 3:11,12
  3:13,15,16,17
  8:10 9:18
  10:15,17 34:6
  34:12 42:13
  67:11,12 75:18
  160:2,4,6
  166:24 167:2,5
**exhibits** 3:9
  4:22 8:8
**exist** 101:1
**existing** 30:23
  168:23

**exit** 19:20
**expands** 61:3,9
**expansion** 61:4
**expect** 56:12
  57:21 86:5,7
  143:20 197:9
**expectation**
  55:23
**expected** 90:7
**expecting**
  55:18
**expel** 101:3
  164:12 169:16
  188:6
**expelled** 171:13
  171:13
**experience**
  29:24 31:23
  43:2 103:8
  125:11 133:7
  139:4,11 140:1
  140:19 143:15
  143:24 144:5
  144:13 154:19
  155:12 159:20
  173:7 180:15
  180:19 181:1
**experiences**
  146:4
**experiments**
  49:16 106:9
  143:15 176:16
**expert** 5:13 8:6
  24:5 27:22,24
  32:3,14 33:22

35:24 43:2
47:14 48:14
61:24 62:3,12
68:2 70:13
74:6,12 75:5
180:22
**expertise** 28:2
  28:4 42:17,20
  43:2 44:12,13
  44:23
**experts** 160:15
  160:23
**explain** 127:6
  192:11
**explained** 66:8
  141:21 156:11
  188:2
**explanation**
  90:17 107:12
  113:15
**exploding** 51:8
**explore** 103:10
**exploring**
  50:16
**explosion** 47:7
  54:23 55:14,16
  104:9
**explosive**
  199:24 201:16
**exponent** 21:9
  21:14,19 23:2
  23:6 26:17,19
  27:15 30:11
  48:5 50:3,6
  53:23 73:7,8

Robert S. Giachetti , Ph.D.                         January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[exponent's - first]**                                      Page 18

**exponent's**
45:18 47:13
**exposed** 105:19
**exposes** 169:10
**exposing**
168:21
**expulsion**
85:23 111:10
**extended** 95:8
**extending**
94:17 95:4
**extends** 94:19
**extent** 71:9
166:13
**external** 190:11
190:21
**extra** 8:4
126:19
**extremes** 138:8
**extrusion** 122:7

**f**

**fabricated**
15:14
**fact** 35:16
100:24 108:15
133:8 187:19
201:14
**factor** 60:10
**facts** 33:15
**fail** 98:2,22
163:11,15
198:19
**failed** 40:22
45:3 98:17

**fails** 98:8,16
163:1 199:5
209:18
**failures** 45:5
**fair** 6:24 9:1
22:2,5 52:1
111:12
**fall** 184:15
**falling** 117:17
118:1
**falls** 81:21
**familiar** 5:11
54:6
**family** 68:20
69:7,12
**far** 12:20 30:23
31:2 45:21
48:13 62:2
67:6 70:10
74:6,7,9 76:2,8
87:24 90:3
96:19 120:24
122:12,16,18
122:21 138:4
142:18 149:12
152:9 157:14
159:1 180:13
184:15 197:1
**fast** 6:20 52:20
54:15 185:15
**fasten** 15:24
**faster** 187:12
**features** 54:4
**february** 8:17
9:2,6 75:19,24

102:11,18
181:15 208:3
209:3
**federal** 1:13
4:14
**feel** 35:21 64:12
195:10
**feeling** 143:12
143:15
**feet** 39:9 41:3
132:22
**fell** 39:24 41:1
**felt** 183:18
**female** 178:20
**field** 12:21
**fields** 11:13
51:11
**figure** 15:24
81:23 113:21
113:21 121:14
178:4 191:11
191:12
**file** 7:17,19
49:2 65:14
66:4,17 196:14
**filed** 8:13,14
9:20
**files** 65:11
**fill** 52:14 54:9
57:11 85:24
175:13 192:17
**filled** 86:3
192:18 200:3
**finally** 7:2 42:2

**find** 26:2 28:4
43:7 55:18
56:1 69:3
79:16 84:6
90:9 118:20
129:19 130:17
134:6
**findings** 132:2
**fine** 4:18 53:4
82:9 185:19
**finger** 133:10
133:13
**fingernails**
117:4
**fingers** 30:7
42:12 90:17
106:7 150:10
153:3 174:16
174:22 175:7
176:11
**fingertips**
105:19,23
106:1,12,16,21
**finish** 6:13,14
6:14
**finished** 196:1
**finite** 120:9
**firing** 156:4
**firm** 30:18
70:20
**first** 4:2,16
6:18 8:21
20:20,23 26:23
35:23 42:13,14
43:3 52:13

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[first - forcing]**                                                                  Page 19

| | | | |
|---|---|---|---|
| 65:7 86:21 | 96:2,7,10,21 | **focus**  88:5 89:3 | 132:20 133:5 |
| 98:10 102:10 | 97:8 99:6,8,12 | **follow**  76:17 | 133:11,13,15 |
| 103:11 112:16 | 99:21,21,23 | 95:12 107:6 | 134:14 135:9 |
| 112:21 124:15 | 100:2 101:17 | 108:3,24 | 135:16,17,22 |
| 124:16 127:13 | 104:1,18,21 | 109:18 153:24 | 136:3 137:10 |
| 129:5 156:7 | 111:4 112:5 | 161:2 187:6,8 | 137:23 138:1 |
| 160:9 173:13 | 115:5,8,12,14 | 201:24 | 142:8 144:10 |
| 176:11 183:7,9 | 115:16 116:4,6 | **followed**  80:4 | 145:4,12 |
| 191:21 207:10 | 116:11,20 | 111:19 186:16 | 147:17,18 |
| **firstly**  187:7 | 117:3,6,7,13,16 | **follower**  82:24 | 150:9,10 152:6 |
| **fits**  74:19 | 117:18 118:7 | 84:14,18 | 153:2,6,18,21 |
| **five**  32:17 | 119:1 120:3,5 | **following**  2:2 | 154:2,15 155:3 |
| 65:22 128:6 | 120:12 121:2,8 | 66:7 116:19 | 157:3 158:11 |
| 131:11 140:24 | 121:13 122:1 | **follows**  4:4 | 158:20 159:24 |
| 141:2 | 122:14,20 | 194:6 | 162:1,5 166:12 |
| **flash**  55:6 | 123:12,13 | **food**  59:23 | 169:14,19 |
| 82:15 | 124:1 125:1,10 | **foods**  69:4 | 170:14,22 |
| **flavor**  42:21 | 149:16 154:7 | **foot**  132:12 | 171:2,4,16 |
| 47:2 | 154:14,24 | 175:20 | 172:6,17 |
| **flaw**  182:5 | 155:24 156:3,8 | **footage**  196:10 | 173:10,16,23 |
| **flaws**  195:14 | 156:10,13,19 | **footnote**  10:3 | 174:5 190:11 |
| **flew**  195:1 | 156:21 166:12 | **force**  43:10 | 190:21 194:5,8 |
| **flip**  17:13 164:5 | 166:13 167:18 | 44:10 88:8 | 194:12,12,14 |
| **flipping**  9:21 | 183:16,17,18 | 95:24 100:9 | 199:1 200:8,11 |
| 67:16 | 183:21 184:2,5 | 122:19 123:4,5 | **forced**  123:2 |
| **float**  80:5,6,12 | 184:7,13 185:8 | 124:19,20 | 190:3 |
| 80:12,14,17,23 | 192:21 | 125:23 126:1 | **forces**  95:16 |
| 81:17,19,24 | **floats**  117:20 | 126:17,21,21 | 137:7 151:14 |
| 82:6,18,21 | **floor**  16:1 | 126:23 127:4,7 | 152:18 157:14 |
| 83:1,2,6,9,13 | 38:17,19,21,23 | 127:13,19 | **forcibly**  58:1 |
| 84:2 89:18 | **flow**  177:18 | 128:2,5,17,21 | 112:18,21 |
| 90:8 91:19 | **fluctuates** | 128:24,24 | **forcing**  85:8 |
| 92:23 93:3,7 | 62:15 | 129:15 130:7 | 101:11 107:23 |
| 93:15 94:21 | **fluid**  19:17,19 | 131:13,16,17 | 168:3 |
| 95:2,3,8,21 | 55:5 104:13 | 132:5,5,7,12,14 | |

Robert S. Giachetti , Ph.D.                                   January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[foregoing - generate]**                                      Page 20

**foregoing**
  207:4,14 211:5
**forensic**  186:12
**forensically**
  188:11
**forget**  122:6
**forgot**  112:6
  126:19
**form**  4:16
  109:8 143:13
  170:8 172:20
  176:20 194:17
**forming**  7:21
  10:1
**forms**  55:10,12
**formulas**
  176:17
**forth**  91:18
  125:11
**forward**  127:21
  130:11 169:18
**forwarded**  7:15
**found**  28:3,9
  31:8 54:3,14
  62:20,24 63:5
  63:14,16 64:4
  77:18 88:9
  90:4 111:5
  129:20,20
  130:18,18
  133:2,3
**four**  20:14 34:5
  34:13,14,22
  35:5 53:1
  55:20 65:22

97:22 102:2,4
  102:11,17
  105:15 108:10
  128:5 186:3
**fourth**  52:20
  98:10
**fractured**
  39:23
**franklin**  208:9
**free**  20:11
  111:5
**freedom**  135:10
**frequency**
  19:13
**frequently**  30:3
**friction**  81:1,3
  81:6,11,17
  84:23 86:7,11
  87:7,12,15
  89:9 100:14,16
  100:18 101:12
  153:22 154:4
  154:10,12,16
  155:19 165:18
**frictional**  84:5
  87:11 101:4
  172:13
**front**  22:21
  23:16 24:13
  25:2 26:16,21
  27:7 45:15,16
  47:14,15 48:6
  68:13 69:23
  71:16,18,23
  72:2,8,12

128:8
**fulcrum**  131:9
**full**  7:7 18:6
  20:14 22:19,23
  58:6 86:4
  140:9 177:1,1
  177:2
**fully**  93:1,2,2
  117:9
**function**  19:22
  90:8
**functioned**
  159:11
**functions**  93:23
**fund**  49:16
**funding**  49:4,6
  49:13 50:11
  53:5
**funnel**  168:23
**furniture**  13:24
  24:21
**further**  46:15
  83:3 92:17
  105:4 124:3
  150:23 151:9
  174:12 201:23
  202:1
**fuses**  98:12
**fusion**  3:13
  21:12,23 23:7
  24:4,9 26:13
  26:18 27:2,4,6
  27:19,19 30:1
  30:23 31:5
  45:5 67:8,9,18

68:18 73:7
  157:1
**fusion's**  67:17
  72:1
**future**  5:19

**g**

**gallons**  133:24
**gap**  17:8
**garage**  77:8
  115:13 201:1
  205:4
**gas**  60:15
**gasket**  87:11
  89:19 115:24
  116:5 117:8
  118:3 155:1
  156:2
**gauge**  39:10
**gauging**  147:9
**gear**  19:16
  196:2
**gearbox**  15:20
  15:20
**geared**  30:15
**general**  31:20
  42:21,23 51:19
  89:22 138:2
  164:19
**generally**  18:11
  36:16 38:5,11
  46:20 48:15
  83:24 127:11
**generate**  67:23
  68:18 134:14
  152:2

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[generated - guess]**                                                Page 21

generated
  99:24 100:10
  178:23
generates
  68:20
generous  68:19
gentleman  39:7
geometry  89:22
georgia  1:1 2:5
getting  16:9,14
  26:12 36:13
  55:8 112:5
  118:14,17
  128:16 204:21
gia  69:2
giachetti  1:11
  3:1,12,15 4:1,8
  4:9,9,10,11,21
  5:4 7:9 9:19
  48:2 71:2
  167:6 186:3
  201:22 209:5
  210:2,24 211:2
  211:4,12
giachetti's  66:4
giant  14:16
  15:19 39:11
  55:9 165:3
gist  19:9
give  5:1 23:13
  26:14 30:17
  49:13 73:13
  126:16 137:14
  155:7 178:1
  198:21 202:24

204:8
given  62:21
  103:20 104:12
  159:20 211:9
gives  42:21
  57:20 126:8,12
  126:13,19
  170:16 171:1
  197:8 204:15
giving  69:15
  72:16 138:11
glorified  46:1
go  9:16 15:13
  19:12 28:11,11
  28:13 29:4
  35:23 39:10
  46:14,22,24
  47:23 52:11
  68:10 70:11,24
  74:8 77:17
  81:11 82:24
  86:2,19,20
  89:7 101:24
  103:9 105:14
  117:22 123:15
  124:10 128:21
  132:22 137:14
  140:23 141:1
  163:19 178:1
  181:8 185:15
  194:20 200:21
  201:6 204:15
goal  200:17
goes  14:18,19
  14:20,21 25:4

48:13 56:18
  58:24 76:8
  82:23 87:24
  96:17 117:23
  123:9 126:6
  150:16 156:10
  156:21 176:13
going  6:13 9:12
  9:13 10:14
  12:13 35:22
  41:4 44:14
  50:20 55:23
  60:7 64:11
  67:10 97:16
  104:6 117:16
  118:3 119:19
  123:14 127:14
  128:24 129:17
  130:11 142:11
  148:4,13,20
  149:1 150:23
  156:4 160:5,6
  167:7 172:1,10
  173:9 176:2
  179:16 181:9
  181:12,16
  183:13 194:4
  195:4,6,16,16
  195:24 198:21
  199:16
goldberg  2:8
  3:14 32:9,20
  65:13 67:8
goldbergsega...
  2:11 209:2

good  5:3 30:9
  47:5 71:12
  79:3 86:19
  97:19 181:7
  185:20,21
  187:18
gotcha  16:24
gotten  35:19
  74:5 148:2
government
  204:5
grab  101:12
  126:8,12 129:2
  169:17
grad  21:2
graduate  43:20
grandma  69:8
  165:4
graphic  179:17
graphs  179:12
  179:13
gray  142:18,19
graze  176:10
greater  80:16
gripe  130:21
gripes  129:15
groove  167:17
ground  6:7
groups  25:17
grow  24:11
guards  42:11
guess  12:8
  17:17 19:24
  48:7 63:11
  75:6 94:16

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[guess - help]**                                                      Page 22

103:18 116:7
118:15 121:24
174:23
**guessing**  32:18
34:11
**guest**  18:17
**guy**  15:10
20:20 44:17
147:2,5
**guys**  78:22
183:10 185:18
202:7

| **h** |
| :---: |

**h**  210:3
**hair**  172:16
**half**  79:24 86:3
86:4,15 99:16
125:18 135:4
136:23 137:1,3
177:1 185:16
200:3
**halfway**  192:17
192:18
**hand**  41:9
42:11 64:23
75:17 114:14
116:3 134:1,19
150:4,4,5,5,14
150:15,19
151:7 152:2,5
152:9,16,17
153:8,12,12,16
168:6,6,9,13,16
169:8,8,23
170:19,24

171:6,9,12,15
172:2,5 173:13
173:14,18,21
173:24 174:10
174:12,17,19
174:24 175:4,5
176:1,5,9,10
177:17,20,23
178:16 193:18
193:21,24
194:7 200:11
**handed**  134:11
134:16 150:21
169:20 194:14
**handle**  45:12
67:19 101:13
121:17 126:22
127:9,10
128:15 129:2
131:5 150:11
152:3 153:9,16
168:7,10,14,16
171:17 173:15
173:22 174:11
174:11,14
176:6 177:24
178:17 183:23
184:3 194:8
198:15,15
**handles**  67:18
89:24,24
153:10 193:5
**hands**  27:1
101:20 105:21
106:1,2,6,11

123:8 152:16
169:5,7,14
170:6,10,13,14
170:15 172:18
174:20 182:16
193:3 194:1,2
**hang**  14:2
**hanging**  19:11
**happen**  52:21
57:7,10 58:11
104:10 163:11
166:21 188:17
**happened**
113:12,12
123:21 179:20
187:24
**happens**  56:3
95:1 162:7
163:13 176:18
177:5
**hard**  83:4
137:1 142:3,6
142:8,16
144:16,19
145:5,11
146:21 188:17
188:20 193:13
197:15
**hardness**  122:3
124:12
**hardware**
41:23
**hardyniec**
53:20,21,22

**harm**  201:17
**hazard**  56:13
201:10
**head**  6:9
132:24 150:16
**heads**  5:1
**headspace**  56:8
**health**  28:16
**healthy**  135:1
139:10
**heard**  196:19
**hearts**  44:20
**heat**  53:16
56:20 78:4
79:7 149:15,16
187:10,11,20
192:20 197:11
**heated**  49:10
80:3
**heath**  33:6,7,9
34:10,11
**heating**  86:22
87:1 192:18
**height**  134:19
135:5,6,18,19
135:24 136:2
136:10 178:23
**heights**  135:17
136:9
**held**  83:17
**help**  23:23 45:4
48:17 54:1
64:1 69:16
89:9,10 90:12
192:14

Robert S. Giachetti , Ph.D.                                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[helpful - human]**                                                    Page 23

**helpful** 53:14
**hereinabove**
    207:17
**hereto** 211:7
**hey** 23:19
    72:15 79:23
**high** 20:9 51:23
    55:21 56:12
    89:23 114:14
    131:8 135:2
    139:19,20
    143:17 145:8
    145:21,23
    150:8 175:16
**higher** 54:9,9
    56:20 59:5,13
    59:16,16,23
    61:1 80:23
    84:4 85:3
    128:6 129:10
    130:7,8 137:7
    187:14
**highlight** 31:23
    43:12
**highlights**
    10:22 43:13
**hill** 97:16
**hips** 170:18
**hire** 23:11
    31:22 68:15
**hired** 27:18
    40:18 45:22
    46:14,22 63:15
    64:9

**hires** 27:18
**hiring** 72:19,20
**hissing** 148:18
    196:18,21
**hit** 10:21 61:8
    86:20 106:6
    119:16 125:6
    175:4 176:10
**hold** 9:9 11:10
    42:16 86:8
    88:7 89:10,11
    95:19 122:14
    154:14,21
    155:4 170:18
    180:21 182:9
**holding** 59:22
    80:18 83:9
    84:1 90:17
    101:12 133:24
    136:6 137:21
    137:23 154:7
    154:11 156:13
    164:7,14
    168:13 173:21
    174:10 194:7
**holds** 24:23
    96:12,21 97:6
    156:2
**hole** 40:10
    82:22,23 91:17
    91:18 92:24
    93:2,7,15
    94:23 95:2,4,8
    95:21 96:3,11
    99:22 100:1

116:12 117:12
    117:21 118:13
    118:16,18
    155:24 156:11
    156:20
**holiday** 31:1
**holistically**
    127:24
**home** 41:5,6,7
    41:10,11,15
    57:14 76:20
    77:19 200:14
    200:21 201:4
**honest** 68:16
**honestly** 46:17
**hooks** 14:3
**horizontal**
    175:19,23,24
    176:9
**horizontally**
    177:9,18
**horne** 2:3
**horsepower**
    15:19
**hospital** 179:23
**hosted** 30:13
**hot** 56:18 60:18
    61:10
**hotel** 39:20
**hotter** 56:19
    58:15 60:7
    61:14,15
**hour** 119:20
    185:16

**hours** 49:18
    67:22 119:19
**house** 75:13
    76:10,19,22
    77:19 120:19
    194:22 196:5
**huber** 202:4
**hubert** 2:9 3:6
    3:15 4:18,20
    5:1,18,21,23
    6:4 8:1 9:15
    10:16 22:3
    46:10 50:13
    53:6,11 65:19
    66:1,3,6,12
    71:12 73:20
    77:22 102:7
    108:9,15
    143:13 149:7
    158:2 163:15
    167:6 170:1,4
    170:8 172:20
    176:20 177:7
    181:12 185:12
    185:16 186:2
    190:15 198:5
    200:5 201:2,22
    206:7,11 209:1
**huge** 141:5
**huh** 5:5 6:9
    116:13,15
    183:20
**human** 44:2,7
    54:15 129:3,24
    140:22

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[humans - injuries]**                                                    Page 24

| | | | |
|---|---|---|---|
| **humans** 139:11 140:20 | **immediately** 58:22 60:15 | **incidents** 53:15 | **indication** 155:7 |
| **humongous** 14:16 | **immovable** 178:12 | **include** 7:20 10:6 34:18 161:18 | **indistinguish...** 129:24 |
| **hundreds** 133:16 | **impact** 190:10 190:20 | **included** 9:3 192:4 | **individual** 121:8 205:15 |
| **hungry** 185:22 | **imparting** 79:6 | **includes** 34:22 66:18 | **individually** 103:10 |
| **hydraulics** 19:21 | **implants** 45:3 | **including** 8:1 34:4 186:10 | **inductor** 20:2 |
| **hypothetically** 132:18 | **implementati...** 23:5 48:7 | **income** 27:8 50:4 68:18,20 | **industries** 12:22 |

**i**

| | | | |
|---|---|---|---|
| **icphso** 28:15 | **implies** 136:22 | **incomplete** 182:24 183:1 | **industry** 37:17 41:22 70:5 86:2 |
| **idea** 23:20 25:23 65:1 95:3 96:12 162:15 | **important** 129:19 148:23 | **inconsistency** 188:3 | **infer** 155:7 189:6 |
| **identical** 179:13 185:1 | **impossible** 141:2 | **inconsistent** 111:10,16 112:3 149:23 150:1 151:22 | **inferences** 198:22 |
| **identified** 5:13 10:3 72:14 74:12 75:4 108:9 182:4 186:4 | **impression** 195:3 | **incorrect** 22:17 | **influence** 52:18 |
| | **inadvertent** 100:15 | **increase** 59:19 81:16 | **information** 47:10 51:15 53:10,14 179:11 182:24 |
| **identify** 9:19 67:14 | **inadvertently** 205:21 | **increased** 59:18 | **informed** 201:2 |
| **ignored** 64:20 101:10 | **inch** 132:12,17 132:19 | **increases** 55:10 56:15 60:10 81:1,2,5,14 | **inherent** 188:2 |
| **illinois** 1:16 11:4 31:12 207:1 208:2,10 | **inches** 126:19 126:20,22 128:6,18 131:12 132:21 | **indention** 116:2 | **initial** 103:4 172:7 183:5 |
| **image** 114:5 117:10 | **incident** 73:12 73:23 109:17 111:16,24 120:20 123:21 125:13 153:20 157:6 167:23 167:23 182:1 188:13 198:20 | **independent** 97:23 99:2 | **initiated** 114:4 119:13 |
| **images** 115:4,5 | | **index** 3:9 | **injure** 41:24 |
| | | **indicate** 110:12 110:23 191:18 | **injured** 40:15 47:11 62:4 64:15 |
| | | | **injuries** 39:14 51:8 63:1,3 |

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[injuries - issue]**                                                    Page 25

104:12,14
105:2,4,17
107:13,16
109:24 110:9
110:17 165:24
169:3,21
172:21,24
175:18 177:16
182:3
**injuring** 39:24
**injury** 38:17
40:16,20 164:9
200:4,7 201:11
**inner** 77:4 98:1
**input** 49:20
72:16 131:22
131:23
**inquired**
160:10
**insert** 90:24
**inset** 117:5
**inside** 52:12
54:18 55:5
59:4,13,16,22
60:6,24 61:13
80:19 82:22
85:23 89:14
99:18 100:4
107:24 115:8
117:7,13,19
121:18 123:5
164:12 168:4
**inspect** 75:11
102:24

**inspected** 64:4
73:11 108:20
183:9
**inspection** 8:22
74:1 76:8,9,18
87:21 108:12
198:2
**instances**
112:20
**institutions**
30:14 203:8
**instruction**
137:2 166:5
184:14
**instructions**
101:7,9
**instructor**
18:20 19:5
**insurance**
46:13,14,22
**insurer** 47:1
**insurers** 46:7
46:10
**integrity** 17:2
40:2
**intellectual**
29:10 35:9
**intended**
141:22
**interest** 50:15
**interested**
31:23 50:11,16
53:5,9 148:5,8
148:9 195:15
207:23

**interesting**
69:18
**interface** 89:5
90:14 127:14
**interfaces** 91:5
115:23
**interference**
82:7 84:3
**interferes**
80:14
**interlocking**
164:22
**intermediate**
78:3
**intern** 16:6,8
**internal** 78:4
100:10 184:16
**internally** 27:1
**international**
25:10,12,13
28:15
**internship**
16:17
**interparties**
35:18
**interpret** 165:7
**interpretation**
127:6,23,24
165:9
**interrogatories**
4:3 207:11
**intertek** 203:16
203:19,19,23
204:21 205:9
205:14

**introduce**
167:9 181:16
**introduction**
19:2
**intuitive** 56:4
**invention** 37:6
**investigation**
89:22 108:6
185:5
**invited** 30:17
**invoice** 67:1
**invoices** 3:13
66:18 67:13,15
67:17,23
**involved** 13:15
22:9 48:14
53:15 69:12
74:10 87:20
197:23
**involvement**
50:7,9 69:14
**involving** 32:1
32:21 71:4
72:18
**inward** 89:17
97:6
**ipr** 35:13,17
36:8
**iprs** 36:17
**ish** 16:3
**issue** 6:2,4 64:5
87:1 88:2
89:13 98:24
99:9 112:23
129:5 161:24

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[issue - know]**                                                    Page 26

185:2 203:10
**issued**  9:2
66:24 102:18
102:23
**issues**  22:15
79:12 205:9
**italian**  11:15,19
11:23 12:2
**italy**  11:15,21
**items**  13:7
**itsy**  15:5
**iv**  2:9 3:6 209:1

**j**

**j**  2:9 3:6 209:1
**jammed**  39:12
65:4
**jamming**
118:18
**january**  1:17
3:2
**jersey**  2:10
**job**  18:6 25:5
95:15
**jobs**  22:8 24:3
**john**  197:21
198:4,6,7
**joint**  12:8
**joints**  44:10
**journal**  53:14
175:11 200:2
**journals**
155:10
**jumped**  175:4
**june**  8:19 9:4,7
66:23 75:16,19

75:24 76:5
102:12 181:20
186:4 191:8

**k**

**k**  2:4 3:5
**keep**  6:8 24:8
32:18 78:13
95:16,16,24
97:5,8 100:19
153:13 173:10
**keeping**  96:19
156:3
**keeps**  59:21
89:17 94:3
96:12 97:10
117:16,24
118:1,3 156:3
**key**  78:12
199:21,22
**kids**  20:9
**killed**  155:19
**kin**  207:24
**kind**  5:11 6:11
7:3 14:18
16:21 21:15
26:24 28:13
30:21,22 31:11
36:7,14,15
37:14,15,23
38:1,11,15
39:6,19 41:8
42:7 44:7,24
46:8 52:7 54:8
55:24 58:7
61:3,22 71:6

72:22 74:5
76:19 77:3
79:5 88:14
96:10,15 100:6
103:10 111:12
112:11 115:8
123:10 135:21
169:9 175:19
181:20 182:16
185:4,5 198:24
**knee**  44:21
180:15
**knew**  64:19
184:13
**know**  5:22 6:8
7:3 12:17
13:20 14:24
17:18 19:19
20:1,3 23:23
25:3 26:23
29:12 30:1,2
30:19,19,20,23
31:1,2 33:13
35:4 36:22
37:7,15,16
39:8 41:21
43:4,6,7,9,10
44:4,14,16,17
44:20 45:4
46:17 47:2
50:15 51:2
55:17 57:4,4
60:22 63:6,15
63:24 65:2
66:19 72:1

74:18 77:6
82:8,13 89:22
91:1 106:3,9
112:22,24
113:1,11
114:23 118:22
118:24 119:6
119:10,17
121:4 123:20
125:7,13 127:5
128:23 129:6
129:12 130:1,3
130:7 131:9
132:17 133:16
134:22,23,24
136:16 137:12
138:5,5,19
141:10,13
147:2 148:12
149:8,9,14,18
149:21 150:7
154:8 158:4,5
158:15,17
159:1 160:15
160:21 162:13
162:17 167:22
171:14,15
173:4 174:11
174:12,13
176:4 177:5,21
178:3,21,23
180:13 181:13
183:13,17
184:1,10,14,24
191:22 197:6

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[know - lid]**                                                      Page 27

199:20 200:19
203:4,23
204:14 205:5,7
**knowledge**
7:23 38:4 43:1
99:1 121:11,15
159:2 183:13
189:14 192:17
**known** 7:10
79:6 197:10
**kraslen** 39:18

**l**

**l** 1:12 207:5
208:8
**lab** 77:7,18
199:13
**label** 184:18,20
202:21,24
203:22 204:8
204:15
**labels** 166:9
**laboratory**
202:16
**lack** 90:16
**ladder** 40:21
**lady** 38:13
**lady's** 146:17
**laid** 103:20
**language** 11:16
20:19
**large** 124:18
125:22 137:19
171:2,3 187:9
**las** 33:3

**latest** 67:1
**law** 30:18
70:20
**laws** 202:8
**lawsuits** 53:10
**layer** 91:1
**laying** 155:1
**leading** 55:19
141:5 142:13
149:9,12
197:12
**learned** 69:8
196:11
**learning** 12:2
**leave** 14:8 55:3
176:19
**lecture** 18:19
**lectured** 19:4
20:4
**lecturer** 17:18
17:20 18:3,16
**lectures** 18:18
**left** 16:12 65:15
114:10,14
116:3,17
117:18 148:13
148:14 168:12
168:13,16
170:19 171:15
173:20,21
174:9,10,12
187:1 196:3,11
**leg** 180:14
**legal** 29:6,13
159:1 209:23

**lengths** 179:5
**letter** 3:15
207:22
**letting** 79:5
**level** 31:5 52:14
57:11 69:12
79:21 85:21,24
86:10 98:10
101:18 139:4
150:8 194:14
**levels** 130:7,8
139:18 144:13
145:13,21,23
175:13 188:14
**lever** 41:10
131:14,19,20
131:20,23
150:6
**leverage**
126:24 127:2
131:15 150:11
151:13,21
152:3 153:5
170:17 198:15
**levers** 153:9
**license** 203:6
203:19
**licensed** 203:4
**licenses** 203:5
**lid** 46:1 54:15
55:3 56:2,6
57:8 60:3 78:2
78:9,13,15
80:19,21 81:2
81:4,10 82:12

83:5 84:6 86:8
87:12,16 88:8
88:10,21 89:4
89:10,11,12,15
89:16,18 90:13
90:14,17 91:6
91:8 92:2,2,6
92:17 93:1
94:20 95:5,15
95:18 96:1,12
96:19,21 97:23
97:23,24 98:2
98:18 99:3
100:7,10,16
101:19,21
104:9 105:21
106:12 107:23
114:17 115:7,8
115:10,16,21
115:24 116:8
116:10,17
117:7,14,21
118:2,19
121:16 123:2
123:24 126:6
126:10,13,18
126:18,22,24
127:5,8,13
128:8,18
129:10 131:5
131:10,13,17
131:19,21
132:21 150:2
150:12 151:2,6
151:12,14,16

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[lid - locked]**                                                   Page 28

| | | | |
|---|---|---|---|
| 151:20 152:1,4 | **limit** 108:16,18 | 65:23 102:2 | 124:6 135:3 |
| 153:13,13,21 | 142:15 182:11 | **listed** 35:24 | 144:22 149:6 |
| 154:3,16 | **limitations** | 43:3 65:21 | 153:9 155:2 |
| 156:11 157:2 | 76:15 182:13 | 102:3 161:13 | 159:14 164:17 |
| 157:14 162:5 | **limited** 23:3 | 191:14 | 183:15,16 |
| 163:5,6,8,9 | 44:13,23 68:4 | **lists** 9:23 | **littleford** 36:10 |
| 166:16,17,18 | 68:7 104:5 | **literature** | 37:20 |
| 168:4,10 170:6 | 129:3 | 20:18 51:4,6,7 | **live** 20:12 |
| 170:21,23 | **line** 14:14 | 82:14 178:5,6 | **lives** 194:23 |
| 171:1,3,7,10 | 15:11 106:10 | **litigation** 23:4 | **load** 192:23 |
| 172:5,9,18 | 113:13 130:9 | 24:5,15 25:3 | **loads** 13:21 |
| 173:7 175:5 | 177:17 194:6 | 26:15 27:13 | **local** 68:23 |
| 177:10 184:15 | 194:11 204:24 | 45:14,21 48:14 | 76:20 |
| 184:20 194:7 | 205:17 210:4,7 | 49:7 50:17 | **location** 152:10 |
| 197:8,15 | 210:10,13,16 | 62:5,19,23 | 198:11 |
| 199:21 | 210:19 | 68:16 71:21,24 | **locations** 168:9 |
| **lid's** 168:7 | **lined** 159:14 | 72:4,13,14,15 | 179:11,18 |
| 173:14 | **lines** 93:3 | 74:10,13 77:15 | **lock** 78:14 |
| **life** 73:8 147:3 | **linkage** 44:5 | 159:20 166:9 | 82:10 83:19 |
| 181:2 | **linkedin** 28:2 | 197:23 | 85:7,15 89:10 |
| **lift** 98:14 | 31:16 | **little** 10:12 15:4 | 94:2 101:7,11 |
| **lifted** 137:24 | **liquid** 54:18 | 15:5 18:8 | 101:23 119:12 |
| **lifting** 13:4 | 58:14,15,20 | 19:15,23 23:15 | 155:8,19 156:1 |
| 14:1 146:8 | 59:5,13,21 | 26:11,12 49:23 | 156:17 163:24 |
| 147:3 | 60:6,12,14,15 | 55:9 56:16 | 164:2 165:12 |
| **likely** 56:21 | 60:24 61:16,17 | 58:12 61:23 | 167:12 189:3,4 |
| 87:17 104:13 | 99:18 100:4 | 69:19 71:13 | 189:7 190:11 |
| 105:2,5 107:11 | 174:21 | 74:5 75:9 76:9 | 190:19,20,24 |
| 124:24 125:7 | **liquids** 54:19 | 80:24 83:2,10 | 193:17 198:21 |
| 172:8 175:18 | 101:3 164:12 | 86:16 88:23 | 198:22,24 |
| 176:15 177:20 | **list** 9:24 10:4 | 89:17 92:4 | 199:20,22 |
| 179:1 187:13 | 30:22,23 34:6 | 93:15 96:16 | 200:7 |
| **limbs** 138:20 | 34:13,13,20 | 99:22 112:16 | **locked** 85:11 |
| 138:22 144:11 | 35:1,4,22 | 114:21 116:12 | 90:15 119:8 |
| | 42:15 43:7 | 117:12 120:2 | 124:1 |

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[locking - magnified]**                                                    Page 29

**locking**  78:1
80:13,15 81:7
81:10 82:3,19
83:22 84:10,10
84:15,16,23,24
85:4,13,16,17
86:8,12,12,23
87:5,15,21
88:2,4,4,7,15
88:18,19 89:1
89:14 90:2,3
91:5,6,8 92:14
92:19 93:5,11
93:12,19 94:6
94:6,10,11,15
94:19 95:3,9
95:11,17,20
96:1,14,21
97:6,15,24
100:12,18,18
100:19,24
101:1 112:1,2
112:6 113:2,6
113:11,17,17
114:7,9,16,16
114:20 121:21
122:12,13,17
124:12 153:22
153:23 154:3,9
154:10,16,20
156:1 162:20
162:21,24
163:20,20,21
164:17 165:13
165:14,15,19

167:17,18
**locks**  126:7
**locomotive**
41:1,2
**log**  65:18,24
**long**  13:12
15:18 17:3
19:20 21:13
24:9 29:15
82:12 104:19
117:4 127:9
178:18 197:10
**longer**  56:20
**look**  10:18 20:2
23:21 46:14,22
46:24,24 47:18
51:4 62:18
63:3 66:14,15
76:7,15 105:2
105:4,17 109:3
109:7 115:17
115:22 116:5,6
116:23 131:8
131:10,12
134:3,10
141:20 147:1
161:22 162:17
166:5 167:6
169:6 175:17
184:15,18
**looked**  7:21 8:5
8:8 15:18
73:14 108:19
108:20 116:11
116:17 183:6

**looking**  19:19
23:12 28:3
38:20 44:2,9
45:5 52:9 54:2
54:22 55:13,15
67:4 103:18
111:24 115:9
115:15 168:20
169:10 174:3
**looks**  9:21 14:5
16:2 17:3,8
54:3,14 67:5
67:16 117:12
129:18
**loose**  179:14
**lost**  42:12
172:23
**lot**  15:21 22:20
30:19 40:10
41:22 51:5,7
51:15,16,17
56:16 83:13
101:14 102:22
117:6 135:16
150:11 157:19
170:16 171:1
175:22 183:16
193:11
**loud**  6:6 148:18
**low**  58:6 79:17
80:9 82:10,11
82:15,16,18,19
114:13 124:17
124:22,22
139:18 140:4,5

143:17 144:2,2
144:3,18,20
145:8,24,24
176:1 188:13
199:23 201:12
201:16
**lower**  60:8
131:16 136:12
136:14 137:8
139:24 177:4
**lowest**  85:21
**lozano**  84:20
**lozano's**  93:18
**lunch**  202:4,7

**m**

**machine**  16:23
39:11,13,17
42:9,10,11
44:8
**machinery**
14:13 37:19
**macon**  1:2 2:5
**made**  13:17
50:23 63:7
73:17 90:20
113:2 158:6,17
160:18 161:2
173:2 182:11
187:19 207:16
211:5
**madison**  11:7
18:4
**magnified**
130:1

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[mail - maximum]**                                                    Page 30

| | | | |
|---|---|---|---|
| **mail** 30:24 66:9 66:10 | **male** 134:18 135:4 139:10 | **mark** 9:12,13 9:16 10:13 | 122:3 160:7 205:22 |
| **mailing** 30:21 30:22 31:12,12 | **male's** 138:13 | 118:12 119:5 160:2,6 166:23 | **materials** 9:23 9:24 25:13 |
| **mails** 65:12,19 65:22 66:6 | **males** 134:17 135:1 141:8 | 191:12 203:6 203:11 204:2 | 38:20 44:15 49:22 81:12 |
| **main** 53:1 | **man** 143:20 | 204:12,14,17 204:22 205:8 | 103:6 121:10 124:13 141:22 |
| **maintain** 15:9 28:1 45:19 | **manage** 106:6 | 205:10,11 | **math** 67:4 |
| **majority** 62:15 | **manhole** 40:5 | **marked** 9:18 | **matter** 9:20 |
| **make** 13:9 22:7 | **mannequin** 49:24 178:15 | 10:17 67:10,12 | 10:1 34:4 35:9 |
| 25:16,18 37:6 | **manpower** 49:22 50:3 | 75:17 160:4 167:2 | 35:15 66:22 74:10 80:11 |
| 44:10 48:10 58:1 60:21 | **manual** 3:18 89:19 90:4 | **market** 27:22 27:24 | 102:20 103:5 129:22 130:10 |
| 63:4 67:15 69:20 73:8 | 98:12 99:4 104:20 111:5 | **marketing** 25:4 29:20 | 130:19 |
| 74:4 77:13 81:3 97:18 | 166:7,11 | **marketplace** 24:1 | **matters** 32:10 32:11 34:1 |
| 101:19 109:21 114:23 119:4 | **manually** 122:18 164:7 164:13 | **markets** 38:8 | 45:13,14 81:24 159:21 |
| 138:10 140:13 152:13 169:7 | **manuals** 166:6 | **marking** 10:14 118:5 | **max** 144:7 |
| 180:23 181:16 182:13 197:3 | **manufacture** 13:6 | **marks** 112:5 120:2 | **maximal** 134:4 136:23 139:9 142:17 |
| **makes** 14:24 25:14 43:22 | **manufacturer** 46:5 69:21 74:17 | **marquette** 10:24 | **maximally** 139:12,12 |
| 85:10 124:8 126:15 140:2,6 | **manufacturers** 159:16 | **marty** 2:4 3:5 4:18 77:22 | **maximum** 98:15 125:6 |
| 176:5 190:24 196:21 | **manufactures** 45:8 | **mass** 19:10 | 134:11,16 136:16 137:3,5 |
| **makeup** 121:8 | **manufacturing** 22:10 36:4 | **master's** 16:9 16:12,14 44:20 | 137:7,10 138:13 139:7 |
| **making** 5:16 10:7 44:19 | 72:17 205:19 | 180:6,13 | 139:17 140:18 140:21 141:12 |
| 52:4 84:2 118:9 | **mariano's** 69:4 | **material** 5:2 29:20 85:23 113:7 121:8 | 142:2 143:11 |

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[maximum - middle]**                                        Page 31

143:16,21
144:1,12,23
146:11,16,17
146:24 147:6
147:10,11
**maximums**
134:20
**mean** 5:18 15:8
18:8 19:6
21:15 22:18
26:17 30:4,5
31:7 34:16
36:3,15 45:23
63:9 64:16
72:16 74:9
76:1 83:21
85:7 91:23
99:4 100:17
104:13 105:15
115:9 119:11
119:13 121:12
126:11 134:11
134:16 141:11
145:6,22 146:3
152:6 162:24
163:13 165:7
165:11 167:14
168:8,15
185:20 205:6
**meaning** 88:9
93:5 111:6
119:14 154:9
178:6
**means** 80:23
83:10,11,14

114:17 118:17
165:10 177:21
187:11 200:5
**meant** 135:13
179:13,14
184:12
**measure** 38:24
121:20 122:15
122:21,22
125:8,19 126:1
149:17,18
153:20 200:14
**measured** 91:3
121:22 122:7
122:11,12
125:23 132:12
132:19 133:12
135:1 136:3
139:17 140:18
**measurement**
146:19
**measurements**
80:2,2 121:14
**measures**
130:12 132:4
132:10
**measuring**
43:10 79:4
133:15 142:2
144:10
**meat** 187:9,9
187:11,20
**mechanical**
10:23 11:3,7
13:4 17:2 21:7

43:5,16,23
44:2,6 45:6
83:22 97:22
99:3 126:13,16
127:1 131:3
132:2 162:20
163:20
**mechanism**
78:2 80:13,15
82:3,19 83:22
84:10,23 85:4
85:13,17 89:14
90:2 91:6,8
93:11 94:6,10
94:11 95:14,21
96:22 97:24
98:1,4 100:18
101:1 123:11
123:18 153:22
154:3,21
165:18
**mechanisms**
84:11 97:22
**medical** 180:3
180:5,6,7,9,13
180:19,22
181:4
**medium** 139:18
139:20,22
140:3 143:17
144:15,19,21
144:22,23
145:4,8,21,23
147:8

**meet** 191:6
204:8
**meets** 127:20
128:18 129:10
189:2
**members** 31:13
**memory** 33:20
39:15
**mention** 76:14
**mentioned** 29:4
43:15 44:11
45:15 48:5
54:8 69:24
70:8 82:21
122:6 131:1
135:18 155:18
157:8 196:18
**mentioning**
58:13 60:10
**message** 31:10
**met** 204:18
**metal** 14:16
86:22 87:5
90:23
**meter** 38:23
**method** 125:24
129:6 130:11
130:23 150:1
**methodology**
107:2 149:23
175:9
**middle** 1:1
95:17 114:22
170:20 171:9

Robert S. Giachetti , Ph.D.

January 31, 2024

Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[miles - never]**

Page 32

| | | | |
|---|---|---|---|
| **miles** 140:24 141:2 | **motors** 15:19 | **mumble** 6:20 | **necessary** 99:17 172:6 211:6 |
| **milk** 133:24 | **mounting** 15:15 | **muscle** 44:4 | |
| **mill** 147:2 | **mouth** 28:5 | **muscles** 170:17 171:2 | **neck** 168:22 |
| **milliseconds** 60:23 | **mouthful** 28:17 | **musso** 38:8 | **need** 7:2 9:14 13:9 46:21 |
| **mind** 119:20 185:13 | **move** 54:22 55:15 57:17 | **n** | 47:6 71:10 76:7 121:12 |
| **mindful** 46:11 | 71:13 80:15 82:7 83:3 | **n** 161:7 | 130:12 152:19 152:21 153:4 |
| **mine** 129:16 | 97:21 110:18 | **name** 7:7 12:1 18:23 25:11 | 154:11 163:24 166:10 167:3 |
| **minor** 11:2 | 122:16,18 128:8 129:2 | 31:8 41:5 42:5 53:19 | 171:8,11 172:10 173:9 |
| **minutes** 103:17 181:8 185:17 | 170:21,24 173:8 | **named** 207:9 | 177:12 178:2,3 181:7,9 182:11 |
| 186:21,23 187:2,6,23 | **moved** 9:3 151:1 | **names** 7:11 33:4 46:17 | 185:12,20,21 203:15 205:2 |
| **misquote** 134:6 | **movement** 80:24 97:13 | 72:6 | **needed** 13:21 15:23 69:16 |
| **missing** 23:22 181:17 | **moves** 89:16 94:19 96:6 | **narrative** 104:1 104:5,17,22 | 105:14 194:8 201:3 |
| **mistaken** 104:3 | 116:20,22 122:13,21 | 107:7 108:2,3 109:19 110:7 | **needs** 155:3 167:6 |
| **misuse** 63:12 113:5 | 150:20 | 110:12,19,23 111:9,16 | **negate** 76:5 |
| **model** 103:8 121:17 178:24 | **moving** 71:8 90:9 97:10 | 149:24 169:19 186:9,13 187:6 | **negated** 76:4 102:16 |
| 184:4,4 205:12 | 122:16 173:10 176:3,4 177:22 | 188:4 | **negligible** 145:24 |
| **models** 120:9 123:1 184:2,7 | **msenn** 2:6 | **narrow** 88:14 | **neither** 163:10 163:13 |
| **mom** 69:8 165:4 | **mug** 19:11 | **nature** 66:8 | **never** 31:14 45:18 63:5 |
| **moment** 72:10 104:23 | **multiple** 5:9 64:24 105:24 | **nda** 72:3 73:5 | 69:20 73:22 101:17 123:9 |
| **money** 48:18 50:4 63:21 64:1 | 108:17 113:9 | **near** 77:19 106:13 174:20 | |
| **motion** 43:9 58:3 151:14 | **multiply** 132:21,24 | **nearly** 184:24 | |
| | | **necessarily** 43:18 44:3 | |
| | | 47:3 56:4 119:11 129:7 138:10 | |

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[never - okay]**                                                    Page 33

137:24 160:13
161:2 180:17
181:2 183:5
**new** 2:10 13:15
14:23 26:2
29:23 127:11
184:4 190:3,5
**nondisclosure**
47:13 48:9
**nonlitigation**
48:21,22 50:22
**norfolk** 40:13
40:17,18
**normal** 38:1
59:1 101:5
150:24 151:10
151:19,20
**normally**
205:18
**north** 208:9
**notary** 1:12
207:6,13 208:2
211:13,19
**note** 209:10
**noted** 211:7
**notes** 180:19
**notice** 4:12
7:13 65:21
**number** 13:17
24:19 28:7
30:17 32:17
36:4 50:24
80:2 81:8
98:22 129:12
136:6 137:19

142:22 160:15
160:23 175:14
182:10 187:14
197:11 203:7
**numbers**
136:13,14
145:20
**numerically**
145:15
**numerous** 24:3

**o**

**o'neil** 39:19
**object** 171:23
194:17 200:1
200:23
**objecting**
108:15
**objection** 50:13
53:6,11 73:20
108:9 143:13
149:7 158:2
170:3,7 172:20
176:20 190:12
197:24
**objections** 4:15
**objective**
138:11
**obscured** 40:10
**observations**
197:3
**observe** 129:2
148:10 149:2
184:8 195:7
198:11

**observed**
107:22 168:2
175:15
**observing**
130:3 148:8
**obstructions**
90:6,11
**obtain** 79:13
**obtainable**
199:13
**obvious** 37:1,3
37:8 113:8
184:7
**obviously**
116:5
**occasions** 5:9
**occupation**
146:7
**occur** 173:1
193:6 199:24
201:16
**ocular** 51:7
**offer** 43:2 45:8
**offered** 14:9
41:12 61:24
62:3,18,19
**offering** 37:23
38:15 40:1
68:1 166:8
**office** 10:5
**official** 208:1
**oh** 5:15 10:11
19:2 20:16
64:7 65:23
71:18,20 115:9

115:11 127:17
163:16
**okay** 4:11,19
4:24 5:3 6:16
6:17 7:1,5,6,19
7:24 8:13,21
9:1,6 10:10,21
11:12 12:1,15
12:20 13:2,12
13:14,23 14:11
15:22 16:2,5
16:11,15,18
17:16,22 18:1
18:6,13,16,22
19:6 20:4 21:3
21:17 22:1,22
23:7,9,18 24:2
24:4,14 25:6
25:20,23 26:9
26:11 27:2,10
27:15,18,22
28:6,10 29:4
30:21 32:5,8
32:11,20 33:2
33:4,13,21,24
34:9,12,18
35:12 36:7
37:4,9 38:20
39:18 40:1,19
40:23 41:4,17
42:2,7,13,19
43:1,22 44:11
45:7 47:16,20
48:13 49:9,13
50:7,21 52:1,7

Robert S. Giachetti , Ph.D.

January 31, 2024

Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[okay - open]**

Page 34

| | | | |
|---|---|---|---|
| 52:24 53:8,18 | 109:14,20 | 171:5 173:12 | 95:1,1 113:13 |
| 53:22 54:18,21 | 110:1,3,8 | 174:2,9 176:14 | 119:7,16 |
| 55:13 57:18 | 111:15,23 | 178:6,12,14,18 | 123:11 155:23 |
| 58:5,10 61:10 | 112:11 113:15 | 178:21 179:10 | 163:11,23 |
| 61:22 62:3,8 | 113:20 114:2,8 | 179:19 180:2,7 | 177:19 189:4 |
| 62:10,17,22 | 114:12 115:4 | 180:17,24 | 204:13 |
| 63:5,23 64:8 | 116:24 117:10 | 181:3,6 182:23 | **ones**   12:12 |
| 64:22 65:3,7 | 117:18 118:9 | 183:8,15 | 34:20,24 89:8 |
| 65:11 66:5,10 | 118:12,24 | 184:10,22 | 127:11 157:21 |
| 66:14,17 68:5 | 119:6,18 | 185:4,9 186:16 | 159:16 |
| 68:7,23 69:3,5 | 120:24 121:7 | 188:23 189:12 | **ongoing**   160:16 |
| 69:18 70:23 | 121:19,24 | 189:15 191:15 | **open**   57:12 |
| 72:6 73:10,18 | 122:17 123:19 | 191:24 192:5 | 60:24 64:23 |
| 73:23 74:4 | 123:24 124:7 | 192:16 194:23 | 78:14 79:24,24 |
| 75:9,16,23 | 124:11,15 | 195:24 196:11 | 81:4 82:12 |
| 76:7,14,23 | 125:3 127:1 | 198:10,17,23 | 92:5,7 93:1,2 |
| 77:20 79:9,12 | 130:10,15,22 | 201:2 202:10 | 93:13,20 96:22 |
| 79:18 81:13,19 | 131:1,18 | 202:23 203:18 | 101:11,21 |
| 82:17 83:16,18 | 132:15,16,20 | 203:20 | 105:6,8 107:23 |
| 84:22 85:9,16 | 133:2,18 | **old**   14:24 127:8 | 112:19 114:9 |
| 85:21 86:1,7 | 140:11 142:7 | 134:17,18 | 118:7 119:7,15 |
| 86:16 87:5,9 | 144:5 145:9 | 135:4 138:13 | 123:2,5,11 |
| 87:18 88:6,13 | 146:6 147:15 | 143:20 146:17 | 133:9 147:16 |
| 89:4,12 91:4 | 147:20,23 | 165:1 | 149:23 150:2 |
| 91:14,21 94:5 | 148:1,7 149:5 | **older**   102:7 | 150:16,19 |
| 94:15 95:7 | 149:11 152:15 | **olds**   137:7 | 151:7,23 152:4 |
| 97:13,21 99:2 | 153:19 156:23 | **onboard**   139:7 | 152:23 153:3,3 |
| 100:6,15 | 158:24 159:7 | 183:10 | 153:6,21 154:3 |
| 101:22 102:22 | 159:23 160:13 | **once**   31:1 52:21 | 154:15 155:20 |
| 103:9,23 104:3 | 160:21 161:17 | 56:1 58:20,24 | 162:5 163:6,7 |
| 104:8 105:1,7 | 161:22 162:13 | 60:8 61:7 | 166:12 168:3 |
| 105:12 106:15 | 162:16 164:5 | 70:21 76:21 | 171:8,14 |
| 106:19,22 | 166:4,8,16 | 80:5 83:12,24 | 172:15,17 |
| 107:1,9,17,21 | 168:1,19 169:4 | 85:3 90:14 | 182:14,16 |
| 108:1,5 109:7 | 169:13 170:12 | 92:19 94:15 | 188:20,22 |

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[open - outstretched]**                                      Page 35

190:3,24 193:3
193:14,18,21
198:16 199:20
200:8
**opened**   103:15
104:2,20,21,23
107:8,10,19
109:5,10,23
110:5,13
111:21 112:18
112:22 114:3
123:24 149:5
167:20 177:3
180:14 182:7
188:17 201:11
201:17
**opening**   54:5
63:10 64:15,16
80:7 85:20
96:1 100:20
112:8 118:21
120:17 124:19
124:20,24
125:23 126:1
128:2 133:5,19
147:21 150:21
151:19,20
152:9 157:4,14
158:12 159:24
161:8,18 162:1
162:21,23
164:20 165:23
166:18 171:3
197:12 199:21

**opens**   163:8
201:9
**operated**   90:7
**operating**
42:10
**opined**   160:15
**opining**   36:16
37:12 41:19
103:19 110:3
110:23 182:15
**opinion**   38:18
43:2 60:22
62:21 63:8
64:5 68:3 76:3
79:3 85:16,21
86:10 100:22
103:11,18,19
104:4 107:3,9
107:17,20
108:1,2,6,7,10
108:11,13,21
109:9,11,15,22
110:1,2,11,11
110:15,15,18
112:12 118:9
120:1 121:5
124:16 133:6
146:1 153:1
155:9 156:23
157:10 158:11
158:19,19,23
159:3,6,23
160:1 161:20
161:21 162:13
162:18 165:22

166:8 167:11
167:19 168:1,2
168:5,8,15
170:9 181:23
182:3,9,23
183:2 184:10
184:22 188:20
190:9,14,16,19
190:19,23
206:1
**opinions**   7:22
9:2,9 10:1,7
33:18 37:12,14
38:15 39:16
40:1 75:18,22
101:24 102:2,2
102:4,5,5,11,13
102:18,18,19
102:22 103:1,9
105:15 108:10
108:17 109:6,8
166:15 171:6
181:5,15 186:4
186:7,8 190:17
**opportunity**
5:12 14:10
75:10 102:24
119:4 195:6
**opposed**   22:15
24:6 26:15
43:22 46:2
57:8 79:6 84:2
157:24
**opposite**
104:16

**oral**   4:3 207:11
**order**   9:17
10:12 15:11
39:9 71:6 90:5
**ordinary**   36:19
164:6,13,15
**oregon**   11:15
12:5
**organization**
28:16
**organized**
30:13
**orifice**   155:1
**original**   141:24
**originally**
197:9
**oscillate**   19:9
**outcome**   33:13
130:24 150:18
**outermost**
127:8
**outlined**   186:4
**outlining**
146:24
**output**   43:11
144:11 146:20
**outside**   22:12
29:19 43:6
69:23 135:24
138:24 139:3,5
140:24 144:3
166:11
**outstretched**
170:16

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[outward - people]**                                              Page 36

**outward** 97:13
122:16,19,21
177:10
**outwards** 97:10
**overall** 89:23
**overcame** 78:1
88:10
**overcome**
78:14 83:20
86:11 101:4
119:12 189:4
**overcoming**
96:1
**overflow** 58:7
**overlapping**
90:16,20
**overpressure**
98:1
**overs** 24:21
58:13
**overseer** 21:1
**own** 73:15 79:5
81:10 98:15
104:20 143:23
156:14 199:9
202:23 203:22
**owned** 41:14
73:15
**owner's** 3:17

**p**

**p.m.** 119:23
185:23,24
206:15
**pacific** 40:19

**packed** 196:2
**page** 3:4,11
9:22,23 17:17
19:1 31:16
34:13 42:13,14
43:3 60:22
76:15 77:21,22
77:23,23 86:21
97:21 100:6
102:1,1 113:21
116:23 117:11
134:8 162:16
179:12 191:12
194:6 210:4,7
210:10,13,16
210:19
**pages** 17:13
**paid** 27:4,16
50:3 67:5,9
**palm** 150:10
**pandemic**
21:15
**paper** 14:17,17
48:16,19 49:18
49:21 52:11
58:9 101:16
155:15 175:11
176:15,22
200:3
**paragraph**
86:21 100:8
**paraphrasing**
196:1
**part** 7:13 18:7
18:12 24:12

48:19 52:13,14
52:16,17,20
60:13 87:6,7
88:1 89:21
93:10 94:8
99:9 101:10
115:23 116:20
117:11,15,24
117:24 138:2
139:16 141:5
160:6 162:11
166:4 167:11
175:6
**partially** 93:4
93:13 150:17
**particles** 55:15
59:21 176:18
**particular**
134:24 183:21
**particularly**
146:6,9
**parties** 33:4
207:24
**partnered** 20:8
**parts** 82:7
120:12 121:8
121:18 161:13
**partway**
150:17
**party** 62:4
64:15
**pass** 30:7 75:7
163:4,9,14
190:7 198:19
201:12,19

202:20 203:11
205:2
**passed** 157:3
191:19,22
202:22 203:7
204:3
**passes** 189:9,24
195:11 199:5
202:24 203:23
203:24 204:9
**passing** 163:3
**passive** 98:15
**past** 92:19
94:15
**pasta** 68:20
**patent** 35:19
36:9 37:3
**patients** 180:17
**pattern** 179:15
**patterns**
168:16
**pay** 50:4
**pays** 27:19,19
**peake** 2:4
**peer** 53:14
155:10 175:12
176:21 178:8
200:3
**pen** 37:5,7 92:5
**pencil** 133:23
**pending** 7:5
72:15
**pens** 29:21 37:6
**people** 13:18,20
18:22 19:10

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[people - piece]**                                         Page 37

20:5,6 22:24
25:15,16,17
28:3,7 29:1,21
29:24 30:7,10
31:22 36:22
38:2 39:21
41:24 51:1,6,7
51:12,20 63:10
64:24 85:20
104:14 113:4
134:6,13 136:1
138:7,21 140:4
140:5 141:16
142:23,24
143:2,7,16
144:14,16,16
145:2,13,14
150:7 154:21
159:22
**people's**  43:10
52:5 138:22
145:17
**perceive**
145:13
**percent**  24:10
24:12,14,16
25:1,2 26:21
26:22 27:12
28:21 49:18
93:24 129:16
134:6,12,15,15
134:20 135:6
136:16 137:15
137:18 138:6
138:13,23

139:6,9,21
140:21 142:15
142:17,20,21
143:10,21
144:1,7,22
146:10,16
147:6,11 155:4
**percentage**
24:5 26:14
62:12
**percentile**
178:20
**perception**
51:16 129:24
138:15 139:1
140:14,16
142:3 145:7,10
145:11,18
146:18,20
147:3 193:12
193:12
**perez**  35:16
42:2
**perfectly**
129:14
**perform**  73:24
78:1,23 122:3
148:1,11
188:24 196:8
196:12 201:4
**performance**
155:8 167:12
**performed**
106:9 108:20
112:8 189:12

192:8 193:10
197:20 198:17
199:10
**performing**
77:24 148:9
**performs**
182:24 196:15
**period**  12:9,10
22:8 45:1 60:6
60:23
**permanently**
123:6
**person**  6:18
36:18,19 37:6
44:19 52:12
100:20 101:5,6
137:10,10,24
138:16,19
139:22 142:9
142:12,22
144:6 145:12
147:13 151:19
153:7,12,15
164:19 165:23
180:18 181:2
182:18 197:22
**person's**
147:11
**personal**
143:11,14
155:9 197:3
**personally**
67:19
**persons**  164:10

**perspective**
50:17,22 51:23
189:23
**pertaining**  1:14
**petition**  35:20
**ph.d.**  1:11 3:1
3:12 4:1 11:6
17:12,19,22
21:6 44:9
138:22 139:17
209:5 210:2,24
211:2,4,12
**pharma**  16:20
**phone**  208:11
**photographic**
40:11
**phrased**  159:14
**physics**  11:2
131:8
**physique**
142:12
**pick**  129:8
**picked**  16:13
116:17
**picture**  114:7
114:11 115:9
116:18 117:1,5
117:19,20
122:2 177:20
178:2 191:9,10
**pictures**  47:1
117:11 148:21
179:19,22,23
**piece**  14:13
48:21 80:14

Robert S. Giachetti , Ph.D.                           January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[piece - possible]**                                              Page 38

92:3 117:23
187:9
**pieces**   13:16
84:7 87:10
123:5 177:17
177:19
**pin**   81:9 84:15
84:16 85:17
86:12 88:4,12
88:19 89:15
90:3 91:8,22
91:23 92:12,16
92:20 93:5,12
93:19 94:6,8
94:15,19 95:3
95:9,17,19
96:13 97:5,7
97:10 101:1
112:1 113:2,5
113:17 114:7,9
114:16 115:2
121:21 122:8
122:10,11,12
122:12,16
123:17 124:3
154:9,16 156:1
162:21,24
165:13,19
**pinching**   84:7
88:8
**piston**   96:11,15
96:16 97:4
**place**   26:22
29:2 72:4
89:10 96:6,12

113:5 153:16
154:17 156:1
172:3 185:14
207:6,17
**placement**
169:5 170:13
**plaintiff**   30:20
35:14 62:4,7
64:3 160:23
187:4,16
193:24
**plaintiffs**   1:5
2:7 10:14
30:13,15 62:14
77:15 120:8
160:6,15
166:24 186:9
188:3 193:11
193:20 194:4
194:11
**plane**   127:19
**planned**   20:22
**plans**   23:5,13
**plastic**   16:22
90:24
**plastically**
167:13,14
**plate**   91:12,17
91:21 92:2,22
92:24 93:3,6,6
93:12 94:20,23
95:2,4,9,21
96:3,3,6,7,11
97:4 99:13,13
101:18 112:6

118:10 120:5
120:12 121:2,9
121:21,21
122:20 123:17
155:24 156:20
156:21 167:17
**plates**   45:5
**plausible**
106:17
**play**   54:3 95:16
**please**   7:8
206:13
**plenty**   104:19
**plug**   13:20,21
**plus**   84:5
102:18 177:21
**point**   16:8
17:12 86:14
99:18 100:22
101:2 140:2
141:24 143:9
156:20 183:12
186:24 192:22
195:13
**pointing**
113:23
**points**   53:1
**pool**   56:17,18
**pop**   94:21 96:7
99:12
**popped**   125:2
**popping**   96:2
97:4
**pops**   55:3 56:6
80:5,6 82:23

92:1 95:2
96:11
**population**
134:3,4 135:1
137:15 138:3,6
141:14 142:1
178:24 179:6
**portion**   88:24
89:3,12 117:13
117:18,19
**portions**   130:6
168:21
**pose**   140:23
**position**   22:2
64:10 78:3,14
90:15 92:7,23
93:4 94:20
96:13 97:6
116:7 124:1
151:18 155:3
155:11
**positioned**
89:17
**positions**   22:8
136:6 169:14
**possibility**
172:12,16
**possible**   52:22
95:18 127:15
150:21 151:8
151:18 171:16
171:19,21,22
171:24 172:4
174:17 177:5

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[post - pressure]**                                                    Page 39

**post**   31:16,19
31:21
**posture**   168:19
169:2 174:2,5
**postures**
135:10
**pot**   46:1 52:4
52:12 54:18,22
55:4 57:8 58:6
59:13 60:2,7
60:24 61:4
83:22 84:11
85:22,23 87:12
89:5,10 90:18
93:12 98:1,3,6
98:18 99:18
100:22 101:2,3
102:24 103:1
103:21 108:19
109:17 110:12
111:19,20
120:24 123:19
127:8,10,20,21
128:18 129:10
147:16 149:5,9
149:12 152:1
152:16,23
153:2,2,3,8,9
153:13,20
157:6 164:12
167:19 175:21
176:19 177:10
178:9 183:4,21
204:23

**potentially**
139:8
**pound**   133:14
137:21,23
157:23 158:20
**pounds**   124:19
124:19 125:23
126:14 128:1
129:23 131:2
132:12,13,17
132:19 133:2,4
133:15,21
134:13,20
143:20 147:15
158:11,16
161:24 162:4,6
162:14 189:7
194:9 199:14
200:8
**power**   3:17
30:11
**practically**
156:14
**practice**   4:13
187:18 205:20
**pratt**   197:21
198:4,6
**pratt's**   198:2,7
**prefer**   68:15
**preferred**
79:15
**preliminary**
8:17 103:6
**prelitigation**
24:6

**premarket**
23:17
**premise**   95:6
**prescott**   36:11
37:19
**presence**   28:1
**present**   2:1
196:4 207:8
**presented**
111:17 149:24
**president**   68:22
**pressure**   3:17
8:22 25:20
26:8 45:9,17
45:23 46:2,7
47:3 49:11,24
51:8,14,21
52:15 53:7
54:3,10 55:2,3
55:6 56:9 57:9
57:10,11,15,16
57:21 58:7,14
58:19,20 59:3
59:4,12,16,18
60:8 61:5,8,19
61:24 62:10,17
62:20,23 63:6
63:14,16 64:4
64:16,17,19,21
69:21 70:4,12
71:4,17 72:9
72:18,23 73:11
73:15,16,19
74:8,13,17,21
74:24 75:3,10

75:11 77:1
78:2,3,8 79:4,7
79:7,17,21
80:3,8,11,16,16
80:18,20,23
81:1,4,24
82:16,18 83:6
83:9,13,21
84:1 85:17,22
86:3,6,10,18
87:19,24 89:23
93:16 94:1
96:17,19,23
98:14 99:11,12
100:1,11 101:3
103:8,14
104:24 105:3,3
106:4,10 107:7
107:8,9,13,18
107:23,24
108:4,22,22
109:2,4,5,9,13
110:4,4,19
111:9 112:13
112:14,17,19
114:6 115:20
119:3,15
123:13,20
124:17,18,18
124:22,22,23
125:4 130:8
133:8 147:15
147:21 148:18
149:18,19
150:19,20

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[pressure - process]**                                        Page 40

| | | | |
|---|---|---|---|
| 151:1 152:11 | 192:23 197:10 | 200:6 | 118:7,20 |
| 153:4 154:4,7 | 197:12,23 | **pressurizes** | 167:22 |
| 154:11,13,15 | 198:16 199:17 | 156:7 | **private** 204:6 |
| 154:21 155:3,8 | 199:23 200:15 | **pressurizing** | **privately** |
| 155:13,14,15 | 200:16,18 | 94:4 98:4 | 160:22 |
| 155:21,22 | 201:10,11,16 | **pretty** 18:2 | **privilege** 65:18 |
| 156:7,16,24 | 205:11,15 | 20:16 53:21 | 66:8 |
| 157:2,9,10,14 | 206:2,5 | 91:20 103:4 | **privileged** |
| 157:18,24 | **pressures** | 129:18 134:22 | 65:20,22,23 |
| 158:1,5,8,12,13 | 82:10,11,15,20 | 135:2 160:14 | 66:7,17 |
| 158:14,21,22 | 84:4 100:9 | 175:21 185:22 | **pro** 24:18 |
| 159:4,5,8,11,24 | 175:14 177:2,4 | **prevent** 93:12 | **probably** 6:2,7 |
| 160:11 161:9 | 197:9 | 93:20 97:14 | 6:18 14:14 |
| 161:16 162:18 | **pressurization** | 111:6 199:21 | 18:12,19 23:1 |
| 162:19,22 | 93:20,21 98:5 | **prevented** | 24:10 32:17 |
| 163:5,8,11,23 | **pressurize** 77:2 | 77:15 | 33:23 34:5,10 |
| 164:8,11 165:2 | 77:4 115:18 | **preventing** | 41:4 46:13 |
| 165:23 166:5 | **pressurized** | 97:13 | 61:12 63:13,13 |
| 166:17,19 | 49:11 59:4,12 | **prevents** | 63:17 66:23 |
| 167:20 168:4,4 | 60:2,3 65:5 | 162:21 166:17 | 73:12 82:9 |
| 168:20 169:15 | 89:9 94:3 95:1 | 166:18 | 83:8,10 85:2 |
| 169:15 170:10 | 106:24 107:1 | **previous** | 93:24 101:12 |
| 170:18,21 | 107:18 108:7 | 102:22 | 101:15 125:4 |
| 171:3,12,14 | 108:14,14 | **previously** | 129:23 130:10 |
| 172:3,10 | 109:10,12,16 | 190:3 207:9 | 137:13 166:22 |
| 173:10 174:3,8 | 109:19,23 | **primarily** | 181:9 183:3 |
| 174:18 175:2 | 110:9,16 | 14:12 | 194:9 197:5 |
| 176:2,3,23 | 111:10 119:8 | **primary** 18:20 | 200:10 |
| 177:21 178:16 | 133:12 156:9 | 19:5 42:23 | **problem** 26:20 |
| 181:18 182:1,6 | 156:17 157:2 | 84:23 85:13 | **procedure** 1:13 |
| 183:6 184:11 | 172:22 173:1,2 | 87:14 93:19 | 4:14 207:20 |
| 184:15 186:24 | 182:7 186:18 | 152:4 | **process** 12:18 |
| 187:1 188:12 | 186:21 187:5 | **princeton** 2:10 | 22:10 45:4 |
| 188:14,15 | 187:22 188:4,6 | **prior** 8:21 32:3 | 69:11 138:5 |
| 189:2 191:9,19 | 188:10,18 | 32:8 76:18 | 203:16 |

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[processes - push]**                                                    Page 41

| | | | |
|---|---|---|---|
| **processes** 14:22 14:24 37:14 | **professor** 18:9 | **provide** 9:24 | **pulford** 39:3 |
| **processing** 14:14 15:11 | **program** 12:8 13:19 18:24 20:7,11 21:4 | 30:14 36:14 48:18 65:11 135:12 141:18 | **pull** 101:20 126:7 127:17 128:7,23 167:7 192:14 |
| **produce** 7:14 65:15,17 66:20 | **prohibited** 183:2 | **provided** 34:14 34:19,23,24 35:3 49:2,17 | **pulled** 39:13 41:10 115:12 115:15 116:10 |
| **produced** 65:19 66:7,17 66:19,19 78:23 | **project** 53:5 **projects** 15:16 24:7 28:7 | 49:17 65:12 66:12 72:22 104:6 120:8 | 122:1 141:9 155:23 |
| **produces** 170:23 | **properly** 166:18 | 135:11 160:7,7 162:20 181:24 | **pulley** 199:13 **pulling** 9:15 |
| **product** 28:16 29:1,3 46:3,4 | **property** 29:10 35:9 | 186:9 **provides** 85:2 | 117:4 128:3,19 141:7 |
| 63:22 202:21 202:24 203:18 | **proportionally** 178:19 | 96:22 **providing** | **pulls** 92:20 **pump** 39:23 |
| 204:7,21 205:7 205:9 | **proportions** 178:22 179:1 | 35:24 71:15 72:7 | 40:2 77:3 **purchase** 201:6 |
| **production** 65:21 204:20 | **propose** 4:15 **proposed** 50:18 | **pseudo** 45:22 **psi** 45:24 78:19 | **purchased** 200:13 |
| 204:23 205:19 205:22 | **prosthetic** 180:15 | 78:20 79:24,24 80:9 83:8,12 | **purpose** 93:10 93:10,19,19 |
| **products** 1:7 2:13 22:21 | **protected** 47:13 48:8 | 83:24 85:3 86:5,7,15 | 198:23 **purposes** 4:12 |
| 25:16,16 30:18 51:18,19 53:16 | 71:6 **protocol** 76:17 | 99:15 101:15 101:20 125:1,5 | 71:8 88:23 **pursuant** 1:13 |
| 209:4 210:1 211:1 | 103:12 111:19 139:16 204:18 | 125:7,12 177:2 177:3 199:18 | 4:12 207:19 **push** 100:2 |
| **profession** 31:18 | **protocols** 82:11 **protrude** | **public** 1:13 207:6,13 208:2 | 134:18 135:23 136:1 137:1,2 |
| **professional** 31:6 | 183:22 **protruding** | 211:19 **publicly** 160:20 | 139:11,12,18 140:8 143:2,3 |
| **professionally** 11:18 12:14,16 | 116:8 184:3 **prove** 173:15 | **published** 101:16 | 143:5,7,16,17 143:21,24 |
| **professionals** 181:4 | 173:23 174:5 | | 144:11,12 |

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[push - reasonable]**                                                        Page 42

145:3 152:13
169:18 170:20
**pushed** 115:17
142:15 144:15
**pushes** 55:12
94:20
**pushing** 80:18
80:20 83:6,13
118:17 128:3
129:3,7 134:12
134:16 135:7
135:17,22
136:4 138:14
138:22 140:20
141:6 142:8
144:6 151:16
**put** 16:22 24:16
25:1 37:1 41:9
42:11 51:18
63:12 78:12,19
80:17 92:6
101:18 105:12
118:22 121:13
123:8 127:9
130:3 138:7
141:23 144:1
151:14 152:14
153:8,12
155:18 158:6
161:7 166:2
171:9 177:19
184:18 199:13
202:21 205:11
205:23

**puts** 15:3
126:18
**putting** 12:1
145:18
**puzzle** 177:17

**q**

**qualify** 144:7
**qualities** 56:9
172:13
**quantifying**
145:15
**quarter** 83:8
99:15 177:1
187:10
**question** 4:16
6:14,22,23,24
7:5 105:18
121:24 123:21
124:11 129:17
138:15 145:9
145:10 147:10
158:10 159:14
167:10,23
170:8,12
171:23,24
173:22 186:8
187:5
**questioning**
194:4,11
**questions** 5:13
50:24 51:2
167:7 181:12
193:11 201:7
201:23 206:7
207:11,15

**quick** 67:4
181:14
**quickly** 10:21
35:23 51:1
**quite** 159:14
**quote** 196:2

**r**

**r** 210:3,3
**radially** 89:16
177:9
**rail** 40:15
**railcar** 40:22
**railroad** 40:14
40:20,20
**raise** 93:7
**raised** 149:16
**raises** 81:21
156:20 192:21
**rak** 39:3,5
**range** 138:23
139:21,23
143:7
**rapid** 54:23
55:14 60:3,13
61:11
**rapidly** 99:24
**rarely** 31:19
**ratio** 131:14
**reach** 169:13
**reached** 48:16
101:17
**reaches** 164:9
**react** 51:1,2
**reaction** 51:16
54:15

**reactions** 51:12
**read** 52:1 53:2
84:19 101:8
104:17 108:24
129:14 132:18
134:13 163:2
163:18 164:11
164:15,20
206:11 209:9
211:5
**reading** 127:23
180:19,19
189:11 190:18
206:9
**reads** 165:11
**ready** 148:22
**realization**
119:7
**really** 11:17
20:7 41:15
45:23 51:3
74:16 80:8
94:6 96:10
101:23 121:21
143:14 147:9
154:20 156:16
156:17 181:14
**reason** 158:6
209:11 210:6,9
210:12,15,18
210:21
**reasonable**
136:24 140:10
140:12 142:16
143:12

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[reasonably - replications]**                                          Page 43

**reasonably**
189:9
**reasons**  161:3
**rebut**  166:11
**recall**  36:6,7
63:2 189:8,11
190:15 193:15
**recalled**  149:19
**receipt**  209:17
**received**  9:23
9:24 10:24
21:6 196:14
**recently**  8:6
71:4
**recess**  47:24
119:22 185:23
**recessed**
183:22 184:23
**recipe**  69:7,9
69:15 103:12
109:1 112:7
186:17 187:8
187:18
**recipes**  69:15
**recitation**
28:21
**recognize**
198:4
**recognized**
150:9
**recoiler**  14:13
15:6
**recollection**
8:16 47:9 53:3
65:9 74:23

103:3 136:12
141:15 192:16
193:22
**recommend**
130:11
**recommended**
159:15
**record**  5:16
47:23 71:1,7
72:12 90:12
166:24 177:8
195:17,20
207:15
**recorded**
196:10
**records**  180:20
**recreated**
103:11
**recruited**
141:16
**reduce**  56:23
**reduced**  129:14
**reduction**  83:4
167:12
**referenced**  4:22
7:21 112:11
209:6
**referencing**
49:1
**referred**  207:17
**referring**  26:6
34:12 88:18
118:6 123:16
134:9

**reflex**  51:17
**regarding**  10:5
108:17 190:19
**regardless**
163:21
**regret**  141:22
**regular**  55:21
**regulate**  78:17
200:18
**regulator**  78:19
79:22
**regulators**
25:17
**relate**  51:14
197:14 201:14
**related**  25:3
29:10 31:20,21
43:21 62:23
71:21
**relates**  88:2
**relationship**
115:21
**release**  46:2
49:10 56:12
90:4 99:4
104:20 106:24
107:2 111:5
172:22 173:1,2
**released**  59:4
166:19
**reliable**  187:3
187:23
**relied**  10:7,8
**relief**  89:19
98:1,12

**relieved**  61:5
163:8
**rely**  180:23
181:4 186:8
**remains**  163:9
**remember**  33:4
33:15,18 40:15
41:18,20 46:5
46:9,18 65:10
68:8,9 74:24
102:15 103:4
150:15 159:9
179:24 192:7
195:23
**removal**  157:2
**remove**  60:2
117:8 154:12
**removed**
101:16 113:8
115:20
**rendering**
183:2
**renovated**
39:21
**rep's**  84:19
**repair**  41:2
**repairs**  13:16
**repeat**  6:22
**replacements**
44:21
**replicate**  57:14
187:15
**replications**
179:14

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[report - rigged]**                                                    Page 44

**report** 8:13,17
8:18,21 9:3,4,7
9:8,13,20 10:8
10:19 34:17
63:18,21 64:11
66:22 74:10,15
74:20,20 75:6
75:16,16,19,20
75:24 76:6,14
86:20 97:21
102:1,8,11,12
102:19,23
103:2,4,6
105:7,10,11,13
107:20 136:13
137:17 166:2
179:11 181:21
183:5,7,9
186:5 191:8,21
**reported**
136:11 137:13
**reporter** 10:13
**reports** 8:14
46:16 75:21
161:6,6
**representation**
179:15
**representative**
93:17 149:21
**represented**
113:20
**representing**
40:17
**represents**
134:13,15

138:3
**request** 66:4,13
**requested** 7:16
9:18 10:17
67:12 160:4
167:2
**requests** 13:11
**require** 153:17
**required** 51:13
133:12,17
154:3 211:13
**requirement**
159:1
**requirements**
157:4 191:6
**requires** 100:3
162:4
**research** 17:14
43:20 44:8,17
51:19 185:4
**reserve** 4:15
71:9
**resist** 85:20
100:15
**resistance** 84:5
85:3 96:22
119:17 124:19
125:22
**resisting** 80:24
**resistor** 20:2
**resists** 189:7
**resonance**
19:13
**resource** 31:9

**respect** 194:10
**responding**
107:4
**response** 65:20
66:6,12 171:23
186:10
**responses** 6:8
66:3
**responsible**
182:2
**rest** 25:3 171:4
**resting** 174:21
**restrain** 170:18
171:2 172:11
176:3,4
**restrained**
193:5
**restraining**
177:22
**restriction**
99:22
**restrictions**
90:10
**result** 129:16
**resulted** 54:10
115:2
**results** 79:10
79:11,13,17
129:18 131:2
**retained** 32:2,8
32:20 45:7,12
45:16 62:6
65:7 70:15
71:4 74:17,18

**retentions**
22:12 62:7
**return** 209:13
209:16
**reveal** 188:11
**review** 25:18
35:18 209:7
**reviewed** 10:1
10:6 53:14
76:1 120:9
155:10 156:24
166:7 175:12
176:21 178:8
192:3 200:3
**reviewing**
102:11
**revising** 24:21
**revolved** 39:16
144:10
**reynolds** 2:3
**reynoldsinjur...**
2:6
**rid** 73:18
**ride** 20:14
96:13 114:10
**rides** 81:9
84:16 88:5,12
88:19 92:13
94:8 113:17
115:8 117:19
**ridg** 39:3,5
**riding** 97:5
115:3 118:16
**rigged** 77:3

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[right - ropes]**                                                    Page 45

| | | | |
|---|---|---|---|
| **right**  4:11 5:4 | 84:10,16 85:19 | 136:20,21 | 199:8,12,18 |
| 5:10,11,21,23 | 87:2,6 88:16 | 137:4,11 | 200:15,20 |
| 6:5 7:2,7,10 | 88:22 89:2,7 | 138:17 139:2 | 202:3 203:2,12 |
| 8:20,23 9:11 | 89:11 90:6,11 | 140:3,7,24 | 204:10,19,24 |
| 10:10,21 11:1 | 90:18,19 91:7 | 141:3,19 | 205:15,16,18 |
| 11:4,9,10,16 | 91:10,19 92:11 | 142:21 143:4,6 | 205:23 206:3,4 |
| 12:11,20 13:1 | 92:14,15,17,18 | 144:9,22,24 | **rigid**  84:3 |
| 13:2 14:5,7 | 92:24 93:1,8,9 | 147:17,19 | 128:20 156:10 |
| 15:17 16:3,4 | 94:17,22,24 | 148:24 149:6 | **rises**  83:7 |
| 17:4 19:12 | 95:5,11,22 | 152:8 153:9 | **risk**  164:9 |
| 21:7,10,12,13 | 96:3,8 97:16 | 154:18 156:2 | 200:4,6,7 |
| 21:15 24:10,20 | 98:21,24 99:7 | 156:20,22 | 201:10,10 |
| 27:5,11,13,14 | 99:10 100:13 | 157:6,12 159:1 | **road**  2:4 |
| 27:20,21 29:14 | 100:14 102:20 | 162:2,10 | **robert**  1:11 3:1 |
| 31:24 32:23 | 103:22,24 | 165:10,11 | 3:12 4:1,7 7:9 |
| 33:10 35:2 | 104:4 105:9 | 166:21 167:21 | 209:5 210:2,24 |
| 39:18 42:6 | 106:23 107:19 | 167:23 168:1,6 | 211:2,4,12 |
| 43:17 44:12 | 109:11 110:5 | 168:6,9,11,18 | **rods**  165:2 |
| 48:2,11,12 | 110:14,18 | 169:6 171:7,19 | **role**  21:20 |
| 49:3,12 54:7 | 111:7,8 113:18 | 172:15 173:13 | 23:10 24:4 |
| 54:12,16,17,20 | 114:1,5,7,10,18 | 173:14,19 | 26:14 54:4 |
| 55:7,8 58:4,16 | 114:21 115:5 | 174:7 176:9,21 | 96:20 97:8 |
| 59:19,24 60:1 | 115:10,16 | 176:24 177:12 | **roles**  22:11 |
| 60:8,16 67:2,6 | 116:7,9 117:12 | 178:8,13 | **roll**  14:16,16,24 |
| 68:1,17,24 | 117:19,20 | 179:14 180:4 | **rolled**  14:22 |
| 69:6,13 70:2 | 118:1,8,11,12 | 180:22,23 | 15:2 112:9 |
| 70:21 71:2,9 | 118:13,13 | 181:21 182:10 | **rollers**  15:15 |
| 71:13 72:19 | 119:24 121:3 | 183:11,19,22 | 23:12 |
| 73:3,6 75:11 | 122:4 123:22 | 186:3 188:7,16 | **rolls**  14:17,23 |
| 75:15,20 76:12 | 123:23 125:9 | 188:18,21,22 | 15:3,7 |
| 76:13,19,20,24 | 125:14,20,21 | 189:16,17 | **room**  49:23 |
| 77:10 78:17,23 | 126:3,4 128:5 | 190:7,21 191:7 | **rope**  101:20 |
| 80:13 81:7,17 | 128:12,15 | 192:1,2 193:7 | 128:19 199:13 |
| 81:18,21 82:1 | 130:19 132:2 | 193:8,21 195:7 | **ropes**  13:17 |
| 82:2,4,8,21 | 135:5,7,8,18 | 196:7,12,13,17 | 14:3 |

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[rotate - second]**                                                        Page 46

**rotate** 92:7,7
92:12 133:9
151:2,7,12
153:13 165:3
171:10 172:15
173:8
**rotated** 88:21
90:15 93:1,2
128:15
**rotates** 163:5,6
**rotating** 78:2
78:13 153:14
**rotation** 96:24
97:1,14 100:16
**rotational**
132:10,11
170:22,23
**roughly** 21:22
21:24
**round** 127:12
**row** 114:22
**rubber** 19:12
**ruf** 42:2,4,5
**rule** 6:19
**ruler** 121:13
**rules** 1:13 4:14
6:7 207:20,20
**run** 16:23
140:24 141:1
181:14 199:14

**s**

**s** 1:11 3:1 4:1
209:5 210:2,3
210:24 211:2,4
211:12

**safe** 189:9
**safer** 126:15
**safeties** 98:2,11
**safety** 28:16
29:1,3 72:20
97:22 98:4
166:17
**salary** 27:4,16
27:19
**salvatore** 7:9
**samples** 16:23
**sand** 199:14
**sauce** 68:20
**savvy** 47:3
**saw** 57:1 66:2
66:15 104:20
113:2 149:5
175:2,24
191:24 196:15
198:5,10 199:7
**saying** 36:24
57:7 61:2
107:4 108:19
109:18 111:18
122:11 135:3
139:2,6 142:14
143:19,22
147:1,5 152:22
153:11 163:19
164:2,11 169:2
169:6 170:5
172:21 174:23
204:18
**says** 10:22
18:22 47:17,17

66:6 84:22
100:8 103:11
110:19 112:17
126:17 132:20
134:11 138:12
143:24 157:17
158:7,8 159:21
162:17,19
164:4,6,16,19
165:6 166:12
166:16 168:12
169:22 171:6
173:13 182:18
191:14 204:6,8
205:1
**scenario**
108:16,19
**scenarios**
108:17
**scheme** 44:9
**schnuck** 38:8
**schnuck's**
38:10
**school** 11:12
16:16 43:20
131:8 165:1
**schools** 20:9
43:19
**science** 10:23
**scientific** 48:16
51:4,11 53:13
78:20 79:16,19
79:20 82:13
138:12 146:19
176:22 177:11

181:24 189:23
**scientifically**
187:3 189:1
195:10
**scientists**
145:14
**scope** 22:12
157:17 160:14
**score** 113:2,10
113:16,23
114:19 115:1
**scores** 113:6,7
114:19
**scoring** 112:1
114:15 120:22
124:8
**scratch** 113:16
113:19,24
114:18 116:14
116:16 118:12
120:2
**scratches** 118:5
119:2 120:22
**screen** 184:6
**screw** 165:3
**screwed** 21:16
57:15
**seal** 93:8 100:3
116:21 156:3
208:1
**sealing** 93:12
**second** 9:23
36:3 47:23
52:14,16 70:24
80:6 81:22

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[second - shape]**                                                      Page 47

83:7 90:3
100:8 102:9
114:23 124:16
129:9 173:20
183:7
**secondly**  187:8
**secrets**  36:13
**section**  160:8
161:23,23
162:2,4,17,17
164:6
**security**  38:18
40:4
**see**  5:2 17:17
19:2 23:13
39:1 48:16
58:11 104:14
111:24 113:6,7
114:4,13,15,19
114:19,22
115:2 116:10
116:12,12,16
117:3,6,8
124:9 135:11
135:15 141:13
148:17,20
150:12 154:2
157:20 162:6
165:1 173:3
177:4 184:6,19
184:23 186:21
188:16 191:15
195:15 196:24
**seeing**  145:20
185:3

**seek**  159:4
**seem**  28:4
105:14
**seemed**  137:18
**seems**  10:20
105:4
**seen**  73:12
84:21 123:1
125:17 147:20
154:21 161:5,9
172:2 173:6
179:19 183:12
184:12,16
185:7 190:13
197:17 205:20
**segalla**  2:8 3:14
32:9,21 65:13
**self**  156:14
**sell**  13:10 23:20
47:18 53:7
**selling**  53:16
**sells**  37:5,6
**seminars**  29:22
30:12
**senarum**  11:15
**send**  4:20 30:24
31:10,11
**senn**  2:4 3:5 4:6
4:7,11,19,24
5:3,15,19,22,24
6:5 8:3 9:12,16
9:19 10:12,18
22:4 46:20
47:23 48:2
50:21 53:8,18

65:17,23 66:2
66:5,10,14
67:10,13 70:24
71:2,13 73:23
77:23 102:9
108:11,18
119:21,24
144:5 149:11
158:10 160:2,5
163:18 166:23
167:3,9 170:3
170:7,9 171:23
173:12 176:24
178:6 181:6,11
181:14 185:9
185:20 190:12
194:17,20
196:4 197:24
200:1,23
201:20,24
202:2 206:6,9
**sense**  60:21
96:5 129:4
169:7 176:5
197:8
**sensio**  45:12,21
46:3,4 70:8,13
71:15,19 74:7
74:14
**sent**  7:19,20 8:1
8:2 38:22,23
65:23 66:10
209:14
**sentence**  6:13
100:8

**separate**  43:17
43:19 66:3
76:2 98:19
102:2
**separates**  98:6
**separating**
120:15
**separation**  47:8
54:24 57:9
104:10
**serious**  39:14
**serve**  168:23
**served**  32:14
**service**  39:21
42:9
**serviced**  41:14
**services**  30:22
36:1 68:2
**servicing**  42:8
42:10
**set**  78:19,20
79:21 80:1
142:22 148:21
195:17 196:9,9
**setting**  49:19
98:15
**setup**  49:21
**several**  32:5
42:15 45:2,16
47:21 62:6
63:11 112:15
112:19 203:3
**shakes**  6:9
**shape**  96:16
125:15 169:9

Robert S. Giachetti , Ph.D.                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[shaped - smoosh]**                                                    Page 48

| | | | |
|---|---|---|---|
| **shaped** 156:5 | 173:23 174:4 | **similar** 74:22 | **skilled** 36:18 |
| **sheet** 14:15 | **side** 30:15 | 125:10 129:18 | **skills** 42:23 |
| 209:11 | 51:21 58:8 | 133:3 197:17 | **skinny** 92:1,1,3 |
| **sheets** 15:16 | 77:15 83:1 | 198:14 201:14 | **sleep** 36:4 |
| **shelf** 13:10 | 91:24 92:1,1,1 | **simplified** | **sleeve** 123:8 |
| **sherlock** 12:4 | 114:5,7,14 | 179:17 | **slid** 95:10,11 |
| **sheryl** 1:3 | 116:3,12 | **simplifying** | 172:3 |
| **ship** 202:19 | 127:21 150:5,6 | 88:23 | **slide** 89:5 95:14 |
| **shoots** 61:9 | 151:22,24 | **simply** 50:7 | 95:20 |
| **shop** 15:13 | 152:1,1,16 | 109:8 186:8 | **slider** 82:23 |
| 37:21 38:1,2 | 153:8,8 168:18 | **single** 88:4 | 83:3 89:15,16 |
| **short** 46:19 | 169:8 174:24 | 113:10 139:22 | 91:15 95:17 |
| **shorter** 124:3,5 | 176:2 178:16 | 164:15,19 | 97:8,9 112:6 |
| **shorthand** | **sidebar** 195:21 | 165:22 181:2 | **slides** 91:18 |
| 207:12 | **sides** 98:19 | 204:23 205:15 | 92:19,22 94:15 |
| **shoulder** | **sidewalk** 41:3 | **singular** 164:16 | **sliding** 97:9 |
| 101:14 135:19 | **sideways** | **sit** 24:19 32:22 | 101:18 121:20 |
| 136:2,10 | 118:18 | 104:1,19 179:3 | 121:21 122:20 |
| **shoulders** | **sign** 206:12 | **site** 148:19 | 152:11 |
| 170:17 | 209:12 | **sitting** 29:18 | **sling** 12:22 |
| **show** 10:14 | **signature** | 30:6 114:7 | 14:8 |
| 36:19 67:10 | 207:18 208:1,7 | 115:11,12 | **slings** 14:3 |
| 110:9 122:23 | **signed** 209:19 | **situation** 57:14 | **slip** 38:23 39:1 |
| 150:18 154:20 | **significance** | **situations** | 91:19 |
| 155:6 160:5 | 186:13 | 176:24 | **slipperiness** |
| 168:9,16 169:5 | **significant** | **six** 32:17 41:3 | 38:24 |
| 170:14 184:2 | 130:17,20 | 126:20 131:12 | **sliver** 172:12 |
| 202:22 | 147:17,18 | **size** 15:15,16 | **slug** 56:24 |
| **showed** 20:10 | 153:18 194:8 | 55:10 69:17 | **small** 48:21 |
| 40:3,5 124:18 | 194:13,14 | 92:4 125:10,15 | **smaller** 15:1 |
| 125:22 173:9 | 197:6 200:11 | **sized** 13:11 | **smashed** 39:14 |
| **shown** 42:24 | **signing** 206:9 | 15:23 | **smattering** |
| **shows** 112:17 | **signs** 112:17 | **sizing** 13:18 | 141:8 142:1 |
| 117:4 166:12 | **silicone** 156:6 | **skill** 36:19 | **smoosh** 81:14 |
| 170:13 173:18 | | | |

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[snack - start]**                                                    Page 49

snack  181:10

society  25:12

sold  37:7 68:21
112:14 181:19

solely  172:18

solid  105:16
129:2

solutions
209:23

somebody
67:18 123:7
136:16,21
152:23 165:6
182:14

someone's  31:8

soon  125:1
156:20 192:21

sorry  4:13
21:13 25:9
26:19 73:7
102:1 109:16
111:2 122:13
126:11 147:17
163:6,16,16,16
163:16 172:23

sort  13:21
17:11 24:10,23
24:24 37:16,16
105:20 119:5
122:14 128:20
170:16 197:9

sorts  175:16

sound  54:6,12
67:2,6 76:12
196:18,21

sounded
149:15 183:5

sounds  5:3 8:20
21:15 27:14
33:10 54:7
71:12 76:13
194:19 196:1

southeast
209:15

southern  6:21
40:13,17,18

speak  29:16

speaking  18:11
127:11 145:16

speaks  166:11

special  46:1

specific  46:21
79:21 108:16
120:24 123:19
128:4 182:4
187:19

specifically
89:1 121:7
145:9 174:13
180:24 187:16

specified  18:17

specify  86:3
127:4

specs  15:12

spectrum  138:4

speculating
201:20

speculation
190:12 194:18
197:24 200:1

200:23

speed  47:5
51:23 54:14
55:21 56:12,22
175:16

spend  63:20
64:1

spill  107:15

spin  45:6

spinning
127:22

spirit  192:19

split  6:3

spoken  29:2

spongy  155:2

spool  39:10

spot  56:19

spray  56:13,22
57:8 177:14

sprays  56:15
58:14

spring  19:10
44:4 56:5,9
61:3 89:17
91:9,18,21
92:4,13,16,20
94:16,19 95:7
95:12,18,24
96:4,6

springiness
95:13

ss  207:1

stainless  44:16

stairs  41:1

stamp  204:18

stand  25:11
76:3 135:23
148:22

standard  25:19
25:20,24 26:2
26:6 41:23
59:9 86:2
121:10,11
127:24 130:13
137:14,16
157:13,22,23
158:4,6,12,20
158:24 159:10
160:10 161:6
161:16 162:9
205:4

standards
24:17,21 25:14
25:15,18 26:3
26:8 157:1
163:1 202:18
202:20,23
203:1,9,21
204:7,9,18
205:3

standing  106:3
136:3 150:23
151:9

standpoint
53:9

stars  172:13

start  17:22
124:21 125:5

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[started - subjective]**                                                    Page 50

**started**  10:13
   16:9 61:22
   69:11
**starting**  44:15
**startle**  51:17
**starts**  100:1
   114:13 192:22
**state**  7:7 31:12
   160:24 191:18
   207:1
**stated**  155:10
   160:24 196:19
**statement**
   46:11 110:10
   136:19 138:9
   160:19 173:15
   174:4 182:11
**states**  1:1,14
   160:14 182:6
   207:21
**static**  135:9
**stating**  111:2,4
**stay**  19:1
   152:14
**staying**  80:17
**stays**  56:19
**stealing**  36:13
**steam**  56:5
   59:20 60:9,9
   60:16,18,18
   61:3,6,10,15,17
   99:19,20,23,24
   196:20 197:3,6
   198:12

**steel**  14:13
   44:16 90:22
   91:1 147:2
**stenographer**
   207:13
**step**  37:2
**sticker**  204:14
**sticking**  92:17
**stop**  30:10 98:4
   98:5
**stopped**  119:8
   119:16 149:3
**stopper**  78:12
**stops**  122:16,21
   123:3
**store**  74:16,18
**stores**  41:23
**story**  50:8
**stove**  56:14
   57:8 58:16
   157:2,9,18,21
   157:24 158:7
   158:12,22
   206:4
**stovetop**  86:3
   162:1
**straight**  88:10
   101:13 136:4,7
   136:9 156:4
**strap**  126:4,5
**street**  1:16
   143:20 208:9
**strength**  101:5
   120:4,18 121:1
   121:10 135:7

   136:15,17
   138:19 154:20
**strengths**
   120:11
**stretch**  123:5
   123:14
**stretched**  124:2
   167:13,14
**stretching**
   123:20
**strike**  91:12
   93:6 96:3
   99:13 100:23
   112:6 118:10
   123:17 130:16
   155:24 156:19
   156:21
**striking**  120:12
   121:2,9
**string**  127:18
   128:23,24
   129:1
**strong**  23:23
   82:11,19 83:11
   84:2 146:6,9
**stronger**  80:17
   80:24 101:14
**strongly**  83:17
**students**  18:20
   21:2
**studied**  138:21
**studies**  155:10
   185:5,7
**study**  11:13
   41:21 50:5,12

   50:23 52:3
   55:14 57:13
   136:13 137:13
   138:3,12
   140:17 141:8
   141:14 142:5
   178:7,8,9
**studying**  12:6
   18:14 145:3
**stuff**  8:1 13:10
   14:1,3 15:23
   17:17,18 22:13
   25:4 29:13
   31:1 45:15,21
   48:8 52:2
   56:14 72:4
   175:16 180:13
**style**  127:8
   149:22 154:18
   155:13
**subbullet**
   124:15
**subject**  102:7
   102:10 188:24
   194:21
**subjective**
   133:19 134:2
   136:19 138:10
   138:16 139:2
   140:3,6,12,14
   141:3,4 142:9
   143:10 145:11
   145:19 146:1
   147:12 193:12
   194:5

Robert S. Giachetti , Ph.D.                                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[submit - take]**                                                    Page 51

**submit**  67:22

**submitted**
34:17 205:8
207:19

**subscribe**  82:5

**subscribed**
211:14

**subsequently**
196:11

**subset**  43:16

**subsidiary**
161:12

**subsidize**  48:17
50:19

**substantial**
84:4 86:6
100:9 130:24
134:14,22
137:23 138:1
165:5

**substantially**
56:24

**substitute**  6:1

**successful**
119:10,13

**suddenly**  57:20

**sued**  36:13

**suffered**  107:13

**sufficient**
100:15

**suggesting**
151:15,17
153:6

**suing**  37:21
41:10 74:16

75:7

**suite**  1:15 2:10
208:10

**summarize**
52:8

**summer**  16:17
17:5,6 20:11
20:13 21:4

**summers**  21:5

**sump**  39:23

**sundae**  19:24

**super**  37:3

**supermarket**
38:14

**superseded**
102:15

**supplemental**
8:18

**support**  50:1
63:18 168:5

**supported**
191:2

**suppose**  37:5
83:7 85:14
101:10

**supposed**  65:6
95:10,10,19
97:5,14 98:21
153:2

**sure**  8:3 10:11
18:2 22:7
23:22 32:19,22
35:14 48:10
64:14 66:21
67:15 69:20

74:4 77:1,13
80:8,9 90:22
91:13 97:18
109:21 125:8
125:13 132:9
136:11 137:9
140:8 141:13
145:1,14
153:24 155:17
169:22 181:16
184:8 192:13
203:15 205:19

**surface**  56:15
56:16,23 57:16
61:5 80:19,21

**surfaces**  50:1

**surge**  58:8

**surgeon**  44:21

**surprised**
28:20

**surrogate**
178:15,19

**surrogate's**
178:18

**survant**  2:3

**suspect**  182:19

**swag**  30:9

**swath**  113:7

**sweatshirt**
123:8,9

**sworn**  4:3
207:10 211:14

**system**  19:21

**systems**  19:3,6
19:7,9,11,17,21

**t**

**t**  210:3,3

**tab**  81:7,10
84:17 88:4,15
88:15,18 89:1
91:2,5 92:14
92:19 93:5
94:16 95:9,11
96:1,14 97:6
97:15 112:2
113:6,11,17
114:10,16,20
115:3 122:13
122:17 167:18

**table**  15:20
115:11,13
178:10

**tables**  204:8

**tabs**  81:8,10
84:24 86:8,12
86:23 87:5,15
87:21,22 88:2
88:7,9,19 89:1
89:4,5 90:13
90:20,20 91:4
91:5 96:20
100:13,19
101:4,4 124:13
153:22,23
154:5,10,16
164:22 165:19

**take**  7:5 19:20
20:12 24:16
37:2 42:22
52:17 66:14,15

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[take - test]**                                                    Page 52

73:13 78:9,15
100:24 104:22
117:8 119:20
119:21 121:13
122:15 143:8
153:21 154:12
155:19 185:12
195:9
**taken**  1:12 4:11
44:6 47:24
119:22 148:21
185:23 207:5
207:12
**takes**  14:24
15:6 138:6
154:15 163:3
200:8
**talent**  20:10
**talk**  6:12,20
28:2 51:12
70:17,21 75:9
76:8 86:16,19
90:2 112:16
126:11 202:7
202:10
**talked**  12:12
26:18 42:14
68:1 69:19
73:24 75:18
86:17 87:6
90:13 92:13
120:1 124:15
129:11 179:10
183:15,16

**talking**  6:15
13:23 30:8
44:24 47:12
61:22 71:3
77:21 81:6
84:9 85:18
89:8 93:11
94:9 99:3,8
100:7,12
113:16 120:1
122:2 132:6
133:16,22
135:21,22
139:9 142:20
142:21,22
144:21 146:18
146:20 151:24
157:5 161:10
162:2,12 180:2
184:9 191:9
**talks**  157:18
**tall**  175:17
**tape**  101:18
**targeted**  43:4
**teabag**  127:17
**teaching**  17:14
17:20 18:3
20:23 21:2
**technical**  13:17
52:2
**technique**
150:4 151:22
198:14
**technology**
36:21 37:16

**ted**  5:15 9:12
10:15 65:17
71:7 167:3
185:10
**ted's**  10:5
**teeter**  131:7,9
**teflon**  101:18
155:18
**tell**  14:11 23:21
23:24 47:18
52:10 63:17,21
64:12 73:5
77:7,11 79:18
113:14 114:2
128:20 140:24
141:2,16 144:5
146:15 176:17
178:24 184:16
189:22 190:6
192:5 193:23
194:10 195:11
198:19 199:7
**telling**  172:4
**tells**  110:7,12
114:15 163:3,4
166:13 188:4
199:4
**temperature**
56:23 59:6,17
59:18,24 61:12
98:20 99:17
100:3
**ten**  14:14 32:19
73:12,23
137:21,23

181:8
**tend**  6:11,20
**tendon**  44:3
**tends**  80:21
**tension**  81:16
120:15
**tensions**  14:19
**terms**  41:15
80:24 88:14
176:14 193:23
193:24 199:1
**terrible**  63:22
**test**  24:1,22,22
77:16,20,21,24
78:23,24,24
80:7 86:4
112:8 120:11
120:17,18
121:1,9 124:24
126:17 128:11
148:1,3,6,23
149:20,22
154:6,15 155:5
155:6,11
156:16 158:16
161:6,8,18
162:23 163:4,7
163:9,12,24
175:3 176:1
187:3 188:11
189:15,18,20
190:2 192:8,9
192:11,12
193:9 194:20
195:4,10,14,18

Robert S. Giachetti , Ph.D.    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[test - think]**    Page 53

| | | | |
|---|---|---|---|
| 195:24 196:8 | 45:8 61:24 | 201:22 206:8 | 43:11 44:20 |
| 196:12,15 | 62:4,18,19 | **thermal** 51:22 | 45:4,5 50:2 |
| 197:17,18,20 | 74:6 94:14 | 55:22 98:12 | 51:3,24 55:18 |
| 198:2,6,7,7,11 | 103:13,21 | **thick** 91:1 | 57:3 65:16 |
| 198:17 199:15 | 106:22 107:5,6 | **thickness** 121:9 | 68:14 69:23 |
| 199:16 201:4 | 108:24 111:20 | **thicknesses** | 72:20 85:8 |
| 201:15 203:3,9 | 169:22 183:17 | 121:12 | 89:21,24 94:2 |
| 204:3 205:2,2 | 186:17 193:15 | **thin** 103:4 | 98:17,22 112:9 |
| 205:14 | 195:9 201:8 | **thing** 5:15 | 120:16 132:8 |
| **tested** 73:10 | 209:9,17 211:8 | 13:22 15:3,7 | 133:10 138:20 |
| 74:3 111:18 | **testing** 25:13 | 16:13 20:22 | 141:4 146:23 |
| 120:21,22 | 73:24 76:22 | 21:22 23:20 | 157:19,20 |
| 121:4,5 124:17 | 78:20 82:11 | 24:23,24 39:12 | 161:5 163:10 |
| 124:22 140:19 | 111:15 120:4 | 47:18 56:11 | 171:5 178:1 |
| 147:16 177:1 | 122:3,23 | 57:13 79:5 | 179:12 192:24 |
| 183:4 186:20 | 153:20 154:2 | 87:20 94:3 | 202:19 205:4 |
| 188:13,14 | 154:19 156:16 | 96:16 98:8,18 | 205:23 |
| 191:4,19 | 156:17 161:6 | 105:20,20 | **think** 5:24 6:4 |
| 199:11 202:20 | 161:12 175:15 | 106:11,17 | 9:22 12:17 |
| 203:18 204:7 | 181:24 186:12 | 108:23 116:22 | 17:24 19:10,11 |
| 204:21 | 187:21 188:10 | 117:21,22 | 23:21,24 25:24 |
| **testified** 4:4 | 190:6,10 191:3 | 118:14 123:10 | 26:17 27:10 |
| 93:18 94:5,12 | 196:4 198:23 | 129:9 132:1,6 | 29:15,17 30:2 |
| 99:11 104:15 | 199:3,9,10 | 150:17 152:12 | 30:16 31:21 |
| 159:7 183:18 | 203:21 204:23 | 165:14 177:3 | 33:6 34:5,10 |
| 188:23 192:3,7 | **tests** 120:15 | 189:5 | 35:13,15 38:22 |
| 194:5 196:17 | 124:12 139:11 | **things** 8:4 | 40:21 42:21 |
| 199:17 | 188:24 189:6 | 15:13,17 16:1 | 43:1 47:19 |
| **testify** 32:24 | 189:12,15,20 | 20:7 22:10,15 | 48:15,20 50:24 |
| **testifying** 26:15 | 189:22 203:11 | 23:5,6 24:17 | 53:1,4,8,13 |
| 32:16 189:8 | **tether** 24:22 | 25:3 28:11 | 54:8,13 55:10 |
| **testimony** 4:21 | **thaddeus** 2:9 | 29:21 31:21 | 55:23 57:4 |
| 24:15 34:13,14 | 3:6 209:1 | 37:1,17,17 | 59:20 62:21 |
| 34:19,23 36:14 | **thank** 28:23 | 38:3,5 39:17 | 63:9,20,24 |
| 37:24 41:12 | 64:13 134:10 | 40:10 43:8,10 | 64:20 65:4 |

66:2,15 68:19
70:10 75:23
76:4 77:2
79:18,20 82:5
82:8 84:12
85:6,6 86:18
87:17 93:24
95:12 99:11
101:6 104:8,10
104:12,14
105:8,16,18,22
106:11,15
107:11,15
111:22 115:19
116:18,19
120:14 121:16
129:20,22
130:10,19,23
131:11 133:20
133:20 134:5,8
136:22,23,24
138:2 140:10
140:12,15
142:5,11,14
145:17,20
146:22 147:1
147:12 148:23
149:19,22
150:1,17
151:11,13,21
152:10 153:15
155:16 157:15
159:13,13
161:4,22
164:24,24

165:5,11,24
175:1,8,20
176:14 180:10
181:6,11,15
182:13,21
183:3,6 185:9
187:1 188:2
192:2,16
203:22 205:1
**thinking** 5:19
6:2,3 184:18
**third** 36:3
52:17 98:9
112:12 120:1
129:12 156:23
174:2
**thought** 6:6
14:9 31:8 56:4
65:4
**threaded** 165:2
**three** 30:6
33:12 34:5,11
35:5,10 46:13
55:20 75:3
98:22 113:7
**threshold**
133:11
**thresholds** 80:1
**threw** 19:23
**throwing** 29:21
**thubert** 2:11
209:2
**thumb** 174:15
175:6 176:11

**ticks** 56:3
**tiles** 38:23
**tilt** 57:21 83:15
127:21
**tilted** 118:14
**tilting** 128:3
129:11
**time** 12:9,10,24
15:18 17:10,15
17:19 18:6,7
18:12 22:8,19
22:23 23:2
24:24 29:15
34:4 36:23
44:24 51:16
53:24 54:16
60:6,23 61:6
68:4 72:11,22
75:8 79:4
103:7 105:21
112:18,21,22
112:23 113:13
149:17 153:19
183:4,8 186:23
186:24 207:7
207:16 209:18
**timeframe**
103:20 209:8
**timer** 125:4
192:22
**times** 13:10
32:5,14,17,17
32:19 33:21,23
34:3 45:16
47:21 55:11

73:10 104:4
113:12 132:22
133:16 186:22
**timing** 56:10
**tiny** 99:22
**tip** 24:21 83:2
**tips** 106:6
**titanium** 44:16
**titled** 20:5 49:9
**today** 5:14 7:22
8:23 31:24
71:8 86:24
87:19 88:2
107:18 110:3
179:10
**together** 12:1
19:22 25:15,17
37:1 51:18
81:15 84:7
85:8,19 91:23
105:5,8 123:18
126:7 165:15
177:19 178:1
205:23
**toilet** 14:17
**told** 50:18
76:18 144:14
144:17 145:2
148:13 160:24
195:23,23
196:7 198:1
**ton** 24:24 69:13
73:14
**tons** 180:18

Robert S. Giachetti , Ph.D.                                January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[took - turning]**

Page 55

| | | | |
|---|---|---|---|
| **took** 8:6 48:2 | **touches** 175:6 | **traveling** | 184:11 |
| 93:17 119:24 | **touching** 87:10 | 122:11 | **true** 17:11 |
| 131:7 136:12 | 87:12 127:18 | **travels** 122:17 | 27:15 48:15 |
| 143:19 171:14 | 174:24 | **trays** 16:21 | 55:17 59:20 |
| 187:15 | **tough** 40:9 | 17:2 | 141:6 186:5 |
| **tool** 182:14,16 | 101:23 | **treated** 51:6 | 189:13 199:3 |
| 182:19,21 | **touliatos** 41:5,5 | 180:17 181:2 | 201:9 207:14 |
| **tools** 41:23 | **toward** 30:15 | **treating** 180:18 | 211:8 |
| 44:2 | 94:20 171:7 | 181:1 | **try** 6:13,19 |
| **top** 19:23 45:24 | **towards** 95:15 | **trial** 33:1 34:24 | 28:1 31:20,20 |
| 87:11 106:12 | **track** 24:8 | 68:10 73:22 | 114:9 150:18 |
| 113:20 114:15 | 32:18 | **trick** 22:6 | 170:20 171:11 |
| 117:1 118:4 | **tracks** 41:2 | **tried** 77:3 | 172:2 |
| 124:8 127:18 | 111:12 | 119:15 151:1 | **trying** 22:6,7 |
| 128:17 149:22 | **tracy** 1:12 | **trims** 14:18 | 24:11 29:19 |
| 150:5,15,22 | 207:5 208:8 | **trip** 22:6 | 30:7 41:20 |
| 152:5,17 169:9 | **trade** 36:13 | 109:20 | 81:23 82:17 |
| 174:15 175:6 | **train** 15:5 | **tripp** 40:19,24 | 88:13 96:22 |
| 175:21 176:10 | **trained** 42:9 | **tristar** 1:7 2:13 | 97:3 108:16,18 |
| 177:17 183:22 | **training** 43:6 | 32:1,2,10,11,15 | 109:14,20 |
| 184:3 | 44:7 133:7 | 32:21,24 33:9 | 122:19 127:21 |
| **topic** 61:23 | 150:8 180:9 | 33:24 34:4 | 128:7 151:7,12 |
| **topics** 19:13 | **trains** 19:16 | 35:6 36:1 45:9 | 162:8 168:24 |
| 42:15,16 50:16 | **trajectory** | 48:11,13 49:7 | 172:9 |
| **torque** 128:11 | 57:22 | 49:13 50:4,11 | **tube** 77:4 |
| 129:5,7,9 | **transcript** | 53:4 62:1 65:8 | **turn** 9:22 15:21 |
| 132:3,4,4,6,10 | 209:6,19 211:5 | 65:13 68:5 | 83:4 85:10 |
| 189:18 198:18 | 211:8 | 70:14 73:1,11 | 92:22 100:6 |
| 199:16 | **transients** | 73:15,17,18 | 101:24 150:6 |
| **toss** 10:10 | 19:18 | 74:7,14 155:16 | 162:16 169:20 |
| **total** 44:21 | **transitioned** | 192:3 202:5 | 173:4,7 192:20 |
| **totally** 115:20 | 20:24 | 205:7 209:4 | **turned** 88:11 |
| **totter** 131:7,9 | **travel** 123:3 | 210:1 211:1 | 95:5 |
| **touch** 29:11,12 | 124:3 | **tristar's** 50:7 | **turning** 84:5 |
| 52:23 72:3 | | 84:19 166:5 | 85:3 128:6 |

Robert S. Giachetti , Ph.D.                          January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[turning - unit]**                                              Page 56

172:11
**turns** 60:9
**twentieth**
133:14
**twiddling** 30:7
**twist** 172:9
**twisted** 163:17
**two** 8:14 17:13
26:3,19 34:10
34:11 35:10,23
46:13,18 63:10
64:24 74:11
76:2 81:12
84:10 85:8,19
87:15 91:24
94:1 97:23
99:2 101:20
104:14 109:6
113:6 129:18
133:13 135:18
136:9 141:4
146:22 150:4
153:3 170:6,9
177:19 182:19
189:12,15
193:2 194:1,2
**type** 13:6 19:11
23:17 24:18
27:6 29:8
37:13 43:10
48:7,22 121:23
131:7
**types** 22:12,14
51:11 135:16

**typically**
157:20

**u**

**u** 39:3,5
**u.s.a.** 14:6
**uh** 5:5 6:9,9,9
116:13,15
183:20
**ul** 3:16 4:22
8:11 26:7,8,10
82:11 126:17
127:4 149:22
157:3,8,10,16
157:17 158:6
158:16,24
159:4,7,10,15
160:8,10,12,18
160:24,24
161:3,7,8,10,11
161:12,13,13
161:14,15,19
161:22 162:11
163:1 165:9,17
182:18 189:2,9
189:20,24
190:2,2,7
191:6,12,14,16
191:18,19,22
192:1,8,12,19
193:1 195:11
198:19 199:5
199:11,15
201:7,19
202:15 203:9
203:11,14,20

203:20,24
204:5,21,22
205:9,14 206:1
**ultimate** 79:12
**unable** 76:16
199:23
**uncertainty**
164:18
**uncleaned**
111:4
**uncontrolled**
136:1
**uncovered** 57:7
**under** 4:13
42:15 45:17
54:9 59:1
64:17,19,20
72:1 73:5 78:3
82:18 90:24
96:23 108:22
108:22 110:4
112:15,19
119:15 123:13
124:16 155:8
156:23 162:22
167:20 171:14
173:1 174:7
176:24 177:21
188:11,13
201:9,19
**undergrad**
12:9,24
**undergraduate**
11:17

**underneath**
81:11 89:7
115:4 116:17
155:2
**underprivileg...**
20:9
**underside**
115:7,10,16
**undersigned**
207:13,23
**understand** 5:6
6:21 8:4 71:5
74:4 82:17
90:13 109:14
145:22 146:2
158:10 172:22
172:24 183:8
186:12 198:24
**understanding**
96:9 184:1
201:13,21
**understood**
6:23 27:10
**underwriters**
202:16
**union** 40:19
**unit** 110:21,24
111:16,24
112:3,4 120:20
133:9 152:19
186:17,21
187:4,22 188:4
188:5,10,11,13
188:18,21,24
189:9,23,24

Robert S. Giachetti , Ph.D.
January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[unit - valve]**

Page 57

| | | | |
|---|---|---|---|
| 190:1,2,4,5,6,7 190:10 191:5 191:22 192:19 192:20,24 193:3,4,7,18,21 194:1,3,21 195:11 196:20 197:4,7 198:12 198:19,20,22 199:4,11,23 200:6,7,8 201:9 **unit's** 190:11 **united** 1:1,14 207:21 **units** 73:12 133:13 165:5 **universitatis** 11:15 **universities** 19:8 **university** 11:4 11:6,14 18:4 20:8,14 **unlimited** 182:11 **unpack** 171:5 **unpleasant** 73:9 **unplug** 80:5 192:20,23 **unplugged** 80:6 87:4 103:15 125:1 | **unreasonably** 112:14 181:19 182:8 **unresponsive** 4:17 **unrolled** 14:17 **upside** 154:22 155:5 **upwards** 100:2 **usability** 72:21 **usable** 79:11 **usage** 110:19 111:9 112:4 121:23 182:19 **use** 4:16 5:17 11:18 12:13,16 25:16 37:16 38:24 78:18 101:6,13,20 127:16 152:16 159:22 181:5 182:14,21 187:13 190:2 193:2,18 **used** 25:10,12 44:18 55:19 73:21 86:4 93:24 122:7 126:1,4 128:11 149:22 150:1,4 155:16 159:10 178:15,19 182:15 187:8 187:18 188:24 193:21 198:14 | 199:12,14 209:19 **useful** 51:20 **user** 62:24 63:7 63:12,14 133:19 139:2 150:24 151:10 151:20,23 152:16 164:6 164:15,16 165:22 **users** 134:4 150:2 164:13 **uses** 150:16 152:2,4 194:5 **using** 36:24 44:1 78:11 79:21 104:6 107:2 140:19 151:21 153:21 169:14 170:13 171:15 172:6 172:17 173:16 173:23 174:5 175:9,15 176:14 183:1 185:2 187:4 200:7,11 **usually** 26:2,4 29:18 67:20 81:21 91:15 99:15 125:11 136:5,7,9 137:13 138:6 | **uw** 20:12 |
| | | | **v** |
| | | | **v** 169:9 209:4 210:1 211:1 **vacate** 35:20 **vague** 74:5 **valid** 189:1 195:10 **value** 164:9 **valve** 46:2 80:5 80:6,12,12,14 80:17,23 81:17 81:19,24 82:6 82:18,22 83:1 83:2,7,9,14 84:2 89:18,20 90:4,8 91:19 92:23 93:3,7 93:15 94:21 95:2,4,8,21 96:2,7,10,21 97:8,23 98:13 99:4,6,8,12,21 99:21,23 100:2 100:18 101:17 104:2,18,20,21 111:4,5 112:5 115:5,8,12,15 115:16 116:5,6 116:11,20 117:3,6,7,13,16 117:18 118:7 119:1 120:3,5 120:12 121:2,9 121:13 122:1 |

**[valve - way]**

Page 58

122:15,20
123:12,13
124:1 125:2
149:16 154:7
154:14,24
155:24 156:4,8
156:10,13,19
156:21 166:12
166:13 167:18
183:17,18,21
184:2,5,7,13
185:8 192:21
**valves** 97:23
99:2 125:10
**vance** 40:13,21
40:24
**variances**
205:22
**varied** 26:20
**varies** 137:10
137:12 184:4
**various** 188:14
**vegas** 33:3
**velocity** 178:4
**vent** 98:14,19
**vented** 110:21
110:23
**verbal** 6:8
**verdict** 33:14
**verify** 209:9
**veritext** 209:14
209:23
**veritext.com.**
209:15

**versa** 129:21
**version** 20:18
132:11 188:3
193:20
**versus** 62:13
130:18 187:20
**vertical** 175:19
175:22
**vibrations** 19:8
19:17
**vice** 68:22
129:20
**video** 38:18
39:1 40:3
147:20 148:19
148:20 150:13
192:14 193:17
196:10,15,19
196:24 198:5
**videotape**
148:22
**villa** 69:2
**violating** 70:9
**viscosity** 19:19
**visibility** 185:8
**visibly** 184:12
**visually** 74:2
**vitae** 3:12
**volume** 54:3
55:11 60:10
**volumes** 54:9
54:18
**voluntary**
157:1 158:24

**vote** 25:18
**vs** 1:6 33:9 36:4
36:10 37:19
38:8 39:3,18
40:13,19 41:5
42:2

**w**

**w.e.** 39:19
**waiting** 183:10
**waive** 206:12
**waived** 207:18
**walk** 163:7
**walking** 38:13
39:22,23
**wall** 24:23
39:10
**want** 4:20 5:1
10:21 19:24
23:19,24 31:22
42:22 46:10,12
47:1,18 48:10
50:23 54:1
60:21 63:20,24
64:11 67:14,14
69:20 77:13
104:9 109:21
127:7,13 128:1
128:1 132:23
140:17 148:10
148:11 161:2,3
162:16 181:9
181:14,16
185:14 191:22
195:22 205:21
206:11

**wanted** 18:9
31:10 48:17
65:15 77:16
78:1,5,7,23
79:1,2 80:4
97:18 132:22
148:4,12,17
149:1 153:16
167:9 188:16
195:13
**wants** 68:15
132:19
**warnings** 72:21
166:9
**watch** 195:13
**watched** 130:2
**water** 19:20
49:11 52:19
54:4 55:2,24
56:18,24 59:17
59:19,21 60:9
82:12 149:20
175:1,13,18
176:8,10,22
177:5,13,18
186:20 187:8
187:10,12,13
187:20,23
**wave** 175:6
**way** 6:15 14:15
23:1,2 28:5
42:22 49:5
57:20 78:13,15
78:21,22 79:2
79:2,8,13,15,18

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[way - worked]**                                                    Page 59

79:20,23 80:3
90:7 92:8 94:4
97:2,3 102:17
106:15 113:1
117:17 118:4
121:24 123:10
123:15 128:9
130:13 131:16
134:21 135:3
137:16 142:15
150:2 151:22
152:4,22
154:12 155:3
159:11,13,15
169:11,16
170:15 173:3
173:12 177:2,3
177:6,7,16
189:1 192:22
205:22
**ways**   145:15
**we've**   12:12
42:13 48:6
71:16 72:8
74:5 84:15
85:18 97:7
99:8 119:19
141:9,11
162:11 204:6
**weak**   95:13
96:4
**weaker**   83:23
**wearing**   123:7
**week**   28:24

**weeks**   35:11
**weight**   83:9
98:13,14
125:10,16
133:23 137:22
137:24 154:23
154:24 156:8
156:14 172:14
**weights**   137:24
146:8
**went**   10:12
21:9 28:14
49:18 50:2
51:10 69:9
71:2 76:20
77:6 82:14
88:10 194:22
195:3 201:4,5
202:4
**west**   1:15
**whatsoever**
101:11
**wheels**   15:5
**whichever**
184:9
**wide**   143:7
**wider**   117:13
**widths**   15:1
**wife**   141:1
202:8
**wiggle**   80:22
83:10,14
**winds**   39:11
**wire**   13:17 14:3
39:9,10

**wisconsin**   11:7
18:4 19:8,15
20:8,9,15
**wise**   12:21
**wish**   147:24
**withstand**
190:11,21
199:1
**withstanding**
102:14
**witness**   4:2,10
5:13 23:3 24:5
24:15 26:15
27:7,12,22
32:3,15,16
33:22 35:24
45:8 46:12
47:14 48:14
50:15 53:7,13
61:24 62:3,13
68:2 70:13
73:21 74:6,12
75:5 112:4
119:19 143:14
147:24 149:8
158:4 163:16
172:21 176:21
177:9 181:8
185:13,18,22
190:13 194:19
198:1 200:2,24
201:21 206:8
206:13 207:5
207:10,16,18
208:1 209:8,10

209:12,18
**witnessing**   28:1
**wobble**   57:17
**word**   28:5 82:5
82:8 116:8
122:6 145:22
146:2
**words**   172:23
190:23
**work**   11:17
12:21 13:12,15
14:10 18:18
21:9,11,12,13
22:20,21,24
23:14,16,17
24:10,13,17,18
25:2 26:21
27:2,6,7,7,12
28:3,9 30:20
30:20 45:17
47:12,14,14,15
48:10,17,18,21
48:23 49:7
51:16,17 62:22
70:4 71:3,18
71:23 72:2,23
74:23 76:24
77:8,12 85:19
90:7,9 95:24
98:20 103:5
132:8 141:10
144:10
**worked**   12:22
14:5 16:2,5
28:8 32:5,23

Robert S. Giachetti , Ph.D.                                    January 31, 2024
Copeland, Edward A., Et Al Vs. Tristar Products, Inc., Et Al

**[worked - young]**                                                        Page 60

39:7 45:2
69:21 147:2
200:13
**worker**  26:24
**working**  17:12
17:13 22:19
23:10 24:20
53:23 72:2
90:5 105:5,8
111:7 146:8
155:13
**works**  5:12
14:15 37:21
39:17 47:4
77:7,7 185:18
**worksheets**
13:17
**world**  28:18
29:13 38:6
**worry**  78:10
82:15
**worse**  28:18
**worthwhile**
29:24 30:4,8
**wow**  20:16
**wraps**  115:24
**wrench**  126:5
126:22,23
128:12,14
129:5,7,9
132:3,4 189:18
198:18 199:16
**wrist**  101:14
**write**  63:17,21
64:11 202:23

**writes**  202:18
**writing**  49:18
74:9
**written**  130:14
**wrong**  27:11
161:23
**wrote**  53:18
74:15 76:4
176:16 183:9

| **x** |
| --- |

**xl**  3:17

| **y** |
| --- |

**y'all**  147:16
183:3 202:10
206:9
**yard**  40:15
**yeah**  12:3,10
41:20 86:9
91:23
**year**  13:13 16:3
20:23 26:20,20
28:14 34:13
62:15,15
134:17,18
135:4 137:7
138:13 143:20
146:17
**years**  20:14
21:18 26:21,22
26:23 30:17
33:12 34:15,23
**yesterday**
202:9

**young**  135:1
139:10

Veritext Legal Solutions

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.